IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


DEAUNNA PHILLIPS, Plaintiff,
by and through her Mother,
Sparkle Stidwell, as next friend,

      Plaintiffs,

      vs.                 Civil Action File
                          No.: 1:19-cv-00401-MHC

YASIN ABDULAHAD,

      Defendant.




      The deposition of YASIN ABDULAHAD via

videoconference, taken on behalf of the

plaintiffs, taken pursuant to agreement of

counsel, taken for all purposes authorized by the

Georgia Civil Practice Act; the reading and

signing of the deposition being reserved; taken

before Julia L. Zamorano, CVR, Certified Court

Reporter, commencing at 11:00 a.m., on this, the

30th day of October 2020.

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   BRIAN SPEARS, Attorney at Law
     Spears & Filipovits, LLC
 4   1126 Ponce de Leon Avenue, N.E.
     Atlanta, Georgia 30306
 5   (404) 872-7086
     bspears@brianspearslaw.com
 6
     JEFF FILIPOVITS, Attorney at Law
 7   Spears & Filipovits, LLC
     1126 Ponce de Leon Avenue, N.E.
 8   Atlanta, Georgia 30306
     (404) 872-7086
 9   jeff@civil-rights.law

10

11   For the Defendant:

12   STACI J. MILLER, Attorney at Law
     City of Atlanta Law Department
13   55 Trinity Avenue
     Suite 5000
14   Atlanta, Georgia 30303-3520
     (404) 330-6402
15   SJMiller@AtlantaGa.gov

16   JOSHUA S. FOSTER, Attorney at Law
     City of Atlanta Law Department
17   55 Trinity Avenue
     Suite 5000
18   Atlanta, Georgia 30303-3520
     (404) 330-6402
19   josfoster@AtlantaGa.gov

20   Also present:  Chris Stewart:  cstewart@smstrial.com

21                  Dianna Lee:  dlee@smstrial.com

22                  Amith Gupta:  amithrgupta@gmail.com

23

24

25
```

3

1                    C O N T E N T S

2              E X A M I N A T I O N

3  Witness                                    Page

4  YASIN ABDULAHAD
        Cross-examination by G. Brian Spears      5

5

6

7

8

9                      EXHIBITS

10  Plaintiff's 4      Warrant                     44

11  Plaintiff's 9      Photo                      109

12  Plaintiff's 10     Photo                      110

13  Plaintiff's 11     Photo                      111

14  Plaintiff's 13     Photo                      112

15  Plaintiff's 15     Photo                      113

16  Plaintiff's 29     Haff interview, audio       59

17  Plaintiff's 30     Enhanced annex video        96

18

19

20

21

22

23

24

25

4

1                       P R O C E E D I N G S

2               THE COURT REPORTER:  Before we proceed, I

3       will ask counsel to agree on the record that

4       under the current national emergency pursuant to

5       Section 319 of the Public Health Service Act,

6       there is no objection to this deposition officer

7       administering a binding oath to the witness by

8       videoconference.

9               One at a time, please state your name, the

10      party you represent, and your agreement on the

11      record.

12              MR. SPEARS:  My name is Brian Spears.  I

13      represent the plaintiff in this action.

14              MR. FILIPOVITS:  Jeff Filipovits for the

15      plaintiff.  And we agree to the stipulation.

16              MS. LEE:  Dianna Lee for the plaintiff.  And

17      we agree to the stipulation.

18              MR. GUPTA:  Amith Gupta for the plaintiff,

19      and we agree.

20              MS. MILLER:  Staci Miller for the defendant,

21      and we agree.

22              MR. FOSTER:  Joshua Foster for the

23      defendant, and we agree.

24              (Whereupon,

25                       YASIN ABDULAHAD

1      was called as a witness and, having first been

2   duly sworn, was examined and testified as follows:)

3                    CROSS-EXAMINATION

4          MR. SPEARS:  Good morning, everyone.  My

5       name is Brian Spears, counsel for Deaunna

6       Phillips, the sole surviving child of Deaundre

7       Phillips.  This will be the deposition of

8       Mr. Yasin Abdulahad taken pursuant to notice and

9       agreement of counsel.  The deposition is being

10      convened pursuant to the Federal Rules of Civil

11      Procedure, and the transcripts will be available

12      for use by the parties for all purposes permitted

13      under the Federal Rules of Civil Procedure and

14      the Federal Rules of Evidence.

15          The deposition will be conducted in

16      accordance with the notice of deposition

17      previously issued and filed which provides for,

18      among other things, the taking of this deposition

19      remotely, via Zoom, under the auspices of

20      American Court Reporting and their staff and for

21      the administration of the oath to the witness

22      remotely.

23          All objections and questions, other than as

24      to the form of the question and the

25      responsiveness of the answer, shall be reserved

6

1 until such time as this deposition or any portion

2 of it may be made use of during the course of

3 these proceedings.

4  The deposition will be conducted pursuant to

5 the Federal Rules of Civil Procedure which

6 provide that an objection made at the time of the

7 examination will be noted on the record but the

8 examination still will proceed.  The deposition

9 will be taken subject to any objection.

10 Consistent with the Federal Rules of Civil

11 Procedure, an objection to a question stated as,

12 "Objection to the form," preserves the form

13 objection, and no further description of the

14 reasoning behind the objection is required.

15  Persons present for the deposition have

16 already been announced.  I trust the witness will

17 reserve signature and may execute before any

18 notary public in the event that the witness signs

19 the errata sheet.  Is that acceptable?

20  MS. MILLER:  That's acceptable.

21  MR. SPEARS:  All right.

22 BY MR. SPEARS:

23 Q Mr. Abdulahad --

24 A Yes, sir.

25 Q -- if you could, please, state your full

7

1  name.

2       A    Yasin Irfan Abdulahad.

3       Q    And please tell me your age.

4       A    I'm 37.

5       Q    And where are you situated now?

6       A    I'm at my home.

7       Q    And are you inside or outside?

8       A    I'm outside right now.

9       Q    And are there any other persons within, say,

10  20 feet of you in either direction?

11      A    No.  Do my dogs count?

12      Q    No, sir.

13      A    No.

14      Q    Do you have any electronic devices with you

15  other than the device that allows us to see your image

16  and hear your voice?

17      A    I have my cell phone.  Do you wish for me to

18  turn it off?

19      Q    Yes, sir.  Thank you.

20      A    I'm sorry.

21      Q    Take your time.

22      A    All right.  It's now off.

23      Q    Thank you, sir.  And I take it there aren't

24  any other electronic devices -- that's all the devices

25  that you have with you?

8

1      A      Yes, sir.

2      Q      Thank you.  Would it be possible -- are you

3  using -- by any chance, could you tell me:  Are you

4  using a laptop such that you could adjust the screen?

5      A      I'm using a laptop.  Yes.  I believe I could

6  adjust the screen.

7      Q      Okay.  If you wouldn't mind, could you

8  adjust it just so we could see a little bit more of

9  your physical person?  Thank you.

10              And do you understand that during the course

11  of the deposition -- that as you are testifying, at

12  least -- I trust there will be breaks at one time or

13  another.  But during those periods of time in which

14  you are testifying, through this deposition to the

15  court, that you will maintain your screen in an on

16  position as well as your microphone.  Do you

17  understand that?

18      A      Yes, sir.

19      Q      Okay.  Thank you.  Please tell me the county

20  in which you reside.

21      A      Newton County.

22      Q      And does anyone else reside with you?

23      A      Yes.

24      Q      And how are you related?

25      A      My wife -- my spouse, and my children.

9

1    Q    Thank you.  Can you tell me, please,
2  whether, other than your wife and your children, you
3  have any other immediate family living in the Atlanta
4  Metropolitan area?
5    A    Yes.  Yes, sir.
6    Q    All right.  Please tell me, by name, who
7  those persons are.
8    A    My mother, Seham Abdulahad; my father, Irfan
9  Abdulahad.  That's it.
10    Q    All right.  Thank you.  Do you -- do you
11  have any family members working in law enforcement or
12  in the justice system even if they're not sworn
13  officers such as prosecutors or judges or attorneys?
14    A    No, sir, not that I know of.
15    Q    Have you provided testimony, by way of a
16  deposition, before today?
17    A    No, sir.
18    Q    Have you provided testimony in any civil
19  lawsuits?  Do you understand what I mean by civil
20  lawsuits?
21    A    Yes, sir.  I have not.
22    Q    You have not?
23    A    No, sir.
24    Q    And with respect to any civil lawsuits, can
25  you tell me, please, whether you yourself have ever

1    brought a civil lawsuit yourself?

2        A    No, sir.

3        Q    Have you ever been a party -- meaning sued

4    by another person in a civil lawsuit other than the

5    one that brings us together today?

6        A    Yes, sir.

7        Q    Can you tell me, please, were there more

8    than one or just one?

9        A    Just one.

10       Q    Can you tell me, please, about that?

11       A    It was an accident that occurred in 2016.

12       Q    And by accident, do you mean a motor-vehicle

13   accident?

14       A    Yes, sir.

15       Q    And where did that accident occur?

16       A    The City of Atlanta.

17       Q    And were you on duty?

18       A    Yes, sir.

19       Q    And excuse me.  By on duty, did you take my

20   question to mean on duty as a police officer?

21       A    Yes, sir.  I understood.

22       Q    Thank you.  Is that still -- is that lawsuit

23   still pending, to the best of your understanding?

24       A    Yes, sir.

25       Q    Can you recall the name of the person or

1  persons who are the plaintiffs in that lawsuit, the

2  ones who brought the suit?

3       A     I can't remember his name.

4       Q     And in connection with that lawsuit, are you

5  represented by one or more attorneys who work in the

6  city attorney's office?

7       A     Yes, sir.

8       Q     Is it your understanding that the City of

9  Atlanta is also a party to that lawsuit -- also a

10  defendant?

11       A     Yes, sir.

12       Q     But you've not yet been deposed in that?

13       A     No, sir.

14       Q     In the -- I take it that you've served as a

15  police officer for a number of years; correct?

16       A     Yes, sir.

17       Q     And over that period of time, it's safe to

18  say that you've testified in court, on a number of

19  occasions, in connection with cases that you brought

20  or cases where you were a witness?

21       A     Yes, sir.

22       Q     And are you able to tell me whether -- in

23  terms of broad numbers of times that you've testified,

24  even for short appearances, maybe scores, hundreds of

25  cases?

1      A    I guess hundreds.  I can't -- don't know an

2  exact number, sir.

3      Q    All right.  I'm not asking for an exact

4  number certainly.  But it's been many, many times?

5      A    Yes, sir.

6      Q    And in all fairness, in terms of what I

7  understand, you've got a range of training that you've

8  received from the City of Atlanta Police Department.

9  From time to time -- if not simply just while you were

10  just going through mandate training -- as an officer,

11  you all also receive certain guidelines on court

12  decorum, manner of testifying, that sort of thing?

13      A    Yes, sir.

14      Q    Have you received that training more than

15  once or can you recall?

16      A    I can't recall.  Probably one time, when I

17  was in the Academy -- that I can recall.

18      Q    Where did you take your Academy training?

19  Was that at the Atlanta Training Center?

20      A    Yes, sir.

21      Q    And do you recall approximately what year

22  that was?

23      A    2005 going into 2006.

24      Q    Were you POST certified as of 2006?

25      A    Yes, sir.

1        Q     To prepare for today's deposition, I trust

2     that you have viewed the video that was shot from the

3     police annex out there on the night of the shooting?

4        A     Yes, sir.

5        Q     Can you tell me whether you've also reviewed

6     other photographic materials such as those that

7     would've been in the GBI files or photos that would've

8     been taken by the Fulton County Medical Examiner's

9     office?

10       A     No, sir.

11       Q     All right.  Well, I'm planning to show you a

12    number of still photos taken that night or possibly at

13    the time of the autopsy.  So if you will just be

14    patient with me because I realize you'll want to see

15    those and take a good look at them before you have

16    anything to say about them.  Is that agreeable?

17       A     Yes, sir.

18       Q     With respect to the -- with respect to the

19    video, do you have a copy of it, yourself, such that

20    you've been able to take a look at it several times in

21    the last few days?

22       A     No, sir.

23       Q     Did you -- did you view it at home or

24    elsewhere?

25       A     At work.

14

1      Q      All right.  And these days, at work means

2   where?

3      A      226 Peachtree Street, Southwest.

4      Q      And does that building have a particular

5   name or is that just the headquarters, the main

6   headquarters --

7      A      Atlanta Public Safety headquarters.

8      Q      Right.  Yes, sir.  And could you tell me,

9   please, who you viewed it with?

10      A      Just myself.

11      Q      Was it in -- do you have an office at the

12   headquarters, yourself?

13      A      I have a cubicle.

14      Q      All right.  Did you view it in your cubicle

15   or another location?

16      A      I viewed it in my cubicle -- a video off of

17   YouTube.

18      Q      Okay.  YouTube.  And was anyone else with

19   you as you viewed it?

20      A      No, sir.

21      Q      Have you had an opportunity, at least up to

22   this point, to take a look at any of the narrative

23   summaries of interviews of yourself that were prepared

24   by the Georgia Bureau of Investigation investigator or

25   any similar documents --

15

1        A     No, sir.

2        Q     -- that were prepared by the Office of

3    Professional Standards?

4        A     No, sir.

5        Q     Have you looked at or reviewed any of the

6    transcripts of your interview with either of those two

7    agencies?

8        A     No, sir.

9        Q     At the present time -- and I'll preface this

10   just by saying that I promise this is a standard

11   question but one that I want to be certain I ask.  At

12   the present time, are you currently on any medications

13   of any kind?

14       A     No, sir.

15       Q     In the last, say, 12 to 24 hours, have you

16   taken any medications that, in your opinion, might

17   interfere with your memory or your ability to answer

18   my questions today?

19       A     No, sir.

20       Q     As you sit here today, at your home, in your

21   opinion, are you well-rested?

22       A     Yes, sir.

23       Q     By chance did you -- were you on duty, as an

24   Atlanta police officer, within the last 24 hours?

25       A     Yes, sir.

1    Q    When did your last shift conclude?

2    A    I finished work just after 6 o'clock, 6 p.m.

3  yesterday.

4    Q    Thank you.  I take it then that you've taken

5  this as a leave day of some kind?

6    A    No, sir.  This is an off day.

7    Q    Do you currently have any off-duty jobs as

8  an off-duty police officer?

9    A    No, sir.

10    Q    And with respect to any other -- I'll call

11  it -- it might be unrelated, but I need to ask.  With

12  respect to any counseling or treatment -- if ever --

13  that you have received for anger management or stress

14  response, have you ever received counseling or

15  treatment for either of those two kinds of conditions?

16    A    The military -- when I came back from

17  deployment but everybody did.

18    Q    And how would you -- if you could, put it in

19  a couple of sentences what that training or counseling

20  consisted of.  What was that about?

21    A    Just suicide prevention -- it was mass

22  training.  If you're having issues with any kind of

23  stress related to anything that happened during

24  combat, you know, speaking with your battle buddy or

25  your commander or going to the VA and speaking with

1  someone, speaking with the chaplain or whatnot.

2  That's pretty much what it was.

3      Q    When were you last in active duty?

4      A    My last deployment -- well, I got off active

5  duty orders in January 2014.

6      Q    All right.  And between 2006 and 2014, what

7  was your status in relation to your military service?

8      A    I was a reservist --

9      Q    All right.

10     A    -- the National Guard reserves.

11     Q    And the branch in which you served, which

12 branch?

13     A    Army.

14     Q    On your discharge, what was your rank?

15     A    Captain.

16     Q    And on your discharge, did you have any --

17 what -- what was your duty assignment at that time?

18     A    During that time, I was the 3rd of 108

19 Cavalry intelligence officer, the S-2 during that

20 time.

21     Q    If you could, just summarize what your

22 duties were insofar as being an intelligence officer.

23     A    During deployment, we would -- the

24 intelligence officers did battlefield analysis.  We

25 tried to figure out what the enemy did and advise

1  operations so they know what they can do as far as

2  their tactics, techniques, procedures.  That sums it

3  up.

4       Q    Did any of your responsibilities, while you

5  were either in active duty or thereafter, involve any

6  law enforcement work at all --

7       A    No, sir.

8       Q    -- similar to police duties?

9       A    No, sir.  Because of my rank, I didn't go

10  out in the field much.

11       Q    Today we'll be talking a lot about

12  January 26, 2017.  Can you agree with me that that's

13  the date of this shooting incident?

14       A    Yes, sir.

15       Q    Okay.  Have you ever fired your service

16  weapon, as a police officer, while on duty other than

17  for purposes of training?

18       A    No, sir.

19       Q    Other than the shooting of Mr. Phillips, can

20  you recall any incident in which, while on duty, you

21  discharged your weapon other than during training?

22       A    No, sir.

23       Q    As of January 26, 2017, please tell me what

24  your approximate height and weight were.

25       A    Five-eleven, 195 pounds.

19

```
 1        Q     Who was bigger, Mr. Phillips or yourself?

 2        A     Myself.

 3        Q     Do you have any recollection of his

 4   approximate size in relation to yourself?  I trust

 5   it's in the autopsy.  But if you have anything you can

 6   shed light on, I'd appreciate it.

 7        A     Probably about the same height as me, 165,

 8   170 pounds maybe.

 9        Q     As of January 26, 2017, what was your cell

10   phone number?

11        A     (404) 709-8298, I believe.

12        Q     Thank you.  And your service provider, was

13   that Sprint?

14        A     Yes.

15        Q     And was the account through which you --

16   that you had with Sprint, for purposes of this cell

17   phone, was that an account in your name?

18        A     Yes.

19        Q     And I realize that people share their

20   accounts with other folks but --

21        A     You know what?  I'm not sure.  Maybe it was

22   with my wife.  I can't remember.  I can't remember.

23        Q     All right.  Thank you.  Could you please

24   give us your wife's name?

25        A     Athena Abdulahad.
```

1     Q    On the day of the shooting, in January of

2  2017, you were assigned to, I believe you

3  characterized it as, the gun unit; is that correct?

4     A    Yes, sir.

5     Q    And tell the Court, please, what the gun

6  unit, at that time at least, was doing.  What were

7  your general responsibilities?

8     A    We investigated nonfatal shootings,

9  particularly anyone who was -- who was shot.  We would

10 investigate those cases, the ones that survived their

11 shootings.

12    Q    If they survived, you would investigate.

13 And I take it if the person who was shot died, then it

14 was investigated by a different unit?

15    A    Homicide.  Yes, sir.

16    Q    After the day of this shooting, was there a

17 period of time in which you were reassigned to another

18 unit?

19    A    Up until now or?

20    Q    Well, at least by way of explanation, I am

21 familiar generally with the fact that many departments

22 utilize a procedure where if there's an

23 officer-involved shooting, then one or more of the

24 officers who were involved in it are placed in some

25 sort of reassignment status pending whatever

1   investigation that particular department might

2   undergo.  Were you reassigned, in any respect,

3   following the shooting temporarily or otherwise?

4        A    I wasn't reassigned until maybe a year

5   later.  But since the day of my shooting, I've been on

6   administrative duties within CID.

7        Q    Within CID.  Is the gun unit a section, if

8   you will, of CID?

9        A    Yes, sir.

10       Q    And CID, tell us, please, what those

11  initials stand for.

12       A    Criminal investigation division.

13       Q    And homicide is under CID, as well?

14       A    Yes, sir.

15       Q    So we have gun unit, homicide.  What other

16  sections are within CID?

17       A    Robbery, special victims, general

18  investigations.  I think that's it.

19       Q    How did your responsibilities change then in

20  that reassignment period right after the shooting?

21       A    Everything that I --

22            MS. MILLER:  Object to form, but you can

23       answer.

24            THE WITNESS:  I -- my responsibilities

25       changed.  I was not allowed out of the office.

1        And everything that I do, since then, has been

2        strictly within the office, assisting anybody who

3        needed help.  As long as I don't leave the

4        office, I'm good -- besides to get food.

5   BY MR. SPEARS:

6        Q    And so I take it that in-office

7   administrative status, that's been the case since the

8   time of the shooting?

9        A    Yes.

10       Q    So basically in that same status?

11       A    Yes, sir.

12       Q    Okay.  In your services following the day of

13  the shooting, did you continue to have Officer

14  Roberson-El as your partner?

15       A    No, sir.

16       Q    Were there assignments that you had with him

17  following the shooting that had you paired up, if you

18  will, in any way?

19       A    No, sir.

20       Q    Have you been promoted since January

21  of 2017?

22       A    No, sir.

23       Q    As of today, is there any -- to the best of

24  your understanding, at least -- is there any open

25  Atlanta Police Department Office of Professional

1    Standards investigation into the Phillips shooting?

2         A     Yes, sir.

3         Q     And what is your understanding, then, of the

4    status of that investigation?

5         A     It's just open, and that's it.

6         Q     What's your understanding?  Again, I'm just

7    asking your understanding.  What's your understanding

8    of why that remains open?

9         A     Because the DA's office hasn't closed it

10   yet.  Or they haven't come up to a resolution on their

11   end from the DA's office.

12        Q     As of today, is it your understanding that

13   there is still an open criminal investigation within

14   the Fulton County District Attorney's Office with

15   regards to the Phillips shooting?

16        A     Yes, sir.

17        Q     Is it your understanding that there is any

18   other investigations of any kind, other than by the

19   District Attorney's Office, pertaining to yourself

20   with respect to any other conduct other than that

21   involving the shooting?

22        A     No, sir.

23        Q     Is it your understanding that there is still

24   an ongoing investigation on the part of persons within

25   the Georgia Bureau of Investigation pertaining to the

**24**

1    Phillips shooting?

2         A    Can you repeat the question?

3         Q    Is the GBI investigation concluded and still

4    in effect, awaiting the District Attorney's Office?

5         A    Yes, sir.

6         Q    As far as you know?

7         A    As far as I know.

8         Q    On the night of the shooting, after it had

9    happened, did a representative of the IBPO come out to

10   the site of the shooting?

11        A    Yes, sir.

12        Q    And you spoke with their representative at

13   that time?

14        A    Yes, sir.

15        Q    Do you recall who that was who came to the

16   scene?

17        A    No, sir.

18        Q    Was it an attorney?

19        A    I don't know.

20        Q    Did you contact IBPO following the shooting?

21        A    Yes.

22        Q    And you contacted them from the scene there

23   before you left.

24        A    Yes.

25        Q    Please tell me why you contacted the IBPO at

1   the scene before you left?

2           MS. MILLER:  Object to form and instruct my

3      client to plead the Fifth.

4           THE WITNESS:  I plead the Fifth.

5   BY MR. SPEARS:

6      Q    Were you advised by the IBPO

7   representative -- well, let me first ask this:  Can

8   you tell me -- well, did you speak to any other

9   representative of the IBPO on that evening while you

10  were still at the scene other than, I take it, the one

11  person who you had initial contact with?

12     A    No.  I don't think so.

13     Q    I'll be glad to rephrase that.  In the event

14  that you don't understand my question, I'll ask that

15  you tell me that you don't understand it; okay?

16     A    I was thinking on whether I did speak with

17  someone else.  And I did not.

18     Q    Okay.  Thank you.  But just in general --

19  and this is just as an aside for purposes of going

20  through the deposition.  Certainly, I want to be

21  confident that whenever you answer, that you've

22  understood what my question is.

23     A    Yes, sir.

24     Q    So I'll ask you that you tell me if you

25  don't understand it at any point prior to answering it

1    because I'd rather have your answer be one that you're

2    confident in than not; okay?

3         A    Yes, sir.

4         Q    When was the next time, after the shooting,

5    that you met with a representative of the IBPO, to the

6    best of your recollection?

7         A    I can't remember exactly when.

8         Q    Was it close in time to the night of the

9    shooting?

10        A    I can't remember.

11        Q    All right.  And just, again, to be certain

12   that the Court understands these initials that we are

13   throwing around, what do you understand IBPO to stand

14   for?

15        A    International Brotherhood of Police

16   Officers.

17        Q    And that's a member organization of which

18   you are a member; correct?

19        A    Yes, sir.

20        Q    And one of the functions that the IBPO

21   serves and services that it provides to its members is

22   to provide them with advice on internal matters that

23   might come up while they're serving as a police

24   officer.  Is that fair to say?

25        A    Yes, sir.

1       Q     And from time to time, IBPO can provide you

2    with -- as a member of the IBPO, with legal counsel in

3    addition to general advice?

4       A     Say that one more time.  I'm sorry.

5       Q     IBPO can provide you with an attorney if

6    they -- I guess if you ask for it and they decide to

7    do it.

8       A     Yes, sir.  Yes, sir.

9       Q     Okay.  And in connection with the Phillips

10   case, you asked for and received attorney

11   representation through the IBPO?

12      A     Yes, sir.  Yes, sir.

13      Q     And it's fair to say that your attorney

14   representative provided to you through the IBPO was

15   Sandra Michaels?

16      A     Yes, it was Michaels.  Sandra Michaels was

17   the original attorney.  It's someone else now.  I

18   don't know who it is.

19      Q     Right.  Do you have a recollection of when

20   that change occurred?

21      A     No, sir.

22      Q     Just approximately?

23      A     Sometime last year.

24      Q     2019?

25      A     Yes, sir.

28

1       Q     Before the pandemic?

2       A     Yes, sir.

3       Q     We'll start referencing that, I suppose,

4    from time to time.  I get it.

5       A     Yes, sir.

6       Q     Let's see.  In connection with any -- the

7    IBPO attorney that you currently have, did you have a

8    chance to confer with that person before this

9    deposition?

10      A     Before when?

11      Q     Before this deposition.

12      A     No, sir.  I haven't spoken with that

13   person -- I've only spoken with that person one time,

14   and I can't remember when that was.  I can't remember

15   when that was.

16      Q     Okay.  And as I understand it, in terms of

17   how that kind of a system works -- and please correct

18   me if I'm wrong.  You can be provided with an

19   attorney, but you don't necessarily have to have a

20   written contract with that attorney for them to talk

21   to you, come out and see you, that sort of thing.

22      A     Exactly.

23      Q     Okay.  So, as we sit here today, or as you

24   sit here today, at least, you don't have a written

25   contract with an IBPO attorney, but you do have the

1  opportunity to consult with them if you wish?

2      A     Yes, sir.

3      Q     At the time of the shooting, were you --

4  that is to say the shooting of Mr. Phillips -- were

5  you wearing gloves?

6      A     No, sir.

7      Q     As of January of 2017 -- correct me if I'm

8  wrong but -- well, let me phrase the question this

9  way:  As a sworn officer within the City of Atlanta

10 Police Department, you are sworn to follow the

11 standard operating procedures, the rules and

12 regulations of the department; correct?

13     A     Yes, sir.

14     Q     And one such rule of the department, among

15 many others, is that employees are to promptly obey

16 all proper and lawful orders of their supervisors and

17 other employees assigned to act in a supervisoral

18 capacity including any order relayed from a superior

19 by an employee of the same or lesser rank.

20     A     Yes, sir.

21     Q     And another of the standard operating

22 procedures provides that:  Except as authorized in an

23 investigation into employee misconduct, employees may

24 not interfere with the complaint investigation in any

25 manner.  Do you agree that that's one of the rules you

1  are to follow?

2      A    Yes, sir.

3      Q    And do you agree, as well, that during the

4  course of such an investigation, you are not to

5  contact the complainant or witnesses concerning the

6  allegations or discuss the existence of facts of a

7  complaint with anyone except designated department

8  authorities concerning the investigation?

9      A    Yes, sir.

10     Q    You were subject to that rule in January of

11 2017?

12     A    Yes, sir.

13     Q    And remain subject to that rule today?

14     A    Yes, sir.

15     Q    During the Office of Professional Standards

16 interview that you had with Investigator Haff --

17 spelled H-a-f-f --

18     A    Yes, sir.

19     Q    -- in February of 2017, you were asked at

20 that time, were you not:  Did you speak with anyone

21 else about this incident other than the GBI?  Do you

22 recall being asked that?

23     A    Yes, sir.

24     Q    And do you recall that you told Investigator

25 Haff, no, you had not?

1     A     Yes, sir.  I did tell him that.

2     Q     That statement to Investigator Haff, as of

3  that date, was not accurate; was it?

4     A     Say that again.

5     Q     That statement that you made to Investigator

6  Haff, on that date, was not accurate; was it?

7     A     It was accurate.

8     Q     The Phillips shooting was on January 26th,

9  2017; correct?

10    A     Yes, sir.

11    Q     And on January the 27th, 2017, you had

12  telephone contact and text messages with Officer

13  Roberson-El on that day following the shooting, did

14  you not?

15    A     Yes, sir.

16    Q     And Roberson-El sent you text messages, and

17  you exchanged text messages throughout that day?

18    A     I guess so.

19    Q     And you continued to speak with Roberson-El

20  via cell phone and text, up to and including February

21  13th of 2017; correct?

22    A     Yes, sir.

23    Q     It wasn't just on January the 27th, the day

24  after the shooting.  Your contact and text messages

25  with the officer continued throughout that period of

32

1    time up until the date that you spoke with

2    Investigator Haff.

3         A     Yes, sir.

4         Q     And your -- and having contact with Officer

5    Roberson-El, you knew that you were having contact

6    with a person who was a witness to the shooting.

7         A     Yes.  I was having contact with him.

8         Q     And why was that?

9         A     He's my best friend.  As long as we're not

10   having contact about the incident itself, about the

11   case itself, then I'm within -- I'm within the SOP.

12        Q     And tell me, please, who has advised you of

13   that?

14        A     That's within the SOP.  As long as I'm not

15   speaking about the incident itself, then I'm within

16   the guidelines of the SOP.  I'm not to discuss the

17   incident itself.

18        Q     Do you still have the cell phone that you

19   had in January of 2017?

20        A     No, sir.  I do not.

21        Q     And is that still -- what's your

22   understanding of where it's currently located?

23        A     It's with the DA's office.

24        Q     And is it your testimony that none of the

25   text messages that were exchanged between you and

1    Roberson-El were ones that the subject of the texts

2    touched at all on the shooting of Mr. Phillips?

3        A    No, sir, not that I can recall.

4        Q    Do you have any understanding with respect

5    to whether the City of Atlanta Internal Affairs or

6    Office of Professional Standards has ever conducted

7    any investigation into the propriety of your contact

8    with Roberson-El following the shooting?

9        A    No, sir.

10       Q    Have you been interviewed by any officers

11   with that department about the text and phone contacts

12   that you had with Roberson-El following the shooting?

13       A    No, sir.

14       Q    Okay.  Now, immediately after the shooting,

15   it was your expectation, was it not, that there would

16   be an internal investigation into the use of force?

17       A    Yes, sir.

18       Q    And that was -- in and of itself, would be a

19   standard practice within the city of Atlanta Police

20   Department?

21       A    Yes, sir.

22       Q    And thus, you knew that it would be

23   important for you to tell investigators, from the

24   Atlanta Police Department, exactly what you had seen

25   and what you had experienced around the circumstances

34

1    of the shooting.

2         A    Yes, sir.

3         Q    And you knew that the outcome of the

4    investigation would hinge on what you told them.

5         A    Say that again.

6         Q    You understood that -- given that you were

7    the officer who had fired your weapon, you understood

8    that what you told investigators would have a great

9    impact on the outcome of the investigation.

10        A    Yes, sir.

11        Q    And, in fact, the conclusions would hinge on

12   what you told them.

13        A    Yes, sir.

14             MS. MILLER:  Object to form.  But you can

15        answer.

16             THE WITNESS:  Yes.

17   BY MR. SPEARS:

18        Q    And you were careful to be honest and

19   truthful with them in your initial description of the

20   incident; correct?

21        A    Yes, sir.

22        Q    And you knew that investigators would be

23   relying on what you said to determine whether or not

24   you had violated any departmental policy or committed

25   any crime.

35

1        A      Yes, sir.

2        Q      And for that reason, you were sure to report

3    each and every fact that you knew to that investigator

4    about why you had used your firearm.

5        A      Yes, sir.

6        Q      When you first reported on the radio that a

7    shooting had occurred and that you, in effect, had

8    shot Phillips, you reported that he, referring to

9    Phillips, was traveling towards the pole.  That's what

10   you told them.

11       A      Say that again, sir.  You cut out on me.

12       Q      All right.  Following the shooting, you had

13   access to the radio.  And with that radio, you

14   contacted your dispatch?

15       A      Yes, sir.

16       Q      And when you contacted your dispatch, you

17   told them that he, referring to Phillips, was

18   traveling towards the pole and that was it.  That's

19   what you told him.

20              MS. MILLER:  Object to form.  I'm going to

21         instruct my client to plead the Fifth.

22              THE WITNESS:  I plead the Fifth.

23   BY MR. SPEARS:

24       Q      Just so I can be clear --

25              MR. SPEARS:  I'll let you reassert, Staci.

**36**

1        I just want to understand the witness's assertion

2        of the Fifth.

3    BY MR. SPEARS:

4        Q    Is it true that when you first reported to

5    dispatch that you had shot Phillips, that you told

6    them that he, referring to Phillips, was traveling

7    towards the pole and that was it --

8            MS. MILLER:  I'm -- Go ahead.

9            MR. SPEARS:  I think I have a little longer

10       quote.  So if you give me just a second, I'll get

11       it out.

12           MS. MILLER:  Okay.

13   BY MR. SPEARS:

14       Q    You reported to them that, quote, he was

15   traveling towards the pole and that was it.  We all

16   was in the vehicle with him, closed quote.  Is that

17   what you told them?

18           MS. MILLER:  Same objection and same

19       instruction.

20           THE WITNESS:  I plead the Fifth.

21   BY MR. SPEARS:

22       Q    When you first reported the fact of the

23   shooting, you did not report that you had ever seen a

24   gun, other than your own; isn't that a fact?

25           MS. MILLER:  Same objection and same

1        instruction.

2                THE WITNESS:  I plead the Fifth.

3    BY MR. SPEARS:

4        Q    You can either say, "I'll plead the Fifth"

5    or just "I'll follow my lawyer's instructions" if

6    that's the choice or the decision that you're making.

7    Is that fair?

8        A    Okay.  I plead the Fifth on that.

9        Q    Yes, sir.  It is a fact, is it not, that the

10   first time that you reported to any investigator of

11   this shooting that, at the time of the shooting,

12   Phillips was reaching for a gun was when you spoke

13   with investigators on February the 13th, 2017?

14               MS. MILLER:  Same objection and same

15          instruction.

16               THE WITNESS:  I plead the Fifth.

17   BY MR. SPEARS:

18       Q    Can you give me any explanation for why for

19   just over two weeks you did not tell any investigator

20   that your observation of a gun inside of the vehicle

21   driven by Phillips had anything to do with the

22   shooting?

23               MS. MILLER:  Same objection and same

24          instruction.

25               THE WITNESS:  I plead the Fifth.

1    BY MR. SPEARS:

2        Q    Changing now from asking you about

3    investigators.  Let me ask this:  In the approximately

4    two weeks between the shooting, just over two weeks,

5    between the shooting on the 26th of January and

6    February the 13th, can you identify any person,

7    whatsoever, to whom you said that, before shooting

8    Mr. Phillips, you saw a gun inside the car?

9            MS. MILLER:  Same objection and same

10        instruction.

11            THE WITNESS:  I plead the Fifth.

12   BY MR. SPEARS:

13       Q    Did you tell Officer Roberson-El, on the

14   night of the 26th, that you had seen a gun inside of

15   the Phillips car before you shot him?

16            MS. MILLER:  Same objection and same

17        instruction.

18            THE WITNESS:  I plead the Fifth.

19   BY MR. SPEARS:

20       Q    You did not see a gun inside of the interior

21   of the Phillips car before you fired your weapon, did

22   you?

23            MS. MILLER:  Same objection and same

24        instruction.

25            THE WITNESS:  I plead the Fifth.

39

1    BY MR. SPEARS:

2         Q    When you fired your weapon and shot

3    Mr. Phillips, both of Mr. Phillips's hands were on the

4    steering wheel; were they not?

5              MS. MILLER:  Same objection and same

6         instruction.

7              THE WITNESS:  I plead the Fifth.

8    BY MR. SPEARS:

9         Q    At the time of the shooting -- excuse me.

10   At the time that you shot Mr. Phillips, Mr. Phillips

11   was not reaching, with his right hand, to anything.

12   And indeed his right hand was on the steering wheel;

13   was it not?

14             MS. MILLER:  Same objection and same

15        instruction.

16             THE WITNESS:  I plead the Fifth.

17   BY MR. SPEARS:

18        Q    Thank you.  And I'm afraid I asked what

19   lawyers would call a compound question.  So I don't

20   mean to belabor it, but let me, please, break it down

21   into two questions.  I think you've already answered

22   or given a response to my question as to whether or

23   not Mr. Phillips had both of his hands on the steering

24   wheel.  So now, I'll simply ask this:  It is a fact,

25   is it not, that Mr. Phillips was not reaching with his

**40**

1    right hand to anything at the time that you shot him?

2          MS. MILLER:  Same objection and same

3      instruction.

4          THE WITNESS:  I plead the Fifth.

5    BY MR. SPEARS:

6       Q    Do you recall that sometime in September

7    of 2017, after the shooting, that your phone was

8    seized by representatives of the office of the Fulton

9    County District Attorney's office?

10      A    Yes.

11      Q    And to the best of your understanding, has

12    that phone been in the control of and/or the custody

13    of the district attorney's office since that time?

14      A    Yes, sir.

15      Q    You were presented with a warrant that was

16    obtained by the Fulton County District Attorney's

17    office pertaining to your cell phone in September of

18    2017; is that correct?

19      A    Yes, sir.

20      Q    And is it your understanding that that

21    search warrant was sought because of that office

22    learning that you had had contact, texting and voice

23    cell phone-wise, with Officer Roberson following the

24    shooting?

25          MS. MILLER:  Object to form.  But you can

1       answer if you know.

2               THE WITNESS:  Yes.

3   BY MR. SPEARS:

4       Q    Okay.  So the search warrant, you were given

5   a copy of the search warrant and the supporting

6   affidavit at the time, were you not?

7       A    Just the search warrant, not the affidavit.

8       Q    Okay.  Have you ever read the affidavit?

9       A    No, sir.

10      Q    Have you ever seen it -- even if you haven't

11  read it?

12      A    I have not seen it.  I don't even know what

13  it looks like.

14              MR. SPEARS:  Since I'm talking about the

15          warrant, let me take a moment and ask Jeff, my

16          associate, if he could, just present us -- well,

17          let's see.  Let me ask a question of Jeff.

18          Everyone is welcome to listen.  The exhibit that

19          we have that pertains to the search warrant,

20          Jeff, is that a composite exhibit that contains

21          both the search warrant and the affidavit?

22              MR. FILIPOVITS:  Well, I can just put it up

23          there if you want.

24              MR. SPEARS:  Now that I look at it, we

25          have -- you know, we have the pages numbered, and

1          it appears to me that that exhibit --

2               MR. FILIPOVITS:  The affidavit's there.

3               MR. SPEARS:  -- is quite long.  So the

4          affidavit's there.  Let me just, if I could, make

5          a suggestion:  I'll put on the record that the

6          witness has testified that he hasn't seen the

7          affidavit before, so I'm not asking him to

8          identify that.

9               But since I have it all in one exhibit, I'd

10         like to, at least, have him identify the warrant

11         and let us know whether or not that's the one he

12         has seen before.  I'm not going to ask him any

13         questions from the affidavit itself.

14              MS. MILLER:  So in terms of the exhibit,

15         will it only be the search warrant or the search

16         warrant and the affidavit?

17              MR. SPEARS:  Well, the exhibit will have all

18         the pages if we are going to proceed to have them

19         submitted to him.  But what I'm suggesting is

20         that we have him agree, on the record, that his

21         testimony is that he hasn't seen the affidavit,

22         but he has seen the warrant.  And if he could

23         recognize those pages of the exhibit, then his

24         testimony would simply be that's the portion of

25         the exhibit that he's familiar with.

1           MS. MILLER:  Okay.  So the search warrant

2      will be the only exhibit.  So the only portion of

3      the exhibit to the deposition is my question.

4           MR. SPEARS:  Well, I don't know if we can

5      break it up.  As it currently stands, it's a

6      composite exhibit with both the warrant and the

7      affidavit.  We didn't break it down.  And let me

8      make this suggestion:  This is as much of an

9      administrative matter as it is anything else.  I

10     think we can handle that with a request to admit

11     as to what it is.  Okay.  Well, let's go on.

12          MR. FILIPOVITS:  All right.  Is that visible

13     to everyone?

14          THE WITNESS:  Yes.

15          MR. SPEARS:  And if you could, let's do this

16     by numbers, Jeff.  By numbers, I mean page

17     numbers.  If you could, just give us the pages of

18     the warrant alone, and let's just identify the

19     number of pages.

20          MR. FILIPOVITS:  I'm not sure I understand

21     what you mean by the pages of the warrant alone.

22          MR. SPEARS:  All right.  Hold on just a

23     second.  I can do it this way --

24          THE WITNESS:  Twenty-seven pages.

25          MR. FILIPOVITS:  Is this the document that

44

1          you are referring to, Brian?

2                    MR. SPEARS:  Yeah.  Exhibit 4, and it's a

3          total, I think, of three pages.  That is to say,

4          the warrant, itself, is only three pages.

5                    MR. FILIPOVITS:  Okay.

6     BY MR. SPEARS:

7          Q    Mr. Abdulahad, with respect to the Exhibit

8     that we're looking at now, which is numbered Exhibit

9     4, I'll ask Jeff to scroll the first three pages.  And

10    once he's done that, I'll ask if you recognize that as

11    a copy of the search warrant for your cell phone that

12    you were served with in September of 2017?

13         A    Yes, sir.

14                   (Plaintiff's Exhibit No. 4 was marked for

15         identification.)

16                   MR. SPEARS:  Thank you.  All right.  We can

17         pull that exhibit down.  And by that, I mean we

18         can just set that aside for now.  Thank you,

19         Jeff.

20    BY MR. SPEARS:

21         Q    Okay.  I'm going to next turn to the

22    question I have about marijuana at the scene.  In a

23    document that has been filed on your behalf called

24    "Initial Disclosures," it's something that both sides

25    file with the court.  In the body of the initial

**45**

1  disclosures, the parties are allowed to give a

2  description of their side of the story, so to speak.

3         In the course of that description, it

4  says -- that is the description filed on your

5  behalf -- it says that after smelling marijuana and

6  going alongside of the car where Phillips was located,

7  Detective Roberson then began communicating with

8  Mr. Phillips who kept his right arm hidden from view.

9         Detective Roberson continued to communicate

10  with Mr. Phillips asking that he toss out the

11  marijuana.  Mr. Phillips denied that he had any

12  marijuana but continued to hide his right arm and

13  appeared to be manipulating an object in the

14  floorboard of the vehicle.  Let me first ask you

15  whether or not you agree with that description of what

16  occurred.

17         MS. MILLER:  Object to form.  And I'm going

18      to instruct my client to plead the Fifth.

19         THE WITNESS:  I object.  I'm sorry.  I plead

20      the Fifth.  I'm sorry.  My apologies.

21  BY MR. SPEARS:

22      Q    Did you understand what I had asked?

23      A    I did.

24      Q    Now, I have read all of the statements and

25  I've listened to several interviews that involved

1    yourself.  And I never saw where either you or

2    Roberson reported to the investigators that you ever

3    asked Mr. Phillips to show you his arm.  Did you

4    report that to the investigators and they just didn't

5    give us that information?

6              MS. MILLER:  Same objection and same

7         instruction.

8              THE WITNESS:  I plead the Fifth.

9    BY MR. SPEARS:

10        Q    Did you ever ask Mr. Phillips to show you

11   his right arm before he got out of the car?

12             MS. MILLER:  Same objection and same

13        instruction.

14             THE WITNESS:  I plead the Fifth.

15   BY MR. SPEARS:

16        Q    Did you hear Officer Roberson ever ask

17   Mr. Phillips to show either of you his arm before

18   Phillips got out of the car?

19             MS. MILLER:  Same objection and same

20        instruction.

21             THE WITNESS:  I plead the Fifth.

22   BY MR. SPEARS:

23        Q    If you didn't ask Mr. Phillips to show you

24   his right arm, it would not have been conduct, on his

25   part, that you would consider to be suspicious if he

1  didn't voluntarily pull it out, would it?

2              MS. MILLER:  Same objection and same

3        instruction.

4              THE WITNESS:  I plead the Fifth.

5  BY MR. SPEARS:

6        Q    It is a fact, is it not, that as you stood

7  alongside of Mr. -- the car in which Mr. Phillips was

8  seated, that he never fidgeted his arm?

9              MS. MILLER:  Same objection and same

10        instruction.

11              THE WITNESS:  I plead the Fifth.

12  BY MR. SPEARS:

13        Q    He did not fidget either his right or left

14  arm before he got out of the car, did he?

15        A    I plead the Fifth.

16        Q    If he did not fidget his arm before he got

17  out of the car, why did you tell investigators that he

18  did?

19        A    I plead the Fifth.

20        Q    When you initially approached Mr. Phillips

21  as he was seated -- let me back up for one second.

22  When you initially approached Mr. Phillips, he was

23  seated in the front-passenger seat of the car; was he

24  not?

25        A    I plead the Fifth.

**48**

1    Q    And with respect to where he was positioned

2    inside of the car, the dome light was not on; was it?

3         A    I plead the Fifth.

4         Q    When you saw that someone was in the car

5    where Phillips was seated, he was -- it was only one

6    person.  It was just him; correct?

7         A    I plead the Fifth.

8         Q    It is a fact, is it not, that at no time

9    before you shot Mr. Phillips that you saw Mr. Phillips

10   smoking marijuana?

11        A    I plead the Fifth.

12        Q    It is a fact, is it not, that before you

13   shot Mr. Phillips, you did not smell any marijuana

14   odor at all; did you?

15        A    I plead the Fifth.

16        Q    It is also a fact, is it not, that before

17   Mr. Phillips got out of the car as you and Roberson-El

18   were standing alongside of it, that neither you nor

19   the other officer asked Mr. Phillips to stop

20   fidgeting?

21        A    I plead the Fifth.

22        Q    It is a fact, is it not, that you did not

23   see a gun on the floorboard of the car in which

24   Phillips was shot before you fired your weapon?

25        A    I plead the Fifth.

49

1      Q   It is a fact, is it not, that once you had

2  shot Mr. Phillips, that you never saw a gun on the

3  floorboard of the car in which he died?

4      A   I plead the Fifth.

5      Q   After you got out of the Phillips car, after

6  you had shot him, you went back into the car; did you

7  not?

8      A   I plead the Fifth.

9      Q   Where in the car did you go after you went

10  into it?

11     A   I plead the Fifth.

12     Q   When Roberson first approached you after you

13  had shot Mr. Phillips, you did not tell him, did you,

14  that you had seen a gun?

15     A   I plead the Fifth.

16     Q   Did you see Roberson-El go into the car

17  after you had exited it after you had shot him?

18     A   I plead the Fifth.

19     Q   What did you see him doing?

20     A   I plead the Fifth.

21     Q   How far was the muzzle of your gun from

22  Mr. Phillips's head when you shot him?

23     A   I plead the Fifth.

24     Q   When you shot Mr. Phillips, you shot him in

25  the head; did you not?

1        A     I plead the Fifth.

2        Q     When you shot him in the head, the muzzle of

3   your gun was directly on his skull; was it not?

4        A     I plead the Fifth.

5        Q     At the time that you fired your weapon,

6   Mr. Phillips was not facing you; was he?

7        A     I plead the Fifth.

8        Q     At the time that you fired your weapon, the

9   weapon was in your right hand; was it not?

10        A     I plead the Fifth.

11        Q     At the time that you fired your weapon,

12   Mr. Phillips was positioned in such a way that his

13   head was turned towards the driver's-side front door.

14        A     I plead the Fifth.

15        Q     At the time that you fired, Mr. Phillips had

16   his left hand on the door; did he not?

17        A     I plead the Fifth.

18        Q     At the time that you fired your weapon,

19   Mr. Phillips had activated the door lever and had

20   opened the door; correct?

21        A     I plead the Fifth.

22        Q     Before you fired your weapon, you saw that

23   Mr. Phillips was attempting to get out of the car

24   through the driver's door; did you not?

25        A     I plead the Fifth.

1      Q    The period of time between -- well, I

2  believe I can ask it this way:  In the entire period

3  of time that you had contact with Mr. Phillips before

4  he died, he never verbally threatened you at all; did

5  he?

6      A    I plead the Fifth.

7      Q    In the period of time that you were in his

8  presence and before he died, Mr. Phillips never

9  verbally threatened Officer Roberson-El; did he?

10      A    I plead the Fifth.

11      Q    In the wake of the shooting, it is correct,

12  is it not, that you have never told anyone that

13  Mr. Phillips had verbally threatened either you or

14  Roberson-El?

15      A    I plead the Fifth.

16      Q    Throughout the period of time that you had

17  contact with Mr. Phillips before he died on that

18  evening, there was no point in time in which he had

19  any object held in his hand, other than the steering

20  wheel; isn't that a fact?

21      A    I plead the Fifth.

22      Q    When he, referring to Mr. Phillips, left the

23  vehicle in response to you and Roberson-El coming to

24  the side window, as he stood there alongside of his

25  vehicle, Roberson-El's flashlight was trained in such

1  a way, up and down Mr. Phillips, so that you could see

2  him there as he stood alongside of the car; correct?

3       A    I plead the Fifth.

4       Q    There was no time at which -- let me

5  rephrase the question.  As Roberson-El trained his

6  flashlight onto Mr. Phillips, he also trained it into

7  the interior of the car from which Mr. Phillips had

8  just come; did he not?

9       A    I plead the Fifth.

10      Q    And in the course of training his -- the

11 beam from his flashlight into the interior of the car,

12 you could see the floorboard of the car; could you

13 not?

14      A    I plead the Fifth.

15      Q    And when you saw the floorboard of the car,

16 there wasn't anything on the floorboard; was there?

17      A    I plead the Fifth.

18      Q    When you first exited the car after the

19 shooting, you noticed that Roberson-El was approaching

20 the car; did you not?

21      A    I plead the Fifth.

22      Q    Can you tell the jury, please, how far from

23 the car Roberson-El was at the time that you first got

24 out?

25      A    I plead the Fifth.

1        Q      How long in time was it between your firing

2    of your weapon and the point at which you got out of

3    the car?

4        A      I plead the Fifth.

5        Q      Did you exit the car using the

6    passenger-side door?

7        A      I plead the Fifth.

8        Q      In order to get out from the passenger-side

9    door, you -- I'll rephrase the question that I

10   started.  By the time that you shot Mr. Phillips, the

11   front passenger-side door was fully closed; was it

12   not?

13       A      I plead the Fifth.

14       Q      In order to get out of that door then, you

15   had to open it up with your hand; correct?

16       A      I plead the Fifth.

17       Q      At the time that you fired your weapon --

18   let me just back up for a second.  The service weapon

19   that you had on your person, that was one for which

20   you were authorized to be in possession of by the

21   department; is that correct?

22       A      Yes.

23       Q      And what model of weapon was it?

24       A      A GLOCK 17.

25       Q      And how many rounds are carried in a GLOCK

54

1   17?

2        A    Seventeen in the magazine and one in the

3   chamber.

4        Q    As you were on duty that evening and before

5   you came into contact with Mr. Phillips, there was a

6   round in the chamber; correct?

7        A    Yes, sir.

8        Q    As of that evening, the GLOCK was fully

9   functional; correct?

10       A    Yes, sir.

11       Q    And as of that evening, the GLOCK was one on

12  which you had practiced?

13       A    Yes, sir.

14       Q    At the practice range?

15       A    Yes, sir.

16       Q    And when you're at the practice range, it is

17  common, is it not, to wear the protective earpieces

18  that will deaden the sound of the firearm as you're

19  test-firing it; correct?

20       A    Yes, sir.

21       Q    And it's your practice to do that when

22  you're at the firing range; is it not?

23       A    Yes, sir.

24       Q    And you use that on your ears so that your

25  eardrums don't get damaged by too many shots --

1       A     Yes, sir.

2       Q     -- in a short duration.

3       A     Yes, sir.

4       Q     It's pretty loud?

5       A     Yes, sir.

6       Q     When you fired the shot into Mr. Phillips's

7   head, was the sound deadened in any way?

8            MS. MILLER:  Object to form.  And I'm going

9       to instruct my client to plead the Fifth.

10            THE WITNESS:  I plead the Fifth.

11  BY MR. SPEARS:

12      Q     At the time you fired your weapon and shot

13  Mr. Phillips, there was no device on the GLOCK itself

14  that was a device designed to retard the sound; was

15  there?

16      A     I plead the Fifth.

17      Q     When you discussed the shooting with

18  Roberson-El right after it happened, he told you that

19  he heard the shot; didn't he?

20      A     I plead the Fifth.

21      Q     And he asked you why you had shot; didn't

22  he?

23      A     I plead the Fifth.

24      Q     And when you spoke to him about why you

25  shot, you did not tell him that you saw a gun before

1   you fired; did you?

2        A    I plead the Fifth.

3        Q    Isn't it accurate to say that the reason why

4   you fired the shot was because you were angered by

5   Mr. Phillips not -- let me rephrase the question.  You

6   understood, when you fired your weapon, that

7   Mr. Phillips badly wanted to get away from you and the

8   other officer?

9        A    I plead the Fifth.

10        Q    And you understood, when you fired your

11   shot, that Mr. Phillips had not taken any act directed

12   towards you to harm you.

13        A    I plead the Fifth.

14        Q    Earlier you were describing to me some of

15   the responsibilities or investigative tasks of the gun

16   unit.  Is it accurate to say that the gun unit, to

17   which you were assigned at that time, conducts

18   investigations into the use of firearms in settings

19   other than homicides?

20        A    Yes, sir.

21        Q    And during the course of your work with the

22   gun unit, from time to time, as a part of your

23   investigation -- even if there's not been a

24   homicide -- that as a member of the gun unit, you

25   seize weapons from the scene of crimes that you're

1    investigating?

2         A    Yes, sir.  That's if we find them.

3         Q    Yes.  And that as a part of your

4    investigation, from time to time, you hold on to such

5    weapons that you come into possession for evidence

6    purposes.

7         A    They get turned into property.  I don't hold

8    on to anything.

9         Q    Understood.  Understood.  I understand that

10   you are to turn them in.  You come into possession of

11   weapons that you find at crime scenes; correct?

12        A    I don't come into possession of it.

13   Property comes into possession of it.  All weapons

14   that we find on crime scenes, if we find any, they get

15   turned in to property as evidence.

16        Q    Okay.  And the weapons that, let me say,

17   temporarily are in your possession before you turn

18   them in, those weapons can include weapons that are

19   owned lawfully as well as weapons that have been

20   stolen; correct?

21        A    Yes.

22        Q    Okay.  At this time, I'm going to ask to

23   have you listen to a portion of the audio recording

24   that was made of your interview with OPS Investigator

25   Haff in February of 2017.  And initially, the purpose

**58**

1   of my asking you to listen to it will simply be to let

2   me know whether or not you recognize your voice and

3   can tell us whether or not it sounds as if that's an

4   audio recording of that interview.

5          MR. SPEARS:  So I'm going to ask Jeff if he

6       could find that exhibit.  And once he's done so,

7       let us know, and we'll start up again.

8          THE COURT REPORTER:  Will this be an

9       exhibit, Mr. Spears?

10         MR. SPEARS:  Yes.  And what we'll do,

11      is this -- it's not in physical form, of course.

12      I'll ask if we could share this recording with

13      you, Staci, just by sending you a copy of what

14      we've played.  And see if we can agree that that,

15      at least, is what's been tendered to the witness.

16         MS. MILLER:  Sure.  That's fine.

17         MR. SPEARS:  If we can avoid the

18      cumbersomeness of not being in each other's

19      presence for it.  I'll have Jeff send that to you

20      once the deposition is finished.

21         MS. MILLER:  Thank you.

22         MR. FILIPOVITS:  All right.  So I am playing

23      a file named:  Audio, underscore, Abdulahad

24      interview at WMA.  And it should come over your

25      audio in a moment.

1          (Plaintiff's Exhibit No. 29 was marked for

2      identification.)

3          (Audio recording played.)

4          MR. FILIPOVITS:  I just wanted to make sure

5      that everybody could hear that.

6  BY MR. SPEARS:

7      Q    Were you able to hear that, Mr. Abdulahad?

8      A    Yes.

9      Q    And that is not your voice yet; is it?

10     A    No.  That was Investigator Haff.

11     Q    Okay.  Thank you.

12         MR. FILIPOVITS:  Staci, could you hear that,

13     as well?

14         MS. MILLER:  Yes.

15         MR. FILIPOVITS:  Okay.  I'll pick it up

16     where I left off.

17         (Audio recording played.)

18         MR. SPEARS:  Jeff, can you hear me?

19         THE WITNESS:  I can't hear you over the

20     recording.

21         MR. SPEARS:  I was asking if Jeff could hear

22     me.

23         MR. FILIPOVITS:  Yes, I can.  Did you want

24     me to stop there?

25         MR. SPEARS:  Yes.  Again, initially, all I

1      want to be able to do is to have the witness

2      identify this as a recording containing his voice

3      and that it's a copy of that interview that he

4      had with Investigator Haff.

5  BY MR. SPEARS:

6     Q   And if I could, let me turn then to you,

7  Mr. Abdulahad, and tell us, please, whether that is

8  the case?

9     A   Yes, sir.

10      MS. MILLER:  Object to form and object to --

11      and instruct my client to plead the Fifth.

12      THE WITNESS:  I plead the Fifth.

13  BY MR. SPEARS:

14     Q   Can you tell us, please, whether or not you

15  were interviewed by any investigators with the Office

16  of Professional Standards, other than Investigator

17  Haff, concerning the Phillips shooting?

18      MS. MILLER:  Same objection and same

19      instruction.

20      THE WITNESS:  I plead the Fifth.

21  BY MR. SPEARS:

22     Q   Can you tell us, please, whether or not you

23  were interviewed by any representatives of the Georgia

24  Bureau of Investigation in connection with the

25  Phillips shooting?

1          MS. MILLER:  Same objection and same

2     instruction.

3          THE WITNESS:  I plead the Fifth.

4  BY MR. SPEARS:

5     Q    Have you provided a written statement from

6  yourself to any representatives of the Office of

7  Professional Standards in which you describe the facts

8  and circumstances of the Phillips shooting?

9          MS. MILLER:  Same objection and same

10    instruction.

11         THE WITNESS:  I plead the Fifth.

12 BY MR. SPEARS:

13    Q    Have you provided any written statement from

14 yourself to representatives of the Georgia Bureau of

15 Investigation concerning the Phillips shooting?

16    A    I plead the Fifth.

17         MS. MILLER:  Same objection same

18    instruction.

19         THE WITNESS:  Sorry about that.

20         MS. MILLER:  No problem.

21 BY MR. SPEARS:

22    Q    Tell us, please, whether or not you have

23 been interviewed by any representatives of the Fulton

24 County District Attorney's office concerning the

25 Phillips shooting?

1           MS. MILLER:  Same objection and same

2       instruction.

3           THE WITNESS:  I plead the Fifth.

4  BY MR. SPEARS:

5       Q    Have you provided any statement -- whether

6  written or recorded -- to representatives of the

7  Fulton County District Attorney's office concerning

8  the Phillips shooting?

9       A    I plead the Fifth.

10      Q    It is true, is it not, that you have been

11 asked by representatives from the Fulton County

12 District Attorney's office to speak with them about

13 the Phillips shooting?

14      A    Say that again.

15      Q    It is a fact, is it not, that you have been

16 asked by representatives of the Fulton County District

17 Attorney's office to speak with them about the

18 Phillips shooting?

19          MS. MILLER:  Same objection and same

20      instruction.

21          THE WITNESS:  I plead the Fifth.

22 BY MR. SPEARS:

23      Q    It is a fact, is it not, that you have

24 refused to speak with representatives of the Fulton

25 County District Attorney's office about your actions

1    in connection with the Phillips shooting?

2         A    I plead the Fifth.

3         Q    It is a fact, is it not, that you have

4    refused to speak with representatives of the Fulton

5    County District Attorney's Office about the content of

6    your communications with Roberson-El in the period of

7    time between January the 26th of 2017 and the date of

8    the execution of the search warrant on your cell

9    phone?

10        A    I plead the Fifth.

11        Q    At the time of the shooting of Mr. Phillips,

12   did you maintain a diary of any kind?

13        A    I plead the Fifth.

14        Q    You have made written statements about the

15   facts and circumstances of the Phillips shooting

16   whereby you recount as much as you could remember

17   about what happened.  You have made such written

18   recordings; have you not?

19        A    I plead the Fifth.

20        Q    It is true, is it not, that in those written

21   recordings that you have made, up until February

22   the 13th of 2017, you did not record any information

23   about your sighting of a gun on the floorboard of the

24   Phillips car prior to your shooting him?

25        A    I plead the Fifth.

1    **Q**    Please tell us whether in January of 2017

2  you were active in any LISTSERVS of any kind whereby

3  you could post a message and receive responses from

4  other persons?

5     **A**    Say that again.

6     **Q**    Are you familiar with what a LISTSERVS is?

7     **A**    A LISTSERV?

8     **Q**   L-i-s-t-s-e-r-v-e [sic].

9     **A**    No, sir.  I don't know what that is.

10    **Q**    Okay.  From time to time -- just by way of

11  explanation, at least, is what I understand them to

12  be -- there can be groups of people who share a common

13  e-mail address to which they can send remarks about

14  the day or questions they have about really anything

15  that they want to post.  And sometimes those LISTSERV

16  are based in professional groups.  Sometimes they are

17  just a bunch of friends who want to stay in touch with

18  one another through a LISTSERV instead of a formal

19  e-mail process.  Having said that, can you now tell us

20  whether or not there were any such LISTSERV of which

21  you were a member in January of 2017?

22    **A**    I plead the Fifth.

23    **Q**    As of January of 2017, were you making use

24  of social media -- such as Facebook or other kinds of

25  social-media programs?

1       A     I plead the Fifth.

2       Q     Do you hold any licenses -- excuse me.  Let

3  me rephrase the question.  As of January of 2017, did

4  you hold any licenses other than a driver's license

5  and a license issued to you by the State of Georgia to

6  be a police officer?

7       A     Did I hold any other licenses?

8       Q     Other than those two.

9       A     Not that I know of.

10       Q     Prior to your having contact with

11  Mr. Phillips in January of 2017, you had never met him

12  to the best of your knowledge; had you?

13       A     No, sir.

14       Q     And prior to having contact with him in the

15  parking lot on the night of January the 26th, 2017,

16  you had no information about Mr. Phillips that you

17  were aware of; did you?

18       A     No, sir.

19       Q     And when you first saw Mr. Phillips, you

20  didn't recognize him in any way; did you?

21       A     No, sir.

22       Q     And you had no information as to his age?

23       A     No, sir.

24       Q     You had no information as to, say, his

25  educational background?

66

1        A      No, sir.

2        Q      Nor where he lived?

3        A      No, sir.

4        Q      Nor -- you didn't have any specific facts

5   about what he had been doing prior to his presence in

6   the parking lot; did you?

7        A      No, sir.

8        Q      And you didn't have any information about

9   whether or not he had ever been arrested; did you?

10       A      No, sir.

11       Q      You had no knowledge of any kind with

12  respect to whether or not he was the subject of any

13  criminal investigations prior to your seeing him; did

14  you?

15       A      No, sir.

16       Q      You had no information about Mr. Phillips to

17  the effect that he was -- what his occupation was; did

18  you?

19       A      No, sir.

20       Q      Or whether he was a member of any

21  organizations of any kind?

22       A      No, sir.

23       Q      During the entire period of time in which

24  you were in Mr. Phillips's presence on that evening,

25  you were not injured; were you?

1            MS. MILLER:  Object to form and instruct my

2       client to plead the Fifth.

3            THE WITNESS:  I plead the Fifth.

4  BY MR. SPEARS:

5       Q    Did you receive any medical treatment for

6  any injuries following your contact with Mr. Phillips

7  which were injuries that you attributed to your

8  interaction with Mr. Phillips on the night of January

9  26th, 2017?

10            MS. MILLER:  Same objection.

11            THE WITNESS:  I plead the Fifth.

12  BY MR. SPEARS:

13       Q    Mr. Phillips did not ever hit you with any

14  part of his body; did he?

15       A    I plead the Fifth.

16       Q    Mr. Phillips did not kick you ever; did he?

17       A    I plead the Fifth.

18       Q    You were dressed in plainclothes at the time

19  that you had contact with Mr. Phillips; did you not?

20       A    I plead the Fifth.

21       Q    Do you have any recollection or

22  understand -- let me phrase it this way:  The clothes

23  that you were wearing were taken into custody by the

24  Georgia Bureau of Investigation for testing; were they

25  not?

1      A    Yes --

2           MS. MILLER:  Object to form and instruct my

3      client to plead the Fifth.

4           THE WITNESS:  I plead the Fifth.

5  BY MR. SPEARS:

6      Q    Do you have those clothes that you were

7  wearing that night?  Do you currently have them?

8           MS. MILLER:  Same objection and same

9      instruction.

10          THE WITNESS:  I plead the Fifth.

11          MS. MILLER:  Mr. Spears, I'm going to ask if

12     we can take a brief break.  I see some dogs

13     trying to get into the deposition, so maybe we

14     can get them situated.

15          THE WITNESS:  Let me go put them away

16     somewhere or somewhere else.

17          MR. SPEARS:  That's fine.  Let's take a

18     ten-minute break.  I have 12:39, so is 12:49 all

19     right?

20          THE WITNESS:  That sounds good.

21          MR. SPEARS:  Thank you.  We'll go off record

22     for ten minutes.

23          (A break was taken from 12:39 p.m. until

24     12:49 p.m.)

25          MR. SPEARS:  We're back on the record then.

1   BY MR. SPEARS:

2        Q    Do you -- if I could, as we're getting

3   started for our next stretch here, have you turned

4   your cell phone off again?

5        A    I haven't turned it off again.  I was

6   just -- I haven't turned it off again.

7        Q    Okay.  Is the person who is there to address

8   your washer, if they come to the house, are they able

9   to notify you at the door?  Do you need to have that

10  cell phone on?

11       A    They will be able to come to the door.  I

12  can turn it off.

13       Q    All right.  Thank you, sir.

14       A    All right.

15       Q    Okay.

16       A    It's off.

17       Q    Okay.  With respect to Officer Roberson-El,

18  do you recall when you first met him -- not that

19  night -- just generally speaking?

20       A    The first time I met him was probably some

21  time in 2011.

22       Q    How long had you worked together, with him,

23  before January of 2017?

24       A    June 2016.

25       Q    And were both of you assigned to the gun

1  unit as of June 2016?

2       A    Yes, sir.

3       Q    Okay.  And were you already working in the

4  gun unit, and then he came and joined you?

5       A    No.  We both joined at the same time.

6       Q    All right.  Prior to June of 2016, were the

7  two of you friends?  Associates?  How would you

8  characterize that?

9       A    Probably went to the same -- attended the

10  same functions.  But we were associates.  Not really

11  have phone calls with each other, but.

12       Q    I'm sorry.  You say rarely had or did have?

13       A    Did not.

14       Q    And your friendship then, I take it, picked

15  up once the two of you were working together in the

16  gun unit?

17       A    Yes, sir.

18       Q    And once you -- once you started working

19  together in the gun unit, did you start to socialize

20  with one another?  Attend -- you know, visit one

21  another's homes, that sort of thing?

22       A    Yes, sir.

23       Q    Are there any organizations that the two of

24  you are both members of -- whether they be social

25  organizations, professional organizations, anything

71

1   along those lines?

2        A    Just religious, that's about it.  Besides

3   work, religious.

4        Q    Okay.  And when you say religious, I don't

5   mean to ask you about your beliefs.  I just want to

6   ask:  Are you both members of a particular church or

7   hall?

8        A    No.  Just faith, just the same religion,

9   same religion.

10       Q    Have your families gone together on

11  vacations?  Had dinner together?  Any shared time like

12  that?

13       A    Yes.  We have dinner together.  We hang out

14  together, yep.

15       Q    And is it fair to say that your friendship

16  hasn't changed, in terms of the kind of contact that

17  you have with one another, since the shooting; has it?

18       A    No, sir.

19       Q    All right.  Is it accurate to say then that

20  since the shooting, the two of you have continued to

21  see one another, socialize with one another outside of

22  work?

23       A    Yes, sir.

24       Q    And by any chance, do the two of you have

25  any hobbies that you work on together like motor

1    vehicles?  Motorcycles?  Sports?  Exercise?  Anything

2    like that?

3         A     Exercise -- we work out together.  Well, not

4    recently but we were working out together for a while.

5         Q     Do you go to any particular gyms or is that

6    something you just do on your own?

7         A     We work out together at headquarters.

8    Sometimes he'll meet me at my gym.  A few times we

9    worked out at the house together.

10        Q     Okay.  Going back to January 26th, 2017.

11   Before the shooting of Mr. Phillips, you never saw

12   Mr. Phillips in possession of any item that you --

13        A     You cut out for a second.

14        Q     Thank you.  And please, get on that right

15   away if I start talking and you can't hear me.  My

16   question has to do with marijuana.  Did you see my

17   client in possession of marijuana at any time the

18   night of the shooting?

19             MS. MILLER:  Object to form.  I'll instruct

20        my client to plead the Fifth.

21             THE WITNESS:  I plead the Fifth.

22   BY MR. SPEARS:

23        Q     Isn't it a fact that before the shooting,

24   you never smelled the odor of marijuana in proximity

25   to my client's car at all?

73

1      A      I plead the Fifth.

2             MS. MILLER:   And I also object; asked and

3      answered.

4   BY MR. SPEARS:

5      Q      When you first saw Mr. Phillips, you were

6   seated in your motor vehicle; were you not?

7      A      Say that one more time.

8      Q      When you first saw Mr. Phillips, on that

9   night -- the very first visual of him -- you were

10  seated in your car; were you not?

11            MS. MILLER:   Object to form.   And instruct

12     my client not to -- I'm sorry -- instruct my

13     client to plead the Fifth.

14            THE WITNESS:   I plead the Fifth.

15  BY MR. SPEARS:

16     Q      When you first saw my client, he was seated

17  in the passenger seat of what we'll call his car; was

18  he not?

19     A      I plead the Fifth.

20            MS. MILLER:   Same objection same

21     instruction.

22  BY MR. SPEARS:

23     Q      When you first saw my client, he was asleep,

24  wasn't he?

25            MS. MILLER:   Same objection and same

74

1      instruction.

2               THE WITNESS:  I plead the Fifth.

3   BY MR. SPEARS:

4      Q     And when you went to -- when you first got

5   out of your car, you noticed my client but initially

6   continued to walk towards the administration or annex

7   building without regard to my client's presence;

8   correct?

9      A     Can you repeat the question?  I didn't hear

10  it.  You cut out.

11     Q     I'll rephrase it.  When you initially got

12  out of your car -- and by the way, you had been

13  driving your car; correct?  You were in the driver's

14  seat?

15              MS. MILLER:  Same objection and same

16       instruction.

17              THE WITNESS:  I plead the Fifth.

18  BY MR. SPEARS:

19     Q     When you got out of your car, you looked

20  over and saw Mr. Phillips seated in his car; did you

21  not?

22              MS. MILLER:  Same objection and same

23       instruction.

24              THE WITNESS:  I plead the Fifth.

25  BY MR. SPEARS:

1      Q    And right after you looked over and saw him

2   in his car, you continued to walk towards the annex

3   building; did you not?

4           MS. MILLER:  Same objection and same

5       instruction.

6           THE WITNESS:  I plead the Fifth.

7   BY MR. SPEARS:

8      Q    And that was because you didn't see anything

9   about Mr. Phillips that in any respect you considered

10  to be suspicious.

11          MS. MILLER:  Same objection and same

12      instruction.

13          THE WITNESS:  I plead the Fifth.

14  BY MR. SPEARS:

15     Q    And had it not been for Mr. Roberson walking

16  up to Phillips's car, you would have continued into

17  the annex; correct?

18          MS. MILLER:  Same objection and same

19      instruction.

20          THE WITNESS:  I plead the Fifth.

21  BY MR. SPEARS:

22     Q    Before Officer Roberson walked up to the

23  Phillips car, neither you nor he had said anything to

24  one another about marijuana; had you?

25          MS. MILLER:  Same objection and same

1      instruction.

2              THE WITNESS:  I plead the Fifth.

3  BY MR. SPEARS:

4      Q    When Mr. Roberson-El approached the Phillips

5  car and before you walked up to it, you had no idea

6  why he was walking up to the Phillips car, did you?

7              MS. MILLER:  Same objection and same

8      instruction.

9              THE WITNESS:  I plead the Fifth.

10  BY MR. SPEARS:

11      Q    When you initially got up to the Phillips

12  car, Mr. Phillips was asleep and leaning against the

13  front-passenger door; was he not?

14              MS. MILLER:  Same objection and same

15      instruction.

16              THE WITNESS:  I plead the Fifth.

17  BY MR. SPEARS:

18      Q    And when you looked in and saw that he was

19  asleep, either you or Roberson tapped on the window

20  and got his attention; correct?

21              MS. MILLER:  Same objection and same

22      instruction.

23              THE WITNESS:  I plead the Fifth.

24  BY MR. SPEARS:

25      Q    The dome light to the Phillips car was not

1    on when he was seated in it and before the point in

2    time at which the passenger-side door was opened?

3              MS. MILLER:  Same objection same instruction

4         and asked and answered.

5              THE WITNESS:  I plead the Fifth.

6    BY MR. SPEARS:

7         Q    Where was the GLOCK, that you were in

8    possession of, on your body when you stood alongside

9    of the Phillips car?

10             MS. MILLER:  Same objection and same

11        instruction.

12             THE WITNESS:  I plead the Fifth.

13   BY MR. SPEARS:

14        Q    Prior to your arrival at the annex, what do

15   you recall about what had occurred on your shift?

16        A    Say that again.

17        Q    Prior to your arrival at the annex, what can

18   you recall about what had occurred on your shift that

19   day -- that afternoon and evening?

20        A    I took out warrants on someone.  And I was

21   walking out to the building to go to the annex to flag

22   the warrants so they could be in the system.

23        Q    And can you describe to me what's the

24   procedure for flagging a warrant?  What does that

25   entail?

1    A    After you've taken out the warrants, you

2   have to go to the annex where GCIC is -- or ACIC,

3   Atlanta Crime Information Center.  And you have to --

4   certain documents you have to have with the warrant so

5   they can flag it, the documents I get off of a program

6   called OMNEX.

7              I'll get a driver's license, the driver's

8   license status, and two other documents -- I can't

9   remember what they are called or whatnot.  But they

10  have the FBI number and the state ID number.  And I'll

11  take them over to the annex, and also, a warrant

12  module from ACIC, at the time.  Once I've taken care

13  of that, one of the young ladies there will take the

14  documents and proceed to inputing the information on

15  the system so that the warrant will be flagged

16  statewide or nationwide -- nationwide.

17             It will be nationwide.  I'm sorry.  That

18  way, no matter where the person goes, if they are

19  stopped by the police or they run a criminal history

20  or whatnot, that somebody will see that they have a

21  warrant for their arrest.

22    Q    Do you have any recollection of what the

23  offenses were for which the warrants had been taken

24  out that you were in possession of that night?

25    A    I believe aggravated battery and possession

79

1   of a firearm during the commission of a crime.

2          Q    Did the passenger-side door window, through

3   which you saw Mr. Phillips that evening before he got

4   out of the car, it wasn't covered in anything that

5   blocked your view; was there?

6              MS. MILLER:  Object to form and instruct my

7          client to plead the Fifth.

8              THE WITNESS:  I plead the Fifth.

9   BY MR. SPEARS:

10         Q    The window was not tinted in any way; was

11  it?

12             MS. MILLER:  Same objection and same

13         instruction.

14             THE WITNESS:  I plead the Fifth.

15  BY MR. SPEARS:

16         Q    The window wasn't clouded by anything -- no

17  covering or smoke behind it?

18             MS. MILLER:  Same objection and same

19         instruction.

20             THE WITNESS:  I plead the Fifth.

21  BY MR. SPEARS:

22         Q    You didn't see any smoke inside the Phillips

23  car, did you?

24             MS. MILLER:  Same objection and same

25         instruction.

1          THE WITNESS:  I plead the Fifth.

2   BY MR. SPEARS:

3      Q    It is a fact, is it not, that in your

4   interview with OPS in February of 2017, that you did

5   not notice anything unusual about the Phillips car

6   when you pulled up?

7          MS. MILLER:  Same objection and same

8      instruction.

9          THE WITNESS:  I plead the Fifth.

10  BY MR. SPEARS:

11     Q    It is a fact, is it not, that the reason

12  that you went to -- you understood that the reason why

13  Roberson-El went to the Phillips car was simply

14  because he was curious?  He wanted to know why someone

15  was sitting inside of their car.

16         MS. MILLER:  Same objection and same

17     instruction.

18         THE WITNESS:  I plead the Fifth.

19  BY MR. SPEARS:

20     Q    There wasn't any information from

21  Roberson-El to you before the two of you stood

22  alongside of my client's car that consisted of

23  information to the effect that he was suspicious of

24  any wrongdoing on my client's part; correct?

25         MS. MILLER:  Same objection and same

1       instruction.

2               THE WITNESS:  I plead the Fifth.

3   BY MR. SPEARS:

4       Q    As the two of you were standing alongside of

5   the Phillips car, one of you told Phillips to get out

6   of the car; correct?

7               MS. MILLER:  Same objection and same

8           instruction.

9               THE WITNESS:  I plead the Fifth.

10  BY MR. SPEARS:

11      Q    And the reason why you asked Phillips, one

12  or the other of you asked Phillips, to get out of the

13  car, was simply because he had denied the claim made

14  by the two of you that he had been smoking marijuana?

15      A    I plead the Fifth.

16              THE WITNESS:  I'm sorry.  The guy is here.

17          Do you mind if I go handle that?

18              MR. SPEARS:  Let's go off record for five

19          minutes?

20              THE WITNESS:  Yes, sir.  Five minutes is

21          fine.

22              (A break was taken from 1:09 p.m. until

23          1:10.)

24              MR. SPEARS:  All right.  We're back on the

25          record.

1  BY MR. SPEARS:

2      Q     Once Mr. Phillips had opened his car door,

3  he was not free to leave; was he?

4            MS. MILLER:  Same objection and same

5      instruction.

6            THE WITNESS:  I plead the Fifth.

7  BY MR. SPEARS:

8      Q     You never told Mr. Phillips that he was free

9  to leave after the point that you told him to get up

10 and out of the car; did you?

11           MS. MILLER:  Same objection and same

12     instruction.

13           THE WITNESS:  I plead the Fifth.

14 BY MR. SPEARS:

15     Q     In fact, the decision to detain Mr. Phillips

16 was made even before you opened the car door; wasn't

17 it?

18           MS. MILLER:  Same objection and same

19     instruction.

20           THE WITNESS:  I plead the Fifth.

21 BY MR. SPEARS:

22     Q     The engine to the Phillips car was running

23 when you approached it; was it not?

24           MS. MILLER:  Same objection and same

25     instruction.

1            THE WITNESS:  I plead the Fifth.

2    BY MR. SPEARS:

3        Q    Up until the point that you -- let's go to

4    the point where Mr. Phillips is standing alongside of

5    the car.  Up until the point that you grabbed

6    Mr. Phillips, he had complied with each request that

7    had been made of him by you and Mr. Roberson-El; had

8    he not?

9            MS. MILLER:  Same objection and same

10       instruction.

11            THE WITNESS:  I plead the Fifth.

12   BY MR. SPEARS:

13       Q    He had rolled down the window; correct?

14            MS. MILLER:  Same objection and same

15       instruction.

16            THE WITNESS:  I plead the Fifth.

17   BY MR. SPEARS:

18       Q    He had opened the door at your request;

19   correct?

20       A    I plead the Fifth.

21       Q    He had gotten out of the car at your

22   request; correct?

23       A    I plead the Fifth.

24       Q    And even though he wasn't engaged in any

25   criminal activity at all, at that time, you grabbed

1   him; correct?

2          A     I plead the Fifth.

3          Q     He did not try to run past you; did he?

4          A     I plead the Fifth.

5          Q     Both you and Mr. Roberson-El were blocking

6   his path, in any event.

7          A     I plead the Fifth.

8          Q     And you were blocking his path to prevent

9   him from getting away from the two of you because you

10  had already decided that you were going to be

11  detaining him and arresting him; correct?

12         A     I plead the Fifth.

13         Q     Once he was grabbed by you, he pulled back

14  towards the interior of the car; correct?

15         A     I plead the Fifth.

16         Q     And when he pulled back towards the interior

17  of the car, you pushed him into the car; correct?

18         A     I plead the Fifth.

19         Q     And when you pushed him into the car, you

20  continued after him; correct?

21         A     I plead the Fifth.

22         Q     And when you continued in after him, he

23  immediately got into the driver's side door because

24  you kept pushing him in that direction; correct?

25         A     I plead the Fifth.

1     Q     Once you got inside of the car, you put your

2     knee onto the seat of the passenger seat as he,

3     Phillips, was seated in the driver's side; correct?

4     A     I plead the Fifth.

5     Q     And once your knee was on that seat, no part

6     of your body was touching the ground; was it?

7     A     I plead the Fifth.

8     Q     No part of your body was extending outside

9     of the car except for your foot which hadn't yet been

10    fully brought into the car; correct?

11    A     I plead the Fifth.

12    Q     You were never ever drug alongside of the

13    car, in any form or fashion, by Mr. Phillips operating

14    the car out of that parking spot; were you?

15    A     I plead the Fifth.

16    Q     When you first reported to officers, other

17    than Roberson, what it was that had happened prior to

18    your shooting Mr. Phillips, you told other officers

19    that you had been dragged by Phillips operating the

20    car -- you were dragged on the ground alongside the

21    car -- that's what you told them; correct?

22    A     I plead the Fifth.

23    Q     You were the only source of information to

24    the responding officers as to whether or not you had

25    been dragged alongside the car when they first

1   reported to the scene; correct?

2        A     I plead the Fifth.

3        Q     No one other than you ever told any of those

4   officers that you had been dragged.

5        A     I plead the Fifth.

6        Q     Roberson didn't say you had been dragged;

7   did he?

8        A     I plead the Fifth.

9        Q     Because that isn't what he saw; is it?

10       A     I plead the Fifth.

11             MR. SPEARS:  Thank you for the pause.  I'm

12        trying to be certain I don't ask -- there will be

13        some repetition.  I know that, and on some level,

14        I'll try to avoid it.  I am going to try to avoid

15        it.

16             THE WITNESS:  I understand.

17             MR. SPEARS:  I'll be right back with you.

18             THE WITNESS:  Yes, sir.

19   BY MR. SPEARS:

20       Q     All right.  As you and Roberson-El stood

21   alongside of the Phillips car, you told Phillips

22   something to the effect, just throw out the weed;

23   correct?

24       A     I plead the Fifth.

25       Q     And at the time that you told him, told

1   Phillips, to just throw out the weed, you had no

2   fact-based information to the effect that he was even

3   in possession of marijuana; correct?

4        A    I plead the Fifth.

5        Q    And when he told you that he didn't have any

6   weed, or was not hiding any weed -- something along

7   those lines -- you just didn't believe him; did you?

8        A    I plead the Fifth.

9        Q    And it was because you didn't believe him

10  that you told him to get up and out of the car;

11  correct?

12       A    I plead the Fifth.

13       Q    Because you thought it was disrespectful --

14  he was not showing you the proper respect in his

15  responses to you and Mr. Roberson-El; was he?

16       A    I plead the Fifth.

17       Q    By proper respect, I mean, in your opinion,

18  he wasn't showing you the proper respect despite his

19  otherwise cooperation; correct?

20       A    I plead the Fifth.

21       Q    Before you told him to get out of the car,

22  you told him, just show us some respect; didn't you?

23       A    I plead the Fifth.

24       Q    And when he didn't immediately respond,

25  that's the point at which you told him just get out of

1     the car.

2          A     I plead the Fifth.

3          Q     And when he got out of the car, there was

4     nothing in his hands; was there?

5          A     I plead the Fifth.

6          Q     You do agree, do you not, that at that point

7     in time, you had made the decision that Phillips was

8     not going to be allowed to leave whether on foot or in

9     the car, no matter what?

10         A     I plead the Fifth.

11         Q     And you would agree, would you not, that at

12    the point in time that Phillips was told to get out of

13    the car, you understood that Roberson-El had decided,

14    as well, that neither you nor he were going to let

15    Mr. Phillips leave whether by foot or by car?

16         A     I plead the Fifth.

17         Q     At the time that Mr. Phillips was grabbed by

18    Officer Roberson-El, and before he went back into the

19    car, he had not committed any criminal offense in your

20    presence; had he?

21         A     I plead the Fifth.

22         Q     That's also the case with respect to your

23    grabbing him.  He had not committed any criminal

24    offense in your presence prior to when you grabbed

25    him, had he?

1     A     I plead the Fifth.

2     Q     Now, when Phillips went into the car --

3     let's see -- the lights were still on; weren't they?

4     A     I plead the fifth.

5     Q     When he went back into the car, and before

6     you pushed him into the driver's side, the

7     driver's-side door was closed; wasn't it?

8     A     I plead the Fifth.

9     Q     And once you got fully into the car,

10    Mr. Phillips -- you could see Mr. Phillips reaching

11    for the car door, the driver's-side door, in an effort

12    to get away from you; didn't you?

13    A     I plead the Fifth.

14    Q     And when he did that, you held on to him

15    with one hand, your left hand; did you not?

16    A     I plead the Fifth.

17    Q     And you would not let him get out of the car

18    by opening the door and continuing away from you;

19    correct?

20    A     I plead the fifth.

21    Q     And at the point in time that you held him

22    in the car and would not allow him to get away from

23    your immediate presence, you pulled your gun and you

24    pointed it at him; did you not?

25    A     I plead the Fifth.

90

1     Q    When you pointed your gun at him, you had

2  one knee on the seat of the passenger-side seat;

3  correct?

4     A    I plead the Fifth.

5     Q    And as a result -- you were not crouching at

6  that point in time.  You were erect, in relative

7  terms, meaning that your knee was on the seat, your

8  other leg was inside, even if the car door wasn't

9  fully closed yet.  And your shoulders were positioned

10  such that they were touching the ceiling of the

11  interior of the car; correct?

12     A    I plead the Fifth.

13     Q    Once you pulled your gun out, you positioned

14  it directly alongside of Mr. Phillips's head, behind

15  his ear; correct?

16     A    I plead the Fifth.

17         MS. MILLER:  Objection; asked and answered,

18    as well.

19 BY MR. SPEARS:

20     Q    And as you pointed it and had it positioned

21  directly against his skull, your shoulders were

22  positioned such that you were higher than his

23  shoulders; correct?

24     A    I plead the Fifth.

25     Q    You were holding him with your left hand,

91

1    and holding him in place, at the time that you pulled

2    the trigger of your GLOCK; correct?

3        A    I plead the Fifth.

4        Q    And at that time that you pulled the trigger

5    of the GLOCK, you saw that he was trying to exit out

6    the driver's-side door; correct?

7        A    I plead the Fifth.

8        Q    And you shot him not because he was then

9    threatening you, but because he was trying to get out

10   of the car.

11       A    I plead the Fifth.

12       Q    Once you pushed Phillips into the car, what

13   did you anticipate was going to happen next?

14       A    I plead the Fifth.

15       Q    Once you pushed Phillips into the car, you

16   had no basis on which to conclude that he was then a

17   threat to your safety; did you?

18       A    I plead the Fifth.

19       Q    Once Mr. Phillips started to operate the car

20   with you in it, he did not verbally threaten you while

21   the car was being operated; did he?

22       A    I plead the Fifth.

23       Q    He was pleading with you to put the gun

24   down; wasn't he?

25       A    I plead the Fifth.

1       Q    He was pleading with you for his life;

2    wasn't he?

3       A    I plead the Fifth.

4       Q    You did not tell him that if he did not stop

5    the car, you were going to shoot; did you?

6       A    I plead the Fifth.

7       Q    Did you tell him that if he stopped the car,

8    you would put the gun down?

9       A    I plead the Fifth.

10      Q    Did you tell them that if he didn't stop the

11   car, you're going to shoot him?

12      A    I plead the Fifth.

13      Q    When Mr. Phillips operated the car in such a

14   way that he drove in a straight line avoiding the

15   exit, you understood that Mr. Phillips was trying to

16   stop; did you not?

17      A    I plead the Fifth.

18      Q    And, in fact, what happened was you saw that

19   Mr. Phillips was bringing the car to a stop, and he

20   tried to open the door.  You saw that; right?

21      A    I plead the Fifth.

22      Q    The car had come to a stop before you fired

23   your weapon; had it not?

24      A    I plead the Fifth.

25      Q    Why did you shoot your gun into

1  Mr. Phillips's head when he was trying to stop the

2  car?

3       A    I plead the Fifth.

4       Q    The car was at full rest at the time that

5  you fired the weapon; correct?

6       A    I plead the Fifth.

7       Q    The car was at full rest when you got out --

8  excuse me.  The car was at full rest when you opened

9  the passenger-side door and got out; correct?

10      A    I plead the Fifth.

11      Q    You had to open the passenger-side door to

12 get out because it was fully closed by the time the

13 car stopped.

14      A    I plead the Fifth.

15      Q    The Phillips car, it was an automatic;

16 wasn't it -- an automatic transmission?

17      A    I plead the Fifth.

18      Q    And the Phillips car had an emergency brake

19 system with the emergency-brake lever adjacent to the

20 transmission-shift lever; correct?

21      A    I plead the Fifth.

22      Q    Once the car came to a stop, Mr. Phillips

23 pulled the emergency brake; didn't he -- right before

24 he was shot?

25      A    I plead the Fifth.

1    Q    You don't have any explanation, do you, for

2  the fact that once you got out of the car, the

3  emergency brake was fully engaged?

4    A    I plead the Fifth.

5    Q    You would agree, would you not, that you

6  didn't pull the emergency brake of that car that

7  night; did you?

8    A    I plead the Fifth.

9    Q    And the only person who would've pulled it

10  before Phillips was shot was Phillips.

11    A    I plead the Fifth.

12    Q    It is a fact, is it not, that Mr. Phillips

13  never reached for the floorboard of that car while he

14  was operating it once you were inside; did he?

15    A    I plead the Fifth.

16    Q    When you looked at the video, in preparation

17  for this deposition, you recognized yourself; did you

18  not?

19    A    Yes, sir.

20        MR. SPEARS:  Counsel?

21  BY MR. SPEARS:

22    Q    And you recognized Mr. Roberson-El; did you

23  not?

24    A    Yes, I did.

25    Q    And you saw a figure that you recognize now

1    as being the person of Mr. Phillips; correct?

2              MS. MILLER:  Object to form.  I'll instruct

3         my client to plead the Fifth.

4              THE WITNESS:  I plead the Fifth.

5              MR. SPEARS:  At this time, I'm going to ask

6         Jeff if he could access the enhanced -- do you

7         possibly have the -- I think what's called or

8         referred to as the enhanced video?

9              MR. FILIPOVITS:  I do.  Yes.

10             MR. SPEARS:  Now, the term "enhanced," as I

11        understand it, that's a term that was assigned to

12        this particular video, not by us.  Just so you

13        know, Staci, we haven't done anything to change

14        what we were given.  We were given a long

15        version, if you will, and then one that, as I

16        understand it at least, was at the request of the

17        district attorney's office and then eventually

18        coming back into the hands of the GBI.  There was

19        a video that was referred to as enhanced that is

20        about, what, four minutes long, Jeff?

21             MR. FILIPOVITS:  Four minutes and 57

22        seconds.

23             MR. SPEARS:  Okay.  So that's the one that I

24        will be showing the witness at this time.  If you

25        could get that queued up, Jeff.  We'll be sharing

1          the screen in just a moment.  Before you start it

2          rolling, Mr. Witness, are you able to see the

3          video image as it's shared with you?

4                THE WITNESS:  Yes, sir.

5    BY MR. SPEARS:

6          Q    Okay.  Now, there is a time imprint in the

7    upper left-hand corner of the image that I see here.

8    Do you see a -- it starts with 2017 --

9          A    Yes, sir.

10         Q    -- and then it ends with the military-time

11   imprint?

12         A    Yes, sir.  I can see that.

13               MR. SPEARS:  What I would ask is for that

14         image be started in -- let's see.  Hold on just a

15         second.

16               MR. FILIPOVITS:  Okay.  Just for the record,

17         the file name here is:  Annex, space, a-p-d,

18         space, hyphen, enhanced, space, hyphen, one, dot,

19         m-4-v.  Brian, just tell me when you're ready,

20         and I'll play it.

21               MR. SPEARS:  All right.  Let's go ahead and

22         start.  And I'll ask you to stop from time to

23         time as we're watching it.  Please go ahead.

24               (Video played.)

25               MR. SPEARS:  All right.  If you could, stop

97

```
1        it just there.  We are now at 44:35.
2    BY MR. SPEARS:
3        Q    Do you see that, sir?
4        A    Yes, sir.
5        Q    And can you -- do you see the red vehicle
6    that you operated, that had both you and Roberson-El
7    inside --
8             MS. MILLER:  Object to form and instruct my
9        client to plead the Fifth.
10             THE WITNESS:  I plead the Fifth.
11    BY MR. SPEARS:
12        Q    And do you see the vehicle that's in close
13    proximity to the red car, the darkened vehicle that
14    has its headlights on?  Do you see that, as well?
15             MS. MILLER:  Same objection and same
16        instruction.
17             THE WITNESS:  I plead the Fifth.
18             MR. SPEARS:  All right.  Could you please
19        run the enhanced?  All right.  If you could,
20        please stop.
21    BY MR. SPEARS:
22        Q    At 44:49, do you see that you've pulled the
23    red car into a parking spot, and you are now separated
24    by maybe ten or 12 feet from the other car?
25             MS. MILLER:  Same objection and same
```

1      instruction.

2              THE WITNESS:  I plead the Fifth.

3  BY MR. SPEARS:

4      Q    And would you agree with me that the

5  headlights and brake lights to the darkened car, the

6  one adjoining you, are still on as you arrive;

7  correct?

8              MS. MILLER:  Same objection and same

9      instruction.

10              THE WITNESS:  I plead the Fifth.

11              MR. SPEARS:  Okay.  Please continue with the

12      video.  You could stop.  We are now at 45:03.

13  BY MR. SPEARS:

14      Q    Do you see, sir, that there's some activity

15  lit up by a dome light in the car that you've just

16  driven up in?

17              MS. MILLER:  Same objection and same

18      instruction.

19              THE WITNESS:  I plead the Fifth.

20              MR. SPEARS:  Continue the video, please.

21      All right.  If you could stop, please.

22  BY MR. SPEARS:

23      Q    Now, do you recognize yourself?  You're the

24  driver of the vehicle; correct?

25              MS. MILLER:  Same objection and same

1       instruction.

2                 THE WITNESS:  I plead the Fifth.

3    BY MR. SPEARS:

4       Q    Do you recognize yourself standing adjacent

5    to the red car having just gotten out of the driver's

6    side?

7                 MS. MILLER:  Same objection and same

8       instruction.

9                 THE WITNESS:  I plead the Fifth.

10                MR. SPEARS:  And just to note for the

11      record, as to this recording with time stamp at

12      19:45:55.

13   BY MR. SPEARS:

14      Q    With respect to the person who is standing

15   alongside the passenger-side door of the red car,

16   that's Officer Roberson-El; is it not?

17                MS. MILLER:  Same objection and same

18      instruction.

19                THE WITNESS:  I plead the Fifth.

20   BY MR. SPEARS:

21      Q    At this point in time, as you're standing

22   alongside of the red car -- up until this point in

23   time, neither you nor Roberson-El have made any

24   comment, whatsoever, about Mr. Phillips or what, at

25   that time, you just knew to be a person sitting in

1    that car; had you?

2              MS. MILLER:  Same objection same

3         instruction.

4              THE WITNESS:  I plead the Fifth.

5    BY MR. SPEARS:

6         Q    And once you were out of the car, and had

7    closed the driver's-side door, your attention was

8    focused on walking into the annex; wasn't it?

9         A    I plead the Fifth.

10             MR. SPEARS:  Can we start the video, please?

11        Stop, please.  We are now at 46:04.

12   BY MR. SPEARS:

13        Q    In the couple of seconds leading up to this

14   particular moment, you were walking directly into the

15   annex; were you not?

16        A    I plead the Fifth.

17        Q    And what is shown at 46:04, we see you turn

18   back so that your face is facing towards the Phillips

19   car; correct?

20        A    I plead the Fifth.

21        Q    And the reason why you turned back to face

22   the Phillips car was you realized that Roberson-El was

23   walking up towards the Phillips car; correct?

24        A    I plead the Fifth.

25        Q    He did not saying anything to you about why

1  he was approaching the car at that time; did he?

2       A    I plead the Fifth.

3       Q    And you did not ask him why he was

4  approaching the car at that time; did you?

5       A    I plead the Fifth.

6       Q    As your partner, you considered it your duty

7  to accompany him if he was walking up to the car

8  regardless of whether you knew why he was doing that;

9  correct?

10      A    I plead the Fifth.

11           MR. SPEARS:  Please run the video.  Please

12      stop.  All right.

13  BY MR. SPEARS:

14      Q    All right.  It's 46:12, and the first person

15  to -- shown on the video as engaging with Mr. Phillips

16  is Mr. Roberson-El; correct?

17      A    I plead the Fifth.

18      Q    And he stares into the window, from what you

19  could tell, at that point in time, 46:12, Mr. Phillips

20  was asleep and leaning against the passenger-side

21  door; correct?

22      A    I plead the Fifth.

23           MR. SPEARS:  Okay.  Please continue the

24      video.  Please stop the video.

25  BY MR. SPEARS:

1      Q    As you see the figure placing something on

2   top of the Phillips car.  You had just, yourself,

3   looked into the Phillips passenger side and seen him

4   seated there asleep; had you not?

5      A    I plead the Fifth.

6      Q    And immediately after that, that is the

7   point in time in which Mr. Roberson-El wakes

8   Mr. Phillips up; correct?

9      A    I plead the Fifth.

10         MR. SPEARS:  Please continue the video.

11   Please stop at 46:43.

12   BY MR. SPEARS:

13      Q    And at this point in time, Mr. Roberson-El

14   is still speaking to Mr. Phillips; is he not?

15      A    I plead the Fifth.

16      Q    And at this point in time, you're still

17   standing behind Mr. Roberson-El; correct?

18      A    I plead the Fifth.

19      Q    And by this point in time, 46:43,

20   Mr. Phillips has activated the window to roll down;

21   had he not?

22      A    I plead the Fifth.

23         MR. SPEARS:  Please run the video.  Please

24      stop.

25   BY MR. SPEARS:

1      Q    We're looking now at 47:07.  You would agree

2   with me, would you not, that the dome light has come

3   on in the interior of the Phillips vehicle; correct?

4      A    I plead the Fifth.

5      Q    And it has come on because Mr. Phillips has

6   now opened the car door after being told to get out by

7   either you or Mr. Roberson; correct?

8      A    I plead the Fifth.

9      Q    Up to this point, again, Mr. Phillips has

10  cooperated with each request submitted to him by

11  either you or Mr. Roberson-El?

12     A    I plead the Fifth.

13          MR. SPEARS:  Please run the video.  Stop

14     please.

15  BY MR. SPEARS:

16     Q    At 47:15, we can see the figure now --

17  figures now of the three of you.  The three of you are

18  standing there alongside of one another; correct?

19     A    I plead the Fifth.

20          MR. SPEARS:  Please go ahead and start the

21     video up again.  At this point, stop.

22  BY MR. SPEARS:

23     Q    At this point, 47:25, we can see that

24  Roberson-El has trained his -- the beam of his

25  flashlight onto Mr. Phillips.  And at this point in

1   time, neither you nor Mr. Roberson see anything in

2   Mr. Phillips's possession; correct?

3        A    I plead the Fifth.

4             MR. SPEARS:  Please continue the video.

5        Please stop the video.  Would you go back at

6        least one second?  Maybe go back to 47:36, if you

7        can.  Stop.

8   BY MR. SPEARS:

9        Q    Now, at 47:36, what the video reflects is

10  the fact that Mr. Roberson-El had grabbed

11  Mr. Phillips.  And you had started to become involved

12  in grabbing him as well; correct?

13            MS. MILLER:  Object to form.

14            MR. SPEARS:  Is it just an objection to

15       form?  I don't mean to barrel ahead unless you

16       have another objection.

17            MS. MILLER:  Well, it's the same objection

18       as before, but also an objection to form.

19  BY MR. SPEARS:

20       Q    At 47:36, were you, yet, grabbing at

21  Mr. Phillips?

22       A    I plead the Fifth.

23            MR. SPEARS:  All right.  Please continue the

24       video.  Please stop.

25  BY MR. SPEARS:

1      Q   Now, at this point in time, at 47:41, you

2  are just starting to push Mr. Phillips down and back

3  across the seat; are you not?

4      A   I plead the Fifth.

5         MR. SPEARS:  Please start again.  Now --

6     stop.  Could you please go back to 47:44?  Stop.

7  BY MR. SPEARS:

8      Q   Now at 47:44, you see that the brake light

9  has now been fully activated at 47:44; correct?

10     A   I plead the Fifth.

11     Q   And you would agree with me, would you not,

12  that that is the point in time in which you have

13  pushed -- you have pushed Mr. Phillips into the

14  driver's-seat area and you yourself have climbed in;

15  correct?

16     A   I plead the Fifth.

17        MR. SPEARS:  Please go ahead with the video.

18     Stop.

19  BY MR. SPEARS:

20     Q   Now, we're looking at 47:47.  At this point

21  in time, you would agree with me, would you not, that

22  the car being operated now by Phillips is also in a

23  circumstance where you are fully inside of the car and

24  no part of your body is touching the ground?  That is

25  correct; is it not?

1      A    I plead the Fifth.

2      Q    And at this point in time, Mr. Phillips's

3  hands, both of his hands, are on the steering wheel

4  navigating the car out of the parking spot; correct?

5      A    I plead the Fifth.

6           MR. SPEARS:  Please continue the video.

7           Stop.  If you could, try to take it back to 47:48

8           I'm going to try to position -- I think this is

9           just the mechanics of the Zoom call, but the way

10          my panels, with our faces on them, are

11          arranged --

12          THE WITNESS:  You can move it to the left.

13          You can drag the faces over to the left of the

14          screen.

15          MR. SPEARS:  Yes, sir.  That is exactly what

16          I was going to suggest.  I don't know if you've

17          yet done that but I was going to do that so we

18          could both can see.

19          MS. MILLER:  You can also exit out of full

20          screen and then the video can go back to the top,

21          the video streams of each person.

22          MR. SPEARS:  Okay.  Thank you.

23  BY MR. SPEARS:

24      Q    All right.  Are you in full screen now, Mr.

25  Abdulahad?

1       A       Yes, sir.

2       Q       And at 47:48, you would agree with me, would

3  you not, that the dome light is still activated in the

4  interior of the car now being driven by Mr. Phillips?

5       A       I plead the Fifth.

6       Q       And in looking into the interior of the car,

7  at this point in time, at 47:48, you would agree with

8  me, would you not, that we see your hands visible in

9  the light as shown by the dome light?

10      A       I plead the Fifth.

11      Q       And in seeing your hands there, we see that

12  you have your left hand on top of Mr. Phillips's

13  shoulder pushing him down and your right hand is, at

14  this point in time, in possession of your GLOCK; is

15  that correct?

16      A       I plead the Fifth.

17      Q       That is -- you were holding your GLOCK at

18  this point in time; were you not?

19      A       I plead the Fifth.

20      Q       And you were holding it because you were

21  threatening to shoot Mr. Phillips in the head because

22  he was trying to get away from you; correct?

23      A       I plead the Fifth.

24      Q       And Mr. Phillips was pleading with you not

25  to shoot him, at this point in time; wasn't he?

1       A     I plead the Fifth.

2       Q     But you kept your gun to his head from this

3  point until you pulled the trigger; didn't you?

4       A     I plead the Fifth.

5       Q     Do you know of anyone -- let me rephrase the

6  question.  I'll withdraw it.

7             Other than pleading with you to not shoot

8  him, and to put the gun down, Mr. Phillips didn't say

9  anything else to you in the period of time between

10  47:48, as we see on the screen now, and the point in

11  time at which the car stopped; correct?

12      A     I plead the Fifth.

13      Q     And you're the only person who could tell us

14  what he was saying before he died; correct?

15      A     I plead the Fifth.

16      Q     Certainly, Mr. Roberson-El has never told

17  you that he heard any of the words that Mr. Phillips

18  was saying between 47:48 and when Phillips died; has

19  he?

20      A     I plead the Fifth.

21            MR. SPEARS:  Let's watch the -- let's start

22        the video again, please.  If you could, take it

23        back 49, 47:49.  Forgive me for my inexactness --

24        47:48 -- there.  Thank you.

25  BY MR. SPEARS:

1      Q     Now, as we look at 47:48, the white patch

2    just above where the two lights of the car are

3    situated -- there's a white patch there illuminated by

4    the dome light of the car; correct?

5      A     I plead the Fifth.

6      Q     And that white patch, again, is your -- an

7    image, even if it's fuzzy, of your hand -- that you

8    have told us did not have a glove on -- pointing the

9    gun at Mr. Phillips head; correct?

10     A     I plead the Fifth.

11           MR. SPEARS:  Please continue.  Okay.  We can

12        stop there.  If we could, let's go to Exhibit 9.

13        And if we could, share that on the screen and

14        I'll ask the witness questions.  It's page 79.

15           (Plaintiff's Exhibit No. 9 was marked for

16        identification.)

17   BY MR. SPEARS:

18     Q     Do you see what's marked as Exhibit No. 9

19   there on the share screen, Mr. Abdulahad?

20     A     Yes, sir.

21     Q     And I'll ask you to take a look at the

22   portion of that photograph that depicts the position

23   of Mr. Phillips's feet there beneath the steering

24   wheel.  Do you see that?

25     A     Yes, sir.

1      Q    And can you assure us that at no time,

2   before you got out of the car, that you moved either

3   of Mr. Phillips's legs after he had been shot?

4           MS. MILLER:  Object to form and Instruct my

5       client to plead the Fifth.

6           THE WITNESS:  I plead the Fifth.

7   BY MR. SPEARS:

8      Q    The position of Mr. Phillip's two feet in

9   the interior of the driver's section of the car, as

10  shown in Exhibit 9, is the position of his feet, as

11  they appeared, when you left the Phillips car and got

12  out; correct?

13     A    I plead the Fifth.

14     Q    The position of his two feet, as shown in

15  Exhibit 9, is the position of his two feet when you

16  shot him; correct?

17     A    I plead the Fifth.

18          MR. SPEARS:  Please, if you could, move on

19      to Exhibit 10, which is page 80.

20          (Plaintiff's Exhibit No. 10 was marked for

21      identification.)

22  BY MR. SPEARS:

23     Q    Do you see Exhibit 10, sir, in the share

24  screen?

25     A    Yes, sir.

1      Q    And would you agree with me that

2  Mr. Phillips is -- as depicted in Exhibit 10 --

3  Mr. Phillips is in the position, the physical

4  position, that he was at the time that you left the

5  car -- that you got out of the car?

6      A    I plead the Fifth.

7      Q    He was on the left side, closest to the --

8  to the left exterior of the car when you removed

9  yourself from the Phillips car; correct?

10      A    I plead the Fifth.

11      Q    Do you see anything in this picture, in

12  Exhibit 10, that was not there when you left the car?

13      A    I plead the Fifth.

14      Q    Is there anything missing in this picture

15  that was there when you left the car?

16      A    I plead the Fifth.

17          MR. SPEARS:  Please go to Exhibit 11,

18      page 81.

19          (Plaintiff's Exhibit No. 11 was marked for

20      identification.)

21  BY MR. SPEARS:

22      Q    Do you see Exhibit 11, Mr. Abdulahad?

23      A    Yes.

24      Q    You would agree with me, would you not, that

25  this depicts an entry wound, a bullet-entry wound,

1    into the skull of Mr. Phillips?

2         A    I plead the Fifth.

3         Q    Do you have any reason to doubt that this is

4    the -- do you see the portion of the exhibit where

5    there is a red circular mark, as this picture is

6    showing us, just below or behind the right ear of

7    Mr. Phillips?

8         A    I plead the Fifth.

9         Q    Do you have any reason to doubt that this is

10   where you shot Mr. Phillips in the head?

11        A    I plead the Fifth.

12             MR. SPEARS:  Please go to Exhibit 13,

13        page 83.

14             (Plaintiff's Exhibit No. 13 was marked for

15        identification.)

16   BY MR. SPEARS:

17        Q    Okay.  Now, do you see Exhibit 13, sir?

18        A    Yes, sir.

19        Q    And in this exhibit, this depicts a portion

20   of the parking lot of the annex; correct?

21        A    I plead the Fifth.

22        Q    And in this photograph, we see the position

23   where the Phillips car came to rest; is that correct?

24        A    I plead the Fifth.

25        Q    The vehicle that is depicted in Exhibit 13

1   is, in fact, the Phillips vehicle; correct?

2        A    I plead the Fifth.

3             MR. SPEARS:  Please pull up Exhibit 15.

4             (Plaintiff's Exhibit No. 15 was marked for

5        identification.)

6   BY MR. SPEARS:

7        Q    All right.  And now, in Exhibit 15, do you

8   see depicted in there the red vehicle that you drove

9   and parked in the annex parking lot?

10       A    I plead the Fifth.

11       Q    And do you see, off in the distance, the car

12   that was operated by Phillips?

13       A    I plead the Fifth.

14       Q    And where that car is positioned, that is to

15  say the car with its brake lights on that we see to

16  the left of the frame in Exhibit 15, that is where the

17  Phillips car came to rest; is it not?

18       A    I plead the Fifth.

19       Q    Do you recall where in this -- in the span

20  of distance or terrain, if you will, between where the

21  red car is now and where the Phillips car is -- off to

22  the left as depicted in Exhibit 15.  Can you tell us

23  where, in that stretch, you fired your weapon?

24       A    I plead the Fifth.

25             MR. SPEARS:  Mr. Abdulahad and Staci, I'm

1      going to suggest that we take a short break,

2      another ten-minute break.  Is that agreeable to

3      you?

4            THE WITNESS:  Yes, sir.

5            MS. MILLER:  Sure.  Do you have an update as

6      to how long you think we'll last after that?

7            MR. SPEARS:  My estimate would be maybe 40

8      minutes.

9            MS. MILLER:  Okay.  Thank you.

10           MR. SPEARS:  It's now 2:05.  We'll reconvene

11      at 2:15.

12           THE WITNESS:  Yes, sir.

13           (A break was taken from 2:05 p.m. until 2:20

14      p.m.)

15           MR. SPEARS:  Back on the record.

16   BY MR. SPEARS:

17      Q    Switching gears just a little bit.  I want

18   to ask you, if you could, to summarize the training

19   that you do.  And I know that you get use-of-force

20   training both when you are involved in the mandate

21   training at the outset of your service as a police

22   officer and then there is some annualized either

23   training or testing that you have to go through.  I

24   wonder, if you would, please, describe for me

25   generally what -- what the initial steps are or

1  sections are in terms of use of the use-of-force

2  training that you receive.

3          And just to be a little more, hopefully,

4  clear about it, I don't mean "How do you shoot a gun?"

5  That isn't the use-of-force training I'm interested

6  in.  I'm interested in asking if you can describe for

7  us, generally, what training you receive in

8  situational settings.  That is, you know,

9  hypothetical-situational settings and

10 shoot/don't-shoot settings where --

11          MS. MILLER:  Object to form.  Were you

12      finished?

13          MR. SPEARS:  I should have been.

14          MS. MILLER:  Okay.  I was going to object to

15      form, but you can answer if you understand the

16      question.

17 BY MR. SPEARS:

18      Q    Go ahead, sir.

19      A    Could you reword the question for me?  I'm

20 trying to understand better.

21      Q    That's fine.  All right.  You're familiar

22 with the phrase, generally speaking, situational

23 shoot/don't-shoot training?

24      A    Yes, sir.

25      Q    And in a manner of speaking -- and I hope

1    I'm getting this accurate -- that training with

2    respect to -- for our purposes at least -- the use of

3    deadly force that you receive that helps an officer be

4    equipped to make decisions about whether or not to use

5    their firearm.

6         A    Okay.  Yes.  So basically what kind of

7    training do we receive when it pertains to shoot/don't

8    shoot?

9         Q    Yes, sir.

10        A    We go through some instruction in the

11   classroom, and we go through a simulator where we

12   do -- they actually simulate for us what situation is

13   right to shoot in and what situation not to shoot in.

14   And we have to demonstrate that we understand these

15   situations by action.  You know, like, I don't know --

16   somebody is -- I don't know.  Somebody presents you

17   with a weapon during the simulation and you fire --

18            (Audio disruption.)

19   BY MR. SPEARS:

20        Q    I'm sorry.  I couldn't understand.

21        A    -- they don't present a weapon --

22        Q    Sir?

23        A    Yeah.  If they don't present a weapon, you

24   don't fire your weapon.

25        Q    Okay.  So that's the kind of training,

1    simulator training?

2         A    Yes, sir.

3         Q    That's an example.  I'm not saying that's

4    exclusive or all-encompassing, but that's one part of

5    it?

6         A    Yes, sir.  They don't have every simulation

7    that you can be presented with.  They just have just

8    general simulations of what's been done around the

9    country and whatnot.  But no one can plan for

10   everything.

11        Q    The simulator training, is that -- I guess,

12   as I think about it, is there a distinction between,

13   kind of, having a video screen versus having dummies

14   or something like that?  What does that look like?

15   Physically, what is simulated and how is it simulated?

16        A    They have -- it's on a screen.  Yeah, it's a

17   screen.  It's, kind of, like a VR thing, but it's

18   around the entire room.  So, yeah, I guess it's a

19   180-degree screen.  It goes from three walls of the

20   room.

21        Q    Okay.  And is that at the Atlanta Training

22   Academy?

23        A    Yes, sir.

24        Q    All right.  And is that -- when you go

25   through the situational -- is it accurate to say

1   situational training?  Is that the right phrase?

2        A     Shoot/don't shoot.

3        Q     Okay.  When you undergo those exercises, are

4   you -- are you the only officer who then is being

5   trained?  That is to say, you're the only one for that

6   session, so to speak?

7        A     Yes, sir.  You'll be the only one during

8   that -- during that -- during that testing period or

9   simulation period.

10       Q     All right.  Do you recall receiving

11  situational training with respect to the use of deadly

12  force as it relates to moving vehicles?

13       A     Yes.

14       Q     All right.  And in connection with that

15  training, generally speaking, what's your

16  understanding of the -- well, whether or not you are

17  to shoot at a moving vehicle, just, kind of, what are

18  the parameters in terms of variables that you take

19  into account?

20       A     Of course, there are exigent circumstances

21  in which you -- which you are allowed to shoot at a

22  moving vehicle.  If you feel that your life is in

23  danger, and it is proven that your life is in danger,

24  then it is allowed.  But generally speaking, you can't

25  just fire on any moving vehicle, at all.  Just because

1    they are driving away, or whatnot, you can't just

2    shoot at them.

3        Q    And from the -- so when you say, you can't

4    just shoot at them -- and please know I don't know

5    whether there is any edict or direct rule that says

6    don't do it except in exigent circumstances.  So let

7    my next question be:  Is there some general -- even if

8    it's not a written SOP, is there some general rule

9    about whether or not to shoot at moving vehicles for

10   which exigent circumstances might change it -- and if

11   so, what is that rule?

12       A    Are you saying is there any SOP stating --

13   say that one more time, now.

14       Q    Sure.  You said something to the effect of:

15   Generally speaking, you know, you're not supposed to

16   shoot at a moving vehicle.

17       A    Yes.

18       Q    Is that something in writing?  I'm just

19   trying to get a feel for whether is that something in

20   writing or is that something you've been trained?

21       A    It's an SOP.  It's an SOP.

22       Q    All right.  And -- and I think you've

23   already indicated that the SOP itself makes reference

24   to exigent circumstances.  I'm understanding that;

25   right?

1      A     Yes, sir.

2      Q     Okay.  And with respect to the general rule

3  though, just rolling it back for a moment, in the

4  course of your receipt of training about the -- what

5  I'll call, the moving-vehicle rule -- what's the

6  understanding that you have with respect to the reason

7  for such a rule?  And by reason for, I mean for

8  purposes of public safety or issues of public safety.

9  What's your understanding of the reason for such a

10  rule?

11      A     For not being able to do it?  They pose no

12  threat.  Why shoot at them?  If they pose no threat to

13  life or limb, to yourself, or a third party, or

14  another party, then why shoot at them?

15      Q     And would it also be fair to say that -- and

16  we're speaking in general terms, generality here.

17      A     Yes, sir.

18      Q     Generally speaking, the added risks posed by

19  shooting at a moving vehicle with the potential of the

20  vehicle, say, going out of control or something like

21  that, are -- if the vehicle is not posing an immediate

22  risk of harm to others or to the officer, then it's

23  too great of a risk to just go ahead and shoot at a

24  vehicle because it's going away from you?

25      A     Yes.

1      Q    So public safety, generally speaking, is the

2   overarching interest and -- and -- and understanding

3   that you have for why you wouldn't just be shooting at

4   a moving vehicle unless you're in immediate risk of

5   harm; correct?

6      A    Absolutely.

7      Q    On the evening of the shooting, did you

8   treat Mr. Phillips just like you would've treated

9   anyone else under similar circumstances?

10          MS. MILLER:  Objection to form.  I'll

11      instruct my client to plead the Fifth.

12          THE WITNESS:  I plead the Fifth.

13   BY MR. SPEARS:

14      Q    In your opinion, did you handle the

15   situation with Phillips in the same way as you would

16   have with anyone else?

17          MS. MILLER:  Same objection and same

18      instruction.

19          THE WITNESS:  I plead the Fifth.

20   BY MR. SPEARS:

21      Q    In your opinion, do you believe that you did

22   everything right insofar as how you handled your

23   interaction with Mr. Phillips up through and including

24   when you used deadly force?

25          MS. MILLER:  Same objection and same

1      instruction.

2              THE WITNESS:  I plead the Fifth.

3      BY MR. SPEARS:

4          Q    In your opinion, do you think that you

5      should've done anything differently?

6              MS. MILLER:  Same objection and same

7          instruction.

8              THE WITNESS:  I plead the Fifth.

9      BY MR. SPEARS:

10         Q    Have you -- as I've undertaken to ask you

11     these series of questions, Mr. Abdulahad, have you

12     understood my questions?

13         A    Yes, sir.

14         Q    Have you answered any questions that, once

15     you answered it, you were concerned that you didn't

16     understand what I had asked?

17         A    No, sir.

18         Q    In thinking about the questions that I have

19     asked and how you have answered the questions, is

20     there anything that you want to add to any of your

21     answers?

22         A    No, sir.

23         Q    Is there anything that, in order to be

24     either more accurate or fully truthful, you believe

25     that you should change to any of your earlier answers?

1       A     No, sir.

2             MR. SPEARS:   Those are the questions I have

3       of this witness.

4             MS. MILLER:   Thank you.   I have no

5       questions.

6             MR. SPEARS:   We are now at 2:33, and we'll

7       be concluding, at least for this time being, this

8       deposition.   Unless you have anything further,

9       I'll say, thank you, Staci, and thank you,

10      Officer.   We're off the record.

11            (Deposition concluded at 2:33 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

124

1                         DISCLOSURE

2    STATE OF GEORGIA          Deposition of YASIN ABDULAHAD

3    COUNTY OF CHEROKEE              Date: October 30, 2020

4                         Pursuant to Article 10.B of the
     Rules and Regulations of the Board of Court Reporting
5    of the Judicial Council of Georgia, I make the
     following disclosure:

6
                          I am a Georgia Certified Court
7    Reporter.  I am here as a representative of American
     Court Reporting Company, Inc.

8
                          I am not disqualified for a
9    relationship of interest under provisions of O.C.G.A.
     9-11-28(c).

10
                          American Court Reporting Company,
11   Inc., was contacted by the offices of G. Brian Spears
     to provide court reporting services for this
12   deposition.

13                        American Court Reporting Company,
     Inc., will not be taking this deposition under any
14   contract that is prohibited by O.C.G.A. 15-14-37(a)
     and (b).

15
                          American Court Reporting Company,
16   Inc., has no exclusive contract to provide reporting
     services with any party to the case, any counsel in
17   the case, or any reporter or reporting agency from
     whom a referral might have been made to cover this
18   deposition.

19                        American Court Reporting Company,
     Inc., will charge its usual and customary rates to all
20   parties in the case, and a financial discount will not
     be given to any party to this litigation.

21

22                            This, the 6th day of November 2020.

23   _____
                                JULIA L. ZAMORANO, CVR, CCR
24                              6320-7516-0073-0112

25

1                    C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF CHEROKEE)

4            I hereby certify that the foregoing

5    transcript was taken down, as stated in the caption,

6    and the proceedings were reduced to typewriting under

7    my direction and control.

8            I further certify that the transcript is a

9    true and correct record of the evidence given at the

10   said proceedings.

11           I further certify that I am neither a

12   relative or employee or attorney or counsel to any of

13   the parties, nor financially or otherwise interested

14   in this matter.

15           This, the 6th day of November 2020.

16

17

18

19

20

21   _____

22   JULIA L. ZAMORANO, CCR, CVR
     6320-7516-0073-0112

23

24

25

126

1                  **E R R A T A   S H E E T**

2   In Re:  DEAUNNA PHILLIPS, Plaintiff, by and through
    her Mother, SPARKLE STIDWELL, as next friend v. YASIN
3   ABDULAHAD
            In the United States District Court Northern
4   District of Georgia, Atlanta Division
                  File No. 1:19-cv-00401-MHC
5
    Deposition of Yasin Abdulahad, taken on October 30,
6   2020.

7   I have read the transcript of my deposition and find
    that no changes are necessary _____.
8                                   Yasin Abdulahad
    or
9
    Having read the transcript of my deposition, I wish to
10  make the following changes:  (Please state reason.)

11

12  Page _____,  Line _____:

13  Page _____,  Line _____:

14  Page _____,  Line _____:

15  Page _____,  Line _____:

16

17

18

19

20  _____

21  Yasin Abdulahad

22

23

24

25

**[**

**[sic] (1)**
64:8

**A**

**ABDULAHAD (16)**
4:25;5:8;6:23;7:2;9:8,9;
19:25;44:7;58:23;59:7;
60:7;106:25;109:19;
111:22;113:25;122:11
**ability (1)**
15:17
**able (8)**
11:22;13:20;59:7;60:1;
69:8,11;96:2;120:11
**above (1)**
109:2
**Absolutely (1)**
121:6
**Academy (3)**
12:17,18;117:22
**acceptable (2)**
6:19,20
**access (2)**
35:13;95:6
**accident (4)**
10:11,12,13,15
**accompany (1)**
101:7
**accordance (1)**
5:16
**account (3)**
19:15,17;118:19
**accounts (1)**
19:20
**accurate (9)**
31:3,6,7;56:3,16;71:19;
116:1;117:25;122:24
**ACIC (2)**
78:2,12
**across (1)**
105:3
**Act (3)**
4:5;29:17;56:11
**action (2)**
4:13;116:15
**actions (1)**

**62:25**
**activated (4)**
50:19;102:20;105:9;
107:3
**active (4)**
17:3,4;18:5;64:2
**activity (2)**
83:25;98:14
**actually (1)**
116:12
**add (1)**
122:20
**added (1)**
120:18
**addition (1)**
27:3
**address (2)**
64:13;69:7
**adjacent (2)**
93:19;99:4
**adjoining (1)**
98:6
**adjust (3)**
8:4,6,8
**administering (1)**
4:7
**administration (2)**
5:21;74:6
**administrative (3)**
21:6;22:7;43:9
**admit (1)**
43:10
**advice (2)**
26:22;27:3
**advise (1)**
17:25
**advised (2)**
25:6;32:12
**Affairs (1)**
33:5
**affidavit (9)**
41:6,7,8,21;42:7,13,16,
21;43:7
**affidavit's (2)**
42:2,4
**afraid (1)**
39:18
**afternoon (1)**
77:19
**Again (18)**

**23:6;26:11;31:4;34:5;**
**35:11;58:7;59:25;62:14;**
**64:5;69:4,5,6;77:16;103:9,**
**21;105:5;108:22;109:6**
**against (3)**
76:12;90:21;101:20
**age (2)**
7:3;65:22
**agencies (1)**
15:7
**aggravated (1)**
78:25
**agree (23)**
4:3,15,17,19,21,23;18:12;
29:25;30:3;42:20;45:15;
58:14;88:6,11;94:5;98:4;
103:1;105:11,21;107:2,7;
111:1,24
**agreeable (2)**
13:16;114:2
**agreement (2)**
4:10;5:9
**ahead (8)**
36:8;96:21,23;103:20;
104:15;105:17;115:18;
120:23
**allegations (1)**
30:6
**all-encompassing (1)**
117:4
**allow (1)**
89:22
**allowed (5)**
21:25;45:1;88:8;118:21,
24
**allows (1)**
7:15
**alone (2)**
43:18,21
**along (2)**
71:1;87:6
**alongside (17)**
45:6;47:7;48:18;51:24;
52:2;77:8;80:22;81:4;83:4;
85:12,20,25;86:21;90:14;
99:15,22;103:18
**American (1)**
5:20
**Amith (1)**
4:18

**among (2)**
5:18;29:14
**analysis (1)**
17:24
**and/or (1)**
40:12
**anger (1)**
16:13
**angered (1)**
56:4
**annex (14)**
13:3;74:6;75:2,17;77:14,
17,21;78:2,11;96:17;100:8,
15;112:20;113:9
**announced (1)**
6:16
**annualized (1)**
114:22
**another's (1)**
70:21
**answered (7)**
39:21;73:3;77:4;90:17;
122:14,15,19
**anticipate (1)**
91:13
**a-p-d (1)**
96:17
**apologies (1)**
45:20
**appearances (1)**
11:24
**appeared (2)**
45:13;110:11
**appears (1)**
42:1
**appreciate (1)**
19:6
**approached (5)**
47:20,22;49:12;76:4;
82:23
**approaching (3)**
52:19;101:1,4
**approximate (1)**
18:24;19:4
**approximately (3)**
12:21;27:22;38:3
**area (2)**
9:4;105:14
**arm (9)**
45:8,12;46:3,11,17,24;

47:8,14,16
**Army (1)**
17:13
**around (4)**
26:13;33:25;117:8,18
**arranged (1)**
106:11
**arrest (1)**
78:21
**arrested (1)**
66:9
**arresting (1)**
84:11
**arrival (2)**
77:14,17
**arrive (1)**
98:6
**aside (2)**
25:19;44:18
**asleep (5)**
73:23;76:12,19;101:20;
102:4
**assertion (1)**
36:1
**assigned (5)**
20:2;29:17;56:17;69:25;
95:11
**assignment (1)**
17:17
**assignments (1)**
22:16
**assisting (1)**
22:2
**associate (1)**
41:16
**Associates (2)**
70:7,10
**assure (1)**
110:1
**Athena (1)**
19:25
**Atlanta (14)**
9:3;10:16;11:9;12:8,19;
14:7;15:24;22:25;29:9;
33:5,19,24;78:3;117:21
**attempting (1)**
50:23
**Attend (1)**
70:20
**attended (1)**

70:9
**attention (2)**
76:20;100:7
**attorney (9)**
24:18;27:5,10,13,17;28:7,
19,20,25
**attorneys (2)**
9:13;11:5
**attorney's (14)**
11:6;23:14,19;24:4;40:9,
13,16;61:24;62:7,12,17,25;
63:5;95:17
**attributed (1)**
67:7
**audio (7)**
57:23;58:4,23,25;59:3,
17;116:18
**auspices (1)**
5:19
**authorities (1)**
30:8
**authorized (2)**
29:22;53:20
**automatic (2)**
93:15,16
**autopsy (2)**
13:13;19:5
**available (1)**
5:11
**avoid (3)**
58:17;86:14,14
**avoiding (1)**
92:14
**awaiting (1)**
24:4
**aware (1)**
65:17
**away (10)**
56:7;68:15;72:15;84:9;
89:12,18,22;107:22;119:1;
120:24

## B

**back (24)**
16:16;47:21;49:6;53:18;
68:25;72:10;81:24;84:13,
16;86:17;88:18;89:5;95:18;
100:18,21;104:5,6;105:2,6;
106:7,20;108:23;114:15;

120:3
**background (1)**
65:25
**badly (1)**
56:7
**barrel (1)**
104:15
**based (1)**
64:16
**basically (2)**
22:10;116:6
**basis (1)**
91:16
**battery (1)**
78:25
**battle (1)**
16:24
**battlefield (1)**
17:24
**beam (2)**
52:11;103:24
**become (1)**
104:11
**began (1)**
45:7
**behalf (2)**
44:23;45:5
**behind (5)**
6:14;79:17;90:14;102:17;
112:6
**belabor (1)**
39:20
**beliefs (1)**
71:5
**below (1)**
112:6
**beneath (1)**
109:23
**besides (2)**
22:4;71:2
**best (6)**
10:23;22:23;26:6;32:9;
40:11;65:12
**better (1)**
115:20
**bigger (1)**
19:1
**binding (1)**
4:7
**bit (2)**

8:8;114:17
**blocked (1)**
79:5
**blocking (2)**
84:5,8
**body (6)**
44:25;67:14;77:8;85:6,8;
105:24
**both (14)**
39:3,23;41:21;43:6;
44:24;69:25;70:5,24;71:6;
84:5;97:6;106:3,18;114:20
**brake (7)**
93:18,23;94:3,6;98:5;
105:8;113:15
**branch (2)**
17:11,12
**break (10)**
39:20;43:5,7;68:12,18,
23;81:22;114:1,2,13
**breaks (1)**
8:12
**Brian (4)**
4:12;5:5;44:1;96:19
**brief (1)**
68:12
**bringing (1)**
92:19
**brings (1)**
10:5
**broad (1)**
11:23
**Brotherhood (1)**
26:15
**brought (4)**
10:1;11:2,19;85:10
**buddy (1)**
16:24
**building (4)**
14:4;74:7;75:3;77:21
**bullet-entry (1)**
111:25
**bunch (1)**
64:17
**Bureau (5)**
14:24;23:25;60:24;61:14;
67:24

## C

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 129 of 146
Deaunna Phillips, et. al. vs.
Yasin Abdulahad

Yasin Abdulahad
October 30, 2020

**call (5)**
16:10;39:19;73:17;106:9;
120:5
**called (5)**
5:1;44:23;78:6,9;95:7
**calls (1)**
70:11
**came (7)**
16:16;24:15;54:5;70:4;
93:22;112:23;113:17
**Can (69)**
9:1,24;10:7,10,25;12:15,
17;13:5;18:1,12,19;19:5;
21:22;24:2;25:7;27:1,5;
28:18;33:3;34:14;35:24;
37:4,18;38:6;40:25;41:22;
43:4,10,23;44:16,18;51:2;
52:22;57:18;58:3,14,17;
59:18,23;60:14,22;64:12,
13,19;68:12,14;69:12;74:9;
77:17,23;78:5;96:12;97:5;
100:10;103:16,23;104:7;
106:12,13,18,19,20;109:11;
110:1;113:22;115:6,15;
117:7,9
**capacity (1)**
29:18
**Captain (1)**
17:15
**car (155)**
38:8,15,21;45:6;46:11,
18;47:7,14,17,23;48:2,4,17,
23;49:3,5,6,9,16;50:23;
52:2,7,11,12,15,18,20,23;
53:3,5;63:24;72:25;73:10,
17;74:5,12,13,19,20;75:2,
16,23;76:5,6,12,25;77:9;
79:4,23;80:5,13,15,22;81:5,
6,13;82:2,10,16,22;83:5,21;
84:14,17,17,19;85:1,9,10,
13,14,20,21,25;86:21;
87:10,21;88:1,3,9,13,15,19;
89:2,5,9,11,17,22;90:8,11;
91:10,12,15,19,21;92:5,7,
11,13,19,22;93:2,4,7,8,13,
15,18,22;94:2,6,13;97:13,
23,24;98:5,15;99:5,15,22;
100:1,6,19,22,23;101:1,4,7;
102:2;103:6;105:22,23;
106:4;107:4,6;108:11;

109:2,4;110:2,9,11;111:5,5,
8,9,12,15;112:23;113:11,
14,15,17,21,21
**care (1)**
78:12
**careful (1)**
34:18
**carried (1)**
53:25
**case (5)**
22:7;27:10;32:11;60:8;
88:22
**cases (4)**
11:19,20,25;20:10
**Cavalry (1)**
17:19
**ceiling (1)**
90:10
**cell (11)**
7:17;19:9,16;31:20;
32:18;40:17,23;44:11;63:8;
69:4,10
**Center (2)**
12:19;78:3
**certain (5)**
12:11;15:11;26:11;78:4;
86:12
**certainly (3)**
12:4;25:20;108:16
**certified (1)**
12:24
**chamber (2)**
54:3,6
**chance (4)**
8:3;15:23;28:8;71:24
**change (5)**
21:19;27:20;95:13;
119:10;122:25
**changed (2)**
21:25;71:16
**Changing (1)**
38:2
**chaplain (1)**
17:1
**characterize (1)**
70:8
**characterized (1)**
20:3
**child (1)**
5:6

**children (2)**
8:25;9:2
**choice (1)**
37:6
**church (1)**
71:6
**CID (6)**
21:6,7,8,10,13,16
**circular (1)**
112:5
**circumstance (1)**
105:23
**circumstances (8)**
33:25;61:8;63:15;118:20;
119:6,10,24;121:9
**City (7)**
10:16;11:6,8;12:8;29:9;
33:5,19
**Civil (9)**
5:10,13;6:5,10;9:18,19,
24;10:1,4
**claim (1)**
81:13
**classroom (1)**
116:11
**clear (2)**
35:24;115:4
**client (19)**
25:3;35:21;45:18;55:9;
60:11;67:2;68:3;72:17,20;
73:12,13,16,23;74:5;79:7;
95:3;97:9;110:5;121:11
**client's (4)**
72:25;74:7;80:22,24
**climbed (1)**
105:14
**close (2)**
26:8;97:12
**closed (7)**
23:9;36:16;53:11;89:7;
90:9;93:12;100:7
**closest (1)**
111:7
**clothes (2)**
67:22;68:6
**clouded (1)**
79:16
**combat (1)**
16:24
**coming (2)**

**children (2)** [column 3 continues]

**51:23;95:18**
**commander (1)**
16:25
**comment (1)**
99:24
**commission (1)**
79:1
**committed (3)**
34:24;88:19,23
**common (2)**
54:17;64:12
**communicate (1)**
45:9
**communicating (1)**
45:7
**communications (1)**
63:6
**complainant (1)**
30:5
**complaint (2)**
29:24;30:7
**complied (1)**
83:6
**composite (2)**
41:20;43:6
**compound (1)**
39:19
**concerned (1)**
122:15
**concerning (6)**
30:5,8;60:17;61:15,24;
62:7
**conclude (2)**
16:1;91:16
**concluded (2)**
24:3;123:11
**concluding (1)**
123:7
**conclusions (1)**
34:11
**conditions (1)**
16:15
**conduct (2)**
23:20;46:24
**conducted (3)**
5:15;6:4;33:6
**conducts (1)**
56:17
**confer (1)**
28:8

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 130 of 146
Deaunna Phillips, et. al. vs.
Yasin Abdulahad

Yasin Abdulahad
October 30, 2020

**confident (2)**
25:21;26:2
**connection (7)**
11:4,19;27:9;28:6;60:24;
63:1;118:14
**consider (1)**
46:25
**considered (2)**
75:9;101:6
**consisted (2)**
16:20;80:22
**Consistent (1)**
6:10
**consult (1)**
29:1
**contact (19)**
24:20;25:11;30:5;31:12,
24;32:4,5,7,10;33:7;40:22;
51:3,17;54:5;65:10,14;67:6,
19;71:16
**contacted (4)**
24:22,25;35:14,16
**contacts (1)**
33:11
**containing (1)**
60:2
**contains (1)**
41:20
**content (1)**
63:5
**continue (9)**
22:13;98:11,20;101:23;
102:10;104:4,23;106:6;
109:11
**continued (10)**
31:19,25;45:9,12;71:20;
74:6;75:2,16;84:20,22
**continuing (1)**
89:18
**contract (2)**
28:20,25
**control (2)**
40:12;120:20
**convened (1)**
5:10
**cooperated (1)**
103:10
**cooperation (1)**
87:19
**copy (5)**

13:19;41:5;44:11;58:13;
60:3
**corner (1)**
96:7
**counsel (5)**
4:3;5:5,9;27:2;94:20
**counseling (3)**
16:12,14,19
**count (1)**
7:11
**country (1)**
117:9
**county (12)**
8:19,21;13:8;23:14;40:9,
16;61:24;62:7,11,16,25;
63:5
**couple (2)**
16:19;100:13
**course (9)**
6:2;8:10;30:4;45:3;
52:10;56:21;58:11;118:20;
120:4
**COURT (9)**
4:2;5:20;8:15;11:18;
12:11;20:5;26:12;44:25;
58:8
**covered (1)**
79:4
**covering (1)**
79:17
**crime (5)**
34:25;57:11,14;78:3;79:1
**crimes (1)**
56:25
**Criminal (7)**
21:12;23:13;66:13;78:19;
83:25;88:19,23
**CROSS-EXAMINATION (1)**
5:3
**crouching (1)**
90:5
**cubicle (3)**
14:13,14,16
**cumbersomeness (1)**
58:18
**curious (1)**
80:14
**current (1)**
4:4
**currently (6)**

15:12;16:7;28:7;32:22;
43:5;68:7
**custody (2)**
40:12;67:23
**cut (3)**
35:11;72:13;74:10

**D**

**damaged (1)**
54:25
**danger (2)**
118:23,23
**darkened (2)**
97:13;98:5
**DA's (3)**
23:9,11;32:23
**date (5)**
18:13;31:3,6;32:1;63:7
**day (11)**
16:5,6;20:1,16;21:5;
22:12;31:13,17,23;64:14;
77:19
**days (2)**
13:21;14:1
**deaden (1)**
54:18
**deadened (1)**
55:7
**deadly (3)**
116:3;118:11;121:24
**Deaundre (1)**
5:6
**Deaunna (1)**
5:5
**decide (1)**
27:6
**decided (2)**
84:10;88:13
**decision (3)**
37:6;82:15;88:7
**decisions (1)**
116:4
**decorum (1)**
12:12
**defendant (3)**
4:20,23;11:10
**demonstrate (1)**
116:14
**denied (2)**

45:11;81:13
**Department (11)**
12:8;21:1;22:25;29:10,
12,14;30:7;33:11,20,24;
53:21
**departmental (1)**
34:24
**departments (1)**
20:21
**depicted (4)**
111:2;112:25;113:8,22
**depicts (3)**
109:22;111:25;112:19
**deployment (3)**
16:17;17:4,23
**deposed (1)**
11:12
**deposition (23)**
4:6;5:7,9,15,16,18;6:1,4,
8,15;8:11,14;9:16;13:1;
25:20;28:9,11;43:3;58:20;
68:13;94:17;123:8,11
**describe (4)**
61:7;77:23;114:24;115:6
**describing (1)**
56:14
**description (6)**
6:13;34:19;45:2,3,4,15
**designated (1)**
30:7
**designed (1)**
55:14
**despite (1)**
87:18
**detain (1)**
82:15
**detaining (1)**
84:11
**Detective (2)**
45:7,9
**determine (1)**
34:23
**device (3)**
7:15;55:13,14
**devices (3)**
7:14,24,24
**Dianna (1)**
4:16
**diary (1)**
63:12

died (7)
20:13;49:3;51:4,8,17;
108:14,18
different (1)
20:14
differently (1)
122:5
dinner (2)
71:11,13
direct (1)
119:5
directed (1)
56:11
direction (2)
7:10;84:24
directly (4)
50:3;90:14,21;100:14
discharge (2)
17:14,16
discharged (1)
18:21
Disclosures (2)
44:24;45:1
discuss (2)
30:6;32:16
discussed (1)
55:17
dispatch (3)
35:14,16;36:5
disrespectful (1)
87:13
disruption (1)
116:18
distance (2)
113:11,20
distinction (1)
117:12
District (13)
23:14,19;24:4;40:9,13,
16;61:24;62:7,12,16,25;
63:5;95:17
division (1)
21:12
document (2)
43:25;44:23
documents (5)
14:25;78:4,5,8,14
dogs (2)
7:11;68:12
dome (7)

48:2;76:25;98:15;103:2;
107:3,9;109:4
done (6)
44:10;58:6;95:13;106:17;
117:8;122:5
door (31)
50:13,16,19,20,24;53:6,9,
11,14;69:9,11;76:13;77:2;
79:2;82:2,16;83:18;84:23;
89:7,11,11,18;90:8;91:6;
92:20;93:9,11;99:15;100:7;
101:21;103:6
dot (1)
96:18
doubt (2)
112:3,9
down (11)
39:20;43:7;44:17;52:1;
83:13;91:24;92:8;102:20;
105:2;107:13;108:8
drag (1)
106:13
dragged (5)
85:19,20,25;86:4,6
dressed (1)
67:18
driven (3)
37:21;98:16;107:4
driver (1)
98:24
driver's (10)
50:24;65:4;74:13;78:7,7;
84:23;85:3;89:6;99:5;110:9
driver's-seat (1)
105:14
driver's-side (5)
50:13;89:7,11;91:6;100:7
driving (2)
74:13;119:1
drove (2)
92:14;113:8
drug (1)
85:12
duly (1)
5:2
dummies (1)
117:13
duration (1)
55:2
during (17)

6:2;8:10,13;16:23;17:18,
19,23;18:21;30:3,15;56:21;
66:23;79:1;116:17;118:7,8,
8
duties (3)
17:22;18:8;21:6
duty (12)
10:17,19,20;15:23;17:3,5,
17;18:5,16,20;54:4;101:6

E

ear (2)
90:15;112:6
eardrums (1)
54:25
Earlier (2)
56:14;122:25
earpieces (1)
54:17
ears (1)
54:24
edict (1)
119:5
educational (1)
65:25
effect (7)
24:4;35:7;66:17;80:23;
86:22;87:2;119:14
effort (1)
89:11
either (15)
7:10;15:6;16:15;18:5;
37:4;46:1,17;47:13;51:13;
76:19;103:7,11;110:2;
114:22;122:24
electronic (2)
7:14,24
else (10)
8:22;14:18;25:17;27:17;
30:21;43:9;68:16;108:9;
121:9,16
elsewhere (1)
13:24
e-mail (2)
64:13,19
emergency (5)
4:4;93:18,23;94:3,6
emergency-brake (1)
93:19

employee (2)
29:19,23
employees (3)
29:15,17,23
end (1)
23:11
ends (1)
96:10
enemy (1)
17:25
enforcement (2)
9:11;18:6
engaged (2)
83:24;94:3
engaging (1)
101:15
engine (1)
82:22
enhanced (6)
95:6,8,10,19;96:18;97:19
entail (1)
77:25
entire (3)
51:2;66:23;117:18
entry (1)
111:25
equipped (1)
116:4
erect (1)
90:6
errata (1)
6:19
estimate (1)
114:7
even (11)
9:12;11:24;41:10,12;
56:23;82:16;83:24;87:2;
90:8;109:7;119:7
evening (9)
25:9;51:18;54:4,8,11;
66:24;77:19;79:3;121:7
event (3)
6:18;25:13;84:6
eventually (1)
95:17
everybody (2)
16:17;59:5
everyone (3)
5:4;41:18;43:13
Evidence (3)

5:14;57:5,15

**exact (2)**
12:2,3

**exactly (4)**
26:7;28:22;33:24;106:15

**examination (2)**
6:7,8

**examined (1)**
5:2

**Examiner's (1)**
13:8

**example (1)**
117:3

**Except (4)**
29:22;30:7;85:9;119:6

**exchanged (2)**
31:17;32:25

**exclusive (1)**
117:4

**excuse (4)**
10:19;39:9;65:2;93:8

**execute (1)**
6:17

**execution (1)**
63:8

**Exercise (2)**
72:1,3

**exercises (1)**
118:3

**exhibit (43)**
41:18,20;42:1,9,14,17,23,
25;43:2,3,6;44:2,7,8,14,17;
58:6,9;59:1;109:12,15,18;
110:10,15,19,20,23;111:2,
12,17,19,22;112:4,12,14,17,
19,25;113:3,4,7,16,22

**exigent (4)**
118:20;119:6,10,24

**existence (1)**
30:6

**exit (4)**
53:5;91:5;92:15;106:19

**exited (2)**
49:17;52:18

**expectation (1)**
33:15

**experienced (1)**
33:25

**explanation (4)**
20:20;37:18;64:11;94:1

**extending (1)**
85:8

**exterior (1)**
111:8

## F

**face (2)**
100:18,21

**Facebook (1)**
64:24

**faces (2)**
106:10,13

**facing (2)**
50:6;100:18

**fact (26)**
20:21;34:11;35:3;36:22,
24;37:9;39:24;47:6;48:8,
12,16,22;49:1;51:20;62:15,
23;63:3;72:23;80:3,11;
82:15;92:18;94:2,12;
104:10;113:1

**fact-based (1)**
87:2

**facts (4)**
30:6;61:7;63:15;66:4

**fair (5)**
26:24;27:13;37:7;71:15;
120:15

**fairness (1)**
12:6

**faith (1)**
71:8

**familiar (4)**
20:21;42:25;64:6;115:21

**families (1)**
71:10

**family (2)**
9:3,11

**far (5)**
18:1;24:6,7;49:21;52:22

**fashion (1)**
85:13

**father (1)**
9:8

**FBI (1)**
78:10

**February (7)**
30:19;31:20;37:13;38:6;
57:25;63:21;80:4

**Federal (5)**
5:10,13,14;6:5,10

**feel (2)**
118:22;119:19

**feet (7)**
7:10;97:24;109:23;110:8,
10,14,15

**few (2)**
13:21;72:8

**fidget (2)**
47:13,16

**fidgeted (1)**
47:8

**fidgeting (1)**
48:20

**field (1)**
18:10

**Fifth (268)**
25:3,4;35:21,22;36:2,20;
37:2,4,8,16,25;38:11,18,25;
39:7,16;40:4;45:18,20;46:8,
14,21;47:4,11,15,19,25;
48:3,7,11,15,21,25;49:4,8,
11,15,18,20,23;50:1,4,7,10,
14,17,21,25;51:6,10,15,21;
52:3,9,14,17,21,25;53:4,7,
13,16;55:9,10,16,20,23;
56:2,9,13;60:11,12,20;61:3,
11,16;62:3,9,21;63:2,10,13,
19,25;64:22;65:1;67:2,3,11,
15,17,20;68:3,4,10;72:20,
21;73:1,13,14,19;74:2,17,
24;75:6,13,20;76:2,9,16,23;
77:5,12;79:7,8,14,20;80:1,
9,18;81:2,9,15;82:6,13,20;
83:1,11,16,20,23;84:2,4,7,
12,15,18,21,25;85:4,7,11,
15,22;86:2,5,8,10,24;87:4,8,
12,16,20,23;88:2,5,10,16,
21;89:1,4,8,13,16,20,25;
90:4,12,16,24;91:3,7,11,14,
18,22,25;92:3,6,9,12,17,21,
24;93:3,6,10,14,17,21,25;
94:4,8,11,15;95:3,4;97:9,
10,17;98:2,10,19;99:2,9,19;
100:4,9,16,20,24;101:2,5,
10,17,22;102:5,9,15,18,22;
103:4,8,12,19;104:3,22;
105:4,10,16;106:1,5;107:5,
10,16,19,23;108:1,4,12,15,

20;109:5,10;110:5,6,13,17;
111:6,10,13,16;112:2,8,11,
21,24;113:2,10,13,18,24;
121:11,12,19;122:2,8

**figure (4)**
17:25;94:25;102:1;
103:16

**figures (1)**
103:17

**file (3)**
44:25;58:23;96:17

**filed (3)**
5:17;44:23;45:4

**files (1)**
13:7

**Filipovits (16)**
4:14,14;41:22;42:2;
43:12,20,25;44:5;58:22;
59:4,12,15,23;95:9,21;
96:16

**find (5)**
57:2,11,14,14;58:6

**fine (4)**
58:16;68:17;81:21;
115:21

**finished (3)**
16:2;58:20;115:12

**fire (3)**
116:17,24;118:25

**firearm (4)**
35:4;54:18;79:1;116:5

**firearms (1)**
56:18

**fired (21)**
18:15;34:7;38:21;39:2;
48:24;50:5,8,11,15,18,22;
53:17;55:6,12;56:1,4,6,10;
92:22;93:5;113:23

**firing (2)**
53:1;54:22

**first (23)**
5:1;25:7;35:6;36:4,22;
37:10;44:9;45:14;49:12;
52:18,23;65:19;69:18,20;
73:5,8,9,16,23;74:4;85:16,
25;101:14

**five (2)**
81:18,20

**Five-eleven (1)**
18:25

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 133 of 146
Deeunna Phillips, et. al. vs.
Yasin Abdulahad
Yasin Abdulahad
October 30, 2020

**flag (2)**
77:21;78:5
**flagged (1)**
78:15
**flagging (1)**
77:24
**flashlight (4)**
51:25;52:6,11;103:25
**floorboard (8)**
45:14;48:23;49:3;52:12,
15,16;63:23;94:13
**focused (1)**
100:8
**folks (1)**
19:20
**follow (3)**
29:10;30:1;37:5
**following (10)**
21:3;22:12,17;24:20;
31:13;33:8,12;35:12;40:23;
67:6
**follows (1)**
5:2
**food (1)**
22:4
**foot (3)**
85:9;88:8,15
**force (4)**
33:16;116:3;118:12;
121:24
**Forgive (1)**
108:23
**form (27)**
5:24;6:12,12;21:22;25:2;
34:14;35:20;40:25;45:17;
55:8;58:11;60:10;67:1;
68:2;72:19;73:11;79:6;
85:13;95:2;97:8;104:13,15,
18;110:4;115:11,15;121:10
**formal (1)**
64:18
**FOSTER (2)**
4:22,22
**four (2)**
95:20,21
**frame (1)**
113:16
**free (2)**
82:3,8
**friend (1)**

32:9
**friends (2)**
64:17;70:7
**friendship (2)**
70:14;71:15
**front (2)**
50:13;53:11
**front-passenger (2)**
47:23;76:13
**full (6)**
6:25;93:4,7,8;106:19,24
**fully (10)**
53:11;54:8;85:10;89:9;
90:9;93:12;94:3;105:9,23;
122:24
**Fulton (10)**
13:8;23:14;40:8,16;
61:23;62:7,11,16,24;63:4
**functional (1)**
54:9
**functions (2)**
26:20;70:10
**further (2)**
6:13;123:8
**fuzzy (1)**
109:7

**G**

**GBI (4)**
13:7;24:3;30:21;95:18
**GCIC (1)**
78:2
**gears (1)**
114:17
**general (9)**
20:7;21:17;25:18;27:3;
117:8;119:7,8;120:2,16
**generality (1)**
120:16
**generally (10)**
20:21;69:19;114:25;
115:7,22;118:15,24;119:15;
120:18;121:1
**Georgia (6)**
14:24;23:25;60:23;61:14;
65:5;67:24
**given (5)**
34:6;39:22;41:4;95:14,14
**glad (1)**

25:13
**GLOCK (10)**
53:24,25;54:8,11;55:13;
77:7;91:2,5;107:14,17
**glove (1)**
109:8
**gloves (1)**
29:5
**goes (2)**
78:18;117:19
**Good (4)**
5:4;13:15;22:4;68:20
**grabbed (6)**
83:5,25;84:13;88:17,24;
104:10
**grabbing (3)**
88:23;104:12,20
**great (2)**
34:8;120:23
**ground (3)**
85:6,20;105:24
**groups (2)**
64:12,16
**Guard (1)**
17:10
**guess (5)**
12:1;27:6;31:18;117:11,
18
**guidelines (2)**
12:11;32:16
**gun (35)**
20:3,5;21:7,15;36:24;
37:12,20;38:8,14,20;48:23;
49:2,14,21;50:3;55:25;
56:15,16,22,24;63:23;
69:25;70:4,16,19;89:23;
90:1,13;91:23;92:8,25;
108:2,8;109:9;115:4
**Gupta (2)**
4:18,18
**guy (1)**
81:16
**gym (1)**
72:8
**gyms (1)**
72:5

**H**

**Haff (9)**

30:16,25;31:2,6;32:2;
57:25;59:10;60:4,17
**H-a-f-f (1)**
30:17
**hall (1)**
71:7
**hand (13)**
39:11,12;40:1;50:9,16;
51:19;53:15;89:15,15;
90:25;107:12,13;109:7
**handle (3)**
43:10;81:17;121:14
**handled (1)**
121:22
**hands (8)**
39:3,23;88:4;95:18;
106:3,3;107:8,11
**hang (1)**
71:13
**happen (1)**
91:13
**happened (6)**
16:23;24:9;55:18;63:17;
85:17;92:18
**harm (3)**
56:12;120:22;121:5
**head (11)**
49:22,25;50:2,13;55:7;
90:14;93:1;107:21;108:2;
109:9;112:10
**headlights (2)**
97:14;98:5
**headquarters (5)**
14:5,6,7,12;72:7
**Health (1)**
4:5
**hear (10)**
7:16;46:16;59:5,7,12,18,
19,21;72:15;74:9
**heard (2)**
55:19;108:17
**height (2)**
18:24;19:7
**held (3)**
51:19;89:14,21
**help (1)**
22:3
**helps (1)**
116:3
**hidden (1)**

45:8
**hide (1)**
45:12
**hiding (1)**
87:6
**higher (1)**
90:22
**hinge (2)**
34:4,11
**history (1)**
78:19
**hit (1)**
67:13
**hobbies (1)**
71:25
**Hold (7)**
43:22;57:4,7;65:2,4,7;
96:14
**holding (4)**
90:25;91:1;107:17,20
**home (3)**
7:6;13:23;15:20
**homes (1)**
70:21
**Homicide (4)**
20:15;21:13,15;56:24
**homicides (1)**
56:19
**honest (1)**
34:18
**hope (1)**
115:25
**hopefully (1)**
115:3
**hours (2)**
15:15,24
**house (2)**
69:8;72:9
**hundreds (2)**
11:24;12:1
**hyphen (2)**
96:18,18
**hypothetical-situational (1)**
115:9

**I**

**IBPO (15)**
24:9,20,25;25:6,9;26:5,
13,20;27:1,2,5,11,14;28:7,

25
**ID (1)**
78:10
**idea (1)**
76:5
**identification (7)**
44:15;59:2;109:16;
110:21;111:20;112:15;
113:5
**identify (5)**
38:6;42:8,10;43:18;60:2
**illuminated (1)**
109:3
**image (5)**
7:15;96:3,7,14;109:7
**immediate (4)**
9:3;89:23;120:21;121:4
**immediately (4)**
33:14;84:23;87:24;102:6
**impact (1)**
34:9
**important (1)**
33:23
**imprint (2)**
96:6,11
**incident (7)**
18:13,20;30:21;32:10,15,
17;34:20
**include (1)**
57:18
**including (3)**
29:18;31:20;121:23
**indeed (1)**
39:12
**indicated (1)**
119:23
**inexactness (1)**
108:23
**information (13)**
46:5;63:22;65:16,22,24;
66:8,16;78:3,14;80:20,23;
85:23;87:2
**initial (5)**
25:11;34:19;44:24,25;
114:25
**initially (7)**
47:20,22;57:25;59:25;
74:5,11;76:11
**initials (2)**
21:11;26:12

**injured (1)**
66:25
**injuries (2)**
67:6,7
**in-office (1)**
22:6
**inputting (1)**
78:14
**inside (13)**
7:7;37:20;38:8,14,20;
48:2;79:22;80:15;85:1;
90:8;94:14;97:7;105:23
**insofar (1)**
17:22;121:22
**instead (1)**
64:18
**instruct (15)**
25:2;35:21;45:18;55:9;
60:11;67:1;68:2;72:19;
73:11,12;79:6;95:2;97:8;
110:4;121:11
**instruction (60)**
36:19;37:1,15,24;38:10,
17,24;39:6,15;40:3;46:7,13,
20;47:3,10;60:19;61:2,10,
18;62:2,20;68:9;73:21;
74:1,16,23;75:5,12,19;76:1,
8,15,22;77:3,11;79:13,19,
25;80:8,17;81:1,8;82:5,12,
19,25;83:10,15;97:16;98:1,
9,18;99:1,8,18;100:3;
116:10;121:18;122:1,7
**instructions (1)**
37:5
**intelligence (3)**
17:19,22,24
**interaction (2)**
67:8;121:23
**interest (1)**
121:2
**interested (2)**
115:5,6
**interfere (2)**
15:17;29:24
**interior (10)**
38:20;52:7,11;84:14,16;
90:11;103:3;107:4,6;110:9
**internal (3)**
26:22;33:5,16
**International (1)**

26:15
**interview (7)**
15:6;30:16;57:24;58:4,
24;60:3;80:4
**interviewed (1)**
33:10;60:15,23;61:23
**interviews (2)**
14:23;45:25
**into (44)**
12:23;23:1;29:23;33:7,
16;39:21;49:6,10,16;52:6,
11;54:5;55:6;56:18;57:5,7,
10,12,13;67:23;68:13;
75:16;84:17,19,23;85:10;
88:18;89:2,5,6,9;91:12,15;
92:25;95:18;97:23;100:8,
14;101:18;102:3;105:13;
107:6;112:1;118:19
**investigate (2)**
20:10,12
**investigated (2)**
20:8,14
**investigating (1)**
57:1
**Investigation (22)**
14:24;21:1,12;23:1,4,13,
24,25;24:3;29:23,24;30:4,8;
33:7,16;34:4,9;56:23;57:4;
60:24;61:15;67:24
**investigations (1)**
21:18;23:18;56:18;66:13
**investigative (1)**
56:15
**investigator (13)**
14:24;30:16,24;31:2,5;
32:2;35:3;37:10,19;57:24;
59:10;60:4,16
**investigators (9)**
33:23;34:8,22;37:13;
38:3;46:2,4;47:17;60:15
**involve (1)**
18:5
**involved (4)**
20:24;45:25;104:11;
114:20
**involving (1)**
23:21
**Irfan (2)**
7:2;9:8
**issued (2)**

5:17;65:5

**issues (2)**
16:22;120:8

**item (1)**
72:12

## J

**January (23)**
17:5;18:12,23;19:9;20:1;
22:20;29:7;30:10;31:8,11,
23;32:19;38:5;63:7;64:1,
21,23;65:3,11,15;67:8;
69:23;72:10

**Jeff (14)**
4:14;41:15,17,20;43:16;
44:9,19;58:5,19;59:18,21;
95:6,20,25

**jobs (1)**
16:7

**joined (2)**
70:4,5

**Joshua (1)**
4:22

**judges (1)**
9:13

**June (3)**
69:24;70:1,6

**jury (1)**
52:22

**justice (1)**
9:12

## K

**kept (3)**
45:8;84:24;108:2

**kick (1)**
67:16

**kind (15)**
15:13;16:5,22;23:18;
28:17;63:12;64:2;66:11,21;
71:16;116:6,25;117:13,17;
118:17

**kinds (2)**
16:15;64:24

**knee (4)**
85:2,5;90:2,7

**knew (7)**
32:5;33:22;34:3,22;35:3;

99:25;101:8

**knowledge (2)**
65:12;66:11

## L

**ladies (1)**
78:13

**laptop (2)**
8:4,5

**last (8)**
13:21;15:15,24;16:1;
17:3,4;27:23;114:6

**later (1)**
21:5

**law (2)**
9:11;18:6

**lawful (1)**
29:16

**lawfully (1)**
57:19

**lawsuit (6)**
10:1,4,22;11:1,4,9

**lawsuits (3)**
9:19,20,24

**lawyers (1)**
39:19

**lawyer's (1)**
37:5

**leading (1)**
100:13

**leaning (2)**
76:12;101:20

**learning (1)**
40:22

**least (13)**
8:12;14:21;20:6,20;
22:24;28:24;42:10;58:15;
64:11;95:16;104:6;116:2;
123:7

**leave (6)**
16:5;22:3;82:3,9;88:8,15

**Lee (2)**
4:16,16

**left (19)**
24:23;25:1;47:13;50:16;
51:22;59:16;89:15;90:25;
106:12,13;107:12;110:11;
111:4,7,8,12,15;113:16,22

**left-hand (1)**

96:7

**leg (1)**
90:8

**legal (1)**
27:2

**legs (1)**
110:3

**lesser (1)**
29:19

**level (1)**
86:13

**lever (3)**
50:19;93:19,20

**license (4)**
65:4,5;78:7,8

**licenses (3)**
65:2,4,7

**life (4)**
92:1;118:22,23;120:13

**light (10)**
19:6;48:2;76:25;98:15;
103:2;105:8;107:3,9,9;
109:4

**lights (4)**
89:3;98:5;109:2;113:15

**limb (1)**
120:13

**line (1)**
92:14

**lines (2)**
71:1;87:7

**listen (3)**
41:18;57:23;58:1

**listened (1)**
45:25

**LISTSERV (4)**
64:7,15,18,20

**L-i-s-t-s-e-r-v-e (1)**
64:8

**LISTSERVS (2)**
64:2,6

**lit (1)**
98:15

**little (4)**
8:8;36:9;114:17;115:3

**lived (1)**
66:2

**living (1)**
9:3

**located (2)**

32:22;45:6

**location (1)**
14:15

**long (9)**
22:3;32:9,14;42:3;53:1;
69:22;95:14,20;114:6

**longer (1)**
36:9

**look (7)**
13:15,20;14:22;41:24;
109:1,21;117:14

**looked (6)**
15:5;74:19;75:1;76:18;
94:16;102:3

**looking (4)**
44:8;103:1;105:20;107:6

**looks (1)**
41:13

**lot (5)**
18:11;65:15;66:6;112:20;
113:9

**loud (1)**
55:4

## M

**m-4-v (1)**
96:19

**magazine (1)**
54:2

**main (1)**
14:5

**maintain (2)**
8:15;63:12

**makes (1)**
119:23

**making (2)**
37:6;64:23

**management (1)**
16:13

**mandate (2)**
12:10;114:20

**manipulating (1)**
45:13

**manner (3)**
12:12;29:25;115:25

**many (6)**
12:4,4;20:21;29:15;
53:25;54:25

**marijuana (12)**

44:22;45:5,11,12;48:10,
13;72:16,17,24;75:24;
81:14;87:3
**mark (1)**
112:5
**marked (8)**
44:14;59:1;109:15,18;
110:20;111:19;112:14;
113:4
**mass (1)**
16:21
**materials (1)**
13:6
**matter (3)**
43:9;78:18;88:9
**matters (1)**
26:22
**may (3)**
6:2,17;29:23
**maybe (8)**
11:24;19:8,21;21:4;
68:13;97:24;104:6;114:7
**mean (12)**
9:19;10:12,20;39:20;
43:16,21;44:17;71:5;87:17;
104:15;115:4;120:7
**meaning (2)**
10:3;90:7
**means (1)**
14:1
**mechanics (1)**
106:9
**media (1)**
64:24
**Medical (2)**
13:8;67:5
**medications (2)**
15:12,16
**meet (1)**
72:8
**member (6)**
26:17,18;27:2;56:24;
64:21;66:20
**members (4)**
9:11;26:21;70:24;71:6
**memory (1)**
15:17
**message (1)**
64:3
**messages (5)**

31:12,16,17,24;32:25
**met (4)**
26:5;65:11;69:18,20
**Metropolitan (1)**
9:4
**Michaels (3)**
27:15,16,16
**microphone (1)**
8:16
**might (5)**
15:16;16:11;21:1;26:23;
119:10
**military (2)**
16:16;17:7
**military-time (1)**
96:10
**Miller (99)**
4:20,20;6:20;21:22;25:2;
34:14;35:20;36:8,12,18,25;
37:14,23;38:9,16,23;39:5,
14;40:2,25;42:14;43:1;
45:17;46:6,12,19;47:2,9;
55:8;58:16,21;59:14;60:10,
18;61:1,9,17,20;62:1,19;
67:1,10;68:2,8,11;72:19;
73:2,11,20,25;74:15,22;
75:4,11,18,25;76:7,14,21;
77:3,10;79:6,12,18,24;80:7,
16,25;81:7;82:4,11,18,24;
83:9,14;90:17;95:2;97:8,15,
25;98:8,17,25;99:7,17;
100:2;104:13,17;106:19;
110:4;114:5,9;115:11,14;
121:10,17,25;122:6;123:4
**mind (2)**
8:7;81:17
**minutes (6)**
68:22;81:19,20;95:20,21;
114:8
**misconduct (1)**
29:23
**missing (1)**
111:14
**model (1)**
53:23
**module (1)**
78:12
**moment (5)**
41:15;58:25;96:1;100:14;
120:3

**more (10)**
8:8;10:7;11:5;12:14;
20:23;27:4;73:7;115:3;
119:13;122:24
**morning (1)**
5:4
**mother (1)**
9:8
**motor (2)**
71:25;73:6
**Motorcycles (1)**
72:1
**motor-vehicle (1)**
10:12
**move (2)**
106:12;110:18
**moved (1)**
110:2
**moving (8)**
118:12,17,22,25;119:9,
16;120:19;121:4
**moving-vehicle (1)**
120:5
**much (4)**
17:2;18:10;43:8;63:16
**muzzle (2)**
49:21;50:2
**myself (2)**
14:10;19:2

## N

**name (11)**
4:9,12;5:5;7:1;9:6;10:25;
11:3;14:5;19:17,24;96:17
**named (1)**
58:23
**narrative (1)**
14:22
**national (2)**
4:4;17:10
**nationwide (3)**
78:16,16,17
**navigating (1)**
106:4
**necessarily (1)**
28:19
**need (2)**
16:11;69:9
**needed (1)**

22:3
**neither (5)**
48:18;75:23;88:14;99:23;
104:1
**Newton (1)**
8:21
**next (5)**
26:4;44:21;69:3;91:13;
119:7
**night (13)**
13:3,12;24:8;26:8;38:14;
65:15;67:8;68:7;69:19;
72:18;73:9;78:24;94:7
**none (1)**
32:24
**nonfatal (1)**
20:8
**nor (7)**
48:18;66:2,4;75:23;
88:14;99:23;104:1
**notary (1)**
6:18
**note (1)**
99:10
**noted (1)**
6:7
**notice (3)**
5:8,16;80:5
**noticed (2)**
52:19;74:5
**notify (1)**
69:9
**number (9)**
11:15,18;12:2,4;13:12;
19:10;43:19;78:10,10
**numbered (2)**
41:25;44:8
**numbers (4)**
11:23;43:16,16,17

## O

**oath (2)**
4:7;5:21
**obey (1)**
29:15
**Object (24)**
21:22;25:2;34:14;35:20;
40:25;45:13,17,19;51:19;
55:8;60:10,10;67:1;68:2;

72:19;73:2,11;79:6;95:2;
97:8;104:13;110:4;115:11,
14
**objection (73)**
4:6;6:6,9,11,12,13,14;
36:18,25;37:14,23;38:9,16,
23;39:5,14;40:2;46:6,12,19;
47:2,9;60:18;61:1,9,17;
62:1,19;67:10;68:8;73:20,
25;74:15,22;75:4,11,18,25;
76:7,14,21;77:3,10;79:12,
18,24;80:7,16,25;81:7;82:4,
11,18,24;83:9,14;90:17;
97:15,25;98:8,17,25;99:7,
17;100:2;104:14,16,17,18;
121:10,17,25;122:6
**objections (1)**
5:23
**observation (1)**
37:20
**obtained (1)**
40:16
**occasions (1)**
11:19
**occupation (1)**
66:17
**occur (1)**
10:15
**occurred (6)**
10:11;27:20;35:7;45:16;
77:15,18
**o'clock (1)**
16:2
**odor (2)**
48:14;72:24
**off (17)**
7:18,22;14:16;16:6;17:4;
59:16;68:21;69:4,5,6,12,16;
78:5;81:18;113:11,21;
123:10
**off-duty (2)**
16:7,8
**offense (2)**
88:19,24
**offenses (1)**
78:23
**office (30)**
11:6;13:9;14:11;15:2;
21:25;22:2,4,25;23:9,11,14,
19;24:4;30:15;32:23;33:6;

40:8,9,13,17,21;60:15;61:6,
24;62:7,12,17,25;63:5;
95:17
**officer (32)**
4:6;10:20;11:15;12:10;
15:24;16:8;17:19,22;18:16;
22:13;26:24;29:9;31:12,25;
32:4;34:7;38:13;40:23;
46:16;48:19;51:9;56:8;
65:6;69:17;75:22;88:18;
99:16;114:22;116:3;118:4;
120:22;123:10
**officer-involved (1)**
20:23
**officers (9)**
9:13;17:24;20:24;26:16;
33:10;85:16,18,24;86:4
**OMNEX (1)**
78:6
**once (23)**
12:15;44:10;49:1;58:6,
20;70:15,18,18;78:12;82:2;
84:13;85:1,5;89:9;90:13;
91:12,15,19;93:22;94:2,14;
100:6;122:14
**One (49)**
4:9;8:12;10:5,8,8,9;11:5;
12:16;15:11;20:23;25:10;
26:1,20;27:4;28:13;29:14,
25;42:9,11;47:21;48:5;
53:19;54:2,11;64:18;70:20,
20;71:17,21,21;73:7;75:24;
78:13;81:5,11;86:3;89:15;
90:2;95:15,23;96:18;98:6;
103:18;104:6;117:4,9;
118:5,7;119:13
**ones (3)**
11:2;20:10;33:1
**ongoing (1)**
23:24
**only (12)**
28:13;42:15;43:2,2;44:4;
48:5;85:23;94:9;108:13;
118:4,5,7
**onto (3)**
52:6;85:2;103:25
**open (7)**
22:24;23:5,8,13;53:15;
92:20;93:11
**opened (7)**

50:20;77:2;82:2,16;
83:18;93:8;103:6
**opening (1)**
89:18
**operate (1)**
91:19
**operated (5)**
91:21;92:13;97:6;105:22;
113:12
**operating (5)**
29:11,21;85:13,19;94:14
**operations (1)**
18:1
**opinion (6)**
15:16,21;87:17;121:14,
21;122:4
**opportunity (2)**
14:21;29:1
**OPS (2)**
57:24;80:4
**order (2)**
29:18;53:8,14;122:23
**orders (2)**
17:5;29:16
**organization (1)**
26:17
**organizations (4)**
66:21;70:23,25,25
**original (1)**
27:17
**others (2)**
29:15;120:22
**other's (1)**
58:18
**otherwise (2)**
21:3;87:19
**out (65)**
13:3;17:25;18:10;21:25;
24:9;28:21;35:11;36:11;
45:10;46:11,18;47:1,14,17;
48:17;49:5;50:23;52:24;
53:2,8,14;71:13;72:3,4,7,9,
13;74:5,10,12,19;77:20,21;
78:1,24;79:4;81:5,12;
82:10;83:21;85:14;86:22;
87:1,10,21,25;88:3,12;
89:17;90:13;91:5,9;93:7,9,
12;94:2;99:5;100:6;103:6;
106:4,19;110:2,12;111:5;
120:20

**outcome (2)**
34:3,9
**outset (1)**
114:21
**outside (4)**
7:7,8;71:21;85:8
**over (9)**
11:17;37:19;38:4;58:24;
59:19;74:20;75:1;78:11;
106:13
**overarching (1)**
121:2
**own (2)**
36:24;72:6
**owned (1)**
57:19

**P**

**page (5)**
43:16;109:14;110:19;
111:18;112:13
**pages (10)**
41:25;42:18,23;43:17,19,
21,24;44:3,4,9
**paired (1)**
22:17
**pandemic (1)**
28:1
**panels (1)**
106:10
**parameters (1)**
118:18
**parked (1)**
113:9
**parking (7)**
65:15;66:6;85:14;97:23;
106:4;112:20;113:9
**part (10)**
23:24;46:25;56:22;57:3;
67:14;80:24;85:5,8;105:24;
117:4
**particular (6)**
14:4;21:1;71:6;72:5;
95:12;100:14
**particularly (1)**
20:9
**parties (2)**
5:12;45:1
**partner (2)**

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 138 of 146
Deeunna Phillips, et. al. vs.                                                    Yasin Abdulahad
Yasin Abdulahad                                                                  October 30, 2020

22:14;101:6

**party (5)**
4:10;10:3;11:9;120:13,14

**passenger (3)**
73:17;85:2;102:3

**passenger-side (10)**
53:6,8,11;77:2;79:2;90:2;
93:9,11;99:15;101:20

**past (1)**
84:3

**patch (3)**
109:1,3,6

**path (2)**
84:6,8

**patient (1)**
13:14

**pause (1)**
86:11

**Peachtree (1)**
14:3

**pending (2)**
10:23;20:25

**people (2)**
19:19;64:12

**period (13)**
11:17;20:17;21:20;31:25;
51:1,2,7,16;63:6;66:23;
108:9;118:8,9

**periods (1)**
8:13

**permitted (1)**
5:12

**person (21)**
8:9;10:4,25;20:13;25:11;
28:8,13,13;32:6;38:6;48:6;
53:19;69:7;78:18;94:9;
95:1;99:14,25;101:14;
106:21;108:13

**Persons (6)**
6:15;7:9;9:7;11:1;23:24;
64:4

**pertaining (3)**
23:19,25;40:17

**pertains (2)**
41:19;116:7

**Phillips (185)**
5:6,7;18:19;19:1;23:1,15;
24:1;27:9;29:4;31:8;33:2;
35:8,9,17;36:5,6;37:12,21;
38:8,15,21;39:3,10,10,23,

25;45:6,8,10,11;46:3,10,17,
18,23;47:7,20,22;48:5,9,9,
13,17,19,24;49:2,5,13,24;
50:6,12,15,19,23;51:3,8,13,
17,22;52:1,6,7;53:10;54:5;
55:13;56:5,7,11;60:17,25;
61:8,15,25;62:8,13,18;63:1,
11,15,24;65:11,16,19;
66:16;67:6,8,13,16,19;
72:11,12;73:5,8;74:20;75:9,
23;76:4,6,11,12,25;77:9;
79:3,22;80:5,13;81:5,5,11,
12;82:2,8,15,22;83:4,6;
85:3,13,18,19;86:21,21;
87:1;88:7,12,15,17;89:2,10,
10;91:12,15,19;92:13,15,
19;93:15,18,22;94:10,10,
12;95:1;99:24;100:18,22,
23;101:15,19;102:2,3,8,14,
20;103:3,5,9,25;104:11,21;
105:2,13,22;107:4,21,24;
108:8,17,18;109:9;110:11;
111:2,3,9;112:1,7,10,23;
113:1,12,17,21;121:8,15,23

**Phillip's (1)**
110:8

**Phillips's (12)**
39:3;49:22;55:6;66:24;
75:16;90:14;93:1;104:2;
106:2;107:12;109:23;110:3

**phone (14)**
7:17;19:10,17;31:20;
32:18;33:11;40:7,12,17;
44:11;63:9;69:4,10;70:11

**phone-wise (1)**
40:23

**photograph (2)**
109:22;112:22

**photographic (1)**
13:6

**photos (2)**
13:7,12

**phrase (4)**
29:8;67:22;115:22;118:1

**physical (3)**
8:9;58:11;111:3

**Physically (1)**
117:15

**pick (1)**
59:15

**picked (1)**
70:14

**picture (3)**
111:11,14;112:5

**place (1)**
91:1

**placed (1)**
20:24

**placing (1)**
102:1

**plainclothes (1)**
67:18

**plaintiff (4)**
4:13,15,16,18

**plaintiffs (1)**
11:1

**Plaintiff's (7)**
44:14;59:1;109:15;
110:20;111:19;112:14;
113:4

**plan (1)**
117:9

**planning (1)**
13:11

**play (1)**
96:20

**played (4)**
58:14;59:3,17;96:24

**playing (1)**
58:22

**plead (267)**
25:3,4;35:21,22;36:20;
37:2,4,8,16,25;38:11,18,25;
39:7,16;40:4;45:18,19;46:8,
14,21;47:4,11,15,19,25;
48:3,7,11,15,21,25;49:4,8,
11,15,18,20,23;50:1,4,7,10,
14,17,21,25;51:6,10,15,21;
52:3,9,14,17,21,25;53:4,7,
13,16;55:9,10,16,20,23;
56:2,9,13;60:11,12,20;61:3,
11,16;62:3,9,21;63:2,10,13,
19,25;64:22;65:1;67:2,3,11,
15,17,20;68:3,4,10;72:20,
21;73:1,13,14,19;74:2,17,
24;75:6,13,20;76:2,9,16,23;
77:5,12;79:7,8,14,20;80:1,
9,18;81:2,9,15;82:6,13,20;
83:1,11,16,20,23;84:2,4,7,
12,15,18,21,25;85:4,7,11,

15,22;86:2,5,8,10,24;87:4,8,
12,16,20,23;88:2,5,10,16,
21;89:1,4,8,13,16,20,25;
90:4,12,16,24;91:3,7,11,14,
18,22,25;92:3,6,9,12,17,21,
24;93:3,6,10,14,17,21,25;
94:4,8,11,15;95:3,4;97:9,
10,17;98:2,10,19;99:2,9,19;
100:4,9,16,20,24;101:2,5,
10,17,22;102:5,9,15,18,22;
103:4,8,12,19;104:3,22;
105:4,10,16;106:1,5;107:5,
10,16,19,23;108:1,4,12,15,
20;109:5,10;110:5,6,13,17;
111:6,10,13,16;112:2,8,11,
21,24;113:2,10,13,18,24;
121:11,12,19;122:2,8

**pleading (4)**
91:23;92:1;107:24;108:7

**please (60)**
4:9;6:25;7:3;8:19;9:1,6,
25;10:7,10;14:9;18:23;
19:23;20:5;21:10;24:25;
28:17;32:12;39:20;52:22;
60:7,14,22;61:22;64:1;
72:14;96:23;97:18,20;
98:11,20,21;100:10,11;
101:11,11,23,24;102:10,11,
23,23;103:13,14,20;104:4,
5,23,24;105:5,6,17;106:6;
108:22;109:11;110:18;
111:17;112:12;113:3;
114:24;119:4

**pm (7)**
16:2;68:23,24;81:22;
114:13,14;123:11

**point (35)**
14:22;25:25;51:18;53:2;
77:1;82:9;83:3,4,5;87:25;
88:6,12;89:21;90:6;99:21,
22;101:19;102:7,13,16,19;
103:9,21,23,25;105:1,12,
20;106:2;107:7,14,18,25;
108:3,10

**pointed (3)**
89:24;90:1,20

**pointing (1)**
109:8

**pole (4)**
35:9,18;36:7,15

**police (17)**
10:20;11:15;12:8;13:3;
15:24;16:8;18:8,16;22:25;
26:15,23;29:10;33:19,24;
65:6;78:19;114:21
**policy (1)**
34:24
**portion (7)**
6:1;42:24;43:2;57:23;
109:22;112:4,19
**pose (2)**
120:11,12
**posed (1)**
120:18
**posing (1)**
120:21
**position (10)**
8:16;106:8;109:22;110:8,
10,14,15;111:3,4;112:22
**positioned (7)**
48:1;50:12;90:9,13,20,
22;113:14
**possession (14)**
53:20;57:5,10,12,13,17;
72:12,17;77:8;78:24,25;
87:3;104:2;107:14
**possible (1)**
8:2
**possibly (2)**
13:12;95:7
**POST (3)**
12:24;64:3,15
**potential (1)**
120:19
**pounds (2)**
18:25;19:8
**practice (4)**
33:19;54:14,16,21
**practiced (1)**
54:12
**preface (1)**
15:9
**preparation (1)**
94:16
**prepare (1)**
13:1
**prepared (2)**
14:23;15:2
**presence (8)**
51:8;58:19;66:5,24;74:7;

88:20,24;89:23
**present (6)**
6:15;15:9,12;41:16;
116:21,23
**presented (2)**
40:15;117:7
**presents (1)**
116:16
**preserves (1)**
6:12
**pretty (2)**
17:2;55:4
**prevent (1)**
84:8
**prevention (1)**
16:21
**previously (1)**
5:17
**prior (11)**
25:25;63:24;65:10,14;
66:5,13;70:6;77:14,17;
85:17;88:24
**Probably (4)**
12:16;19:7;69:20;70:9
**problem (1)**
61:20
**Procedure (6)**
5:11,13;6:5,11;20:22;
77:24
**procedures (3)**
18:2;29:11,22
**proceed (4)**
4:2;6:8;42:18;78:14
**proceedings (1)**
6:3
**process (1)**
64:19
**Professional (8)**
15:3;22:25;30:15;33:6;
60:16;61:7;64:16;70:25
**program (1)**
78:5
**programs (1)**
64:25
**promise (1)**
15:10
**promoted (1)**
22:20
**promptly (1)**
29:15

**proper (4)**
29:16;87:14,17,18
**property (3)**
57:7,13,15
**propriety (1)**
33:7
**prosecutors (1)**
9:13
**protective (1)**
54:17
**proven (1)**
118:23
**provide (4)**
6:6;26:22;27:1,5
**provided (7)**
9:15,18;27:14;28:18;
61:5,13;62:5
**provider (1)**
19:12
**provides (3)**
5:17;26:21;29:22
**proximity (2)**
72:24;97:13
**Public (6)**
4:5;6:18;14:7;120:8,8;
121:1
**pull (4)**
44:17;47:1;94:6;113:3
**pulled (11)**
80:6;84:13,16;89:23;
90:13;91:1,4;93:23;94:9;
97:22;108:3
**purpose (1)**
57:25
**purposes (7)**
5:12;18:17;19:16;25:19;
57:6;116:2;120:8
**pursuant (4)**
4:4;5:8,10;6:4
**push (1)**
105:2
**pushed (7)**
84:17,19;89:6;91:12,15;
105:13,13
**pushing (2)**
84:24;107:13
**put (8)**
16:18;41:22;42:5;68:15;
85:1;91:23;92:8;108:8

**Q**

**queued (1)**
95:25
**quite (1)**
42:3
**quote (3)**
36:10,14,16

**R**

**radio (3)**
35:6,13,13
**range (4)**
12:7;54:14,16,22
**rank (3)**
17:14;18:9;29:19
**rarely (1)**
70:12
**rather (1)**
26:1
**reached (1)**
94:13
**reaching (4)**
37:12;39:11,25;89:10
**read (3)**
41:8,11;45:24
**ready (1)**
96:19
**realize (2)**
13:14;19:19
**realized (1)**
100:22
**really (2)**
64:14;70:10
**reason (11)**
35:2;56:3;80:11,12;
81:11;100:21;112:3,9;
120:6,7,9
**reasoning (1)**
6:14
**reassert (1)**
35:25
**reassigned (3)**
20:17;21:2,4
**reassignment (2)**
20:25;21:20
**recall (16)**
10:25;12:15,16,17,21;

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 140 of 146
Deeanna Phillips, et. al. vs.
Yasin Abdulahad

Yasin Abdulahad
October 30, 2020

18:20;24:15;30:22,24;33:3;
40:6;69:18;77:15,18;
113:19;118:10
**receipt (1)**
    120:4
**receive (7)**
    12:11;64:3;67:5;115:2,7;
    116:3,7
**received (5)**
    12:8,14;16:13,14;27:10
**receiving (1)**
    118:10
**recently (1)**
    72:4
**recognize (7)**
    42:23;44:10;58:2;65:20;
    94:25;98:23;99:4
**recognized (2)**
    94:17,22
**recollection (5)**
    19:3;26:6;27:19;67:21;
    78:22
**reconvene (1)**
    114:10
**record (14)**
    4:3,11;6:7;42:5,20;63:22;
    68:21,25;81:18,25;96:16;
    99:11;114:15;123:10
**recorded (1)**
    62:6
**recording (8)**
    57:23;58:4,12;59:3,17,
    20;60:2;99:11
**recordings (2)**
    63:18,21
**recount (1)**
    63:16
**red (9)**
    97:5,13,23;99:5,15,22;
    112:5;113:8,21
**reference (1)**
    119:23
**referencing (1)**
    28:3
**referred (2)**
    95:8,19
**referring (5)**
    35:8,17;36:6;44:1;51:22
**reflects (1)**
    104:9

**refused (2)**
    62:24;63:4
**regard (1)**
    74:7
**regardless (1)**
    101:8
**regards (1)**
    23:15
**regulations (1)**
    29:12
**related (2)**
    8:24;16:23
**relates (1)**
    118:12
**relation (2)**
    17:7;19:4
**relative (1)**
    90:6
**relayed (1)**
    29:18
**religion (2)**
    71:8,9
**religious (3)**
    71:2,3,4
**relying (1)**
    34:23
**remain (1)**
    30:13
**remains (1)**
    23:8
**remarks (1)**
    64:13
**remember (9)**
    11:3;19:22,22;26:7,10;
    28:14,14;63:16;78:9
**remotely (2)**
    5:19,22
**removed (1)**
    111:8
**repeat (2)**
    24:2;74:9
**repetition (1)**
    86:13
**rephrase (7)**
    25:13;52:5;53:9;56:5;
    65:3;74:11;108:5
**report (3)**
    35:2;36:23;46:4
**reported (9)**
    35:6,8;36:4,14,22;37:10;

46:2;85:16;86:1
**REPORTER (2)**
    4:2;58:8
**Reporting (1)**
    5:20
**represent (2)**
    4:10,13
**representation (1)**
    27:11
**representative (6)**
    24:9,12;25:7,9;26:5;
    27:14
**representatives (10)**
    40:8;60:23;61:6,14,23;
    62:6,11,16,24;63:4
**represented (1)**
    11:5
**request (6)**
    43:10;83:6,18,22;95:16;
    103:10
**required (1)**
    6:14
**reserve (1)**
    6:17
**reserved (1)**
    5:25
**reserves (1)**
    17:10
**reservist (1)**
    17:8
**reside (2)**
    8:20,22
**resolution (1)**
    23:10
**respect (23)**
    9:24;13:18,18;16:10,12;
    21:2;23:20;33:4;44:7;48:1;
    66:12;69:17;75:9;87:14,17,
    18,22;88:22;99:14;116:2;
    118:11;120:2,6
**respond (1)**
    87:24
**responding (1)**
    85:24
**response (3)**
    16:14;39:22;51:23
**responses (2)**
    64:3;87:15
**responsibilities (5)**
    18:4;20:7;21:19,24;56:15

**responsiveness (1)**
    5:25
**rest (5)**
    93:4,7,8;112:23;113:17
**result (1)**
    90:5
**retard (1)**
    55:14
**reviewed (2)**
    13:5;15:5
**reword (1)**
    115:19
**right (64)**
    6:21;7:8,22;9:6,10;12:3;
    13:11;14:1,8,14;17:6,9;
    19:23;21:20;26:11;27:19;
    35:12;39:11,12;40:1;43:12,
    22;44:16;45:8,12;46:11,24;
    47:13;50:9;55:18;58:22;
    68:19;69:13,14;70:6;71:19;
    72:14;75:1;81:24;86:17,20;
    92:20;93:23;96:21,25;
    97:18,19;98:21;101:12,14;
    104:23;106:24;107:13;
    112:6;113:7;115:21;
    116:13;117:24;118:1,10,14;
    119:22,25;121:22
**risk (3)**
    120:22,23;121:4
**risks (1)**
    120:18
**Robbery (1)**
    21:17
**Roberson (13)**
    40:23;45:7,9;46:2,16;
    49:12;75:15,22;76:19;
    85:17;86:6;103:7;104:1
**Roberson-El (42)**
    22:14;31:13,16,19;32:5;
    33:1,8,12;38:13;48:17;
    49:16;51:9,14,23;52:5,19,
    23;55:18;63:6;69:17;76:4;
    80:13,21;83:7;84:5;86:20;
    87:15;88:13,18;94:22;97:6;
    99:16,23;100:22;101:16;
    102:7,13,17;103:11,24;
    104:10;108:16
**Roberson-El's (1)**
    51:25
**roll (1)**

102:20
**rolled (1)**
  83:13
**rolling (2)**
  96:2;120:3
**room (2)**
  117:18,20
**round (1)**
  54:6
**rounds (1)**
  53:25
**rule (10)**
  29:14;30:10,13;119:5,8,
  11;120:2,5,7,10
**Rules (7)**
  5:10,13,14;6:5,10;29:11,
  25
**run (6)**
  78:19;84:3;97:19;101:11;
  102:23;103:13
**running (1)**
  82:22

**S**

**S-2 (1)**
  17:19
**safe (1)**
  11:17
**Safety (5)**
  14:7;91:17;120:8,8;121:1
**same (129)**
  19:7;22:10;29:19;36:18,
  18,25,25;37:14,14,23,23;
  38:9,9,16,16,23,23;39:5,5,
  14,14;40:2,2;46:6,6,12,12,
  19,19;47:2,2,9,9;60:18,18;
  61:1,1,9,9,17,17;62:1,1,19,
  19;67:10;68:8,8;70:5,9,10;
  71:8,9;73:20,20,25,25;
  74:15,15,22,22;75:4,4,11,
  11,18,18,25,25;76:7,7,14,
  14,21,21;77:3,3,10,10;
  79:12,12,18,18,24,24;80:7,
  7,16,16,25,25;81:7,7;82:4,4,
  11,11,18,18,24,24;83:9,9,
  14,14;97:15,15,25,25;98:8,
  8,17,17,25,25;99:7,7,17,17;
  100:2,2;104:17;121:15,17,
  17,25,25;122:6,6

**Sandra (2)**
  27:15,16
**saw (23)**
  38:8;46:1;48:4,9;49:2;
  50:22;52:15;55:25;65:19;
  72:11;73:5,8,16,23;74:20;
  75:1;76:18;79:3;86:9;91:5;
  92:18,20;94:25
**saying (6)**
  15:10;100:25;108:14,18;
  117:3;119:12
**scene (7)**
  24:16,22;25:1,10;44:22;
  56:25;86:1
**scenes (2)**
  57:11,14
**scores (1)**
  11:24
**screen (15)**
  8:4,6,15;96:1;106:14,20,
  24;108:10;109:13,19;
  110:24;117:13,16,17,19
**scroll (1)**
  44:9
**search (11)**
  40:21;41:4,5,7,19,21;
  42:15,15;43:1;44:11;63:8
**seat (10)**
  47:23;73:17;74:14;85:2,
  2,5;90:2,2,7;105:3
**seated (11)**
  47:8,21,23;48:5;73:6,10,
  16;74:20;77:1;85:3;102:4
**second (7)**
  36:10;43:23;47:21;53:18;
  72:13;96:15;104:6
**seconds (2)**
  95:22;100:13
**Section (3)**
  4:5;21:7;110:9
**sections (2)**
  21:16;115:1
**seeing (2)**
  66:13;107:11
**Seham (1)**
  9:8
**seize (1)**
  56:25
**seized (1)**
  40:8

**send (2)**
  58:19;64:13
**sending (1)**
  58:13
**sent (1)**
  31:16
**sentences (1)**
  16:19
**separated (1)**
  97:23
**September (3)**
  40:6,17;44:12
**series (1)**
  122:11
**served (3)**
  11:14;17:11;44:12
**serves (1)**
  26:21
**Service (6)**
  4:5;17:7;18:15;19:12;
  53:18;114:21
**services (2)**
  22:12;26:21
**serving (1)**
  26:23
**session (1)**
  118:6
**set (1)**
  44:18
**settings (4)**
  56:18;115:8,9,10
**Seventeen (1)**
  54:2
**several (2)**
  13:20;45:25
**shall (1)**
  5:25
**share (6)**
  19:19;58:12;64:12;
  109:13,19;110:23
**shared (2)**
  71:11;96:3
**sharing (1)**
  95:25
**shed (1)**
  19:6
**sheet (1)**
  6:19
**shift (3)**
  16:1;77:15,18

**shoot (20)**
  92:5,11,25;107:21,25;
  108:7;115:4;116:8,13,13;
  118:2,17,21;119:2,4,9,16;
  120:12,14,23
**shoot/don't (2)**
  116:7;118:2
**shoot/don't-shoot (2)**
  115:10,23
**shooting (68)**
  13:3;18:13,19;20:1,16,
  23;21:3,5,20;22:8,13,17;
  23:1,15,21;24:1,8,10,20;
  26:4,9;29:3,4;31:8,13,24;
  32:6;33:2,8,12,14;34:1;
  35:7,12;36:23;37:11,11,22;
  38:4,5,7;39:9;40:7,24;
  51:11;52:19;55:17;60:17,
  25;61:8,15,25;62:8,13,18;
  63:1,11,15,24;71:17,20;
  72:11,18,23;85:18;120:19;
  121:3,7
**shootings (2)**
  20:8,11
**short (3)**
  11:24;55:2;114:1
**shot (34)**
  13:2;20:9,13;35:8;36:5;
  38:15;39:2,10;40:1;48:9,13,
  24;49:2,6,13,17,22,24,24;
  50:2;53:10;55:6,12,19,21,
  25;56:4,11;91:8;93:24;
  94:10;110:3,16;112:10
**shots (1)**
  54:25
**shoulder (1)**
  107:13
**shoulders (3)**
  90:9,21,23
**show (6)**
  13:11;46:3,10,17,23;
  87:22
**showing (4)**
  87:14,18;95:24;112:6
**shown (5)**
  100:17;101:15;107:9;
  110:10,14
**side (8)**
  45:2;51:24;84:23;85:3;
  89:6;99:6;102:3;111:7

Case 1:19-cv-00401-MHC   Document 102-1   Filed 11/19/21   Page 142 of 146
Deaunna Phillips, et. al. vs.
Yasin Abdulahad

Yasin Abdulahad
October 30, 2020

**sides (1)**
44:24

**sighting (1)**
63:23

**signature (1)**
6:17

**signs (1)**
6:18

**similar (3)**
14:25;18:8;121:9

**simply (6)**
12:9;39:24;42:24;58:1;
80:13;81:13

**simulate (1)**
116:12

**simulated (2)**
117:15,15

**simulation (3)**
116:17;117:6;118:9

**simulations (1)**
117:8

**simulator (3)**
116:11;117:1,11

**sit (3)**
15:20;28:23,24

**site (1)**
24:10

**sitting (2)**
80:15;99:25

**situated (3)**
7:5;68:14;109:3

**situation (3)**
116:12,13;121:15

**situational (5)**
115:8,22;117:25;118:1,
11

**situations (1)**
116:15

**size (1)**
19:4

**skull (3)**
50:3;90:21;112:1

**smell (1)**
48:13

**smelled (1)**
72:24

**smelling (1)**
45:5

**smoke (2)**
79:17,22

**smoking (2)**
48:10;81:14

**social (2)**
64:24;70:24

**socialize (2)**
70:19;71:21

**social-media (1)**
64:25

**sole (1)**
5:6

**somebody (3)**
78:20;116:16,16

**someone (3)**
17:1;25:17;27:17;48:4;
77:20;80:14

**Sometime (2)**
27:23;40:6

**sometimes (3)**
64:15,16;72:8

**somewhere (2)**
68:16,16

**SOP (8)**
32:11,14,16;119:8,12,21,
21,23

**sorry (10)**
7:20;27:4;45:19,20;
61:19;70:12;73:12;78:17;
81:16;116:20

**sort (4)**
12:12;20:25;28:21;70:21

**sought (1)**
40:21

**sound (3)**
54:18;55:7,14

**sounds (2)**
58:3;68:20

**source (1)**
85:23

**Southwest (1)**
14:3

**space (3)**
96:17,18,18

**span (1)**
113:19

**speak (10)**
25:8,16;30:20;31:19;
45:2;62:12,17,24;63:4;
118:6

**speaking (14)**
16:24,25;17:1;32:15;

69:19;102:14;115:22,25;
118:15,24;119:15;120:16,
18;121:1

**Spears (182)**
4:12,12;5:4,5;6:21,22;
22:5;25:5;34:17;35:23,25;
36:3,9,13,21;37:3,17;38:1,
12,19;39:1,8,17;40:5;41:3,
14,24;42:3,17;43:4,15,22;
44:2,6,16,20;45:21;46:9,15,
22;47:5,12;55:11;58:5,9,10,
17;59:6,18,21,25;60:5,13,
21;61:4,12,21;62:4,22;67:4,
12;68:5,11,17,21,25;69:1;
72:22;73:4,15,22;74:3,18,
25;75:7,14,21;76:3,10,17,
24;77:6,13;79:9,15,21;80:2,
10,19;81:3,10,18,24;82:1,7,
14,21;83:2,12,17;86:11,17,
19;90:19;94:20,21;95:5,10,
23;96:5,13,21,25;97:2,11,
18,21;98:3,11,13,20,22;
99:3,10,13,20;100:5,10,12,
23,25;103:13,15,20,22;
104:4,8,14,19,23,25;105:5,
7,17,19;106:6,15,22,23;
108:21,25;109:11,17;110:7,
18,22;111:17,21;112:12,16;
113:3,6,25;114:7,10,15,16;
115:13,17;116:19;121:13,
20;122:3,9;123:2,6

**special (1)**
21:17

**specific (1)**
66:4

**spelled (1)**
30:17

**spoke (4)**
24:12;32:1;37:12;55:24

**spoken (2)**
28:12,13

**Sports (1)**
72:1

**spot (3)**
85:14;97:23;106:4

**spouse (1)**
8:25

**Sprint (2)**
19:13,16

**Staci (7)**
4:20;35:25;58:13;59:12;
95:13;113:25;123:9

**staff (1)**
5:20

**stamp (1)**
99:11

**stand (2)**
21:11;26:13

**standard (4)**
15:10;29:11,21;33:19

**Standards (6)**
15:3;23:1;30:15;33:6;
60:16;61:7

**standing (8)**
48:18;81:4;83:4;99:4,14,
21;102:17;103:18

**stands (1)**
43:5

**stares (1)**
101:18

**start (10)**
28:3;58:7;70:19;72:15;
96:1,22;100:10;103:20;
105:5;108:21

**started (6)**
53:10;69:3;70:18;91:19;
96:14;104:11

**starting (1)**
105:2

**starts (1)**
96:8

**state (4)**
4:9;6:25;65:5;78:10

**stated (1)**
6:11

**statement (5)**
31:2,5;61:5,13;62:5

**statements (2)**
45:24;63:14

**statewide (1)**
78:16

**stating (1)**
119:12

**status (6)**
17:7;20:25;22:7,10;23:4;
78:8

**stay (1)**
64:17

**steering (6)**

39:4,12,23;51:19;106:3;
109:23
**steps (1)**
114:25
**still (15)**
6:8;10:22,23;13:12;
23:13,23;24:3;25:10;32:18,
21;89:3;98:6;102:14,16;
107:3
**stipulation (2)**
4:15,17
**stolen (1)**
57:20
**stood (6)**
47:6;51:24;52:2;77:8;
80:21;86:20
**stop (29)**
48:19;59:24;92:4,10,16,
19,22;93:1,22;96:22,25;
97:20;98:12,21;100:11;
101:12,24;102:11,24;
103:13,21;104:5,7,24;
105:6,6,18;106:7;109:12
**stopped (4)**
78:19;92:7;93:13;108:11
**story (1)**
45:2
**straight (1)**
92:14
**streams (1)**
106:21
**Street (1)**
14:3
**stress (2)**
16:13,23
**stretch (2)**
69:3;113:23
**strictly (1)**
22:2
**subject (5)**
6:9;30:10,13;33:1;66:12
**submitted (2)**
42:19;103:10
**sued (1)**
10:3
**suggest (2)**
106:16;114:1
**suggesting (1)**
42:19
**suggestion (2)**

42:5;43:8
**suicide (1)**
16:21
**suit (1)**
11:2
**summaries (1)**
14:23
**summarize (2)**
17:21;114:18
**sums (1)**
18:2
**superior (1)**
29:18
**supervisoral (1)**
29:17
**supervisors (1)**
29:16
**supporting (1)**
41:5
**suppose (1)**
28:3
**supposed (1)**
119:15
**sure (7)**
19:21;35:2;43:20;58:16;
59:4;114:5;119:14
**survived (2)**
20:10,12
**surviving (1)**
5:6
**suspicious (3)**
46:25;75:10;80:23
**Switching (1)**
114:17
**sworn (4)**
5:2;9:12;29:9,10
**system (5)**
9:12;28:17;77:22;78:15;
93:19

**T**

**tactics (1)**
18:2
**talk (1)**
28:20
**talking (3)**
18:11;41:14;72:15
**tapped (1)**
76:19

**tasks (1)**
56:15
**techniques (1)**
18:2
**telephone (1)**
31:12
**temporarily (2)**
21:3;57:17
**ten (2)**
68:22;97:24
**tendered (1)**
58:15
**ten-minute (2)**
68:18;114:2
**term (2)**
95:10,11
**terms (9)**
11:23;12:6;28:16;42:14;
71:16;90:7;115:1;118:18;
120:16
**terrain (1)**
113:20
**test-firing (1)**
54:19
**testified (4)**
5:2;11:18,23;42:6
**testifying (3)**
8:11,14;12:12
**testimony (5)**
9:15,18;32:24;42:21,24
**testing (3)**
67:24;114:23;118:8
**texting (1)**
40:22
**texts (1)**
33:1
**thereafter (1)**
18:5
**thinking (2)**
25:16;122:18
**third (1)**
120:13
**though (2)**
83:24;120:3
**thought (1)**
87:13
**threat (3)**
91:17;120:12,12
**threaten (1)**
91:20

**threatened (3)**
51:4,9,13
**threatening (2)**
91:9;107:21
**three (6)**
44:3,4,9;103:17,17;
117:19
**throughout (3)**
31:17,25;51:16
**throw (2)**
86:22;87:1
**throwing (1)**
26:13
**thus (1)**
33:22
**times (4)**
11:23;12:4;13:20;72:8
**tinted (1)**
79:10
**today (10)**
9:16;10:5;15:18,20;
18:11;22:23;23:12;28:23,
24;30:13
**today's (1)**
13:1
**together (13)**
10:5;69:22;70:15,19;
71:10,11,13,14,25;72:3,4,7,
9
**told (29)**
30:24;34:4,8,12;35:10,17,
19;36:5,17;51:12;55:18;
81:5;82:8,9;85:18,21;86:3,
21,25,25;87:5,10,21,22,25;
88:12;103:6;108:16;109:8
**took (1)**
77:20
**top (3)**
102:2;106:20;107:12
**toss (1)**
45:10
**total (1)**
44:3
**touch (1)**
64:17
**touched (1)**
33:2
**touching (3)**
85:6;90:10;105:24
**towards (12)**

35:9,18;36:7,15;50:13;
56:12;74:6;75:2;84:14,16;
100:18,23
**trained (6)**
51:25;52:5,6;103:24;
118:5;119:20
**training (28)**
12:7,10,14,18,19;16:19,
22;18:17,21;52:10;114:18,
20,21,23;115:2,5,7,23;
116:1,7,25;117:1,11,21;
118:1,11,15;120:4
**transcripts (2)**
5:11;15:6
**transmission (1)**
93:16
**transmission-shift (1)**
93:20
**traveling (4)**
35:9,18;36:6,15
**treat (1)**
121:8
**treated (1)**
121:8
**treatment (3)**
16:12,15;67:5
**tried (2)**
17:25;92:20
**trigger (3)**
91:2,4;108:3
**true (3)**
36:4;62:10;63:20
**trust (4)**
6:16;8:12;13:1;19:4
**truthful (2)**
34:19;122:24
**try (5)**
84:3;86:14,14;106:7,8
**trying (9)**
68:13;86:12;91:5,9;
92:15;93:1;107:22;115:20;
119:19
**turn (7)**
7:18;44:21;57:10,17;
60:6;69:12;100:17
**turned (7)**
50:13;57:7,15;69:3,5,6;
100:21
**Twenty-seven (1)**
43:24

**two (21)**
15:6;16:15;37:19;38:4,4;
39:21;65:8;70:7,15,23;
71:20,24;78:8;80:21;81:4,
14;84:9;109:2;110:8,14,15

## U

**under (5)**
4:4;5:13,19;21:13;121:9
**undergo (2)**
21:2;118:3
**underscore (1)**
58:23
**understands (1)**
26:12
**understood (12)**
10:21;25:22;34:6,7;56:6,
10;57:9,9;80:12;88:13;
92:15;122:12
**undertaken (1)**
122:10
**unit (14)**
20:3,6,14,18;21:7,15;
56:16,16,22,24;70:1,4,16,19
**unless (3)**
104:15;121:4;123:8
**unrelated (1)**
16:11
**unusual (1)**
80:5
**up (40)**
14:21;18:3;20:19;22:17;
23:10;26:23;31:20;32:1;
41:22;43:5;47:21;52:1;
53:15,18;58:7;59:15;63:21;
70:15;75:16,22;76:5,6,11;
80:6;82:9;83:3,5;87:10;
95:25;98:15,16;99:22;
100:13,23;101:7;102:8;
103:9,21;113:3;121:23
**update (1)**
114:5
**upper (1)**
96:7
**use (10)**
5:12;6:2;33:16;54:24;
56:18;64:23;115:1;116:2,4;
118:11
**used (2)**

35:4;121:24
**use-of-force (3)**
114:19;115:1,5
**using (4)**
8:3,4,5;53:5
**utilize (1)**
20:22

## V

**VA (1)**
16:25
**vacations (1)**
71:11
**variables (1)**
118:18
**vehicle (23)**
36:16;37:20;45:14;51:23,
25;73:6;97:5,12,13;98:24;
103:3;112:25;113:1,8;
118:17,22,25;119:16;
120:19,20,21,24;121:4
**vehicles (3)**
72:1;118:12;119:9
**verbally (4)**
51:4,9,13;91:20
**version (1)**
95:15
**versus (1)**
117:13
**via (2)**
5:19;31:20
**victims (1)**
21:17
**video (30)**
13:2,19;14:16;94:16;
95:8,12,19;96:3,24;98:12,
20;100:10;101:11,15,24,24;
102:10,23;103:13,21;104:4,
5,9,24;105:17;106:6,20,21;
108:22;117:13
**videoconference (1)**
4:8
**view (4)**
13:23;14:14;45:8;79:5
**viewed (4)**
13:2;14:9,16,19
**violated (1)**
34:24
**visible (2)**

43:12;107:8
**visit (1)**
70:20
**visual (1)**
73:9
**voice (5)**
7:16;40:22;58:2;59:9;
60:2
**voluntarily (1)**
47:1
**VR (1)**
117:17

## W

**wake (1)**
51:11
**wakes (1)**
102:7
**walk (2)**
74:6;75:2
**walked (2)**
75:22;76:5
**walking (7)**
75:15;76:6;77:21;100:8,
14,23;101:7
**walls (1)**
117:19
**warrant (24)**
40:15,21;41:4,5,7,15,19,
21;42:10,15,16,22;43:1,6,
18,21;44:4,11;63:8;77:24;
78:4,11,15,21
**warrants (2)**
77:20,22;78:1,23
**washer (1)**
69:8
**watch (1)**
108:21
**watching (1)**
96:23
**way (18)**
9:15;20:20;22:18;29:9;
43:23;50:12;51:2;52:1;
55:7;64:10;65:20;67:22;
74:12;78:19;79:10;92:14;
106:9;121:15
**weapon (25)**
18:16,21;34:7;38:21;
39:2;48:24;50:5,8,9,11,18,

22;53:2,17,18,23;55:12;
56:6;92:23;93:5;113:23;
116:17,21,23,24
**weapons (8)**
56:25;57:5,11,13,16,18,
18,19
**wear (1)**
54:17
**wearing (3)**
29:5;67:23;68:7
**weed (4)**
86:22;87:1,6,6
**weeks (3)**
37:19;38:4,4
**weight (1)**
18:24
**welcome (1)**
41:18
**well-rested (1)**
15:21
**weren't (1)**
89:3
**whatnot (5)**
17:1;78:9,20;117:9;119:1
**What's (11)**
23:6,7;32:21;58:15;
77:23;95:7;109:18;117:8;
118:15;120:5,9
**whatsoever (2)**
38:7;99:24
**wheel (6)**
39:4,12,24;51:20;106:3;
109:24
**whenever (1)**
25:21
**whereby (2)**
63:16;64:2
**Whereupon (1)**
4:24
**white (3)**
109:1,3,6
**wife (3)**
8:25;9:2;19:22
**wife's (1)**
19:24
**window (8)**
51:24;76:19;79:2,10,16;
83:13;101:18;102:20
**wish (2)**
7:17;29:1

**withdraw (1)**
108:6
**within (14)**
7:9;15:24;21:6,7,16;22:2;
23:13,24;29:9;32:11,11,14,
15;33:19
**without (1)**
74:7
**witness (103)**
4:7;5:1,21;6:16,18;11:20;
21:24;25:4;32:6;34:16;
35:22;36:20;37:2,16,25;
38:11,18,25;39:7,16;40:4;
41:2;42:6;43:14,24;45:19;
46:8,14,21;47:4,11;55:10;
58:15;59:19;60:1,12,20;
61:3,11,19;62:3,21;67:3,11;
68:4,10,15,20;72:21;73:14;
74:2,17,24;75:6,13,20;76:2,
9,16,23;77:5,12;79:8,14,20;
80:1,9,18;81:2,9,16,20;
82:6,13,20;83:1,11,16;
86:16,18;95:4,24;96:2,4;
97:10,17;98:2,10,19;99:2,9,
19;100:4;106:12;109:14;
110:6;114:4,12;121:12,19;
122:2,8;123:3
**witnesses (1)**
30:5
**witness's (1)**
36:1
**WMA (1)**
58:24
**wonder (1)**
114:24
**words (1)**
108:17
**work (11)**
11:5;13:25;14:1;16:2;
18:6;56:21;71:3,22,25;72:3,
7
**worked (2)**
69:22;72:9
**working (5)**
9:11;70:3,15,18;72:4
**works (1)**
28:17
**wound (2)**
111:25,25
**writing (2)**

119:18,20
**written (9)**
28:20,24;61:5,13;62:6;
63:14,17,20;119:8
**wrong (2)**
28:18;29:8
**wrongdoing (1)**
80:24

**Y**

**YASIN (3)**
4:25;5:8;7:2
**year (3)**
12:21;21:4;27:23
**years (1)**
11:15
**yep (1)**
71:14
**yesterday (1)**
16:3
**young (1)**
78:13
**YouTube (2)**
14:17,18

**Z**

**Zoom (2)**
5:19;106:9

**1**

**1:09 (1)**
81:22
**1:10 (1)**
81:23
**10 (5)**
110:19,20,23;111:2,12
**108 (1)**
17:18
**11 (3)**
111:17,19,22
**12 (2)**
15:15;97:24
**12:39 (2)**
68:18,23
**12:49 (2)**
68:18,24
**13 (4)**

112:12,14,17,25
**13th (4)**
31:21;37:13;38:6;63:22
**15 (5)**
113:3,4,7,16,22
**165 (1)**
19:7
**17 (2)**
53:24;54:1
**170 (1)**
19:8
**180-degree (1)**
117:19
**19:45:55 (1)**
99:12
**195 (1)**
18:25

**2**

**2:05 (2)**
114:10,13
**2:15 (1)**
114:11
**2:20 (1)**
114:13
**2:33 (2)**
123:6,11
**20 (1)**
7:10
**2005 (1)**
12:23
**2006 (3)**
12:23,24;17:6
**2011 (1)**
69:21
**2014 (2)**
17:5,6
**2016 (4)**
10:11;69:24;70:1,6
**2017 (30)**
18:12,23;19:9;20:2;
22:21;29:7;30:11,19;31:9,
11,21;32:19;37:13;40:7,18;
44:12;57:25;63:7,22;64:1,
21,23;65:3,11,15;67:9;
69:23;72:10;80:4;96:8
**2019 (1)**
27:24
**226 (1)**

14:3
**24 (2)**
15:15,24
**26 (3)**
18:12,23;19:9
**26th (7)**
31:8;38:5,14;63:7;65:15;
67:9;72:10
**27th (2)**
31:11,23
**29 (1)**
59:1

**3**

**319 (1)**
4:5
**37 (1)**
7:4
**3rd (1)**
17:18

**4**

**4 (3)**
44:2,9,14
**40 (1)**
114:7
**404 (1)**
19:11
**44:35 (1)**
97:1
**44:49 (1)**
97:22
**45:03 (1)**
98:12
**46:04 (2)**
100:11,17
**46:12 (2)**
101:14,19
**46:43 (2)**
102:11,19
**47:07 (1)**
103:1
**47:15 (1)**
103:16
**47:25 (1)**
103:23
**47:36 (3)**
104:6,9,20

**47:41 (1)**
105:1
**47:44 (3)**
105:6,8,9
**47:47 (1)**
105:20
**47:48 (7)**
106:7;107:2,7;108:10,18,
24;109:1
**47:49 (1)**
108:23
**49 (1)**
108:23

**5**

**57 (1)**
95:21

**6**

**6 (2)**
16:2,2

**7**

**709-8298 (1)**
19:11
**79 (1)**
109:14

**8**

**80 (1)**
110:19
**81 (1)**
111:18
**83 (1)**
112:13

**9**

**9 (5)**
109:12,15,18;110:10,15