1           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4
   DEAUNNA PHILLIPS, Plaintiff,
5  by and through her Mother,
   SPARKLE STIDWELL, as next friend,
6
          Plaintiffs,
7
       vs.                          Civil Action File
8
                                    No:1:19-CV-00401-MHC
9  YASIN ABDULAHAD,

10         Defendant.

11

12

13

14          The remote deposition of INV. ARTHUR NIXON,

15      JR., Individually and as a 30(b)(6)

16      representative of the City of Atlanta, taken on

17      behalf of the Plaintiff via video teleconference,

18      taken pursuant to agreement of counsel, taken for

19      all purposes authorized by the Georgia Civil

20      Practice Act; the reading and signing of the

21      deposition being reserved; taken before Vivian C.

22      Whitlow, CCR, CVR, Certified Court Reporter and

23      Notary Public, commencing at 12:00 p.m., on this

24      the 8th day of June, 2021.

25

2

1                    A P P E A R A N C E S

2

    For the Plaintiffs:

3

         JEFFERY FILIPOVITS, ESQ.
4        Spears & Filipovits, LLC
         1126 Ponce de Leon Avenue, NE
5        Atlanta, Georgia 30306
         Phone:    404-872-7086
6        Email:    jeff@civil-rights.law

7

         G. BRIAN SPEARS, ESQ.
8        Spears & Filipovits, LLC
         1126 Ponce de Leon Avenue, NE
9        Atlanta, Georgia 30306
         Phone:    404-872-7086
10       Email:    bspears@civil-rights.law

11

    For the Defendant:

12

         STACI J. MILLER, ESQ.
13       JOSHUA FOSTER, ESQ.
         City of Atlanta Law Department
14       55 Trinity Avenue, Suite 5000
         Atlanta, Georgia 30303-3520
15       Phone:    404-546-4100
         Email:    sjmiller@atlantaga.gov

16

17  Also present:

18       Robert Evans, Spears & Filipovits, LLC

19

20

21

22

23

24

25

3

1        I N D E X   T O   E X A M I N A T I O N S

2                                                    Page

3     Cross-Examination by Mr. Filipovits              4

4

5            I N D E X   T O   E X H I B I T S

6                                                    Page

7     P-1  Schedule A -- Deposition Topics            5

8     P-2  GBI Investigative Summary - Bates         16
           numbered 939, 940, 943, 944, 961
9
      P-4  Warrant for Search & Seizure Robeson-El   45
10
      P-5  Crime Scene Log Sheet                     25
11

12

13     *Exhibits P-2, P-4, P-5 retained by counsel.

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1

2          THE COURT REPORTER:  Before we proceed, I

3     will ask counsel to agree on the record that

4     under the current National Emergency pursuant to

5     Section 319 of the Public Health Service Act,

6     there is no objection to this deposition Officer

7     administering a binding oath to the witness

8     remotely.

9          Please state your agreement on the record.

10          MR. FILIPOVITS:  Plaintiffs agree.

11          MS. MILLER:  Defendants and the City agrees.

12  INV. ARTHUR NIXON, JR., Individually and as a 30(b)(6)

13    representative of the City of Atlanta, having been

14       duly sworn to tell the truth under oath,

15            testified as follows:

16                CROSS-EXAMINATION

17  BY MR. FILIPOVITS:

18     Q    All right.  Mr. Nixon, thank you for coming

19  in to help us out with this deposition today.  Could

20  you please give us your full name.

21     A    Yes.  My name is Arthur Nixon, Det. Arthur

22  Nixon, Jr.

23     Q    And what is your position with the City of

24  Atlanta?

25     A    I'm an Investigator with the Office of

1    Professional Standards, Internal Affairs Unit.

2         Q    Great.  I'm going to show you an exhibit

3    here which is Exhibit 1.

4         (Plaintiffs' Exhibit No. P-1 was marked for

5                   identification.)

6    BY MR. FILIPOVITS:

7         Q    These are the deposition topics that we

8    provided to the City.  My understanding is that you're

9    here to testify about Topics 1 through 7 and No. 10.

10   I'll show you No. 10, first.  That's disciplinary

11   actions against Abdulahad or Robeson-El.  You're here

12   to testify about that one, correct?

13        A    Yes.

14        Q    And then Topics 1 through 7, which you're

15   welcome to read through if you need to know otherwise

16   I could just scroll down.  You can tell me when you're

17   ready to scroll.  I just want to make sure we're on

18   the same page about what you're going to talk about.

19        A    Yeah, that's fine.  That's -- yeah, that's

20   fine.  I'm ready.

21        Q    Okay.  Very good.  So tell me what your

22   duties are as an Investigator -- just an overview of

23   your day-to-day duties as an Investigator with OPS.

24        A    I investigate any applications of policy

25   violations committed by Officers.  Policy violations

6

1    could turn into criminal allegations, but for the most

2    part, it's any alleged policy violations.

3         Q    Are you assigned cases to investigate?

4         A    Yes, sir, I am.  Yes, sir.

5         Q    How many other Investigators are in OPS who

6    share your same role?

7         A    As far as on the shoot team, there are, one,

8    two -- there's five of us.  But as far as

9    Investigators that investigate all policy violations,

10   there's about -- there's about ten of us.

11        Q    Okay.  You referenced the shoot team, tell

12   me what that means.

13        A    Yes, it's the Officer-involved Shooting

14   Team.  And what it is, it's comprised of a Lieutenant,

15   a Sergeant, myself and two other Investigators.  And

16   whenever we have an Officer-involved shooting where an

17   Officer discharges their firearm, we are the ones that

18   go out and investigate it.  And there's three

19   Investigators including myself.  And there's one

20   Sergeant and one Lieutenant.

21        Q    Did you -- you know about the case that's

22   the subject of this lawsuit, right, the Abdulahad

23   shooting?

24        A    Yeah, I'm aware of it.  I wasn't the one

25   that responded to this, but it -- because it was still

7

1    an open investigation when the Investigator retired,

2    it got handed off to me.

3         Q    Got it.  So you were not on the scene?

4         A    No, sir, I was not.

5         Q    So the -- you're here today to testify as a

6    designee of the City of Atlanta which means you are

7    standing in place of the City and your testimony will

8    be binding with the City.  You understand that,

9    correct?

10        A    Correct, yes.

11        Q    Okay.  So is it -- am I correct that you are

12   not going to be testifying about your personal -- when

13   we're talking about the facts of the incident, you're

14   not testifying about anything you observed personally.

15   You're testifying about what you learned after the

16   incident, right?

17        A    Correct.  Yes, sir.

18        Q    So what did you consult or who did you

19   consult outside of the City attorney when preparing

20   for the deposition today?

21        A    No one.

22        Q    Okay.  Did you consult any documents?

23        A    Yes, about maybe 15 minutes ago, yes.

24        Q    Okay.  Tell me what those documents were.

25        A    It was the actual file, the investigative

1    file.

2         Q    Okay.  Does that include the GBI report?

3         A    I did look at the GBI report.  I just wanted

4    to look at -- I wasn't here at work on Friday and I

5    was notified of the deposition on Friday so this is my

6    first time actually having access to the documents.  I

7    wasn't here yesterday either.  So today is the first

8    day I actually had to look at it.

9         Q    Okay.  So you have not looked at the GBI

10   report?

11        A    I did back -- not in preparation for this.

12        Q    Okay.  When was the last time you did look

13   at it?  Ball Park.

14        A    Maybe about a year ago.

15        Q    Okay.  Can you describe what documents.  You

16   said you had the OPS file.  What was actually in that

17   file?

18        A    Statements.  The actual report.  The GBI

19   file.

20        Q    When you're talking about statements, whose

21   statements are you referencing?

22        A    Investigator Abdulahad, Investigator

23   Robeson-El, Lieutenant Buldini, Sergeant Perretti;

24   anyone that was on scene and Investigator at the time

25   had to make a statement -- had to come in to make a

9

1    statement.

2        Q    You said the Investigator at the time had to

3    come in to make a statement?  I'm just making sure

4    heard you correctly.

5        A    The Investigator who it was assigned to --

6    it was assigned to Investigator Don Half [ph] and

7    whoever he felt needed to come in to make a statement,

8    he would have them come in and make a statement.

9        Q    Okay.  Is Investigator Half the one who

10   retired?

11       A    Yes, he retired and Lieutenant Bennett

12   retired also.  Yes, sir.

13       Q    The statements that you're referencing, are

14   those that were made to APD pursuant to a Garrity

15   warning?

16       A    That's correct.

17       Q    Okay.  So in the OPS file, we've got those

18   witness statements, you referenced a report.  What

19   report are you talking about?

20       A    The actual Incident Report.  Yeah, with the

21   Incident Report that the -- whoever the Officer was at

22   the time or whoever (audio distortion) incident

23   report -- make an incident report (audio distortion).

24       Q    Do you have that with you?

25       A    Yes.

1       Q      Would you mind holding it up to the screen?
2    I just want to see if I have a copy of that.
3       A      This Incident Report (indicating) is going
4    to be very concise and short.  This is where
5    Investigator Abdulahad says that he discharged his
6    weapon so that he could get his ammunition back
7    because we have to account for each round.  So what
8    typically the Officers would do, they would do a very
9    short Incident Report acknowledging they discharged
10   their weapon, but the GBI will come in and actually
11   give us the nuts and bolts of what actually happened.
12      Q      Understood.  Would you mind reading to me --
13   does that say narrative on that report?  Is there a
14   narrative heading?
15      A      Yeah, it is an incident narrative, but it's
16   just basically a couple of lines.  It says on
17   January 26, 2017, I, Investigator Abdulahad, was
18   involved in an incident where I discharged my
19   City-issued weapon.  The scene was secured until the
20   GBI came to take over the scene.
21      Q      Got it.  Okay.  Okay.  I don't want to make
22   this more painful than we need to, but I want to make
23   sure I know everything that you've looked at.  So
24   we've got the witness statements that were given to
25   OPS.  We got that report that you just read; you

1  referenced a GBI file, we don't have to talk about

2  that.  Is there anything else?

3       A    There's a Use of Force Report.  And

4  basically what a Use of Force Report is is the

5  Supervisor will complete a Use of -- whenever there's

6  any force done at the scene of an incident, whether

7  it's physical or in this case, a shooting, the

8  Supervisor will complete a Use of Force Report

9  documenting --

10       Q    Let's pause for a second.

11          (A discussion was held off the record.)

12  BY MR. FILIPOVITS:

13       Q    Okay.  All right.  So with all that, I lost

14  track of where we were.  So we were talking about OPS

15  file, what's inside of it; we got the statements that

16  were given to the City of Atlanta as part of its

17  internal investigation; you got the report you

18  referenced; then you referenced another, Use of Force

19  Report, that was different than the Firearms Discharge

20  Report?

21       A    Yeah, there's a Firearm Discharge Report and

22  a Use of Force Report.  The Firearms Discharge Report

23  basically says where the suspect was struck, how many

24  rounds were fired, the Officer's name, the suspect's

25  name.  The Use of Force Report will have a narrative.

1    It will show what type of force whether it was pepper

2    spray, gunshot, physical hands, and sometimes the --

3    sometimes, not all the times, but sometimes the

4    Supervise will place in the narrative box whether or

5    not if it was justified or not.

6         Q    Okay.  Do you have that report in front of

7    you there?

8         A    Yes, I have it.

9         Q    You mind holding it up.  It doesn't sound

10   familiar to me so I want to see if I have that.

11        A    (Witness complies.)

12        Q    That box you described about whether the use

13   of force was justified or not, can you tell me if

14   that's checked.

15        A    Yeah, sometimes the Supervisors will -- it's

16   a narrative, the box is actually a narrative that they

17   write and it's right in here (indicating).  And what

18   this Supervisor wrote was Investigator was flagging a

19   warrant at the Public Safety Annex when he had a

20   police/citizen encounter and an altercation ensued

21   where the involved party was shot by the Investigator.

22   He didn't put down whether it was justified or not,

23   but there have been instances of the past where the

24   Supervisor will say it was a good justifiable shooting

25   or use of force or if it was a bad justifiable use of

1    force.

2           Q    Okay.

3           A    As of late, the Supervisors have been

4    letting the GBI say if it was good or bad within their

5    investigation.  Now, the GBI doesn't make a

6    determination on whether it was a good use of force or

7    bad use of force, but you can generally get the sense

8    of where they're going with it through their

9    investigation and how they write it.

10          Q    Understood.  Tell me about how OPS

11   handles -- how an OPS investigation and a GBI

12   investigation overlap.

13          A    The investigation is pretty much done at the

14   same time.  They're doing a criminal investigation

15   because it will be handed off to the DA's office,

16   where we are conducting strictly an administrative

17   investigation.  Since the persons involved, the

18   majority are going to be employees, who has to make a

19   statement to us which is created by Garrity and the

20   GBI is also conducting their investigation.  When it

21   comes to evidence and some things, we typically don't

22   do that, we let the GBI do that.  And when the GBI is

23   finished with their investigation, they'll hand us

24   their investigation.  It will be on a thumb drive and

25   we go through their documents and how they have

1    everything labeled and we will print everything out

2    and merge it with our investigation.

3            So if they get a statement from an Officer,

4    we might already have a statement from the Officer, if

5    the Officer decides -- the Officer and their attorney

6    decides to give a statement to the GBI, then we will

7    two statements from the Officer.

8        Q    OPS does not seize evidence if there's

9    simultaneous GBI investigation?

10       A    Correct, because the evidence is considered

11   a criminal matter and we're strictly administrative.

12   Say like a bloody shirt or a shell casing, we won't

13   touch that because it's -- that's going to be

14   considered evidence on the criminal side.

15       Q    Do you work collaboratively with the GBI?

16   Like suppose that you wanted to get some piece of

17   evidence that the GBI might not have been interested

18   in, it might not be relevant to their criminal case,

19   but maybe you think it could bear on policy violation,

20   do you communicate with the GBI about that?

21       A    Yeah, we do.  If there's a question that we

22   might have, we'll find out who the lead -- typically

23   when we respond out to the shooting, we'll meet

24   whoever the lead Investigator is on the GBI side and

25   we'll exchange numbers and I pretty much know all the

1    GBI agents, so I might -- I probably already have

2    their number.  But if I have a question about

3    anything, I can call them and say, Hey, XYZ, you know,

4    what happened?  And he can tell me, but I can't give

5    any information to him because everything is Garrity

6    protected.

7        Q    So let's talk about this incident and the

8    investigations that we have that relate to the

9    underlying facts of this incident.  First, was this

10   scene of the shooting regarded as a crime scene as it

11   relates to City policy?

12       A    Yes.

13       Q    Okay.  Do you have a timeline of when the

14   shooting occurred and who was on the scene, you know,

15   who arrived on the scene first and when the GBI

16   actually arrived?

17       A    Can I look at the file?

18       Q    Yeah, sure.

19       A    Okay.

20       Q    You know, I can also show you some stuff

21   that might help and see if you agree with what I'm

22   showing you.

23       A    That will work, too.

24       Q    Okay.  Let's do that.  I'm going to share

25   Exhibit 2 with you.

1        (Plaintiffs' Exhibit No. P-2 was marked for

2                  identification.)

3  BY MR. FILIPOVITS:

4     Q   This is a number of documents that was

5  provided by the City and I'm going to -- a portion of

6  the GBI Investigative Summary.  This states -- this

7  states -- this is Bates number 939, June 26, 2017, I

8  think that's a typo.  It's got to be January, at

9  approximately 7:57, Clinton Thomas was in contact with

10  Sergeant Moody.

11         Do you have any reason to doubt or question

12  that at 7:57 on the night of the shooting is when the

13  City of Atlanta reach out to the GBI?

14     A   Yeah, other than the date, no, not at all.

15     Q   Yeah, and we agree that January 26, 2017?

16     A   Yeah.  Yeah.

17     Q   Okay.  Okay.  So we take that timing of

18  contact and then let's look at Page 940, which is the

19  next one.  And it says, January 26, 2017 at 8:55 p.m.,

20  Special Agent Thomas met with officials.  You can read

21  that first paragraph to yourself, but you agree that

22  that's the time of the first meeting?

23     A   Yes.

24     Q   Okay.  So that means, you know -- by the

25  way, do you personally know Special Agent Thomas?

1      A    I did, yes.  I don't believe he's with the

2  GBI anymore, but, yes, at the time, I did know him.  I

3  think we might have met on a shooting incident after

4  this one.

5      Q    Okay.  So based on that exhibit, GBI was

6  contacted at 7:57 p.m. and then arrived and had their

7  first meeting, and by "they" I just mean a GBI agent

8  at 8:55 p.m.  Any reason for the City to question that

9  account?

10     A    No, sir.

11     Q    Okay.  That would mean that the City

12 controlled the scene and by that I mean the City

13 Officers were in charge of the crime scene from the

14 time of the shooting until at least 8:55 p.m., right?

15     A    Correct.

16          MS. MILLER:  Objection, but you can answer.

17     A    Correct.

18 BY MR. FILIPOVITS:

19     Q    Okay.  So for about an hour?

20     A    Yes, because it typically takes the GBI

21 about an hour to get to the scene.

22     Q    Okay.  So the City of Atlanta has a number

23 of policies that relate to preserving a crime scene,

24 correct?

25     A    Correct.

1        Q    I'll just ask you some questions generally

2   about that policy.  You know, if -- I'm trying to

3   avoid pulling it up and going section by section.  So

4   tell me if you agree with these -- that these

5   propositions, you know, generally reflect the City

6   policy that would have governed the actions of the

7   Officers on the scene of the shooting prior to the

8   GBI's arrival, okay?

9        A    (Nods head up and down.)

10       Q    First, you know, Officers are to ensure that

11  the crime scene remains undisturbed to the maximum

12  extent possible?

13       A    Correct.

14       Q    And to the extent anything at the scene is

15  disturbed or moved for some reason, that is to be

16  logged, documented, and communicated to the

17  Investigator in charge of the scene, right?

18       A    Correct.

19       Q    Officers at a crime scene are to separate

20  witnesses so that witnesses can't communicate with

21  each other about what they saw, correct?

22       A    Correct.

23       Q    The Officers are to review the actions of

24  any first responders and document any way in which the

25  actions of the first responders disturb the crime

1    scene?

2         A     Correct.

3         Q     And in addition to this being a crime scene

4    that there are two other policies that come into play

5    which is that it was a homicide investigation,

6    correct?

7         A     Correct.

8         Q     And it was an Officer-involved shooting?

9         A     Correct.

10        Q     When Officers are in charge of a crime scene

11   such as this one, they are required to keep a log of

12   any person who enters or leaves the scene, correct?

13        A     Correct.

14        Q     Tell me how the Officers, as a matter of

15   policy, would have regarded the scope of the crime

16   scene here.  Would it have been the car, the entire

17   parking lot, or something in between?

18        A     It should have been the parking lot.  In my

19   opinion, it should have been the entire parking lot,

20   but definitely the car.  Once the Officer involved in

21   the use of force tells someone what happened and where

22   it happened, that particular area would be considered

23   the crime scene.  But just to make sure there's no

24   evidence -- once they found out the car moved from

25   point A to point B then all of that area is considered

1      part of the crime scene because something could have

2      fell out.  You just never know what happened between

3      point A and point B.

4          Q    Okay.  I'm going to show you an exhibit here

5      that is also from the GBI investigation.  We're going

6      back to Exhibit 2 and here we are on page Bates

7      number 943.  Down here at this paragraph I'm

8      highlighting that the second -- the last full

9      paragraph on the page, it states that Special Agent

10     Ellis noted that the vehicle driven by the subject was

11     not searched prior to a search warrant being obtained

12     by Special Agent David Jones.  Is that your

13     understanding as well that no APD Officers searched

14     the vehicle prior to the GBI obtaining a search

15     warrant?

16         A    Yes.

17         Q    So tell me, in a situation like this one

18     where the Officers, the APD Officers there, did know

19     that the GBI was going to be investigating this?

20         A    They should have because the GBI started

21     investigating Officer-involved shooting in 2016.  So

22     this was not the first investigation the GBI had with

23     our Officers in an Officer-involved shooting.

24         Q    When the GBI does investigate an

25     Officer-involved shooting, is the role of APD as a

1    matter of policy and practice with the City to simply

2    secure the scene and deal with any exigency that might

3    be present, but then otherwise to preserve the scene

4    for the GBI?

5          A    Right.  That's totally correct.

6          Q    Okay.  So do you know if the City Detectives

7    aren't going to be logging evidence or taking photos

8    or anything of that nature?

9          A    They shouldn't be, no.  It's -- once the

10   GBI -- once it's determined that GBI is going to get

11   involved, then it's pretty much a hands off for the

12   City.

13         Q    Okay.  So the City's role then would be to

14   make sure that any movement of the scene that happens

15   before the arrival of the GBI or any activity in the

16   scene is reported to the GBI, so the GBI knows whether

17   anything had changed from the time of the crime to the

18   time of their arrival?

19         A    Correct.  And we also assist with -- with

20   anything, you know, like reports that might be done

21   internally, like the use of force or if they need

22   anything as far as reports, we'll give it to them.

23   But as far as the incident itself on the scene, we're

24   there just to maintain the scene until they arrive.

25         Q    Okay.  All right.  So I'm showing you -- I'm

1    going back to Exhibit 2, Bates number 944.  And again

2    the last full paragraph here, the sentence I'm

3    interested in here -- well, let me just clarify.  The

4    black or dark blue Chevy Malibu, that's the car that

5    Phillips was -- that references the car that Phillips

6    was driving when he was shot, correct?

7        A    Correct.

8        Q    It is not a trick question.  I can go up and

9    show you something else if you need to see it.

10       A    Okay.

11       Q    Okay.  The proceeding page, 943, Special

12   Agent Ellis notes the vehicle driven by the subject,

13   black or dark blue colored Chevy Malibu was not

14   searched.  Okay.  So you agree the Chevy Malibu

15   they're referencing is the one that was being driven

16   by Phillips, right?

17       A    Correct.

18       Q    Okay.  So the -- what this paragraph

19   reflects on page 944 is that when the GBI arrived,

20   that Malibu was running, right?

21       A    Correct.

22       Q    And that the car was still running is

23   consistent with what we just discussed, which is the

24   Officers on the scene should not touch or disturb the

25   scene in any way.  And so the car was running, they

23

1    left it running, right?

2          A    Correct.  Yes, sir.

3          Q    Okay.  And so same thing here, the front

4    driver and passenger doors were open.  Again, you

5    know, if that's the condition that they found at the

6    scene when they arrived, then that's the condition

7    they should preserve it in for the GBI?

8          A    Correct.  You know, the only -- I think the

9    door -- the driver door was probably opened, they

10   probably tried to render aid until the determination

11   that he was actually deceased is my guess as to why

12   the door was opened.

13         Q    Okay.  So it could be that EMS opened the

14   door.  If the door was closed and EMS opened the door

15   then that's something that should have been noted and

16   supplied to the GBI, correct?

17         A    It should have, yeah.  It should have.

18         Q    So for example if we go down to page 961 of

19   the GBI -- or, I'm sorry, Bates number 961 of

20   Exhibit 2.  This is a continuation of the GBI report?

21         A    Okay.  Yeah, I see it.

22         Q    Yeah, EMS and AFD advised that Phillips was

23   moved slightly to check for a pulse.  So again,

24   someone is relaying information to the GBI about what

25   activities the first responders took on the scene,

1  right?

2      A    Yes, sir, correct.

3      Q    Okay.  Do you have any additional

4  information about this that -- the statement that

5  Phillips was moved slightly to check for a pulse?

6      A    No, sir.

7      Q    No?

8      A    No, sir.

9      Q    Okay.  Is there anywhere that that

10  information would have been written down in a report

11  by APD or would that just have been communicated

12  verbally to the GBI?

13      A    That Phillips -- that Phillips did not make

14  statement?

15      Q    Oh, no, well, I -- it's really not a

16  specific question as it relates to that statement.

17  It's really just, you know, before the GBI gets there,

18  should there be a written log or report that APD

19  creates to communicate anything that happened at the

20  scene before GBI got there?  Should that be in writing

21  or is that typically communicated verbally to GBI?

22      A    It can be both.  Say like there's a log --

23  there's supposed to be a log of people who come into

24  the crime scene and their name is written down.  But

25  if something is unusual about the crime scene,

1    typically that will be related verbally to whoever the

2    lead Investigator is.

3         Q    Okay.  I'm going to show you Exhibit 5.

4         (Plaintiffs' Exhibit No. P-5 was marked for

5                        identification.)

6    BY MR. FILIPOVITS:

7         Q    Just to clarify, is this the type of crime

8    sheet -- Crime Scene Log Sheet that you just

9    referenced?

10        A    Yes, that's it.

11        Q    Is this an APD form that we're looking at?

12        A    Yes, it is.  It's a generic form, but it's,

13   yeah, it's an APD form.

14        Q    Okay.  Do you know who created this form?

15        A    No, I don't.  Typically, whoever the first

16   Supervisor is to arrive on scene will designate one of

17   the Officers on scene to start a log, start a Crime

18   Scene Log.

19        Q    Oh, actually we do know, right?  Log keeper.

20        A    Okay.  Yeah.  Okay.  And Buldini, her name

21   being the first one on top, she was probably the first

22   Supervisor on scene.

23        Q    Okay.  The order in which the names appear

24   on this log is to reflect the order in which people

25   appeared on the scene; is that right?

1     A     Correct.  Usually once the Officer creating

2     the log see someone, they'll go over and they'll ask

3     them their name.  If they're in civilian clothes,

4     they'll ask them their rank and then ask them what

5     their unit number is.

6     Q     Okay.  Is this number of Officers, I mean --

7     well, does the City have any idea what each of these

8     Officers were doing on the scene?  Is there any

9     written log of what role these guys or, you know, men

10    and women were playing?

11    A     The majority -- some of these I see are

12    Supervisors and I think also with -- I can't remember

13    if we ever had a shooting at our Annex before, but

14    just the fact that we had a shooting at the Annex,

15    that probably spurred more people to come out to see

16    what was going on.

17    Q     Do you have any idea how many Officers, you

18    know, maybe might have been in that Annex on that

19    evening?

20    A     That was going -- around 7:00, that was

21    going to be after hours so it's not going to be that

22    many on the inside.  There are Officers that worked in

23    there 24/7.  But there weren't that many on the inside

24    on this particular evening I'm assuming.  But all of

25    these Officers are going to be -- there's a lot of --

1   I see Lieutenant, Sergeants, Deputy Chiefs, more

2   Lieutenants, Sergeant, a Major, but there's a lot of

3   Supervisors that came out on this particular shooting.

4        Q    Okay.  Regardless of the number of

5   Supervisors or Officers on the scene, you expect each

6   one of them to follow City policy and not disturb the

7   crime scene in any way?

8        A    Correct.

9        Q    So, for example, I want to go back to

10  Exhibit 2 for a moment.  So we're on page 9 -- Bates

11  number 944 of Exhibit 2 and we see the last sentence

12  on this page starts, A black and blue in color Los

13  Angeles Dodgers baseball cap was located on the roof

14  of the vehicle on the passenger side of the car.

15  Examination of the cap revealed blood stains on the

16  top outer surface of the cap.

17            So that cap would not have been moved from

18  the car to the roof by any APD Officer, correct?

19        A    Should not have.  It says blood was on it.

20  The only thing -- I don't know who would have moved

21  it.

22        Q    Okay.  And I can just tell you that was

23  Abdulahad's cap.  I mean, I'm not going to pull it up

24  but what I'm getting at is if he -- if Abdulahad

25  placed that cap on the top of the car after the

1    shooting, that's where it would have remained, right?

2        A    Correct.

3        Q    Okay.  Okay.  I have some questions for you

4    about the underlying facts and what the City's

5    investigation -- what the City has learned through its

6    investigation of this.

7            First, I think we answered this.  No

8    photographs were taken of the scene by a City

9    employees, correct?

10       A    Should not have, correct.

11       Q    Did the City make any effort to determine

12   the distance that the car in which, you know, Phillips

13   and Abdulahad were driving in how far that car

14   traveled?

15       A    The City would not have.  That would be

16   considered or on the criminal side.  If it was done,

17   the GBI would have done it.

18       Q    Okay.  Likewise, well, let me ask it this

19   way:  So let's -- whether Officer Abdulahad was

20   truthful in his statements to OPS is a matter that is

21   of relevance to the City's OPS investigation, correct?

22       A    Say that again.

23       Q    Whether Officer Abdulahad was truthful in

24   his statements to OPS is relevant to your -- the OPS

25   investigation, right?

1        A      Oh, yes, correct.  Yes.

2        Q      Lying would be a violation of policy?

3        A      Right.

4        Q      Lying would also be, you know, could be a

5   criminal violation, correct?

6        A      Correct.  Yes, it sure can.

7        Q      Well, in a situation -- in that situation,

8   how does the City go about investigating whether there

9   were any, you know, complications in a statement to

10  OPS when the GBI's investigating the same thing?

11       A      Most of the time when they give, if they

12  give a statement to the GBI, we would compare the

13  statement given to the GBI with the statement given to

14  us.  And if there are any discrepancies, either we'll

15  find out about it or even at the DA's office may find

16  out about it if they subpoena the file -- the

17  statements.  What they're looking for is any

18  truthfulness that -- they can't -- the DA's office

19  can't use against the Officer with the exception of

20  the truthfulness.  So if they discover the

21  truthfulness, they will go ahead and charge the oath

22  of office -- Violation of Oath of Office with the

23  perjury.

24       Q      What if you have to -- what if the

25  truthfulness doesn't depend on inconsistent

1    statements, but it depends on physical evidence that

2    could, you know, indicate that a statement's false.

3    So do to the City then just wait for the GBI's

4    investigation to be complete or does the City request

5    evidence from the GBI?  How does it --

6         A    If we're made aware that there is something

7    that may led us to think that the Officer was

8    untruthful in making a statement, we'll dive right

9    into it to see exactly what's going on.  And if we

10   need to reach out to the GBI, then we'll try to

11   conclude it, you know, we'll try to reaffirm our

12   assertion whether or not the Officer was lying or

13   not and then call the Officer back in to challenge him

14   or her on whatever it is they were being untruthful

15   about.

16        Q    The City does not hold its OPS

17   investigation, like in abatement until the GBI

18   investigation is complete.  There are certain

19   circumstances where the City will continue to

20   investigate prior to the conclusion of the separate

21   GBI investigation?

22        A    What we've done in the past is once -- like

23   I say, with this particular case, we have the GBI

24   investigation, but it's still considered open because

25   the DA's office is looking at it.  And once we get a

1    determination from the DA's office that they intend to

2    either indict him or not indict him, then we'll close

3    our portion of it and turn it in.  But we usually

4    don't turn it in unless we have a letter from the DA's

5    office saying that there are no criminal -- there's no

6    criminal conduct by that Officer.

7         Q    So the ultimate disposition of the internal

8    OPS investigation will be resolved if the DA's office

9    decided not to charge?

10        A    If they decide not to charge, then the

11   criminal aspect will be done, but let's say Abdulahad

12   violated some policies.  So if he violated some

13   policies, then he will get reprimanded for the policy

14   violation at the time that the criminal

15   investigation was over with.  Once we get the

16   determination that the criminal investigation was

17   done, then I turn that file in to my Supervisors and

18   then they through and they acknowledge if there was

19   any policy violations.

20        Q    Okay.  Is the City aware of the Fulton

21   County District Attorney's Office investigation as it

22   relates to communications between Abdulahad and

23   Robeson-El after the shooting?

24        A    Are we aware of any?

25        Q    Yes.

1       A       Not to my knowledge.  No, sir.

2       Q       All right.  I'm going to ask you a few

3   questions just about what the City has determined with

4   regard to certain underlying facts.  Based on our

5   conversations so far, I assume the answer to most of

6   these is going to be that the City has not made such a

7   determination, but I want to run through those.  So,

8   you know, you can say -- if you say, yes, you know,

9   I'll ask you a follow-up and say what has the City

10  determined.  If you say no, I'm going to assume that

11  that not just means the City has not made a finding or

12  investigated that and is relying on, you know, the GBI

13  and/or the Fulton District Attorney's Office, okay?

14      A       Okay.

15      Q       Makes sense?  Okay.  Does the City have any

16  information or belief concerning the location of any

17  gun that was found inside the car?

18      A       Do we have any knowledge?

19      Q       Yeah.  Have you, for the purposes of your

20  OPS investigation, gathered evidence concerning the

21  location of the gun?

22      A       No.

23      Q       Okay.  What about the Detective's car, did

24  the City perform a search of Abdulahad -- the car

25  being driven by Robeson-El and Abdulahad?

1      A      Not to my knowledge.  I'd have to check -- I

2   don't believe, but I would have to check the report

3   just to make sure, but I don't believe so.

4      Q      Did the City investigation concern

5   determining how the car being driven by Phillips

6   ultimately came to a stop?

7      A      No, sir.

8      Q      It did not determine when the car came to a

9   stop relative to the time of the shooting, i.e.

10  whether it was before or after the shooting?

11     A      No, sir.

12     Q      Did it determine whether there's any

13  evidence showing that Abdulahad touched the emergency

14  brake either before or after the shooting?

15     A      No, sir.

16     Q      APD did not do any dusting for fingerprints,

17  correct?

18     A      Correct.

19     Q      Aside from the information concerning EMS

20  slightly moving Phillips to check his pulse, did APD

21  move Phillips in any way or, you know, gather any

22  evidence concerning the exact location of his body?

23     A      Not to my knowledge, no, sir.

24     Q      Did APD make any investigation into or

25  determination of whether the driver side door was open

34

1    at the time of the shooting?

2         A    No, sir.

3         Q    And -- but we can say that to the extent

4    anyone with APD moved that door, that that

5    information, as a matter of policy, should have been

6    communicated to the GBI agent?

7         A    Correct, yes, sir.

8         Q    And the City has not taken any disciplinary

9    action or investigation against any Officer who was on

10   the scene prior to the arrival for the GBI for failing

11   to communicate information to them or for disturbing

12   the crime scene?

13        A    Correct.

14        Q    Same question as it relates to the

15   passenger-side door.  APD did not make any

16   investigation as to whether that door was open or

17   closed at the time of the shooting, right?

18        A    Correct, correct.

19        Q    Can you tell me what EAP stands for if you

20   use that acronym it with the City.

21        A    Yes.  EAP is the Employee Assistance

22   Program.  And what that is if an employee, let's say

23   in this particular situation, anytime there's a

24   traumatic incident that happens like this, EAP, a

25   representative from EAP, usually a doctor, will come

1    out to the scene to make sure that they are mentally

2    okay.  And if they need any time off, if they need to

3    have an extended amount of time off, that doctor will

4    say, Hey, Abdulahad needs X amount of days off so that

5    he can, you know, compose himself and get himself

6    mentally where he needs to be at.

7         Q    Okay.  So EAP is a -- was that Employee

8    Assistance Program?

9         A    Employee assistance, yeah, Employee

10   Assistance Program.

11        Q    So that relates strictly to -- hold on a

12   second.

13        (A brief discussion was held off the record.)

14   BY MR. FILIPOVITS

15        Q    So we said it's employee, not employment

16   Assistance Program, right?

17        A    Correct.

18        Q    And that program just relates to mental

19   health/fitness for duty?

20        A    Yeah, fitness for duty.  It can go from, if

21   an Officer has any substance abuse issues that, say

22   alcohol, they can go to EAP to get put on some type of

23   treatment plan.  If they're having some type of

24   financial issues, they can go over there and they can

25   help them out with getting on some type of a budget.

36

1   So they're a well-rounded unit and is there for the

2   Officer whatever personal distress comes up.

3        Q    Do you have any record of any contact

4   between Abdulahad and EAP?

5        A    I don't have any record, but that's usually

6   private since it's a -- there's usually a doctor that

7   interacts with the Officer.  But I believe how EAP

8   works is, let's say if I was the Supervisor and I knew

9   my Officer had an alcohol problem, if the Officer went

10  on their own to EAP, then the City will not find out

11  any of the results.  But if I had to recommend the

12  Officer to go, then I would be kept in the loop on

13  what's going on.  So I'm not sure if -- I'm sure EAP

14  probably did make contact with Abdulahad, but I don't

15  know what happened.

16       Q    Is the City aware of a statement by Officer

17  Robeson-El that he did not hear the gunshot that

18  Abdulahad fired?

19       A    Correct.

20       Q    Has the City made any determination as to

21  the veracity of that statement that he did not hear

22  the gunshot?

23       A    Not to my knowledge.  No, sir.

24       Q    Is there any records of any APD Officer or

25  City employee who was at the scene of the incident

1    after, you know, after it occurred verifying that

2    there was a smell of marijuana?

3         A    After the incident occurred?

4         Q    Yes.

5         A    Not to my knowledge.

6         Q    Is there -- do you have any information

7    specifically related to the marijuana alleged to have

8    been found on Phillips person as to whether, first,

9    whether it has been tested and the results of that

10   test, if any?

11             MS. MILLER:  Objection, but you can answer.

12        A    No, sir.

13   BY MR. FILIPOVITS:

14        Q    Does the City have any information regarding

15   how the marijuana was packaged, to the extent it was

16   marijuana?

17        A    No, sir.

18        Q    And then you would expect that the City

19   doesn't know about that because knowing about that

20   would have required breaching the crime scene prior to

21   the GBI arrival, right?

22        A    Correct.

23        Q    Can you provide any account of where

24   Abdulahad and Roberson were moved, physically moved

25   after the incident.  Were they separated from each

1    other?

2         A    They should have been.  That would have been

3    on the first Supervisor that would have gotten to the

4    scene.  The first Supervisor would have been the one

5    to instruct the two to stay, you know, you stand

6    there, you stand there and wait for the GBI to get

7    here.

8         Q    What's the purpose of separating them?

9         A    So that -- so they can't get the stories to

10   rhyme together -- to, you know, we want to hear

11   your -- what happened.  We want to hear what you have

12   to say.  We don't want you to get together and come up

13   with a story, create something.  We want -- we

14   separate them so they can't get together and tell

15   their -- we want to hear separately what happened.

16        Q    Right.  You don't want them to influence

17   each other's recollection of how things unfolded?

18        A    Correct.

19        Q    And if they're -- it's standard practice for

20   any witnesses to a crime, right?

21        A    Right.

22        Q    And here, the only witness to this event

23   was -- is it fair to say that Robeson-El was the

24   primary witness to this event?

25        A    Right.

39

1       Q    There may have been people in the parking

2    lot, but they can't really provide us any detail of

3    what happened inside the car, right?

4              MS. MILLER:  Objection, but you can answer.

5       A    If I remember correctly, the video, there's

6    was one, I believe it was a black male, he was in the

7    parking lot, but I'm not sure to what he saw.

8    BY MR. FILIPOVITS:

9       Q    Right.  The one who was crouched behind the

10   white car?

11      A    Correct, yes.

12      Q    And then we see him sort of run quickly, you

13   know, leave and run into the building, right?

14      A    Correct, sir, correct.

15      Q    Okay.  Aside from that gentleman, Robeson-El

16   would have been the only other witness to --

17   eyewitness on the scene, right?

18      A    Correct, yes, sir.

19      Q    Does the City have any information

20   concerning Phillips being a member of any gang?

21      A    I don't have any information.  Now, I'm not

22   sure if he'd been -- I haven't looked at his criminal

23   history, so I'm not sure if our Gang Unit has any

24   intel on him or not.  That would be something that

25   would have to be gathered from the Gang Unit.  But to

1    my knowledge, I don't have any information that he was

2    in a gang.

3        Q    Tell me, what information would the Gang

4    Unit have?  I'm not sure what they would be looking at

5    or what they might have available to them that could

6    indicate gang membership.

7        A    If they had any prior arrests where they

8    photograph him with, say, some gang affiliated

9    tattoos, if they talked to Mr. Phillips in the past

10    and he admitted to being in a gang, I'm not sure how

11    they verify whether or not somebody is in a gang or

12    not, but I know they do an extensive and exhaustive

13    compilation of whether or not somebody is in a gang or

14    not.  But I don't have any knowledge that Mr. Phillips

15    was in a gang.

16        Q    Okay.  When you say when they determine

17    whether someone is a member of a gang, it -- do they

18    have their own events of potential gang members that

19    they update on an ongoing basis?

20            MS. MILLER:  Objection; to the extent this

21        is outside of the topics that Investigator Nixon

22        is here to speak about, but he can answer in his

23        personal capacity.

24        A    I believe so.  This is just what I've

25    learned that they have their own way of categorizing

1    potential members of gangs.

2    BY MR. FILIPOVITS:

3         Q    Okay.

4              MR. FILIPOVITS:  Now, I just want to

5         clarify, No. 4 is Facts known to the City,

6         including if Mr. Phillips' membership and/or

7         affiliation with groups considered by the City to

8         be gang.  So I think it's within the scope.  If

9         he doesn't know, that's fine and if that's the

10        qualification, that's fine, but I think it's

11        within the scope.

12             MS. MILLER:  Sure.  The question was about

13        what the Gang Unit does and how they compile

14        information.  That's outside of the scope and

15        that was the objection.

16             MR. FILIPOVITS:  Okay.  I understand your

17        objection.  Okay.

18    BY MR. FILIPOVITS:

19        Q    So just to let you know, and, you know,

20    Staci can correct me if you wish, but the way this

21    works, Investigator Nixon, if I ask you a question

22    that goes beyond the scope of one of these

23    designations, you can answer that and should answer

24    that in your personal capacity.  It's just that your

25    answer won't be binding on the City.  So to the extent

42

1    Staci and I disagree about that, that's what we're

2    doing.

3              So I'm going to ask you a couple more

4    follow-up questions.

5              MR. FILIPOVITS:  And Staci, I'll ask these

6         of him in his individual capacity to the extent

7         he can answer based on his personal knowledge.

8              THE WITNESS:  Okay.

9    BY MR. FILIPOVITS:

10    Q    With regard to -- I honestly forget the last

11    question I asked before all of that and what your

12    answer was, but I'm just trying to understand if the

13    Gang Unit has a compilation of, you know, tries to

14    track gang membership in some informal way that they

15    share amongst themselves or with others of the City?

16    A    Do they have an informal way of sharing that

17    information?

18    Q    Yeah, just, you know, do they have a list of

19    suspected gang members?

20    A    Personally, I believe they do that no one

21    has access to.  I've never seen that list of potential

22    gang members.  It's usually not until something like

23    this happens that, you know, you hear on the news or

24    the family member, somebody shows up at the precinct

25    to protest the shooting and that's usually how I'll

43

1    find out about it is when somebody shows up to protest

2    it.

3         Q    You mean like a citizen shows up and says I

4    shouldn't be on this list?

5         A    No, no, no.  Let's say like -- I remember

6    hearing that Mr. Phillips' family or some friends or

7    something had shown up at the Annex to protest the

8    shooting and some of those members -- some of those

9    people were gang members.  I think there was an

10   unofficial hit put out on Abdulahad that, you know,

11   somebody was going to kill him or something like that

12   shortly after the shooting happened.  And if I

13   remember correctly, that was gang-related I believe.

14   And that's the only way I find out about some of this

15   stuff.

16        Q    Okay.  Tell me what you know about this

17   unofficial hit that you heard about.  How did you hear

18   about that?

19        A    Just the word of mouth.  Just people

20   talking.  And that was right after the incident

21   happened.  So this would have been 2017.

22        Q    And when you say people talking --

23        A    Yeah, just Officers walking, Hey, man, did

24   you hear about such and such and such.  So there's no

25   real way of verifying it, but, you know, because I

44

1    don't know where the source -- where it actually came

2    from.  But generally our Homeland Security would be

3    the ones that would tell the Officer, Hey, we just

4    verified X, Y, and Z, you need to do this, you need to

5    do that.  And our Homeland Security, they make sure

6    the Officers are aware of any type of threat on their

7    life based on a shooting like this.

8         Q    Okay.

9              MR. FILIPOVITS:  How about we take -- I

10        probably got, I don't know, 30 minutes or so, but

11        I want to take a quick five-minute break if

12        that's okay with you guys.  Is that okay?

13             MS. MILLER:  Yes, that's fine.

14         (A brief recess was taken at 1:02 PM)

15   BY MR. FILIPOVITS:

16        Q    Is the City aware that a search warrant was

17   served on Abdulahad and Robeson-El to obtain their

18   cell phones?

19        A    No, I did not know that.

20        Q    You did not?  Okay.

21        A    It may be in the file, but I just haven't

22   seen it in the file, but I wasn't aware.

23        Q    Would you take a look and tell me if you

24   have that in the file.

25        A    Okay.  After taking a quick look at the

1   file, I don't see a copy of the search warrant in

2   here.

3        Q    Okay.  Is that file that you have with you

4   today the complete OPS file the City has maintained?

5        A    Correct.  It is.

6        Q    I'm going to show you Exhibit 4.

7        (Plaintiffs' Exhibit No. P-4 was marked for

8                    identification.)

9   BY MR. FILIPOVITS:

10       Q    You've never seen this document before?

11       A    No.

12       Q    You're aware that -- does the City have any

13   awareness of any communications after the incident

14   between Abdulahad and Robeson-El?

15       A    No.  This is a -- Investigator Appell is

16   with the DA's office at the time so, no, this is my

17   first time seeing this.

18       Q    This page 4 of 27 that I'm showing you is

19   entitled Affidavit of Search Warrant and Seizure.  As

20   you can see in the middle of that page and the item to

21   be searched is a cellphone, correct?

22       A    Correct.

23       Q    Okay.  This is still part of the Affidavit

24   for the Warrant Application.  As you can see here, the

25   Warrant Affidavit says Abdulahad called Robeson-El six

46

1   times on January 27th, 2017 and sent nine text

2   messages between the 27th and 28th.  Robeson-El sent

3   five text messages to Abdulahad on those same dates.

4            You agree that January 27th is one day after

5   the incident?

6        A    Yes.

7        Q    Is that level of communication between an

8   Officer who shot someone in the head and his partner

9   something that the City, you know, typically thinks is

10  appropriate?

11           MS. MILLER:  Objection, but you can answer.

12           THE WITNESS:  Yes, ma'am.

13       A    When we get to talk to them, it's usually

14  not right away, like the same day when we get our

15  administrative statement, but once we do talk to the

16  Officer, we tell them, we typically will tell them

17  don't discuss this with anyone other than your

18  representative or your attorney.  So I'm sure

19  Investigator Half had not got to him and told him not

20  to talk about this to anybody other than his attorney

21  but.

22       Q    Going down to page 15.  It reads, On

23  February 13, 2017, Investigator Half reminded

24  Abdulahad and Robeson-El not to contact any facts of

25  the internal investigation.  Then the warrant

1    affidavit continues and contains a list of calls after

2    that admonition from Investigator Half the 15, 16, 17,

3    18 and on 18 we see rise there a hundred and 63

4    instances of communication after that admonition from

5    Investigator Half.  The City and APD was not aware of

6    this fact before this date?

7          A     I guess, again, they were partners, I

8    can't -- well, I can't remember if he was relieved

9    immediately right after the shooting.  He probably

10   was.  I can see where it look, you know, a certain

11   kind of way.

12         Q     Did any of your predecessors conduct any

13   inquiry or investigation or ask for this information

14   from the Fulton County District Attorney's Office?

15         A     No, we didn't know it exists.  I didn't know

16   it existed.

17         Q     Are Officers required by any policies to

18   report when they are served with a search warrant?

19         A     It would be good if the Officer let their

20   Supervisor know.  I have to see if it's a policy

21   violation if they don't.  That's a good question.  I

22   would have to look into that.

23         Q     Did the City look at the video evidence and

24   compared the video evidence to Officer Abdulahad's

25   statement as to his position in the vehicle?

1        A     Say that again, sir.

2        Q     Has the City, as part of its internal

3    investigation, looked to the video of the incident?

4    The security camera video, the one we were discussing

5    earlier.

6        A     Yes.

7        Q     And compared that video to Abdulahad's in

8    which he recounts that he was hanging out of the car?

9    I'm paraphrasing him.

10       A     Correct, yes.

11       Q     Has the City compared those two accounts to

12   determine whether Abdulahad made any false statement?

13       A     I remember looking at that.  If I remember

14   correctly, Abdulahad said his legs were hanging out of

15   the car and in the video from what I can remember

16   about the video, I don't believe I saw his legs

17   hanging out the car, but then again, it could be --

18   not saying that he was intentionally trying to be

19   untruthful, it could be his recollection of how

20   everything went down or how everything that happened.

21   And it would be up to my Supervisors if they want --

22   once this gets closed on the DA's side, I will brief

23   my Supervisors that they want me to bring him in to

24   talk about that then I will.

25       Q     And what's the purpose of waiting for it to

1   be resolved on the DA's side?

2       A    Bringing him back in?

3       Q    What's the purpose of waiting?  Why do you

4   say wait until the DA's side is resolved before you --

5       A    It's just because that -- that is -- that

6   weighs a whole lot heavier than what we can do.

7   Ultimately we can, you know, if they went that far, we

8   can fire him, but over there, they can actually indict

9   him and he can go to jail.  So it's just a matter

10  of -- I could bring him in, question him, but it won't

11  be closed until they get done with their side.  That's

12  the only reason I said I would wait for them to get

13  finished with -- the DA's side get finished with

14  whatever they are going to do because once I bring him

15  back over here and I question him about it, then I can

16  go ahead and wrap everything up, close it up and turn

17  it in.

18      Q    So the City does not intend to perform any

19  investigation of whether Abdulahad or Robeson-El

20  violated City policy -- any further investigation

21  until the District Attorney's Office concludes its

22  investigation and charging decision?

23      A    Well, this right here was just made new to

24  me, so I probably will brief my Supervisor about this

25  because I had no idea about this.

1      Q    Okay.  So I guess it sounds like your answer

2   is that the City may not wait until the District

3   Attorney's Office concludes its investigation.  I

4   just -- I'm just trying to understand if any

5   decision -- any employment decision is going to await

6   the charging decision by the DA's office?

7      A    Correct, yeah, any employment decision will

8   be made after the DA's office makes their decision.

9      Q    Okay.  Will any employment decision be

10   influenced by the District Attorney's decision?

11      A    Yes.

12      Q    And if the District Attorney's Office

13   decides to charge either Officer with a crime, how

14   would that influence the employment or disciplinary

15   decision?

16      A    It would ultimately be up to the Chief.  The

17   Chief normally, if we have an Officer that's been

18   charged with a felony, we had another high-profile

19   shooting that happened last year almost about this

20   exact time in which that --

21      Q    Are you referring to Rayshard Brooks here?

22      A    Correct, yes.  And Officer Brosnan was

23   charged with a felony.  He is still an employee of the

24   department, but he's not receiving a paycheck.  And so

25   Abdulahad and Robeson-El would be in that same

1    position.  If they're indicted -- well, I'm sorry, if

2    they're charged with a felony, they would be placed --

3    would be suspended without pay.

4         Q    The Officer you referenced with regard to

5    the Brooks case, what's his name?

6         A    Rolfe.

7         Q    Okay.  I thought you said a different name.

8         A    Well, it was two Officers.  Rolfe was

9    actually fired, he was terminated, but Brosnan,

10   Brosnan, he was not fired.

11        Q    If the District Attorney's Office does not

12   charge a crime, what bearing would that decision have

13   on any OPS disciplinary decision?

14        A    That would be up to the Supervisor when I

15   turned it in.  And what typically will happen is, we

16   would get a letter saying that the DA's office does

17   not intend to charge Robeson-El or Abdulahad.  So then

18   I would take my file, hand it to my Supervisor, he

19   would go through it and I would let my Supervisor know

20   what I see are possible policy violations.  Then they

21   would review it and make sure they concur or don't

22   concur with my finding.

23        Q    Okay.  And that -- that ultimate report of

24   yours will await the disposition from the District

25   Attorney, right?

52

1       A     Yes, sir.

2       Q     As a matter of City policy, Officers are --

3    you expect an Officer to know that if they're the

4    subject of an internal investigation or a criminal

5    investigation, they should not communicate with any

6    witness about the facts of that investigation or the

7    underlying incident?

8       A     I would let them know to not communicate?

9       Q     I'm not asking you if you let them know.

10   Would you expect, as a matter of policy, an Officer to

11   know that they should make those communications even

12   if they haven't been admonished to avoid them?

13      A     Yeah, only because I would hate to be asked

14   the question if I was either of the Officers involved,

15   Hey, did you talk to such and such, you know, after

16   the shooting.  And if they answer yes, then it's what

17   did you talk about?  Then it just makes you look -- it

18   can look a certain kind of way.

19      Q     Right.  And Officers know that witnesses to

20   a crime just shouldn't talk to each other as a matter

21   of general policing an investigation.  You would

22   expect that, right?

23            MS. MILLER:  Objection, but you can answer.

24      A     Yeah, but typically we tend to forget about

25   it.  I'm just speaking just personally because it was

53

1   a traumatic event, Officers aren't used to being

2   victims.  And I'm not sure what they talked about in

3   those text messages and phone calls.  I'm not -- I

4   can't remember if he was relieved immediately after

5   this or not.  If he was still on the street then those

6   conversations could have been about -- basically we're

7   handling.  I'm just not aware.

8       Q    Right.  So we don't know the content.  Based

9   on the Search Warrant Affidavit that we discussed, the

10  City does not know -- well, the City just generally

11  does not know the content of any of those

12  communications, right?

13      A    Correct.

14      Q    Has not asked these Officers about the

15  content of these communications?

16      A    Correct.

17      Q    Has not asked the District Attorney's Office

18  to supply any of the content of the communications

19  they obtained following the search and execution of

20  the warrants on the cell phones?

21      A    Correct.

22      Q    Do you have -- are City Officers -- well,

23  Abdulahad and Robeson-El, as of January 26, 2017,

24  would they have as a matter of practice have been

25  issued City cell phones?

54

1              MS. MILLER:  Objection.  To the extent it's

2         outside the scope of what Investigator Nixon is

3         here to speak about, but he can answer in his

4         personal capacity.

5              THE WITNESS:  Yes, ma'am.

6         A    It depends on what unit you're in.  Let's

7    say the unit I'm in, Internal Affairs, were issued

8    cellphones.  When I was in Sex Crimes, we were issued

9    cell phones, but there are units in the department

10   that they are not issued cellphones.  Now, this was a

11   few years ago.  But now, I'm not sure if everyone is

12   issued a cell phone or not, but I do know there are a

13   lot of Investigators with cellphones.

14   BY MR. FILIPOVITS:

15        Q    Okay.  So you do not know, and here, I'm

16   asking again of the City's knowledge of post-shooting

17   communications betweens Officers.  The City has no

18   knowledge of whether any such communications happened

19   on City phones or on personal phones, right?

20        A    Correct.

21        Q    Going back to the investigation before the

22   arrival of the GBI, well, I'm sorry, not the

23   investigation, that's not the right word, but just the

24   preservation of the crime scene prior to the arrival

25   of the GBI.  There's no employee with the City of

1    Atlanta other than Abdulahad and Robeson-El who

2    reported to the City or memorialized in any way the

3    odor of marijuana coming from the vehicle, correct?

4         A    Correct.

5         Q    Okay.  Give me five minutes once more and

6    then we should be able to wrap up shortly thereafter.

7         A    Yes, sir.

8          (A brief recess was taken at 1:28 p.m.)

9              MR. FILIPOVITS:  Those are all the questions

10         that I have for you, right now, Investigator

11         Nixon.  You're -- the City's attorney may have

12         some for you.  And if she does, I may have a

13         couple of follow-ups.

14             MS. MILLER:  I don't have any questions for

15         you Investigator Nixon.  Thank you for joining us

16         today.

17             THE WITNESS:  Thank you.

18             MR. FILIPOVITS:  All right.  Thank you for

19         your time and, you know, I appreciate you coming

20         in to help us out with this.

21             THE WITNESS:  Thank you.  Everyone take

22         care.

23          (The Deposition concluded at 1:31 p.m.)

24

25

56

1                          DISCLOSURE

2    STATE OF GEORGIA           Deposition of Inv. Arthur
                                Nixon, Jr., Individually and
3                               as a 30(b)(6) representative
                                of the City of Atlanta
4    COUNTY OF BARROW           Date: June 8th, 2021

5          Pursuant to Articles 7.C and 10.B of the Rules
     and Regulations of the Board of Court Reporting of the
6    Judicial Council of Georgia, I make the following
     disclosure:

7
           I am a Georgia Certified Court Reporter.  I am
8    here as a representative of American Court Reporting
     Company, Inc.

9
           I am not disqualified for a relationship of
10   interest under provisions of O.C.G.A. 9-11-28(c).

11         American Court Reporting Company, Inc., was
     contacted by the offices of Spears & Filipovits, LLC
12   to provide court reporting services for this
     deposition.

13
           American Court Reporting Company, Inc., will
14   not be taking this deposition under any contract that
     is prohibited by O.C.G.A. Sec. 9-11-28(c).

15
           American Court Reporting Company, Inc., has no
16   exclusive contract to provide reporting services with
     any party to the case, any counsel in the case, or any
17   reporter or reporting agency from whom a referral
     might have been made to cover this deposition.

18
           American Court Reporting Company, Inc., will
19   charge its usual and customary rates to all parties in
     the case, and a financial discount will not be given
20   to any party to this litigation.

21         This the 29th day of June, 2021.

22         _____

23                           Vivian Whitlow, CVR, CCR
                             Certified Court Reporter
24                               #6542-7835-9986-9952

25

57

1                   C E R T I F I C A T E

2     STATE OF GEORGIA

3     COUNTY OF BARROW

4          I hereby certify that the foregoing transcript

5     was taken down, as stated in the caption, and the

6     proceedings were reduced to typewriting under my

7     direction and control.

8          I further certify that the transcript is a true

9     and correct record of the evidence given at the said

10    proceedings.

11         I further certify that I am neither a relative or

12    employee or attorney or counsel to any of the parties,

13    nor financially or otherwise interested in this

14    matter.

15         This the 29th day of June, 2021.

16

17

18

19

20

21                                 

22

23    _____

24                        Vivian Whitlow, CVR, CCR
                          Certified Court Reporter
25                               #6542-7835-9986-9952

58

1                   E R R A T A   S H E E T

2    In Re: Deaunna Phillips, Plaintiff, by and through her
              Mother, Sparkle Stidwell, as next friend v.
3             Yasin Abdulahad
              In the Northern District Court Northern
4             District of Georgia Atlanta Division
              File No. 1:19-CV-00401-MHC

5

6    Deposition of Inv. Arthur Nixon, Jr., Individually and
     as a 30(b)(6) representative of the City of Atlanta,
     taken on June 8th, 2021.

7

8    I have read the transcript of my deposition and find
     that no changes are necessary _____.
                              Inv. Arthur Nixon, Jr.,
9                             Individually and as a 30(b)(6)
                              representative of the City of
10                            Atlanta

11   or

12   Having read the transcript of my deposition, I wish to
     make the following changes:  (Please state reason.)

13

14   Page _____,  Line _____:

15   Page _____,  Line _____:

16   Page _____,  Line _____:

17   Page _____,  Line _____:

18

19

20

21

22   _____

23   Inv. Arthur Nixon, Jr., Individually
     and as a 30(b)(6)representative
24   of the City of Atlanta

25

**[**

**[ph] (1)**
9:6

**A**

**abatement (1)**
30:17
**Abdulahad (32)**
5:11;6:22;8:22;10:5,17;
27:24;28:13,19,23;31:11,
22;32:24,25;33:13;35:4;
36:4,14,18;37:24;43:10;
44:17;45:14,25;46:3,24;
48:12,14;49:19;50:25;
51:17;53:23;55:1
**Abdulahad's (3)**
27:23;47:24;48:7
**able (1)**
55:6
**abuse (1)**
35:21
**access (2)**
8:6;42:21
**account (3)**
10:7;17:9;37:23
**accounts (1)**
48:11
**acknowledge (1)**
31:18
**acknowledging (1)**
10:9
**acronym (1)**
34:20
**Act (1)**
4:5
**action (1)**
34:9
**actions (4)**
5:11;18:6,23,25
**activities (1)**
23:25
**activity (1)**
21:15
**actual (3)**
7:25;8:18;9:20
**actually (12)**
8:6,8,16;10:10,11;12:16;

**15:16;23:11;25:19;44:1;
49:8;51:9**
**addition (1)**
19:3
**additional (1)**
24:3
**administering (1)**
4:7
**administrative (3)**
13:16;14:11;46:15
**admitted (1)**
40:10
**admonished (1)**
52:12
**admonition (2)**
47:2,4
**advised (1)**
23:22
**AFD (1)**
23:22
**Affairs (2)**
5:1;54:7
**Affidavit (5)**
45:19,23,25;47:1;53:9
**affiliated (1)**
40:8
**affiliation (1)**
41:7
**again (8)**
22:1;23:4,23;28:22;47:7;
48:1;17;54:16
**against (3)**
5:11;29:19;34:9
**Agent (7)**
16:20,25;17:7;20:9,12;
22:12;34:6
**agents (1)**
15:1
**ago (3)**
7:23;8:14;54:11
**agree (8)**
4:3,10;15:21;16:15,21;
18:4;22:14;46:4
**agreement (1)**
4:9
**agrees (1)**
4:11
**ahead (2)**
29:21;49:16
**aid (1)**

**23:10**
**alcohol (2)**
35:22;36:9
**allegations (1)**
6:1
**alleged (2)**
6:2;37:7
**almost (1)**
50:19
**altercation (1)**
12:20
**ammunition (1)**
10:6
**amongst (1)**
42:15
**amount (2)**
35:3,4
**and/or (2)**
32:13;41:6
**Angeles (1)**
27:13
**Annex (5)**
12:19;26:13,14,18;43:7
**answered (1)**
28:7
**anymore (1)**
17:2
**APD (16)**
9:14;20:13,18,25;24:11,
18;25:11,13;27:18;33:16,
20,24;34:4,15;36:24;47:5
**appear (1)**
25:23
**appeared (1)**
25:25
**Appell (1)**
45:15
**Application (1)**
45:24
**applications (1)**
5:24
**appreciate (1)**
55:19
**appropriate (1)**
46:10
**approximately (1)**
16:9
**area (2)**
19:22,25
**around (1)**

**26:20**
**arrests (1)**
40:7
**arrival (7)**
18:8;21:15,18;34:10;
37:21;54:22,24
**arrive (2)**
21:24;25:16
**arrived (5)**
15:15,16;17:6;22:19;23:6
**ARTHUR (3)**
4:12,21,21
**Aside (2)**
33:19;39:15
**aspect (1)**
31:11
**assertation (1)**
30:12
**assigned (3)**
6:3;9:5,6
**assist (1)**
21:19
**Assistance (5)**
34:21;35:8,9,10,16
**assume (2)**
32:5,10
**assuming (1)**
26:24
**Atlanta (7)**
4:13,24;7:6;11:16;16:13;
17:22;55:1
**attorney (6)**
7:19;14:5;46:18,20;
51:25;55:11
**Attorney's (9)**
31:21;32:13;47:14;49:21;
50:3,10,12;51:11;53:17
**audio (2)**
9:22,23
**available (1)**
40:5
**avoid (2)**
18:3;52:12
**await (2)**
50:5;51:24
**aware (11)**
6:24;30:6;31:20,24;
36:16;44:6,16,22;45:12;
47:5;53:7
**awareness (1)**

45:13
**away (1)**
46:14

**B**

**back (9)**
8:11;10:6;20:6;22:1;
27:9;30:13;49:2,15;54:21
**bad (3)**
12:25;13:4,7
**Ball (1)**
8:13
**baseball (1)**
27:13
**based (5)**
17:5;32:4;42:7;44:7;53:8
**basically (4)**
10:16;11:4,23;53:6
**basis (1)**
40:19
**Bates (5)**
16:7;20:6;22:1;23:19;
27:10
**bear (1)**
14:19
**bearing (1)**
51:12
**behind (1)**
39:9
**belief (1)**
32:16
**Bennett (1)**
9:11
**betweens (1)**
54:17
**beyond (1)**
41:22
**binding (3)**
4:7;7:8;41:25
**black (4)**
22:4,13;27:12;39:6
**blood (2)**
27:15,19
**bloody (1)**
14:12
**blue (3)**
22:4,13;27:12
**body (1)**
33:22

**bolts (1)**
10:11
**both (1)**
24:22
**box (3)**
12:4,12,16
**brake (1)**
33:14
**breaching (1)**
37:20
**break (1)**
44:11
**brief (5)**
35:13;44:14;48:22;49:24;
55:8
**bring (3)**
48:23;49:10,14
**Bringing (1)**
49:2
**Brooks (2)**
50:21;51:5
**Brosnan (3)**
50:22;51:9,10
**budget (1)**
35:25
**building (1)**
39:13
**Buldini (2)**
8:23;25:20

**C**

**call (2)**
15:3;30:13
**called (1)**
45:25
**calls (2)**
47:1;53:3
**came (5)**
10:20;27:3;33:6,8;44:1
**camera (1)**
48:4
**can (43)**
5:16;8:15;12:13;13:7;
15:3,4,17,20;16:20;17:16;
22:8;24:22;27:22;29:6;
32:8;34:3,19;35:5,20,22,24,
24;37:11,23;39:4;40:22;
41:20,23;42:7;45:20,24;
46:11;47:10;48:15;49:6,7,8,

8,9,15;52:18,23;54:3
**cap (6)**
27:13,15,16,17,23,25
**capacity (4)**
40:23;41:24;42:6;54:4
**car (22)**
19:16,20,24;22:4,5,22,25;
27:14,18,25;28:12,13;
32:17,23,24;33:5,8;39:3,10;
48:8,15,17
**care (1)**
55:22
**case (5)**
6:21;11:7;14:18;30:23;
51:5
**cases (1)**
6:3
**casing (1)**
14:12
**categorizing (1)**
40:25
**cell (5)**
44:18;53:20,25;54:9,12
**cellphone (1)**
45:21
**cellphones (3)**
54:8,10,13
**certain (4)**
30:18;32:4;47:10;52:18
**challenge (1)**
30:13
**changed (1)**
21:17
**charge (9)**
17:13;18:17;19:10;29:21;
31:9,10;50:13;51:12,17
**charged (3)**
50:18,23;51:2
**charging (2)**
49:22;50:6
**check (5)**
23:23;24:5;33:1,2,20
**checked (1)**
12:14
**Chevy (3)**
22:4,13,14
**Chief (2)**
50:16,17
**Chiefs (1)**
27:1

**circumstances (1)**
30:19
**citizen (1)**
43:3
**City (72)**
4:11,13,23;5:8;7:6,7,8,19;
11:16;15:11;16:5,13;17:8,
11,12,22;18:5;21:1,6,12;
26:7;27:6;28:5,8,11,15;
29:8;30:3,4,16,19;31:20;
32:3,6,9,11,15,24;33:4;
34:8,20;36:10,16,20,25;
37:14,18;39:19;41:5,7,25;
42:15;44:16;45:4,12;46:9;
47:5,23;48:2,11;49:18,20;
50:2;52:2;53:10,10,22,25;
54:17,19,25;55:2
**City-issued (1)**
10:19
**City's (5)**
21:13;28:4,21;54:16;
55:11
**civilian (1)**
26:3
**clarify (3)**
22:3;25:7;41:5
**Clinton (1)**
16:9
**close (2)**
31:2;49:16
**closed (4)**
23:14;34:17;48:22;49:11
**clothes (1)**
26:3
**collaboratively (1)**
14:15
**color (1)**
27:12
**colored (1)**
22:13
**coming (3)**
4:18;55:3,19
**committed (1)**
5:25
**communicate (6)**
14:20;18:20;24:19;34:11;
52:5,8
**communicated (4)**
18:16;24:11,21;34:6
**communication (2)**

46:7;47:4

**communications (8)**
31:22;45:13;52:11;53:12,
15,18;54:17,18

**compare (1)**
29:12

**compared (3)**
47:24;48:7,11

**compilation (2)**
40:13;42:13

**compile (1)**
41:13

**complete (5)**
11:5,8;30:4,18;45:4

**complications (1)**
29:9

**complies (1)**
12:11

**compose (1)**
35:5

**comprised (1)**
6:14

**concern (1)**
33:4

**concerning (5)**
32:16,20;33:19,22;39:20

**concise (1)**
10:4

**conclude (1)**
30:11

**concluded (1)**
55:23

**concludes (2)**
49:21;50:3

**conclusion (1)**
30:20

**concur (2)**
51:21,22

**condition (2)**
23:5,6

**conduct (2)**
31:6;47:12

**conducting (2)**
13:16,20

**considered (7)**
14:10,14;19:22,25;28:16;
30:24;41:7

**consistent (1)**
22:23

**consult (3)**

7:18,19,22

**contact (5)**
16:9,18;36:3,14;46:24

**contacted (1)**
17:6

**contains (1)**
47:1

**content (4)**
53:8,11,15,18

**continuation (1)**
23:20

**continue (1)**
30:19

**continues (1)**
47:1

**controlled (1)**
17:12

**conversations (2)**
32:5;53:6

**copy (2)**
10:2;45:1

**correctly (4)**
9:4;39:5;43:13;48:14

**counsel (1)**
4:3

**County (2)**
31:21;47:14

**couple (3)**
10:16;42:3;55:13

**COURT (1)**
4:2

**create (1)**
38:13

**created (2)**
13:19;25:14

**creates (1)**
24:19

**creating (1)**
26:1

**crime (25)**
15:10;17:13,23;18:11,19,
25;19:3,10,15,23;20:1;
21:17;24:24,25;25:7,8,17;
27:7;34:12;37:20;38:20;
50:13;51:12;52:20;54:24

**Crimes (1)**
54:8

**criminal (14)**
6:1;13:14;14:11,14,18;
28:16;29:5;31:5,6,11,14,16;

39:22;52:4

**CROSS-EXAMINATION (1)**
4:16

**crouched (1)**
39:9

**current (1)**
4:4

# D

**dark (2)**
22:4,13

**DA's (15)**
13:15;29:15,18;30:25;
31:1,4,8;45:16;48:22;49:1,
4,13;50:6,8;51:16

**date (2)**
16:14;47:6

**dates (1)**
46:3

**David (1)**
20:12

**day (3)**
8:8;46:4,14

**days (1)**
35:4

**day-to-day (1)**
5:23

**deal (1)**
21:2

**deceased (1)**
23:11

**decide (1)**
31:10

**decided (1)**
31:9

**decides (3)**
14:5,6;50:13

**decision (11)**
49:22;50:5,5,6,7,8,9,10,
15;51:12,13

**Defendants (1)**
4:11

**definitely (1)**
19:20

**department (2)**
50:24;54:9

**depend (1)**
29:25

**depends (2)**

30:1;54:6

**deposition (6)**
4:6,19;5:7;7:20;8:5;55:23

**Deputy (1)**
27:1

**describe (1)**
8:15

**described (1)**
12:12

**designate (1)**
25:16

**designations (1)**
41:23

**designee (1)**
7:6

**Det (1)**
4:21

**detail (1)**
39:2

**Detectives (1)**
21:6

**Detective's (1)**
32:23

**determination (7)**
13:6;23:10;31:1,16;32:7;
33:25;36:20

**determine (5)**
28:11;33:8,12;40:16;
48:12

**determined (3)**
21:10;32:3,10

**determining (1)**
33:5

**different (2)**
11:19;51:7

**disagree (1)**
42:1

**Discharge (3)**
11:19,21,22

**discharged (3)**
10:5,9,18

**discharges (1)**
6:17

**disciplinary (4)**
5:10;34:8;50:14;51:13

**discover (1)**
29:20

**discrepancies (1)**
29:14

**discuss (1)**

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 62 of 71
DEAUNNA PHILLIPS, etc. vs.
YASIN ABDULAHAD
INV. ARTHUR NIXON
June 8, 2021

46:17
**discussed (2)**
  22:23;53:9
**discussing (1)**
  48:4
**discussion (2)**
  11:11;35:13
**disposition (2)**
  31:7;51:24
**distance (1)**
  28:12
**distortion (2)**
  9:22,23
**distress (1)**
  36:2
**District (10)**
  31:21;32:13;47:14;49:21;
  50:2,10,12;51:11,24;53:17
**disturb (3)**
  18:25;22:24;27:6
**disturbed (1)**
  18:15
**disturbing (1)**
  34:11
**dive (1)**
  30:8
**doctor (3)**
  34:25;35:3;36:6
**document (2)**
  18:24;45:10
**documented (1)**
  18:16
**documenting (1)**
  11:9
**documents (6)**
  7:22,24;8:6,15;13:25;
  16:4
**Dodgers (1)**
  27:13
**Don (1)**
  9:6
**done (9)**
  11:6;13:13;21:20;28:16,
  17;30:22;31:11,17;49:11
**door (10)**
  23:9,9,12,14,14,14;33:25;
  34:4,15,16
**doors (1)**
  23:4
**doubt (1)**

16:11
**down (9)**
  5:16;12:22;18:9;20:7;
  23:18;24:10,24;46:22;
  48:20
**drive (1)**
  13:24
**driven (5)**
  20:10;22:12,15;32:25;
  33:5
**driver (3)**
  23:4,9;33:25
**driving (2)**
  22:6;28:13
**duly (1)**
  4:14
**dusting (1)**
  33:16
**duties (2)**
  5:22,23
**duty (2)**
  35:19,20

**E**

**EAP (10)**
  34:19,21,24,25;35:7,22;
  36:4,7,10,13
**earlier (1)**
  48:5
**effort (1)**
  28:11
**either (6)**
  8:7;29:14;31:2;33:14;
  50:13;52:14
**Ellis (2)**
  20:10;22:12
**else (2)**
  11:2;22:9
**Emergency (2)**
  4:4;33:13
**Employee (9)**
  34:21,22;35:7,9,9,15;
  36:25;50:23;54:25
**employees (2)**
  13:18;28:9
**employment (5)**
  35:15;50:5,7,9,14
**EMS (4)**
  23:13,14,22;33:19

**encounter (1)**
  12:20
**ensued (1)**
  12:20
**ensure (1)**
  18:10
**enters (1)**
  19:12
**entire (2)**
  19:16,19
**entitled (1)**
  45:19
**even (2)**
  29:15;52:11
**evening (2)**
  26:19,24
**event (3)**
  38:22,24;53:1
**events (1)**
  40:18
**everyone (1)**
  54:11;55:21
**evidence (14)**
  13:21;14:8,10,14,17;
  19:24;21:7;30:1,5;32:20;
  33:13,22;47:23,24
**exact (2)**
  33:22;50:20
**exactly (1)**
  30:9
**Examination (1)**
  27:15
**example (2)**
  23:18;27:9
**exception (1)**
  29:19
**exchange (1)**
  14:25
**execution (1)**
  53:19
**exhaustive (1)**
  40:12
**exhibit (16)**
  5:2,3,4;15:25;16:1;17:5;
  20:4,6;22:1;23:20;25:3,4;
  27:10,11;45:6,7
**exigency (1)**
  21:2
**existed (1)**
  47:16

**exists (1)**
  47:15
**expect (5)**
  27:5;37:18;52:3,10,22
**extended (1)**
  35:3
**extensive (1)**
  40:12
**extent (8)**
  18:12,14;34:3;37:15;
  40:20;41:25;42:6;54:1
**eyewitness (1)**
  39:17

**F**

**fact (2)**
  26:14;47:6
**facts (7)**
  7:13;15:9;28:4;32:4;
  41:5;46:24;52:6
**failing (1)**
  34:10
**fair (1)**
  38:23
**false (2)**
  30:2;48:12
**familiar (1)**
  12:10
**family (2)**
  42:24;43:6
**far (7)**
  6:7,8;21:22,23;28:13;
  32:5;49:7
**February (1)**
  46:23
**fell (1)**
  20:2
**felony (3)**
  50:18,23;51:2
**felt (1)**
  9:7
**few (2)**
  32:2;54:11
**file (18)**
  7:25;8:1,16,17,19;9:17;
  11:1,15;15:17;29:16;31:17;
  44:21,22,24;45:1,3,4;51:18
**FILIPOVITS (22)**
  4:10,17;5:6;11:12;16:3;

17:18;25:6;35:14;37:13;
39:8;41:2,4,16,18;42:5,9;
44:9,15;45:9;54:14;55:9,18
**financial (1)**
    35:24
**find (6)**
    14:22;29:15,15;36:10;
    43:1,14
**finding (2)**
    32:11;51:22
**fine (5)**
    5:19,20;41:9,10;44:13
**fingerprints (1)**
    33:16
**finished (3)**
    13:23;49:13,13
**fire (1)**
    49:8
**firearm (2)**
    6:17;11:21
**Firearms (2)**
    11:19,22
**fired (4)**
    11:24;36:18;51:9,10
**first (21)**
    5:10;8:6,7;15:9,15;16:21,
    22;17:7;18:10,24,25;20:22;
    23:25;25:15,21,21;28:7;
    37:8;38:3,4;45:17
**fitness (1)**
    35:20
**five (3)**
    6:8;46:3;55:5
**five-minute (1)**
    44:11
**flagging (1)**
    12:18
**follow (1)**
    27:6
**following (1)**
    53:19
**follows (1)**
    4:15
**follow-up (2)**
    32:9;42:4
**follow-ups (1)**
    55:13
**Force (15)**
    11:3,4,6,8,18,22,25;12:1,
    13,25;13:1,6,7;19:21;21:21

**forget (2)**
    42:10;52:24
**form (4)**
    25:11,12,13,14
**found (4)**
    19:24;23:5;32:17;37:8
**Friday (2)**
    8:4,5
**friends (1)**
    43:6
**front (2)**
    12:6;23:3
**full (3)**
    4:20;20:8;22:2
**Fulton (3)**
    31:20;32:13;47:14
**further (1)**
    49:20

**G**

**gang (20)**
    39:20,23,25;40:2,3,6,8,
    10,11,13,15,17,18;41:8,13;
    42:13,14,19,22;43:9
**gang-related (1)**
    43:13
**gangs (1)**
    41:1
**Garrity (3)**
    9:14;13:19;15:5
**gather (1)**
    33:21
**gathered (2)**
    32:20;39:25
**GBI (64)**
    8:2,3,9,18;10:10,20;11:1;
    13:4,5,11,20,22,22;14:6,9,
    15,17,20,24;15:1,15;16:6,
    13;17:2,5,7,20;20:5,14,19,
    20,22,24;21:4,10,10,15,16,
    16;22:19;23:7,16,19,20,24;
    24:12,17,20,21;28:17;
    29:12,13;30:5,10,17,21,23;
    32:12;34:6,10;37:21;38:6;
    54:22,25
**GBI's (3)**
    18:8;29:10;30:3
**general (1)**
    52:21

**generally (5)**
    13:7;18:1,5;44:2;53:10
**generic (1)**
    25:12
**gentleman (1)**
    39:15
**gets (2)**
    24:17;48:22
**given (4)**
    10:24;11:16;29:13,13
**goes (1)**
    41:22
**good (6)**
    5:21;12:24;13:4,6;47:19,
    21
**governed (1)**
    18:6
**Great (1)**
    5:2
**groups (1)**
    41:7
**guess (3)**
    23:11;47:7;50:1
**gun (2)**
    32:17,21
**gunshot (3)**
    12:2;36:17,22
**guys (2)**
    26:9;44:12

**H**

**Half (6)**
    9:6,9;46:19,23;47:2,5
**hand (2)**
    13:23;51:18
**handed (2)**
    7:2;13:15
**handles (1)**
    13:11
**handling (1)**
    53:7
**hands (2)**
    12:2;21:11
**hanging (3)**
    48:8,14,17
**happen (1)**
    51:15
**happened (15)**
    10:11;15:4;19:21,22;

**generally (5)**
    20:2;24:19;36:15;38:11,15;
    39:3;43:12,21;48:20;50:19;
    54:18
**happens (3)**
    21:14;34:24;42:23
**hate (1)**
    52:13
**head (2)**
    18:9;46:8
**heading (1)**
    10:14
**Health (1)**
    4:5
**health/fitness (1)**
    35:19
**hear (8)**
    36:17,21;38:10,11,15;
    42:23;43:17,24
**heard (2)**
    9:4;43:17
**hearing (1)**
    43:6
**heavier (1)**
    49:6
**held (2)**
    11:11;35:13
**help (4)**
    4:19;15:21;35:25;55:20
**Hey (5)**
    15:3;35:4;43:23;44:3;
    52:15
**highlighting (1)**
    20:8
**high-profile (1)**
    50:18
**himself (2)**
    35:5,5
**history (1)**
    39:23
**hit (2)**
    43:10,17
**hold (2)**
    30:16;35:11
**holding (2)**
    10:1;12:9
**Homeland (2)**
    44:2,5
**homicide (1)**
    19:5
**honestly (1)**

42:10
**hour (2)**
17:19,21
**hours (1)**
26:21
**hundred (1)**
47:3

## I

**idea (3)**
26:7,17;49:25
**identification (4)**
5:5;16:2;25:5;45:8
**ie (1)**
33:9
**immediately (2)**
47:9;53:4
**incident (24)**
7:13,16;9:20,21,22,23;
10:3,9,15,18;11:6;15:7,9;
17:3;21:23;34:24;36:25;
37:3,25;43:20;45:13;46:5;
48:3;52:7
**include (1)**
8:2
**including (2)**
6:19;41:6
**inconsistent (1)**
29:25
**indicate (2)**
30:2;40:6
**indicating (2)**
10:3;12:17
**indict (3)**
31:2,2;49:8
**indicted (1)**
51:1
**individual (1)**
42:6
**Individually (1)**
4:12
**influence (2)**
38:16;50:14
**influenced (1)**
50:10
**informal (2)**
42:14,16
**information (17)**
15:5;23:24;24:4,10;

32:16;33:19;34:5,11;37:6,
14;39:19,21;40:1,3;41:14;
42:17;47:13
**inquiry (1)**
47:13
**inside (5)**
11:15;26:22,23;32:17;
39:3
**instances (2)**
12:23;47:4
**instruct (1)**
38:5
**intel (1)**
39:24
**intend (3)**
31:1;49:18;51:17
**intentionally (1)**
48:18
**interacts (1)**
36:7
**interested (2)**
14:17;22:3
**Internal (7)**
5:1;11:17;31:7;46:25;
48:2;52:4;54:7
**internally (1)**
21:21
**into (7)**
6:1;19:4;24:23;30:9;
33:24;39:13;47:22
**INV (1)**
4:12
**investigate (6)**
5:24;6:3,9,18;20:24;
30:20
**investigated (1)**
32:12
**investigating (4)**
20:19,21;29:8,10
**investigation (48)**
7:1;11:17;13:5,9,11,12,
13,14,17,20,23,24;14:2,9;
19:5;20:5,22;28:5,6,21,25;
30:4,17,18,21,24;31:8,15,
16,21;32:20;33:4,24;34:9,
16;46:25;47:13;48:3;49:19,
20,22;50:3;52:4,5,6,21;
54:21,23
**investigations (1)**
15:8

**investigative (2)**
7:25;16:6
**Investigator (28)**
4:25;5:22,23;7:1;8:22,22,
24;9:2,5,6,9;10:5,17;12:18,
21;14:24;18:17;25:2;40:21;
41:21;45:15;46:19,23;47:2,
5;54:2;55:10,15
**Investigators (5)**
6:5,9,15,19;54:13
**involved (6)**
10:18;12:21;13:17;19:20;
21:11;52:14
**issued (5)**
53:25;54:7,8,10,12
**issues (2)**
35:21,24
**item (1)**
45:20

## J

**jail (1)**
49:9
**January (7)**
10:17;16:8,15,19;46:1,4;
53:23
**joining (1)**
55:15
**Jones (1)**
20:12
**JR (2)**
4:12,22
**June (1)**
16:7
**justifiable (2)**
12:24,25
**justified (3)**
12:5,13,22

## K

**keep (1)**
19:11
**keeper (1)**
25:19
**kept (1)**
36:12
**kill (1)**
43:11

**kind (2)**
47:11;52:18
**knew (1)**
36:8
**knowing (1)**
37:19
**knowledge (11)**
32:1,18;33:1,23;36:23;
37:5;40:1,14;42:7;54:16,18
**known (1)**
41:5
**knows (1)**
21:16

## L

**labeled (1)**
14:1
**last (6)**
8:12;20:8;22:2;27:11;
42:10;50:19
**late (1)**
13:3
**lawsuit (1)**
6:22
**lead (3)**
14:22,24;25:2
**learned (3)**
7:15;28:5;40:25
**least (1)**
17:14
**leave (1)**
39:13
**leaves (1)**
19:12
**led (1)**
30:7
**left (1)**
23:1
**legs (2)**
48:14,16
**letter (2)**
31:4;51:16
**letting (1)**
13:4
**level (1)**
46:7
**Lieutenant (5)**
6:14,20;8:23;9:11;27:1
**Lieutenants (1)**

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 65 of 71
DEAUNNA PHILLIPS, etc. vs.
YASIN ABDULAHAD
INV. ARTHUR NIXON
June 8, 2021

27:2

**life (1)**
44:7

**Likewise (1)**
28:18

**lines (1)**
10:16

**list (4)**
42:18,21;43:4;47:1

**located (1)**
27:13

**location (3)**
32:16,21;33:22

**log (11)**
19:11;24:18,22,23;25:8,
17,18,19,24;26:2,9

**logged (1)**
18:16

**logging (1)**
21:7

**look (13)**
8:3,4,8,12;15:17;16:18;
44:23,25;47:10,22,23;
52:17,18

**looked (4)**
8:9;10:23;39:22;48:3

**looking (5)**
25:11;29:17;30:25;40:4;
48:13

**loop (1)**
36:12

**Los (1)**
27:12

**lost (1)**
11:13

**lot (9)**
19:17,18,19;26:25;27:2;
39:2,7;49:6;54:13

**Lying (3)**
29:2,4;30:12

## M

**ma'am (2)**
46:12;54:5

**maintain (1)**
21:24

**maintained (1)**
45:4

**Major (1)**

27:2

**majority (2)**
13:18;26:11

**Makes (3)**
32:15;50:8;52:17

**making (2)**
9:3;30:8

**male (1)**
39:6

**Malibu (4)**
22:4,13,14,20

**man (1)**
43:23

**many (5)**
6:5;11:23;26:17,22,23

**marijuana (5)**
37:2,7,15,16;55:3

**marked (4)**
5:4;16:1;25:4;45:7

**matter (10)**
14:11;19:14;21:1;28:20;
34:5;49:9;52:2,10,20;53:24

**maximum (1)**
18:11

**may (7)**
29:15;30:7;39:1;44:21;
50:2;55:11,12

**maybe (4)**
7:23;8:14;14:19;26:18

**mean (6)**
17:7,11,12;26:6;27:23;
43:3

**means (4)**
6:12;7:6;16:24;32:11

**meet (1)**
14:23

**meeting (2)**
16:22;17:7

**member (3)**
39:20;40:17;42:24

**members (6)**
40:18;41:1;42:19,22;
43:8,9

**membership (3)**
40:6;41:6;42:14

**memorialized (1)**
55:2

**men (1)**
26:9

**mental (1)**

35:18

**mentally (2)**
35:1,6

**merge (1)**
14:2

**messages (3)**
46:2,3;53:3

**met (2)**
16:20;17:3

**middle (1)**
45:20

**might (11)**
14:4,17,18,22;15:1,21;
17:3;21:2,20;26:18;40:5

**MILLER (11)**
4:11;17:16;37:11;39:4;
40:20;41:12;44:13;46:11;
52:23;54:1;55:14

**mind (3)**
10:1,12;12:9

**minutes (3)**
7:23;44:10;55:5

**moment (1)**
27:10

**Moody (1)**
16:10

**more (5)**
10:22;26:15;27:1;42:3;
55:5

**most (3)**
6:1;29:11;32:5

**mouth (1)**
43:19

**move (1)**
33:21

**moved (9)**
18:15;19:24;23:23;24:5;
27:17,20;34:4;37:24,24

**movement (1)**
21:14

**moving (1)**
33:20

**much (3)**
13:13;14:25;21:11

**myself (2)**
6:15,19

## N

**name (9)**

4:20,21;11:24,25;24:24;
25:20;26:3;51:5,7

**names (1)**
25:23

**narrative (7)**
10:13,14,15;11:25;12:4,
16,16

**National (1)**
4:4

**nature (1)**
21:8

**need (9)**
5:15;10:22;21:21;22:9;
30:10;35:2,2;44:4,4

**needed (1)**
9:7

**needs (2)**
35:4,6

**new (1)**
49:23

**news (1)**
42:23

**next (1)**
16:19

**night (1)**
16:12

**nine (1)**
46:1

**NIXON (9)**
4:12,18,21,22;40:21;
41:21;54:2;55:11,15

**Nods (1)**
18:9

**normally (1)**
50:17

**noted (2)**
20:10;23:15

**notes (1)**
22:12

**notified (1)**
8:5

**number (11)**
15:2;16:4,7;17:22;20:7;
22:1;23:19;26:5,6;27:4,11

**numbers (1)**
14:25

**nuts (1)**
10:11

# O

**oath (4)**
4:7,14;29:21,22
**objection (10)**
4:6;17:16;37:11;39:4;
40:20;41:15,17;46:11;
52:23;54:1
**observed (1)**
7:14
**obtain (1)**
44:17
**obtained (2)**
20:11;53:19
**obtaining (1)**
20:14
**occurred (3)**
15:14;37:1,3
**odor (1)**
55:3
**off (8)**
7:2;11:11;13:15;21:11;
35:2,3,4,13
**Office (22)**
4:25;13:15;29:15,18,22,
22;30:25;31:1,5,8,21;32:13;
45:16;47:14;49:21;50:3,6,8,
12;51:11,16;53:17
**Officer (38)**
4:6;6:17;9:21;14:3,4,5,5,
7;19:20;26:1;27:18;28:19,
23;29:19;30:7,12,13;31:6;
34:9;35:21;36:2,7,9,9,12,
16,24;44:3;46:8,16;47:19,
24;50:13,17,22;51:4;52:3,
10
**Officer-involved (6)**
6:13,16;19:8;20:21,23,25
**Officers (32)**
5:25;10:8;17:13;18:7,10,
19,23;19:10,14;20:13,18,
18,23;22:24;25:17;26:6,8,
17,22,25;27:5;43:23;44:6;
47:17;51:8;52:2,14,19;53:1,
14,22;54:17
**Officer's (1)**
11:24
**officials (1)**
16:20

**Once (12)**
19:20,24;21:9,10;26:1;
30:22,25;31:15;46:15;
48:22;49:14;55:5
**one (22)**
5:12;6:7,19,20,24;7:21;
9:9;16:19;17:4;19:11;
20:17;22:15;25:16,21;27:6;
38:4;39:6,9;41:22;42:20;
46:4;48:4
**ones (2)**
6:17;44:3
**ongoing (1)**
40:19
**only (7)**
23:8;27:20;38:22;39:16;
43:14;49:12;52:13
**open (5)**
7:1;23:4;30:24;33:25;
34:16
**opened (4)**
23:9,12,13,14
**opinion (1)**
19:19
**OPS (19)**
5:23;6:5;8:16;9:17;
10:25;11:14;13:10,11;14:8;
28:20,21,24,24;29:10;
30:16;31:8;32:20;45:4;
51:13
**order (2)**
25:23,24
**others (1)**
42:15
**other's (1)**
38:17
**otherwise (2)**
5:15;21:3
**out (23)**
4:19;6:18;14:1,22,23;
16:13;19:24;20:2;26:15;
27:3;29:15,16;30:10;35:1,
25;36:10;43:1,10,14;48:8,
14,17;55:20
**outer (1)**
27:16
**outside (4)**
7:19;40:21;41:14;54:2
**over (6)**
10:20;26:2;31:15;35:24;

49:8,15
**overlap (1)**
13:12
**overview (1)**
5:22
**own (3)**
36:10;40:18,25

# P

**P-1 (1)**
5:4
**P-2 (1)**
16:1
**P-4 (1)**
45:7
**P-5 (1)**
25:4
**packaged (1)**
37:15
**page (12)**
5:18;16:18;20:6,9;22:11,
19;23:18;27:10,12;45:18,
20;46:22
**painful (1)**
10:22
**paragraph (5)**
16:21;20:7,9;22:2,18
**paraphrasing (1)**
48:9
**Park (1)**
8:13
**parking (5)**
19:17,18,19;39:1,7
**part (5)**
6:2;11:16;20:1;45:23;
48:2
**particular (5)**
19:22;26:24;27:3;30:23;
34:23
**partner (1)**
46:8
**partners (1)**
47:7
**party (1)**
12:21
**passenger (2)**
23:4;27:14
**passenger-side (1)**
34:15

**past (3)**
12:23;30:22;40:9
**pause (1)**
11:10
**pay (1)**
51:3
**paycheck (1)**
50:24
**people (7)**
24:23;25:24;26:15;39:1;
43:9,19,22
**pepper (1)**
12:1
**perform (2)**
32:24;49:18
**perjury (1)**
29:23
**Perretti (1)**
8:23
**person (2)**
19:12;37:8
**personal (7)**
7:12;36:2;40:23;41:24;
42:7;54:4,19
**personally (4)**
7:14;16:25;42:20;52:25
**persons (1)**
13:17
**Phillips (15)**
22:5,5,16;23:22;24:5,13,
13;28:12;33:5,20,21;37:8;
39:20;40:9,14
**Phillips' (2)**
41:6;43:6
**phone (2)**
53:3;54:12
**phones (6)**
44:18;53:20,25;54:9,19,
19
**photograph (1)**
40:8
**photographs (1)**
28:8
**photos (1)**
21:7
**physical (3)**
11:7;12:2;30:1
**physically (1)**
37:24
**piece (1)**

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 67 of 71
DEAUNNA PHILLIPS, etc. vs.
YASIN ABDULAHAD
INV. ARTHUR NIXON
June 8, 2021

14:16
**place (2)**
7:7;12:4
**placed (2)**
27:25;51:2
**Plaintiffs (1)**
4:10
**Plaintiffs' (4)**
5:4;16:1;25:4;45:7
**plan (1)**
35:23
**play (1)**
19:4
**playing (1)**
26:10
**Please (2)**
4:9,20
**pm (7)**
16:19;17:6,8,14;44:14;
55:8,23
**point (4)**
19:25,25;20:3,3
**police/citizen (1)**
12:20
**policies (5)**
17:23;19:4;31:12,13;
47:17
**policing (1)**
52:21
**policy (20)**
5:24,25;6:2,9;14:19;
15:11;18:2,6;19:15;21:1;
27:6;29:2;31:13,19;34:5;
47:20;49:20;51:20;52:2,10
**portion (2)**
16:5;31:3
**position (3)**
4:23;47:25;51:1
**possible (2)**
18:12;51:20
**post-shooting (1)**
54:16
**potential (3)**
40:18;41:1;42:21
**practice (3)**
21:1;38:19;53:24
**precinct (1)**
42:24
**predecessors (1)**
47:12

**preparation (1)**
8:11
**preparing (1)**
7:19
**present (1)**
21:3
**preservation (1)**
54:24
**preserve (2)**
21:3;23:7
**preserving (1)**
17:23
**pretty (3)**
13:13;14:25;21:11
**primary (1)**
38:24
**print (1)**
14:1
**prior (8)**
18:7;20:11,14;30:20;
34:10;37:20;40:7;54:24
**private (1)**
36:6
**probably (9)**
15:1;23:9,10;25:21;
26:15;36:14;44:10;47:9;
49:24
**problem (1)**
36:9
**proceed (1)**
4:2
**proceeding (1)**
22:11
**Professional (1)**
5:1
**Program (5)**
34:22;35:8,10,16,18
**propositions (1)**
18:5
**protected (1)**
15:6
**protest (3)**
42:25;43:1,7
**provide (2)**
37:23;39:2
**provided (2)**
5:8;16:5
**Public (2)**
4:5;12:19
**pull (1)**

27:23
**pulling (1)**
18:3
**pulse (3)**
23:23;24:5;33:20
**purpose (3)**
38:8;48:25;49:3
**purposes (1)**
32:19
**pursuant (2)**
4:4;9:14
**put (3)**
12:22;35:22;43:10

**Q**

**qualification (1)**
41:10
**quick (2)**
44:11,25
**quickly (1)**
39:12

**R**

**rank (1)**
26:4
**Rayshard (1)**
50:21
**reach (2)**
16:13;30:10
**read (3)**
5:15;10:25;16:20
**reading (1)**
10:12
**reads (1)**
46:22
**ready (2)**
5:17,20
**reaffirm (1)**
30:11
**real (1)**
43:25
**really (3)**
24:15,17;39:2
**reason (4)**
16:11;17:8;18:15;49:12
**receiving (1)**
50:24
**recess (2)**

44:14;55:8
**recollection (2)**
38:17;48:19
**recommend (1)**
36:11
**record (6)**
4:3,9;11:11;35:13;36:3,5
**records (1)**
36:24
**recounts (1)**
48:8
**referenced (7)**
6:11;9:18;11:1,18,18;
25:9;51:4
**references (1)**
22:5
**referencing (3)**
8:21;9:13;22:15
**referring (1)**
50:21
**reflect (2)**
18:5;25:24
**reflects (1)**
22:19
**regard (3)**
32:4;42:10;51:4
**regarded (2)**
15:10;19:15
**regarding (1)**
37:14
**Regardless (1)**
27:4
**relate (2)**
15:8;17:23
**related (2)**
25:1;37:7
**relates (6)**
15:11;24:16;31:22;34:14;
35:11,18
**relative (1)**
33:9
**relaying (1)**
23:24
**relevance (1)**
28:21
**relevant (2)**
14:18;28:24
**relieved (2)**
47:8;53:4
**relying (1)**

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 68 of 71
DEAUNNA PHILLIPS, etc. vs.
YASIN ABDULAHAD
INV. ARTHUR NIXON
June 8, 2021

32:12

**remained (1)**
28:1

**remains (1)**
18:11

**remember (9)**
26:12;39:5;43:5,13;47:8;
48:13,13,15;53:4

**reminded (1)**
46:23

**remotely (1)**
4:8

**render (1)**
23:10

**report (31)**
8:2,3,10,18;9:18,19,20,
21,23,23;10:3,9,13,25;11:3,
4,8,17,19,20,21,22,22,25;
12:6;23:20;24:10,18;33:2;
47:18;51:23

**reported (2)**
21:16;55:2

**REPORTER (1)**
4:2

**reports (2)**
21:20,22

**representative (3)**
4:13;34:25;46:18

**reprimanded (1)**
31:13

**request (1)**
30:4

**required (3)**
19:11;37:20;47:17

**resolved (3)**
31:8;49:1,4

**respond (1)**
14:23

**responded (1)**
6:25

**responders (3)**
18:24,25;23:25

**results (2)**
36:11;37:9

**retired (4)**
7:1;9:10,11,12

**revealed (1)**
27:15

**review (2)**
18:23;51:21

**rhyme (1)**
38:10

**right (44)**
4:18;6:22;7:16;11:13;
12:17;17:14;18:17;21:5,25;
22:16,20;23:1;24:1;25:19,
25;28:1,25;29:3;30:8;32:2;
34:17;35:16;37:21;38:16,
20,21,25;39:3,9,13,17;
43:20;46:14;47:9;49:23;
51:25;52:19,22;53:8,12;
54:19,23;55:10,18

**rise (1)**
47:3

**Roberson (1)**
37:24

**Robeson-El (17)**
5:11;8:23;31:23;32:25;
36:17;38:23;39:15;44:17;
45:14,25;46:2,24;49:19;
50:25;51:17;53:23;55:1

**role (4)**
6:6;20:25;21:13;26:9

**Rolfe (2)**
51:6,8

**roof (2)**
27:13,18

**round (1)**
10:7

**rounds (1)**
11:24

**run (3)**
32:7;39:12,13

**running (4)**
22:20,22,25;23:1

**S**

**Safety (1)**
12:19

**same (9)**
5:18;6:6;13:14;23:3;
29:10;34:14;46:3,14;50:25

**saw (3)**
18:21;39:7;48:16

**saying (3)**
31:5;48:18;51:16

**scene (56)**
7:3;8:24;10:19,20;11:6;
15:10,10,14,15;17:12,13,21,

23;18:7,11,14,17,19;19:1,3,
10,12,16,23;20:1;21:2,3,14,
16,23,24;22:24,25;23:6,25;
24:20,24,25;25:8,16,17,18,
22,25;26:8;27:5,7;28:8;
34:10,12;35:1;36:25;37:20;
38:4;39:17;54:24

**scope (6)**
19:15;41:8,11,14,22;54:2

**screen (1)**
10:1

**scroll (2)**
5:16,17

**search (9)**
20:11,14;32:24;44:16;
45:1,19;47:18;53:9,19

**searched (4)**
20:11,13;22:14;45:21

**second (3)**
11:10;20:8;35:12

**Section (3)**
4:5;18:3,3

**secure (1)**
21:2

**secured (1)**
10:19

**Security (3)**
44:2,5;48:4

**seeing (1)**
45:17

**seize (1)**
14:8

**Seizure (1)**
45:19

**sense (2)**
13:7;32:15

**sent (2)**
46:1,2

**sentence (2)**
22:2;27:11

**separate (3)**
18:19;30:20;38:14

**separated (1)**
37:25

**separately (1)**
38:15

**separating (1)**
38:8

**Sergeant (5)**
6:15,20;8:23;16:10;27:2

**Sergeants (1)**
27:1

**served (2)**
44:17;47:18

**Service (1)**
4:5

**Sex (1)**
54:8

**share (3)**
6:6;15:24;42:15

**sharing (1)**
42:16

**Sheet (2)**
25:8,8

**shell (1)**
14:12

**shirt (1)**
14:12

**shoot (2)**
6:7,11

**Shooting (33)**
6:13,16,23;11:7;12:24;
14:23;15:10,14;16:12;17:3,
14;18:7;19:8;20:21,23,25;
26:13,14;27:3;28:1;31:23;
33:9,10,14;34:1,17;42:25;
43:8,12;44:7;47:9;50:19;
52:16

**short (2)**
10:4,9

**shortly (2)**
43:12;55:6

**shot (3)**
12:21;22:6;46:8

**show (8)**
5:2,10;12:1;15:20;20:4;
22:9;25:3;45:6

**showing (4)**
15:22;21:25;33:13;45:18

**shown (1)**
43:7

**shows (3)**
42:24;43:1,3

**side (10)**
14:14,24;27:14;28:16;
33:25;48:22;49:1,4,11,13

**simply (1)**
21:1

**simultaneous (1)**
14:9

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 69 of 71
DEAUNNA PHILLIPS, etc. vs.
YASIN ABDULAHAD
INV. ARTHUR NIXON
June 8, 2021

**situation (4)**
20:17;29:7,7;34:23
**six (1)**
45:25
**slightly (3)**
23:23;24:5;33:20
**smell (1)**
37:2
**somebody (5)**
40:11,13;42:24;43:1,11
**someone (5)**
19:21;23:24;26:2;40:17;
46:8
**sometimes (4)**
12:2,3,3,15
**sorry (3)**
23:19;51:1;54:22
**sort (1)**
39:12
**sound (1)**
12:9
**sounds (1)**
50:1
**source (1)**
44:1
**speak (2)**
40:22;54:3
**speaking (1)**
52:25
**Special (5)**
16:20,25;20:9,12;22:11
**specific (1)**
24:16
**specifically (1)**
37:7
**spray (1)**
12:2
**spurred (1)**
26:15
**Staci (3)**
41:20;42:1,5
**stains (1)**
27:15
**stand (2)**
38:5,6
**standard (1)**
38:19
**Standards (1)**
5:1
**standing (1)**

**7:7**
**stands (1)**
34:19
**start (2)**
25:17,17
**started (1)**
20:20
**starts (1)**
27:12
**state (1)**
4:9
**statement (22)**
8:25;9:1,3,7,8;13:19;
14:3,4,6;24:4,14,16;29:9,
12,13,13;30:8;36:16,21;
46:15;47:25;48:12
**Statements (12)**
8:18,20,21;9:13,18;
10:24;11:15;14:7;28:20,24;
29:17;30:1
**statement's (1)**
30:2
**states (3)**
16:6,7;20:9
**stay (1)**
38:5
**still (6)**
6:25;22:22;30:24;45:23;
50:23;53:5
**stop (2)**
33:6,9
**stories (1)**
38:9
**story (1)**
38:13
**street (1)**
53:5
**strictly (3)**
13:16;14:11;35:11
**struck (1)**
11:23
**stuff (2)**
15:20;43:15
**subject (4)**
6:22;20:10;22:12;52:4
**subpoena (1)**
29:16
**substance (1)**
35:21
**Summary (1)**

**16:6**
**Supervise (1)**
12:4
**Supervisor (14)**
11:5,8;12:18,24;25:16,
22;36:8;38:3,4;47:20;
49:24;51:14,18,19
**Supervisors (8)**
12:15;13:3;26:12;27:3,5;
31:17;48:21,23
**supplied (1)**
23:16
**supply (1)**
53:18
**suppose (1)**
14:16
**supposed (1)**
24:23
**sure (22)**
5:17;9:3;10:23;15:18;
19:23;21:14;29:6;33:3;
35:1;36:13,13;39:7,22,23;
40:4,10;41:12;44:5;46:18;
51:21;53:2;54:11
**surface (1)**
27:16
**suspect (1)**
11:23
**suspected (1)**
42:19
**suspect's (1)**
11:24
**suspended (1)**
51:3
**sworn (1)**
4:14

**T**

**talk (10)**
5:18;11:1;15:7;46:13,15,
20;48:24;52:15,17,20
**talked (2)**
40:9;53:2
**talking (6)**
7:13;8:20;9:19;11:14;
43:20,22
**tattoos (1)**
40:9
**team (3)**

**6:7,11,14**
**tells (1)**
19:21
**ten (1)**
6:10
**tend (1)**
52:24
**terminated (1)**
51:9
**test (1)**
37:10
**tested (1)**
37:9
**testified (1)**
4:15
**testify (3)**
5:9,12;7:5
**testifying (3)**
7:12,14,15
**testimony (1)**
7:7
**thereafter (1)**
55:6
**Thomas (3)**
16:9,20,25
**thought (1)**
51:7
**threat (1)**
44:6
**three (1)**
6:18
**thumb (1)**
13:24
**timeline (1)**
15:13
**times (2)**
12:3;46:1
**timing (1)**
16:17
**today (6)**
4:19;7:5,20;8:7;45:4;
55:16
**together (3)**
38:10,12,14
**told (1)**
46:19
**took (1)**
23:25
**top (3)**
25:21;27:16,25

Case 1:19-cv-00401-MHC   Document 102-6   Filed 11/19/21   Page 70 of 71

DEAUNNA PHILLIPS, etc. vs.                                    INV. ARTHUR NIXON
YASIN ABDULAHAD                                                      June 8, 2021

**topics (4)**
  5:7,9,14;40:21
**totally (1)**
  21:5
**touch (2)**
  14:13;22:24
**touched (1)**
  33:13
**track (2)**
  11:14;42:14
**traumatic (2)**
  34:24;53:1
**traveled (1)**
  28:14
**treatment (1)**
  35:23
**trick (1)**
  22:8
**tried (1)**
  23:10
**tries (1)**
  42:13
**truth (1)**
  4:14
**truthful (2)**
  28:20,23
**truthfulness (4)**
  29:18,20,21,25
**try (2)**
  30:10,11
**trying (4)**
  18:2;42:12;48:18;50:4
**turn (5)**
  6:1;31:3,4,17;49:16
**turned (1)**
  51:15
**two (7)**
  6:8,15;14:7;19:4;38:5;
  48:11;51:8
**type (6)**
  12:1;25:7;35:22,23,25;
  44:6
**typically (11)**
  10:8;13:21;14:22;17:20;
  24:21;25:1,15;46:9,16;
  51:15;52:24
**typo (1)**
  16:8

**U**

**ultimate (2)**
  31:7;51:23
**ultimately (3)**
  33:6;49:7;50:16
**under (2)**
  4:4,14
**underlying (4)**
  15:9;28:4;32:4;52:7
**Understood (2)**
  10:12;13:10
**undisturbed (1)**
  18:11
**unfolded (1)**
  38:17
**Unit (10)**
  5:1;26:5;36:1;39:23,25;
  40:4;41:13;42:13;54:6,7
**units (1)**
  54:9
**unless (1)**
  31:4
**unofficial (2)**
  43:10,17
**untruthful (3)**
  30:8,14;48:19
**unusual (1)**
  24:25
**up (18)**
  10:1;12:9;18:3,9;22:8;
  27:23;36:2;38:12;42:24;
  43:1,3,7;48:21;49:16,16;
  50:16;51:14;55:6
**update (1)**
  40:19
**Use (16)**
  11:3,4,5,8,18,22,25;
  12:12,25,25;13:6,7;19:21;
  21:21;29:19;34:20
**used (1)**
  53:1
**Usually (8)**
  26:1;31:3;34:25;36:5,6;
  42:22,25;46:13

**V**

**vehicle (6)**

  20:10,14;22:12;27:14;
  47:25;55:3
**veracity (1)**
  36:21
**verbally (3)**
  24:12,21;25:1
**verified (1)**
  44:4
**verify (1)**
  40:11
**verifying (2)**
  37:1;43:25
**victims (1)**
  53:2
**video (8)**
  39:5;47:23,24;48:3,4,7,
  15,16
**violated (3)**
  31:12,12;49:20
**violation (6)**
  14:19;29:2,5,22;31:14;
  47:21
**violations (6)**
  5:25,25;6:2,9;31:19;
  51:20

**W**

**wait (5)**
  30:3;38:6;49:4,12;50:2
**waiting (2)**
  48:25;49:3
**walking (1)**
  43:23
**warning (1)**
  9:15
**warrant (11)**
  12:19;20:11,15;44:16;
  45:1,19,24,25;46:25;47:18;
  53:9
**warrants (1)**
  53:20
**way (15)**
  16:25;18:24;22:25;27:7;
  28:19;33:21;40:25;41:20;
  42:14,16;43:14,25;47:11;
  52:18;55:2
**weapon (3)**
  10:6,10,19
**weighs (1)**

  49:6
**welcome (1)**
  5:15
**well-rounded (1)**
  36:1
**weren't (1)**
  26:23
**what's (7)**
  11:15;30:9;36:13;38:8;
  48:25;49:3;51:5
**whenever (2)**
  6:16;11:5
**white (1)**
  39:10
**whole (1)**
  49:6
**whose (1)**
  8:20
**wish (1)**
  41:20
**within (3)**
  13:4;41:8,11
**without (1)**
  51:3
**witness (13)**
  4:7;9:18;10:24;12:11;
  38:22,24;39:16;42:8;46:12;
  52:6;54:5;55:17,21
**witnesses (4)**
  18:20,20;38:20;52:19
**women (1)**
  26:10
**word (2)**
  43:19;54:23
**work (3)**
  8:4;14:15;15:23
**worked (1)**
  26:22
**works (2)**
  36:8;41:21
**wrap (2)**
  49:16;55:6
**write (2)**
  12:17;13:9
**writing (1)**
  24:20
**written (4)**
  24:10,18,24;26:9
**wrote (1)**
  12:18

## X

**XYZ (1)**
15:3

## Y

**year (2)**
8:14;50:19
**years (1)**
54:11
**yesterday (1)**
8:7

## 1

**1 (3)**
5:3,9,14
**1:02 (1)**
44:14
**1:28 (1)**
55:8
**1:31 (1)**
55:23
**10 (2)**
5:9,10
**13 (1)**
46:23
**15 (3)**
7:23;46:22;47:2
**16 (1)**
47:2
**17 (1)**
47:2
**18 (2)**
47:3,3

## 2

**2 (6)**
15:25;20:6;22:1;23:20;
27:10,11
**2016 (1)**
20:21
**2017 (8)**
10:17;16:7,15,19;43:21;
46:1,23;53:23
**24/7 (1)**
26:23

**26 (5)**
10:17;16:7,15,19;53:23
**27 (1)**
45:18
**27th (3)**
46:1,2,4
**28th (1)**
46:2

## 3

**30 (1)**
44:10
**30b6 (1)**
4:12
**319 (1)**
4:5

## 4

**4 (3)**
41:5;45:6,18

## 5

**5 (1)**
25:3

## 6

**63 (1)**
47:3

## 7

**7 (2)**
5:9,14
**7:00 (1)**
26:20
**7:57 (3)**
16:9,12;17:6

## 8

**8:55 (3)**
16:19;17:8,14

## 9

**9 (1)**

27:10
**939 (1)**
16:7
**940 (1)**
16:18
**943 (2)**
20:7;22:11
**944 (3)**
22:1,19;27:11
**961 (2)**
23:18,19