1

1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

DEAUNNA PHILLIPS, Plaintiff,     CIVIL ACTION FILE
4  by and through her Mother,       NO: 1:19-CV-00401-MHC
SPARKLE STIDWELL,
5  as next friend,

6                     Plaintiffs,

7          vs.

8  YASIN ABDULAHAD,

9                     Defendant.

10                      VOLUME I

11          The videoconference deposition of EL MALIK

12  ROBESON-EL; the reading and signing of the deposition

13  being waived; taken before Cathy Cox, Certified Court

14  Reporter, commencing at 10:02 a.m., on the 16th day of

15  March 2021.

16

17

18

19

20

21

22

23

24

25

2

1   APPEARANCES OF COUNSEL:

2   FOR THE PLAINTIFF:

3       G. BRIAN SPEARS, ESQUIRE
        JEFFREY FILIPOVITS, ESQUIRE
4       Spears & Filipovits, LLC
        1126 Ponce de Leon Ave., N.E.
5       Atlanta, Georgia 30306
        404-872-7086
6       bspears@civil-rights.law

7       CHRIS STEWART, ESQUIRE
        DIANNA J. LEE, ESQUIRE
8       Stewart Miller Simmons Trial Attorneys LLC
        55 Ivan Allen Jr Blvd Suite 700
9       Atlanta, Georgia 30308
        dlee@smstrial.com
10

11  FOR THE DEFENDANT:

12      STACI J. MILLER, ESQUIRE
        JOSHUA FOSTER, ESQUIRE
13      City of Atlanta Law Department
        55 Trinity Avenue, Suite 5000
14      Atlanta, Georgia 30303-3520

15  Also Present:  Sparkle Stidwell

16

17

18

19

20

21

22

23

24

25

3

1                              CONTENTS

2

3                            EXAMINATION

4        Cross-Examination by Mr. Spears.................4

5                              EXHIBITS

6      Plaintiff's

7        Exhibit 1.....Video of Annex...................48
         Exhibit 2.....Robeson-El interview.............39
8        Exhibit 9.....Interview with Clint Thomas......42
         Exhibit 10....Awareness statement & sketch.....86
9        Exhibit 11....Affidavit for search & seizure...70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                   P R O C E E D I N G S

 2          MR. SPEARS:  Let the record reflect that

 3      this will be the deposition taken for purposes of

 4      discovery and cross-examination and all other

 5      purposes permitted by the Federal Rules of Civil

 6      Procedure.  The deposition will be conducted

 7      pursuant to those rules and to that end, as the

 8      deposition proceeds, all objections other than as

 9      to the form of the question and the

10      responsiveness of the answer will be reserved

11      until such time of this deposition or any portion

12      thereof may be made use of during the course of

13      this litigation.

14          The deposition is being taken pursuant to

15      notice and agreement of counsel as to the time

16      and date and manner of taking of the deposition.

17      It, of course, is a remote deposition.

18          As I understand it, the witness is alone; is

19      that correct, sir?

20          THE DEPONENT:  Yes.

21          MR. SPEARS:  All right.  And we have all

22      other counsel being remote at this time.  Let's

23      see, could you please swear in the witness and

24      then I'll ask if anyone else has anything else to

25      ask.
```

5

1                     (Deponent was sworn.)

2           MR. SPEARS:  Before, I start asking

3       questions any questions from counsel or anything

4       counsel wishes to state on the record before we

5       start.

6           MS. MILLER:  No, thank you.

7           COURT REPORTER:  Mr. Spears, should I go

8       ahead and state -- ask for an agreement?

9           MR. SPEARS:  Oh, sure, go ahead with your

10      statement.

11          COURT REPORTER:  I will ask counsel to agree

12      on the record that under the current National

13      Emergency pursuant to Section 319 of the Public

14      Health Service Act, there is no objection to this

15      deposition officer administering a binding oath

16      to the witness by videoconference.  Please state

17      your agreement on the record.

18          MR. SPEARS:  We agree.  Plaintiff.

19          MS. MILLER:  Counsel for the defendants, we

20      agree.

21                     EL MALIK ROBESON-EL,

22  having been first duly sworn, was examined and

23  testified as follows:

24                     CROSS-EXAMINATION

25  BY MR. SPEARS:

6

1     Q    All right, Mr. Robeson, let me start by

2   asking a few questions just to be certain that we're

3   able to proceed successfully with the deposition.

4   First of all, are you able to hear me clearly?

5     A    Yes, I am.

6     Q    And at any point during the course of this

7   deposition if I have asked you anything or said

8   anything and you have not understood me, will you

9   please tell me that?

10    A    Yes.

11    Q    And you understand, of course, that if you

12  don't tell me to explain or to repeat a question, I'll

13  assume that before you answer that you understood the

14  question and answered it pursuant to your

15  understanding; is that agreeable?

16    A    Yes.  Yes.

17    Q    Have you had your deposition taken before?

18    A    No, sir.

19    Q    Have you sworn under oath to testify while

20  in court?

21    A    Yes.

22    Q    And approximately how many times that's

23  taken place, please?

24    A    I can't count it.  Numerous amount of times.

25    Q    Would it be hundreds?

7

1      A     Yes.

2      Q     And during the course of your adult life

3  have you ever yourself brought a lawsuit?

4      A     No.  No, sir.

5      Q     Have you yourself ever been a defendant?  A

6  named party as a defendant in a lawsuit?

7      A     For a car accident, yes.

8      Q     For any other matter?

9      A     No, sir.

10      Q     The car accident that occurred, was that one

11  in which at the time it occurred you were in law

12  enforcement?

13      A     Yes.

14      Q     Did it involve -- were you in a law

15  enforcement vehicle?

16      A     Oh, no, sir.  No.

17      Q     You just happened to be at that time to be a

18  law enforcement officer?

19      A     Yes.

20      Q     As we're proceeding today, are there any

21  physical conditions that for you make it difficult for

22  you to hear or to understand my questions?

23      A     No.

24      Q     Are there any conditions that you have on

25  this day that make it difficult for you to express

8

1   yourself or remember?

2        A     No, sir.

3        Q     Have you ever been known to be hard of

4   hearing?

5        A     No.

6        Q     Have you ever had earaches or conditions

7   that make it difficult to hear from time to time?

8        A     I had earrings, but I don't -- yes, I had

9   earrings before in the past.

10       Q     Okay.  And I may not have been clear in the

11  way I asked a question.  The question as asked had to

12  do with earaches, such as an infection in your ear.

13  Have you ever had that circumstance?

14       A     Yes, as a child, but not as a adult.

15       Q     And have you ever worn glasses?

16       A     Yes.

17       Q     And currently you have prescription lenses

18  of any kind?

19       A     Yes.

20       Q     And are those the kind that you wear such as

21  myself or are they contacts?

22       A     Yes, the ones you wear.  Like the ones you

23  have, yes.

24       Q     All right.  And are you nearsighted or

25  farsighted?

9

1      A     I just use them for reading.  I am far --
2  farsighted.
3      Q     I understand.  So you're able to use the
4  glasses in order to read, but otherwise you're able to
5  see at a distance successfully?
6      A     Yes.
7      Q     Please state your full name.
8      A     El Malik Robeson-El.
9      Q     And the name of Malik means king?
10     A     Yes.
11     Q     And is that a given name or is that one that
12  you by chance may have added as a first name?
13     A     It was given.
14     Q     Thank you.  And are you married, sir?
15     A     No, sir.
16     Q     In 2017 were you married?
17     A     No, sir.
18     Q     Do you have any children?
19     A     Yes.
20     Q     And what are their ages, please?
21     A     26, 21, 19, 7 and 5.
22     Q     And have you been married in the past?
23     A     Yes.
24     Q     And did there come a time when there was a
25  judicial proceeding that resulted in the conclusion of

1   or divorce of that marriage?

2        A     Yes.

3        Q     Have you been married more than once?

4        A     No, sir.

5        Q     Your ex-spouse's name, what is that?

6        A     Nicole Fleming.

7        Q     And please tell me what occupation she has.

8        A     I don't know.  I haven't spoken to her in a

9   while.  I couldn't tell you.

10       Q     During your marriage, what was it?

11       A     She was -- she was working for a hospital.

12   She was a nurse's assistant at the time.

13       Q     In 2017, were you the owner of a 2013 Lexus?

14       A     Yes.

15       Q     And were you the owner of a 1996 GMC Sonoma

16   truck?

17       A     Yes.

18       Q     And in 2017, your cellphone service provider

19   was Sprint; am I correct?

20       A     Yes.

21       Q     And your cellphone number at that time was

22   404-621-1531; is that correct?

23       A     Yes.

24       Q     Is that still your cellphone number?

25       A     No, it isn't.

1     Q     And when did you change it?

2     A     I think I changed it like a year ago.

3     Q     Okay.  All right.  And throughout the period

4  of time then from 2017 until about a year ago, was

5  your cellphone provider still the Sprint Company?

6     A     Yes.

7     Q     And you still had that same cellphone

8  number?

9     A     Yes.

10     Q     Okay.  In early 2017, please tell me what

11  social media platforms you used?

12     A     Instagram.

13     Q     Any others?

14     A     No, sir.

15     Q     Did you have a Facebook account?

16     A     No.  I had a Facebook account like years ago

17  when it first -- when it first -- when it first --

18  when it first started, but I never -- I don't use it.

19     Q     And have you ever had a LinkedIn profile or

20  used that service?

21     A     No, I didn't.  I think the job created one

22  for me, but I didn't have access to it.  I never had a

23  password or anything to it.

24     Q     There are some other websites I'd like to

25  ask you about.  And tell me, please, whether or not

1   you participated in or read or posted to any of the

2   following:  There's one called Police One, are you

3   familiar with that?

4       A    No.

5       Q    There's one called Cops In The Hood.  Are

6   you familiar with that?

7       A    No, sir.

8       Q    There's one entitled Protect And Serve.  Are

9   you familiar with that?

10      A    No.

11      Q    Do you currently participate or in the

12  past -- let me first ask it this way.  In the past

13  have you participated in any private discussions

14  forums about police work?

15      A    No.

16      Q    Have you served in the military?

17      A    Yes.

18      Q    Please tell me about that.

19      A    I performed in the United States Navy from

20  1997 to 2000.

21      Q    And where were you stationed, please?

22      A    I was stationed on the USS George Washington

23  CVN73 in Norfolk, Virginia.

24      Q    And can you describe for us what your

25  primary duty was as you were in the Navy?

1              MS. MILLER:  Objection; but you can answer.

2         A    Okay.  I started out as air traffic -- I

3    mean parking air crafts, and then I changed my job to

4    an IT.  Information technologist, fixing computers.

5         Q    And were you working in IT when you left the

6    Navy?

7         A    Yes.

8         Q    And when you left the Navy --

9         A    No, I'm sorry.  Before I left the Navy.

10   Before I left the Navy.  After the Navy, no.

11        Q    All right.  And what occupations did you

12   have after you left the Navy and before you became a

13   police officer?

14        A    I was a correctional officer.

15        Q    For what agency or department?

16        A    State of Maryland, Patuxent Institution of

17   Maryland.

18        Q    Sorry.  You gave us a name of an

19   institution.  What was that again, please?

20        A    Patuxent.

21        Q    Can you please spell that for the court

22   reporter?

23        A    P-A-T-U-X-E-N-T (spelling).

24        Q    And as a correction officer, did you -- were

25   you certified?  Did you have the authority to arrest?

14

1      A      No.

2      Q      When did you become P.O.S.T. certified by

3  the State of Georgia?

4      A      Two thousand -- I graduated the Academy in

5  March 2008.

6      Q      And have you ever worked for any law

7  enforcement agencies other than for the City of

8  Atlanta?

9      A      Yes.

10      Q      What other agencies?

11      A      University of Baltimore and University of

12  Baltimore College and Baltimore Housing Authority.

13      Q      In the state of Georgia, are there any

14  agencies that you have worked for -- law enforcement

15  agencies other than the City of Atlanta?

16      A      No, sir.

17      Q      And within the City of Atlanta for what

18  divisions or sections of the police department have

19  you worked?

20      A      Just CIU, and I worked the Gun Unit for like

21  a year.  And the rest of my -- I just was working in

22  Field Operations Division.  CIU is a Criminal

23  Investigating Unit.

24      Q      The initials CIU, is that Criminal

25  Investigations Unit?

1      A     Yes.

2      Q     And with the -- let's see, with the Gun

3  Unit -- did you say Gun Unit earlier?

4      A     Yes, yes.

5      Q     Was that also known or has that also been

6  known as the Gun Reduction Task Force.

7      A     Yes.

8      Q     All right.  How long -- was that a section

9  of the Gangs Unit?

10      A     No, sir.  It was -- it was a section in the

11  Major Crimes Unit.  It's done changed.  I can't --

12  when I started it was -- it was -- it was just putting

13  together a unit at the time when it first began.  So

14  it was a Major Crimes Unit just known as the

15  Aggravated Assault Gun Unit where we just responded to

16  calls -- responded to shootings.  We investigate

17  shootings, sorry.

18      Q     And you say in -- you were with that for

19  about a year, I think you said?

20      A     I think about a year.  I can't give you

21  exact dates, but I'd say approximately a year.

22      Q     All right.  And were you in the -- what you

23  called the Gun Unit in January of 2017?

24      A     Yes.

25      Q     As was Officer Abdulahad?

1      A    Yes.

2      Q    While you were -- let's see, over the course

3  of time, you have made a number of arrests; correct?

4      A    Yes.

5      Q    And over the course of time you have made a

6  number of arrests for drug-related offenses including

7  possession of drugs?

8      A    Yes.

9      Q    And for assault, both miscellaneous and

10  felony assault?

11      A    Yes.

12      Q    And you've made arrests for marijuana

13  possession and other drugs?

14      A    Yes.

15      Q    Are you able to approximate for us the

16  number of drug arrests that you have made, and by drug

17  arrests I mean for possession of drugs?

18      A    I'd say like hundreds.

19      Q    In a given -- I take it you continue to work

20  with CIU?

21      A    Yes.

22      Q    And within a given month is there -- can you

23  give us an estimate of about how many arrests you will

24  make?

25      A    Well, I don't physically make the arrests.

1   I just do the investigation and get a warrant for

2   their arrest.  Another unit go make the arrest.

3          Q     All right.  Was that also the case in 2017?

4          A     Yes.

5          Q     With the Gun Unit, you described it as

6   responding to shootings and investigating shootings.

7   During the course of your service within the Gun Unit,

8   would you have occasion from time to time to seize

9   guns that were associated with a particular incident?

10         A     Yes.

11         Q     And sometimes those guns you would find them

12  to have been stolen; correct?

13         A     I personally never had a gun -- seized a gun

14  that was stolen while I was in that unit, but I have

15  seized a gun a time or -- a time or two while during

16  my investigation.

17         Q     At any time before January 26 of 2017, had

18  you ever heard of Deaundre Phillips?

19         A     No, sir.

20         Q     You had never encountered Mr. Phillips

21  before?

22         A     No, sir, not that I could recall.

23         Q     And you had no knowledge of anything about

24  him such as where he went to school?  You didn't --

25         A     No.

18

1        Q    -- know anything about him?

2        A    No.

3        Q    You knew nothing about any of his associates

4   or his activities; is that correct?

5        A    No, sir.

6        Q    You knew nothing about where he had ever

7   been arrested?

8        A    No, sir.

9        Q    Nor, did -- I'm sorry, I didn't mean to cut

10   you off.

11        A    I knew nothing about him.  Never even seen

12   him before as far as I can recall.  I wouldn't know if

13   I seen him again.

14        Q    I'm sorry, please say again.

15        A    I wouldn't know if I had seen him again.

16        Q    And that evening on January 26, 2017, you've

17   had no knowledge of any warrants for his arrest; is

18   that correct?

19        A    Correct.

20        Q    Nor any knowledge of any status that he may

21   have vis-à-vis parole, probation, First Offender, any

22   of that?

23        A    That's correct.

24        Q    Fair to say then that as of that evening on

25   January 26th, 2017, there was nothing in his prior

1    history about which you had any information

2    whatsoever; correct?

3        A    Correct.

4        Q    So before Mr. Phillips was shot on that

5    evening all that you knew about him is what you had

6    heard and seen from the point that you pulled your car

7    -- you were in a car and pulled into the parking spot

8    until the point that you saw him and he was dead?

9    That's the time frame of your entire knowledge?

10       A    Yes.

11       Q    Am I correct in understanding that Officer

12   Abdulahad has never told you that he knew anything

13   about Phillips, has he?

14       A    Correct.

15       Q    And that would go both before or after the

16   shooting?

17       A    Correct.

18       Q    As to the car that Mr. Phillips was seated

19   in when you first arrived into the parking lot there

20   at the Annex, from your observation of the car, you

21   didn't notice any decals on the car, did you?

22       A    No.

23       Q    You didn't notice any strange markings on

24   the car?

25       A    No.

1      Q      Nor did you notice one way or another
2    whether the windows of the car were tinted or
3    difficult to see into?
4      A      No.
5      Q      From the outside of the car, that is to say
6    the car that Mr. Phillips was seated in, there was no
7    indication about it that there was anything illegal
8    inside of the car when you first observed it; correct?
9      A      When I first observed it, no, I didn't.
10     Q      You had no report to the effect that the car
11   had ever been involved in any unlawful activity at the
12   time that you observed it and before Mr. Phillips got
13   out of the car?
14     A      Repeat that question.  I don't understand.
15     Q      All right.
16     A      I don't understand the question.
17     Q      Again, just trying to get a sense -- you
18   know, a sense of what you knew about -- first I've
19   asked you about Mr. Phillips and now I'm asking you
20   about the car.
21            As to the car itself, was there any
22   indication whatsoever to you as you observed it and
23   before you had contact with Mr. Phillips that there
24   was anything about the car that suggested it was being
25   used for any illegal activity?

21

1       A       No.

2       Q       Another way to put it is there was nothing
3   suspicious about the car; right?

4       A       No, not as -- no, I didn't see anything.  I
5   didn't see anything illegal about the car.

6       Q       Okay.  On the night of the shooting, do you
7   recall your chain of command?  The officers in your
8   chain of command.

9       A       No, sir.  I don't remember who my chain of
10  -- no, huh-uh.

11      Q       All right.

12      A       It changed a lot.

13      Q       And is it your recollection that officers in
14  your chain of command responded to the scene of the
15  shooting after it had occurred?

16      A       No, sir.  Not in my chain of command.  I
17  think it was from that zone responded.

18      Q       You said zone, Z-O-N-E, (spelling), zone?

19      A       Yes.  From that Zone, Zone 1.

20      Q       Okay.  Now on the night of Phillips' death,
21  you and Officer Abdulahad, you were working in plains
22  clothes; is that right?

23      A       Yes.

24      Q       And each of you were equipped with a
25  firearm; is that correct?

1        A       Yes.

2        Q       And that was a Glock?  Each of you had a

3   Glock?

4        A       Yes.

5        Q       And did you or Officer Abdulahad carry any

6   additional weapons?

7        A       I didn't.

8        Q       All right.

9        A       I don't know if he did or not.  I wasn't

10  sure.  He didn't tell me.

11       Q       You were equipped with a flashlight?

12       A       No.

13       Q       Was there one in your vehicle?

14       A       Huh, no.

15       Q       On your person, how would you carry the

16  firearm that you had?

17       A       In my holster.

18       Q       And how was the holster positioned?  Was it

19  positioned on your waist or elsewhere on your body?

20       A       Around my waist.

21       Q       And as to Officer Abdulahad, what do you

22  recall about how he positioned his holster?

23       A       I think it was on his waist.  If I'm -- yes,

24  it was on his waist.

25       Q       It's my understanding that he was

1    right-handed; is that your recollection?

2        A    Yes.

3        Q    And in your observations of where he carried

4    his holster or positioned his holster, was it to his

5    left side, his right side?  Where on his waist?

6        A    It was on his right side.

7        Q    Can you recall any other equipment -- issued

8    equipment that you carried on yourself as of that

9    evening or on that evening in addition to the firearm

10   that you had?

11       A    My badge, my I.D., and my radio.

12       Q    And where was the radio positioned?

13       A    My radio was in my -- my radio was in my

14   pocket.

15       Q    The radio in your pocket, is that -- I take

16   it then that was small enough it could fit into a --

17   was it a jeans pocket or a jacket pocket?

18       A    A jacket pocket.

19       Q    All right.  So it was mobile.  It wasn't

20   tethered to your body?

21       A    Correct.

22       Q    Was that also the case with Officer

23   Abdulahad?

24       A    Yes.  I think -- yes.  He had a clip on

25   his -- I think he had a little clip on it where you

1    could clip it on your pocket.

2        Q    Okay.  Since January of 2017, have you ever

3    been contacted by any member of the Phillips family?

4        A    No.

5        Q    Have you ever been contacted by someone who

6    was a family friend of theirs reaching out to you for

7    any purpose?

8        A    No.

9        Q    Has that ever come to your attention that

10   any person from either Phillips family or family and

11   friends have reached out to or had any contact with

12   Mr. Abdulahad?

13       A    Not that I know of, no.

14       Q    After Mr. Phillips was shot by Officer

15   Abdulahad, are you aware of any special security

16   precautions that were taken with respect to your

17   physical safety?

18       A    No.

19       Q    Are you aware of any special security

20   precautions that were taken with respect to the

21   personal safety of Mr. Abdulahad?

22       A    Yes.  He had -- they put -- our agency

23   put -- our agency Homeland Security placed cameras on

24   his home.

25       Q    And what's your understanding of what, if

1  anything, those cameras ever saw or found that related

2  to the security of Mr. Abdulahad?

3      A    Say it again.  I don't understand.

4      Q    Did the cameras ever catch anybody trying to

5  threaten or interfere with Mr. Abdulahad?

6      A    I'm not aware.  No one told me anything.

7      Q    Are you aware of any other steps taken other

8  than the placement of cameras at his home that were

9  steps taken in order to provide security to Officer

10  Abdulahad in the wake of the shooting?

11      A    No.

12      Q    Okay.  Let me touch on a few -- just to kind

13  of get oriented.  We'll see if I have some of these

14  facts right.  I want to ask you a series of questions.

15  As I understand it, you and Abdulahad were at the

16  Annex January 26th, 2017, to pull a warrant; is that

17  correct?

18      A    No.  We went to go place a warrant in GCIC.

19  Once we get the warrant signed, you have to take it to

20  GCIC so they can place it in the system.

21      Q    And the term you used is place, P-L-A-C-E

22  (spelling) form?

23      A    Yes.

24      Q    So I take it then that on your arrival there

25  was a warrant that was in existence already?

1          A      Yes.

2          Q      All right.  That the -- that the two of you

3    had pursuant to some investigation that you were

4    conducting?

5          A      Yes.

6          Q      And was it one warrant or more than one?

7          A      I can't recall.  I think it was more than

8    one.

9          Q      Okay.  And the warrant had been -- it was

10   already issued --

11         A      Yes.

12         Q      -- by the time you arrived at the parking

13   lot?

14         A      Yes.

15         Q      Okay.  And what -- it was issued by virtue

16   of, I take it, a magistrate signing the warrant?

17         A      Yes.

18         Q      And was that signing of the warrant done

19   electronically or was that done in person with you and

20   Officer Abdulahad or either of you meeting with a

21   magistrate?

22         A      Electronically.

23         Q      All right.  Do you recall anything about

24   that warrant either who it was for or what it was for?

25         A      No.

1      Q    All right.  So the warrant was already

2   issued and you went to that location to place the

3   warrant into the GCIC system; is that correct?

4      A    Yes.

5      Q    And the initials GCIC stand for what?

6      A    So I'm not sure.  I forgot, sir.  I forgot

7   the --

8      Q    Let me ask you this:  Do you recall there's

9   such a entity known as the Georgia Crime Information

10   Center?

11      A    Yes.  Yes.

12      Q    And for purposes of placing the warrant, is

13   it accurate to say that you went to the Annex in order

14   to place the warrant with the Georgia Crime

15   Information Center?

16      A    Yes.

17      Q    All right.  What is it going to the Annex

18   that is associated with placing a warrant on the GCIC

19   system?

20      A    Okay.  Once we get the warrant signed from

21   the judge, we got to place -- put some documents

22   together.  We got to do the criminal history on the

23   subject and fill out some documents that they require

24   us to fill out.  Like, demographics of the subject,

25   and we just take it there.  Put it in the packet.  And

1    we give it to them and they review it and make sure we

2    done everything correctly, and they'll place

3    everything in the system.

4         Q    All right.  The GCIC system, that's a system

5    for which there is limited access; correct?

6         A    Yes.

7         Q    And neither -- on that evening, neither you

8    nor Officer Abdulahad yourselves had access to the

9    GCIC, that is to say, to where you could go on it

10   yourself?  Am I right?

11        A    Yes.

12        Q    Okay.  And so I take it then there's some

13   office at the Annex that processes the receipt of

14   warrants and associated documentation and then post

15   that information with GCIC?

16        A    Yes.

17        Q    Is there a particular name for that office?

18        A    Just GCIC.  Just GCIC.

19        Q    By that I mean within APD, is that the name

20   given to the APD office as well?

21        A    Yes.

22        Q    And prior to your arrival had you alerted

23   the APD GCIC office that you were on your way?

24        A    No.

25        Q    Once you arrived at the parking lot, did

29

1    either of you two officers contact dispatch to let

2    them know that you had arrived?

3        A    No.

4        Q    Okay.  Going back to that list that I

5    referred to before, just to kind of get some

6    parameters down on what happened that night.

7                 Is it your testimony that at the time

8    that Mr. Phillips was killed that you did not hear a

9    gunshot?

10       A    No, I didn't.

11       Q    You never heard it?

12       A    No, I didn't.

13       Q    And when the Malibu driven by Phillips came

14   to a stop, it didn't hit anything, did it?

15       A    No.

16       Q    What, if anything, did you observe that as

17   you were looking at the vehicle caused the Malibu to

18   stop?

19       A    I had tunnel vision on the tag.  I was

20   looking at the tag and that's all I remember seeing is

21   the tag.  The tag number.  I was looking at the tag

22   number.  That's it.  That's all I can recall.

23       Q    Insofar what caused that car to stop -- stop

24   at that timing, am I correct in understanding then

25   that you have no information from your own observation

1    what caused it to stop?

2         A    No, I didn't.

3         Q    When you were alongside of the Malibu and

4    Phillips were at that point where Mr. Phillips had

5    opened the door, was standing alongside -- before

6    Phillips -- let me rephrase the question because I

7    don't want it to get too long.

8              Do you understand where we are, though,

9    time-wise?  He's alongside the car.  You're alongside

10   the car.  And Mr. Abdulahad is there with you.

11        A    Yes.

12        Q    At that point in time, am I correct, that

13   Mr. Phillips did not throw any punches, did he?

14        A    No.  No.

15        Q    And he never kicked you or anybody else at

16   that time?

17        A    No.  He grabbed me.

18        Q    Was that before or after he was shot?

19        A    That was -- that was -- that was before he

20   was shot.  Yes, that was before he was shot.

21        Q    And did he push you before or after you told

22   him that he should get out of there?

23        A    He pushed me afterwards.

24        Q    In the course of your contact with

25   Mr. Phillips, am I correct in understanding that you

1   were never physically injured?

2        A     Correct.

3        Q     And is it your understanding during the

4   course of the contact that Mr. Abdulahad had with

5   Mr. Phillips that he was not injured either, was he?

6              MS. MILLER:  Objection, but you can answer.

7        A     I'm not sure.  I didn't physically see any

8   injuries.

9        Q     Did you ask him was he hurt?

10       A     Yeah.  I just asked him if he was okay.

11       Q     Right.  Right.  And he said -- he said -- he

12   said I'm okay; didn't he?

13             MS. MILLER:  Objection, but you can answer.

14       Q     Your observation.  You're listening --

15       A     He was crying.

16       Q     He says --

17       A     He was crying.  He is crying.

18       Q     He was crying.  Okay.

19       A     Yes.

20       Q     Did he say he was hurt in any way?

21       A     No.

22       Q     And you didn't see any injury on him?

23       A     No.

24       Q     And in the several minutes of time that it

25   took between the time of the shooting and the time

1    that the first governmental vehicle showed up, you

2    didn't see any injury on his body, did you?

3         A    No.

4         Q    And he never told you that he had any injury

5    to his body, did he?

6         A    No.

7         Q    Okay.  Let's see.  Now again, just before

8    Officer Abdulahad went into the car after

9    Mr. Phillips, Phillips had been standing on the

10   payment alongside the open passenger door; correct?

11        A    No, I didn't see him.  I didn't see him.

12        Q    Okay.  Let me rephrase my question because

13   I'm not sure I was clear in referencing the point in

14   time.  Okay?

15        A    Uh-huh.

16        Q    The point in time that I'm talking about is

17   the point of time before Mr. Abdulahad goes into the

18   Malibu.

19        A    Oh, okay.  Yes.  Yeah.

20        Q    Before Mr. Abdulahad went into the Malibu,

21   Mr. Phillips had been standing on the pavement

22   alongside of the car; correct?

23        A    Yes.

24        Q    With a open passenger side -- front

25   passenger side door?

1     A    Yes.

2     Q    Okay.  And as he was standing there in front

3 of you he wasn't smoking anything, was he?

4     A    Correct.

5     Q    And at the time -- if I read this right --

6 at the time you noticed that he was -- in your

7 words -- a small guy.  A small in build.

8     A    Yes.

9     Q    And you looked at him using a flashlight,

10 didn't you?

11     A   I don't think it was my -- I'm not sure.  I

12 don't remember.  I don't remember if I had a

13 flashlight.  I think I did I probably had Abdulahad's

14 flashlight.  I don't -- I didn't have one myself.

15     Q    Okay.  Well, let's touch on that just a

16 second because I don't want any misunderstanding in

17 terms of what I read or what you've read and that sort

18 of thing.

19            After the shooting, you ran back to the

20 scene of where your red car was, didn't you?

21     A    Yes.

22     Q    And you picked up off of the ground a

23 flashlight, didn't you?

24     A    Yes, yes.  Yes.

25     Q    And was that a flashlight that had been on

34

1  your person or in your possession before the shooting

2  happened?

3      A    I can't -- to be honest I can't recall.  I

4  can't recall where I got the flashlight from.  I can't

5  remember because I don't use to carry a flashlight on

6  me at that time.  I don't -- I don't -- I can't recall

7  where I got that flashlight from.

8      Q    Do you recall one way or another whether or

9  not as Mr. Phillips was standing alongside the car,

10 and again before Mr. Abdulahad had went into the car,

11 that you were able to see Mr. Phillips through the

12 illumination of a flashlight?

13     A    You said I was able to see him through the

14 illumination of a flashlight.

15     Q    Yeah, illumination mean that the flashlight

16 spraying up and down on him?

17     A    Right.  No, I didn't do that.  No.

18     Q    And is it your testimony -- all right, I

19 understand you didn't do that.  Did anyone do it in

20 your presence?  Did Abdulahad do it in your presence?

21     A    He -- he may have, but I wasn't paying

22 attention to it.  I wasn't paying attention to it.  I

23 wasn't paying attention to -- I was paying attention

24 to the subject.

25     Q    To Mr. Phillips?

1       A     Yes.

2       Q     Okay.

3       A     Because Abdulahad was behind me and I wasn't

4    really paying attention to that.  I was looking at

5    him.  I was looking -- I was looking at Deaunna.

6       Q     And you saw that his hands were to his side,

7    didn't you?

8       A     Yes.

9       Q     And you saw there was nothing in his hands.

10   You didn't see anything in his hands, did you?

11      A     I couldn't see his hands at all.

12      Q     When he was standing alongside the car and

13   before Mr. Abdulahad had went into the car, did you

14   take note of Mr. Phillips' hands?

15      A     Yes.

16      Q     All right.  And what, if anything, did you

17   see in either hand at the time that he was standing

18   there?

19      A     I didn't see anything in his hands.

20      Q     And before Mr. Abdulahad went into the car,

21   you told him to hold him referring to Phillips, didn't

22   you?

23      A     Yes.

24      Q     And as of that point in time, what was the

25   charge that you anticipated making against

36

1    Mr. Phillips by virtue of taking him into custody?

2         A    I wasn't taking him into custody.  We was

3    just conducting an investigation, and I just wanted

4    him to hold him while I pull out on the radio.

5    Because I was trying to pull out on the radio.

6         Q    He wasn't free to go at that point in time,

7    was he?

8         A    No, he wasn't.

9         Q    When you told Mr. Abdulahad to hold him, you

10   intended that Mr. Abdulahad in fact do that, hold

11   Mr. Phillips?

12        A    Yes.

13        Q    And Mr. Phillips was being held why?

14        A    Because we smelled marijuana.

15        Q    At the time that you told Mr. Abdulahad to

16   hold Mr. Phillips, there wasn't any other reason to

17   hold him other than what you just told me; is that

18   right?

19        A    Yes.

20        Q    That he -- that you smelled marijuana?

21        A    Yes.

22        Q    And I know we've had more than one time when

23   we trying to take this deposition.  I appreciate your

24   cooperation in letting us reset it.  With that said,

25   I'd like you to describe for us the steps you took

1  knowing you were going to be a witness testifying

2  under oath, what steps you took to get ready for your

3  deposition?

4      A    I didn't take any steps.  I didn't take any

5  steps actually.  Because right now I'm on vacation.

6  And I was just trying to make attempts to get -- I

7  emailed Ms. Staci Miller to let her know that I didn't

8  have the link.  And I just -- I practiced before to

9  see, you know, if everything was working correctly.

10 Just got up and, you know, and that was it.

11     Q    But when you practiced that was this

12 morning; correct?

13     A    Yes.

14     Q    To make sure the link worked --

15     A    Yes.

16     Q    -- for the deposition?

17     A    Yes.

18     Q    And in addition to being certain that the

19 link worked, you had an opportunity, did you not, to

20 look over the transcript of your interview with the

21 Office of Professional Responsibility?

22     A    No, I didn't.

23     Q    Did you look over the transcript of -- if a

24 transcript exist -- of the interview that you had with

25 the Georgia Bureau of Investigation, Special Agent, in

1    February of 2017?

2         A     No, I didn't.

3         Q     Did you listen to either one of those

4    interviews?

5         A     No.

6         Q     And by that, I mean -- let me -- I was

7    asking you about preparing for the deposition.  Let me

8    broaden it out.  Have you ever heard the audio

9    recording of your interview with either OPS or with

10   the GBI?

11        A     No.

12        Q     Okay.  I wonder if we could take just a

13   moment because this will be for identification

14   purposes, Staci.  I have as exhibits -- proposed

15   exhibits to the deposition a couple of -- well, each

16   of those two audio recordings.  These are the ones

17   that I believe that your office sent over to us.

18   Since I'm only doing this for purposes of

19   identification, I suppose the simple thing to do would

20   be we could play the start and finish of it.  And you

21   can tell us whether you can stipulate, or if you want

22   me to, I'll ask the witness to listen and let us know

23   whether if he recognizes it.  We can do it either way.

24   I just want to be able to have them as exhibits.

25                  Why don't we do this then, Jeff, if you

1    could play first the OPS recording at the very

2    beginning of what I believe is this witness's

3    interview, and then advance it to the end and we will

4    see if we could expedite this identification process.

5              MS. MILLER:  Are there any Bates numbers

6         associated with these recordings?

7              MR. SPEARS:  The Bates numbers?

8              MS. MILLER:  Yes.

9              MR. SPEARS:  Not the recording itself.  No.

10        I mean, not that I'm aware of.  There might be

11        some entry in the Atlanta production that would

12        reflect a page number, but I don't have that.

13             MS. MILLER:  Okay.  I was going to see if I

14        could also locate those since you said they came

15        from us.  But, we can talk about that afterwards.

16             MR. SPEARS:  Okay.  And if you could just

17        call out the number that we've assigned to this

18        exhibit, Jeff, before you start it.

19             MR. FILIPOVITS:  Yes.  So I'm playing what

20        we've marked as Exhibit 2 to the Robeson-El APD

21        Interview.WMA.  I wanted to make sure everybody

22        could hear that.

23             MR. SPEARS:  Yes.  Although, I don't hear

24        anything yet, Jeff.  Can you hear it?

25             MR. FILIPOVITS:  Okay.  Let me try that

1     again.

2                    (Audio played.)

3          MR. FILIPOVITS:  Is that audio coming

4     through?

5          MR. SPEARS:  Yes.

6                    (Audio continued to be played.).

7          MR. FILIPOVITS:  I'm pausing there at 14

8     seconds.  This is an audio recording that's 8

9     minutes and 15 seconds long.  And I'm going to

10    fast forward now to 17 minutes and 35 seconds of

11    the same recording.

12                    (Audio continued to be played to

13                     the end.)

14         MR. SPEARS:  Let me see if it's possible --

15    Staci, let me just ask you first.  Do you want to

16    stipulate to that or should I ask the witness

17    more questions about it?

18         MS. MILLER:  You can ask him more questions

19    about it.

20         MR. SPEARS:  All right.

21    Q     (By Mr. Spears) Officer, did you recognize

22  your voice on that audio recorded?

23    A     Yes.

24    Q     And do you recall on February 13th, 2017,

25  you were interviewed by a officer with the Office of

41

1    Professional Standards, Officer Half?

2         A    Yes.

3         Q    And during the course of that interview, you

4    understood it was being audio recorded?

5         A    Yes.

6         Q    And you were there in the presence of

7    your -- of your -- of an attorney, Sandra Michaels?

8         A    Yes.

9         Q    And in listening to -- I know it wasn't

10   long -- but in listening to what you heard, did you

11   recognize your voice?

12        A    Yes.

13        Q    And can you agree with us that that's a

14   recording of your interview with Officer Half?  At

15   least the part you heard.  I know you didn't hear the

16   whole thing?

17        A    Yes.  Yes.

18        Q    No one is trying to pull anything on you,

19   you know.  If you listened to this and you decide

20   there's something in it that wasn't you, then, you

21   know, please, let us know.  But at least for purposes

22   of this deposition, let's provisionally have it

23   identified by this witness; is that acceptable?

24        A    Yes.

25             MR. SPEARS:  All right.  Jeff, if you could

1          please go on to the next audio recording.

2               MR. FILIPOVITS:  All right.  This is marked

3          as Exhibit 9, eFile is GBI Interview

4          170213_0284.FP3.  It's a that is 23 minutes and

5          28 seconds long.  I'm going to begin playing it

6          starting at the beginning.  Give me one moment.

7     Q    Officer, are you able to hear it all; right?

8     A    Yes.

9     Q    Thank you.

10              MR. FILIPOVITS:  All right.  Starting at the

11         beginning.

12                        (Playing audio recording.)

13              MR. FILIPOVITS:  I'm pausing the recording

14         at 1 minute.  I'll fast forward to -- bear with

15         me for a moment.  I'll fast forward to 22 minutes

16         and 27 seconds of the recording.

17                        (Playing audio recording.)

18              MR. SPEARS:  So the witness can hear it

19         better, back it up before you hear the female

20         voice.

21              MR. FILIPOVITS:  Okay.  I'll go back to 21

22         minutes and 39 seconds.

23                        (Continued playing audio

24                        recording.)

25              MR. FILIPOVITS:  All right.  I'll pause it

43

1      there at 21 minutes and 55 seconds.  I don't know

2      if you want any more played.

3      Q    (By Mr. Spears) All right.  Thank you.

4           Mr. Robeson, were you able to identify

5 your voice on that recording?

6      A    Yes.

7      Q    And is that -- from what you heard of that

8 recording, does that correspond with an interview that

9 you provided to Special Agent Clint Thomas of the

10 Georgia Bureau of Investigation on February 13th,

11 2017?

12     A    Yes.

13     Q    Okay.  Have you yourself met with anyone to

14 prepare for this deposition either telephonically, by

15 Zoom, or in person?

16     A    No, I didn't understand the question.  Say

17 it again.

18     Q    We're going back to how did you get ready

19 for the deposition.  Okay?

20     A    Okay.  Right.

21     Q    At any time, and I don't just mean this

22 morning, have you had occasion to meet with anyone to

23 prepare for your deposition?

24     A    I spoke with Ms. Staci Miller prior to this.

25     Q    Okay.  It's understandably you want to know

44

1    what's going to go on and that sort of thing.  So,

2    did -- was anyone else present when you met with Ms --

3    or had contact with Ms. Miller in whatever form that

4    was?

5         A    No.

6         Q    All right.  And was that -- that was

7    telephonically or in person?

8         A    Yes.  Telephonically.

9         Q    You have viewed, have you not, the video or

10   at least a portion of the video that captures the

11   physical movements of the cars and some of yourself

12   and the other two men that were there that night.

13   Have you not taken a look at that video?

14        A    Not since -- not since the incident

15   occurred.  That was in 2017.  That was the last time I

16   saw it.

17        Q    All right.  And when you saw it, were you

18   able to view it before you had your interview with

19   either OPS or the GBI?

20        A    No.

21        Q    Did you -- I take it then that you were

22   allowed to view it after that?

23        A    I saw it on the news.

24        Q    Okay.  And what -- is that the only

25   occasion -- let me rephrase the question.

1             The video that you saw on the news,

2    that's not the entirety of the video; right?  It

3    doesn't show all 20 minutes or 15 minutes, whatever it

4    is?

5         A    Correct.

6         Q    Okay.  All right.  In a manner of speaking,

7    the video shows the car driving away, that kind of

8    time frame mode of activity?

9         A    Yes.

10        Q    Okay.  Have you ever had occasion to look at

11   the entirety of the video that was turned over to the

12   GBI and made a part of their investigation?

13        A    No.

14        Q    It was offered to you, was it not, right

15   after your interview on February 13th, 2017?

16        A    No.

17        Q    When was the most recent time that you took

18   a look at the video?

19        A    I think it was in 2017.  I just -- I didn't

20   really look at it too much.

21        Q    Right.  Did you see the portion of the video

22   in which the Malibu pulls into the parking lot in

23   which Mr. Phillips was riding and then the Malibu

24   parks and a couple of folks get outside?

25        A    No.  No, I didn't see it.

1          MR. SPEARS:  I'd like to be able to identify

2     that video if we could and to that end since part

3     of it -- and I'm just thinking out loud about

4     this, Staci, the initial part of the video that

5     we have, of course, shows -- shows the Phillips'

6     car come in and park, and then there's a far

7     amount of time that passes and then a few other

8     things happen.  So I realize that it's not as if

9     he was watching that whole time, but I would like

10    just for, I guess, the sake of having the video

11    in the record to have us take a look, beginning

12    and end that we have, and see if you and I could

13    agree it can be used as an exhibit.

14          So to that end Jeff, if you could, please,

15    pull up that exhibit which is the video and start

16    at the very beginning, and then just take us to

17    the very end of it so we have a sense of its

18    length.  And we'll see if we can stipulate to it

19    being a copy of the video taken by the video

20    camera that was positioned on the exterior wall

21    of the police Annex there.

22          MS. MILLER:  Brian, will you be asking

23    Investigator Robeson-El any questions about the

24    video?

25          MR. SPEARS:  I expect I want to show him

1   some of what are called the scene next to the

2   car.  So the short answer is yes.  But, the

3   portions that I'll be asking him about will be

4   when he was there.

5           MS. MILLER:  Okay.  And you will show that

6   portion of the video before you ask the

7   questions?

8           MR. SPEARS:  Well, it depends on what he has

9   to say otherwise.

10          MS. MILLER:  Okay.  I will let you finish

11  your questions, then we can -- the time we watch

12  the video will be entered as an exhibit.  So go

13  ahead with your questions.

14          MR. SPEARS:  Okay.  Well, Staci, forgive me,

15  I'm not sure the process that you were

16  anticipating.  All I want to do now is see if you

17  and I can agree this is a copy of the video.  The

18  method of questioning the witness, of course,

19  that will just unfold over time.  I'm not -- I'm

20  not -- I have a particular sequence to the way

21  I'll be asking the questions.  He says he hasn't

22  looked at it.  So it's certainly not a recording

23  that refreshes his recollection in the sense that

24  he made it.  So let's just see how it goes.

25  Okay?  Let's see if we can agree it being a copy

1      of the video, and then we'll go back into my

2      question.  Okay?

3           Jeff, if you could start.

4           MR. FILIPOVITS:  Yes.  So I'm playing what

5      we're calling Exhibit 1.  The file name is Annex

6      Video CH07, open paren 1, close paren, dot, PPI.

7      And it's a 24-minute video.  I'll be starting it

8      at the beginning.  Can everyone see it on their

9      screen?

10          MR. SPEARS:  Yes.

11          MS. MILLER:  Yes.

12          THE DEPONENT:  Yes.

13          MR. FILIPOVITS:  There is no audio

14     associated with this video, so you won't be

15     hearing anything.  Brian, if you want me to skip

16     ahead, just let me know.

17          MR. SPEARS:  Let's see.  Why don't you --

18     why don't you go to about -- let's just say 3600,

19     193600.

20          MR. FILIPOVITS:  Oh, you're talking about

21     the timestamp.

22          MR. SPEARS:  Yeah.

23          MR. FILIPOVITS:  All right.  We're starting

24     at the timestamp on the video itself or the

25     running time of the video is 2 minutes and 5

1      seconds.  The timestamp in the top of the corner
2      is 193606.
3          MR. SPEARS:  Okay.  Why don't you -- let's
4      see, let's go ahead to say 1948 and 0 seconds.
5          MR. FILIPOVITS:  All right.  We're starting
6      at 194806 on the timestamp of the video, and 14
7      minutes and 5 seconds according to the run time
8      of the video.
9          MR. SPEARS:  Okay.  Could you, Jeff, go
10     ahead and take us to the end time of the video,
11     whatever that is.
12         MR. FILIPOVITS:  All right.  So we are now
13     at 195748 on the timestamp.  And 23 minutes, 45
14     seconds on the run time of the video.  And it's
15     going to close in 2 seconds.
16         MR. SPEARS:  Okay.  I wonder, can we
17     stipulate that that's a copy of the video, Staci?
18     At least provisionally for purposes of this
19     deposition?
20         MS. MILLER:  Yes, we can.
21         MR. SPEARS:  Thank you.
22     Q    (By Mr. Spears) All right.  I want to get
23  you to describe how you first met Mr. Abdulahad, how
24  long have you known him?  Just give us some background
25  in that regard.

50

1     A    I met him -- I met him a couple of times

2    prior to us becoming partners in this unit, but I

3    really didn't know him.  I just, you know, saw him

4    around.  He worked Zone 1, and someone that I probably

5    partnered up with knew him very well and, you know, we

6    spoke like that, but I really know him.  I didn't

7    really become friends with him until he became my

8    partner when I -- when I was a part of the Gun Unit.

9     Q    Was that -- was your work with the Gun Unit

10   the first time you had been partnered with

11   Mr. Abdulahad?

12    A    Yes.

13    Q    You said something to the effect that there

14   was someone who knew him well before you knew Officer

15   Abdulahad well.  Who was that?

16    A    He's no longer with the department.  His

17   name was Alif Richardson.

18    Q    Who?

19    A    Alif.

20    Q    Alif?

21    A    Yes.  Richardson.  I assumed they worked

22   together before and they worked together in Zone -- in

23   Zone 1, but he was my partner when I was working Zone

24   4, CIU Unit.  Alif was my partner and we went out to

25   eat breakfast one day, and Abdulahad pulled up with

1   his partner and the two -- those two were speaking

2   and, you know, I spoke to him.  You know, that was my

3   first encounter with him, but I really didn't know

4   him.

5        Q    All right.  As of January 2017, how long had

6   you been partnered with Mr. Abdulahad?

7        A    From the beginning of the unit.  From the

8   time the unit began, he was my partner starting out.

9   And I really don't know the beginning date.  How long

10  we were over there before this incident occurred.

11       Q    Was it more than a couple of months?

12       A    Yes.  Yes.

13       Q    And by being partners that meant that you

14  shared the same vehicle for purposes of carrying out

15  your duties?

16       A    Yes.  Sometimes -- I mean, we didn't have

17  to, but, you know, we chose to work together, you

18  know.

19       Q    Okay.

20       A    We just chose to ride together.

21       Q    And again in the time that you were in the

22  same Gun Unit, the activities in which you engaged

23  included having an office of some kind?  Some place

24  where you kept your investigative material?

25       A    Yes.  Well, we had a cubicle.  It's like an

1   open -- open floor with a lot of desks and separated

2   by cubicles.

3       Q   And where was that cubicle located?  In what

4   building?  Where in town?

5       A   It was in the main -- it was in the main

6   headquarters building.

7       Q   In coming on to work at the Gun Unit, did

8   the two of you receive any particular training

9   associated with what your tasks were going to be?

10      A   No.

11      Q   As between the two of you, yourself and

12   Abdulahad, had you worked with the department longer

13   than he had?

14      A   No.  He was working longer than I had.

15      Q   He was hired before you were?

16      A   Yes.

17      Q   After the shooting of Mr. Phillips, did you

18   remain in contact with Mr. Abdulahad?

19      A   Yes.

20      Q   Did both of you continue to work in the Gun

21   Unit?

22      A   No.  They separated us.  They sent me to

23   Zone 5.

24      Q   In Zone 5 --

25      A   CIU.

53

1     Q    -- had to do?

2     A    CIU, that's where I'm currently working.

3     Q    Okay.  And what's your understanding of

4 where Mr. Abdulahad was assigned?

5     A    They kept him there.

6     Q    And by there, what does that mean?

7     A    In the same unit.  They kept him in the same

8 unit.  Kept him in the same unit, but I think he just

9 had desk duties.  And then, you know, they took his

10 gun and his badge.

11     Q    And you yourself you -- once you went into

12 Zone 5 you were no longer working in the Gun Unit; is

13 that correct?

14     A    Correct.

15     Q    So, and this transfer, these shifts in

16 assignment, they happened immediately after the

17 shooting, I take it?

18     A    Yes.  A short -- yes.

19     Q    It was within 24 hours or thereabouts?

20     A    No.  It wasn't in 24 hours.  It was like --

21 I would say like probably a few weeks.  A few weeks

22 later.

23     Q    And did you remain in contact with

24 Mr. Abdulahad after the shooting?

25     A    Yes.

54

1    Q    And in what -- how did you communicate with
2  him?
3    A    We're friends.  I talked to him on the
4  phone.  Sometimes I go over to his house.  He'll come
5  over to my house and his wife, you know.  We're
6  friends.
7    Q    And that -- that contact you had with him by
8  phone and seeing one another, that continued after the
9  shooting?
10   A    Yes.
11   Q    The communication that you had with him, did
12 it also include text messages?
13   A    Yes.
14   Q    And Snapchat?
15   A    No Snapchat.  No.
16   Q    Any other messaging apps?
17   A    No.  We don't have any messaging apps.  I
18 don't.  I don't know if he do, but I don't.
19   Q    And it's fair to say you continued to be
20 friends with Mr. Abdulahad --
21   A    Yes.
22   Q    -- up through today?
23   A    Yes.
24   Q    Did Mr. Abdulahad describe to you any of
25 what happened at his deposition in this case?

1      A     No.  We really don't try to talk about it.

2  We don't talk about it, you know.

3      Q     But if -- what do mean?

4      A     About the incident.  We don't really talk

5  about the incident.

6      Q     Is it your testimony that after the two of

7  you were separated at the scene of the shooting by

8  superior officers that you not once have spoken to

9  Abdulahad about the actual events that occurred at the

10  time of the shooting?

11      A     No, we don't -- not like -- from his

12  perspective, like, I think I probably asked him like,

13  you know, was he okay, you know.  Because, you know,

14  he's been taking it really hard, you know.  So I kind

15  of don't like talking about it because it bothers him.

16      Q     Has he provided you with any information

17  about what he observed prior to shooting Mr. Phillips

18  other than what you saw that night yourself?

19      A     Yes.  On the scene -- on the scene we talked

20  about it.

21      Q     Okay.  And by on the scene you mean that

22  night right after the shooting?

23      A     Yes.

24      Q     Okay.

25      A     Yes.  Because --

56

1     Q    Go ahead.

2     A    Yes.  Because the vehicle just stopped.  The

3  vehicle just stopped.  He got out and he was crying.

4  And I was like:  What the hell happened, you know.

5  And, you know, he went into details about what

6  happened inside the car.

7     Q    Okay.  And what are those details?

8          MS. MILLER:  Objection.

9     A    He said.

10    Q    What are those details?

11         MS. MILLER:  Objection.  I'm going to

12       instruct him not to answer.

13         MR. SPEARS:  On what ground?  It's not a

14       privilege issue.  On what ground?

15         MS. MILLER:  It is a privilege issue for my

16       other client.

17         MR. SPEARS:  All right.  This witness has

18       said that when the officer who shot and killed

19       Mr. Phillips got out of the car he said something

20       to this officer.  My question is:  What did he

21       say.  Is it your instruction that he not answer?

22         MS. MILLER:  Yes.

23    Q    (By Mr. Spears) Are you going to follow that

24  instruction, Mr. Robeson?

25    A    Yes.

57

```
1        Q    And what is the basis for the assertion of
2    this privilege?
3             MS. MILLER:  So, as you are aware, my other
4        client has plead the Fifth.  And this client,
5        you're asking him for hearsay from what another
6        person said who has plead the Fifth.
7             MR. SPEARS:  This officer is not asserting a
8        Fifth Amendment privilege, is he?  I'm entitled
9        to know one way or another.  Is he asserting a
10       Fifth Amendment privilege, yes or no?
11            MS. MILLER:  Is he, Robeson-El?
12            MR. SPEARS:  Is Investigator Robeson-El --
13       are you instructing him to not to answer my
14       question on the basis of a privilege that this
15       witness holds?
16            MS. MILLER:  That this witness holds?  No.
17            MR. SPEARS:  What privilege, if any, are you
18       asserting on behalf of this witness, if any?
19            MS. MILLER:  Mr. Spears, I believe what
20       you're asking Mr. Robeson-El for hearsay.  And if
21       that's what you are asking him for, then he can
22       respond, but I have objected to it.
23       Q    (By Mr. Spears) Okay.  All right.
24   Mr. Robeson, please tell me what you heard.
25       A    I'm going to go along with what my lawyer
```

1    said.  I'm going to plead the Fifth as well.

2         Q     And in saying that you are going to plead

3    the Fifth, are you saying that you decline to testify

4    response to my question on the basis of your personal

5    apprehension of criminal prosecution through the words

6    that you say?

7         A     I'm saying I'm pleading the Fifth because my

8    lawyer -- she objected to it, so I'm not going to say

9    anything.

10        Q     As to that question?

11        A     Correct.

12        Q     You're still going to testify in this

13   deposition, are you not?

14        A     Yes.  If my lawyer like me to, I will.

15        Q     When you say your lawyer, is it your

16   testimony to this court that Staci Miller today is

17   representing you in your personal capacity as a

18   witness?

19        A     I mean --

20        Q     Yes or no, sir.

21        A     Yes, sir.  I guess.

22        Q     All right.  And do you have any other

23   lawyers who I need to know about who are representing

24   you in any respect in connection -- either in your

25   testimony or your claim to take the Fifth?

59

```
1        A     Not that I know of, no.

2              MR. SPEARS:  And just so I'm clear,

3        Ms. Miller, is it your counsel to this witness

4        that he assert the Fifth Amendment in response to

5        the question that I posed -- the most recent

6        question that I posed to him?

7              MS. MILLER:  My most recent comment was that

8        if you're asking him for hearsay that he can

9        respond, but I have objected to that.

10       Q     (By Mr. Spears) Do you understand that,

11  Mr. Witness?

12       A     Yes.

13       Q     And do you understand that she is not

14  instructing you not to answer?

15       A     Yes.

16       Q     And do you understand that she is not

17  asserting a Fifth Amendment privilege on your part?

18       A     Correct.

19       Q     And she's not counseling you that you have a

20  Fifth Amendment privilege in relation to that

21  question.  Do you understand that?

22       A     Yes.

23       Q     And is it your statement then for the court

24  that you're not going to answer the question based on

25  a Fifth Amendment privilege?
```

60

1      A     Yes.

2      Q     It's a fact, is it not, that Officer

3  Abdulahad never told you -- after he shot

4  Mr. Phillips -- that Mr. Phillips had a gun in his

5  hand?  He never told you that, did he?

6      A     He did.

7      Q     And when did he tell you that he had a gun

8  in his hand?

9      A     This is the same question you just asking

10  me, you asked me another way.  I plead the Fifth to

11  that.

12      Q     Well, sir, you've answered a question and so

13  now my question --

14      A     He told me -- he told me right after the

15  accident.  I mean -- you know, right after the

16  shooting when he got out of the car.  He said he had a

17  gun.  He said, you know, that he had a gun.

18      Q     I understand.  And now you've testified that

19  Mr. Abdulahad had said that Mr. Phillips had a gun.  I

20  understand that.  Mr. Abdulahad never told -- never

21  said the words:  He had a gun in his hand, did he?

22          MS. MILLER:  Objection.

23      Q     Did he?

24          MS. MILLER:  But you can answer.

25      Q     He never said he had it in his hands, did

61

1   he?

2        A    No.  He just said he had a gun.

3        Q    All right.  And then of course he said, that

4   is to say, Mr. Abdulahad had said he shot the man --

5   who was lying in the car.

6        A    Yes.

7        Q    You didn't know what his name was at that

8   point, did you?

9        A    No.

10       Q    All right.  But he said I shot him and he

11  said he had a gun.  And he didn't tell you anything

12  else about what had happened, did he?

13       A    No, not -- no.  No.

14       Q    Not at that time?

15       A    No.

16       Q    Okay.  He did later, didn't he?

17       A    Like shortly after -- like I said, what

18  happened.  You know, what the hell happened.

19       Q    All right.  And what did he say?

20            MS. MILLER:  The same objection, but you can

21       answer.

22       Q    What did he say?

23            MR. SPEARS:  You can't object based on

24       hearsay, Ms. Miller.  I'm sorry.  This is

25       cross-examination.  And I get to ask him

1      questions that are designed as cross-examination

2      questions which include asking him matters that

3      other witnesses said at the time.  And whether or

4      not it's hearsay depends on the purpose for which

5      it's being offered.

6           MS. MILLER:  Right.  And I can object and

7      then you can ask a question.  I said he can

8      answer.

9           MR. SPEARS:  That's not a formed question.

10     Just because the response may be hearsay is not

11     grounds for a form objection.  And I'll ask you

12     not to continue to interrupt my questioning of

13     this witness.

14     Q    (By Mr. Spears) Officer, what else did he

15 tell you at the scene that night after he shot

16 Mr. Phillips?

17          MS. MILLER:  The same objection, but you can

18     answer.

19     A    I plead the Fifth.

20     Q    What criminal prosecution do you anticipate

21 or fear might come to you by virtue of answering my

22 question?

23     A    I'm not --

24          MS. LEE:  Hey, Brian.  Brian, can we take a

25     quick break?

63

1          MR. SPEARS:  Yes.  We'll take 10-minute

2      break.  It's not 11:31.

3                    (Recess from 11:31 a.m. to 11:42

4                    a.m.)

5          MR. SPEARS:  Go back on the record.

6      Q    (By Mr. Spears) All right.  First of all,

7  Mr. Robeson, during the break that we just had, did

8  you have an opportunity to speak by telephone with

9  anyone?

10     A    No.

11     Q    Did you text anyone?

12     A    No.

13     Q    Did you receive any texts?

14     A    No.

15     Q    Have you let anyone know that there's a

16  break going on in which it follows your having

17  asserted a Fifth Amendment privilege?

18     A    No.

19     Q    Okay.  Do you understand, do you not, sir,

20  that the Fifth Amendment privilege entitles someone

21  not to have their own words used against them?

22     A    Yes.

23     Q    All right.  Is it your plan to assert the

24  Fifth Amendment privilege during any question in this

25  deposition with respect to any line of questioning

1    about which you're familiar?

2         A     No.

3         Q     Then we can proceed?

4         A     Yes.

5              MR. SPEARS:  All right.

6              MS. MILLER:  Mr. Spears, about how much

7         longer do you think we have?

8              MR. SPEARS:  Are you speaking of the

9         questions for this witness during this

10         deposition?

11             MS. MILLER:  Yes.

12             MR. SPEARS:  I have a number of other

13         questions.  It will be quite a while.

14             MS. MILLER:  All right.  Thank you.  We can

15         continue.

16         Q     (By Mr. Spears) Mr. Robeson, as to

17    Mr. Abdulahad's statements to you after he shot

18    Mr. Phillips, as I recall it, you told us that he said

19    that he saw a gun and that he shot Mr. Phillips?

20         A     Yes.

21         Q     And you were just starting to tell us that

22    Mr. Abdulahad had said other things.  And my question

23    to you is:  What else did he say?

24         A     He said -- he didn't really say anything.

25    He said that the guy had a gun and he said that he

1   shot him and he thinks he's dead.  That's all he said.

2   And I walked up to the car.  I said -- and he was

3   crying and I grabbed him.  Looked in the car.  I told

4   him to stand back and I'd take it from here.

5       Q    Did Mr. Abdulahad say anything else to you

6   about the events that transpired inside of the car at

7   that time?

8       A    No.

9           MS. MILLER:  I have an objection.  You can

10          answer, and you have.

11           MR. SPEARS:  Well, it wasn't a form

12          objection.  And I can ask him what this other man

13          said.  I'll ask you, please, not to interrupt the

14          line of questioning.  That's not a form

15          objection.  It's not a privilege assertion.  I

16          don't understand what that is for other than just

17          to interrupt.

18           MS. MILLER:  Mr. Spears, I have my

19          objection.  You have your question.  We can

20          continue.

21           MR. SPEARS:  All you have to say if it's a

22          form objection.  Because all others, of course,

23          are reserved unless you make a privilege

24          objection on behalf of this witness.  All you

25          need to say is form.  If you want to make a form

1          objection, that's what we're allowed to do during

2          the course of these depositions, just say form.

3               MS. MILLER:  Mr. Spears, I'm not going to

4          tell you how to ask your questions.  So please

5          don't tell me how to object.  Please continue.

6               MR. SPEARS:  All right.  I won't tell you

7          how to object --

8               MS. MILLER:  Thank you.

9               MR. SPEARS:  -- since I'm not favorable of

10         you objecting so much to interrupt my

11         questioning.

12         Q    (By Mr. Spears) Mr. Robeson.

13         A    Yes.

14         Q    At any time after -- after other persons

15    arrived at the scene of the shooting, did

16    Mr. Abdulahad say anything else in your presence that

17    described any of the events that occurred inside of

18    the vehicle at or around the time that he shot and

19    killed Mr. Phillips?

20              MS. MILLER:  Objection, but you can answer.

21         A    No.  They separated us.

22         Q    Okay.  I understand that.  Did you hear him

23    talking to anybody else about what happened?  Yes or

24    no.

25         A    No.

67

1    Q    Did he tell anybody else in your hearing
2  what led up to the shooting?
3    A    No.  I don't know who he spoke with.  I
4  mean, like I said, they separated us.
5    Q     Right now I don't care who he talked to.
6  I just want to know if you heard him say anything
7  else?
8    A    No.  No.
9    Q    And is it your testimony you didn't hear him
10  say anything more about what happened and why he shot
11  Mr. Phillips; is that your testimony?
12    A    Yes.
13    Q    It's the case then that Abdulahad never told
14  you that Mr. Phillips was reaching for a gun, did he?
15    A    No.  He just said he had a gun.
16    Q    And he never told you that he,
17  Mr. Abdulahad, saw a light pole ahead of him as he and
18  Mr. Phillips were traveling in the car?  He never told
19  you that, did he?
20    A    No.  But I saw it.
21    Q    In 2017, you were investigated by the Fulton
22  County District Attorneys Office, were you not?
23    A    Yes.
24    Q    And there was a search warrant issued that
25  resulted in the seizure of your cellphone at that

68

1   time; correct?

2        A    Yes.

3        Q    And that investigation has concluded, has it

4   not?

5        A    I don't know.  I never got my cellphone

6   back.  They said they lost it.

7        Q    Did you -- who said that they lost it?

8        A    I called to try -- I called for the

9   whereabouts of my cellphone and they told me they

10  don't have it.

11       Q    And where did you call for your cellphone?

12       A    I called the D.A.'s office.

13       Q    And do you recall who you spoke to?

14       A    No.  No.  I don't know who --

15       Q    Was it the same person -- well, was it --

16  was it the same person who seized your cellphone?

17       A    I don't know who took it.  Because it was

18  like different agencies that came in.  It was GBI and

19  the D.A. offices.  I didn't know who belonged with

20  who.  And my chef, and they just told us we had to

21  turn them over.  I don't know -- and they gave us a

22  search warrant for our car and our phone and that was

23  it.  They didn't explain nothing.  They told it.  And

24  I asked my lawyer.  She didn't know.  So I don't know.

25  They didn't tell us anything.

1    Q    And that lawyer, was that Sandra Michaels
2  again?
3    A    Yes.
4    Q    Have you ever seen or been told what the
5  results were of the search of the contents of your
6  cellphone?
7    A    No.
8    Q    When was the last time that you sought
9  information about the location of your cellphone?
10    A    When they took it -- the last time they took
11  it they said they were only to keep it for a day or
12  two.  And I called like -- I called two days later.  I
13  gave them two days, and they said that, oh, it's going
14  to take a little longer.  And then I called like a
15  week later and no one -- I didn't get anything.  So I
16  don't know.  It's been a long time.
17    Q    Your cellphone was taken from your
18  possession more than once; is that what you're telling
19  us?
20    A    No.  It was only taken one time.  They never
21  returned it.  They've been telling me -- like telling
22  me anything.  Like, basically just keeping my phone.
23  And they didn't tell me anything.  I don't know where
24  my phone is.  I don't know what they got from my
25  phone.  I don't know anything.

**70**

1      Q    Between the shooting and the time that your

2   phone was taken, that was some number of months; am I

3   correct?

4      A    Yes.

5      Q    Your phone was taken -- excuse me.  Your

6   phone was taken from your possession in September of

7   2017; correct?

8      A    Around that time, I assume.

9      Q    And it was taken pursuant to a warrant that

10  was obtained by members of the Fulton County District

11  Attorneys Office; correct?

12     A    Yes.

13     Q    And you were served with a copy of that

14  warrant, were you not?

15     A    Yes.

16          MR. SPEARS:  Jeff, if we could just take a

17      minute, please, and pull up a copy of that

18      warrant.

19          MR. FILIPOVITS:  Just stand by one second.

20     Q    (By Mr. Spears) All right.  Let the record

21  reflect we're looking at now what has been identified

22  as Plaintiff's Exhibit 11 to this deposition.

23          If you will, Mr. Robeson, please take a

24  look at that page, and I'll ask Jeff to scroll from

25  page 1 through the other pages.  There's a total of

71

1   27, but I think we'll be glad to go at whatever pace

2   you want, sir.

3           MR. FILIPOVITS:  Just tell me when you want

4       me to scroll through the next page, Mr. Robeson.

5       Q    Do you see that page, sir?

6       A    Yes.

7       Q    All right.  Can we go on to the next page?

8       A    Next page.  Next.

9       Q    You see what is marked as affidavit for

10  search and seizure this third -- excuse me, this

11  fourth page of the exhibit?

12      A    Yes.

13      Q    Next page.  And 6, 7, 8, 9, 10, 11, 12, 13,

14  14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,

15  27.

16           Mr. Robeson-El, do you recognize that

17  as a copy of the warrant, the supporting affidavit,

18  and the order sealing the original document?

19      A    Yes.

20      Q    Now, according to the terms for application,

21  when Mr. Phillips was found shot dead in the car the

22  engine to the Malibu was still running.  Do you have

23  any information about what you're familiar either from

24  your own personal observations or otherwise, that is

25  contrary to that observation?

72

1       A       No, I just don't.

2       Q       All right.  And respect to the observation

3   in the search warrant application that the gear shift

4   was in park, do you have any information from any

5   source to the effect that that observation is

6   incorrect?

7       A       I don't know anything about it being in

8   park.

9       Q       And the search warrant application also

10  declares that when Phillips was found shot and dead in

11  the car that the parking brake was engaged.  My

12  question to you is whether you have any information

13  from any source received at any time contrary to that

14  observation?

15      A       No.

16      Q       Is it your understanding that once

17  Mr. Abdulahad had fired his weapon inside of the car,

18  that he personally never touched anything other than

19  getting out of the car?

20      A       I don't know.  I don't have no knowledge.

21      Q       Are you aware of any facts whatsoever to the

22  effect that Mr. Phillips was not the person who put

23  that transmission into park?

24      A       I have no knowledge.  I don't know.  I don't

25  know who did it.

1      Q    Do you have any information whatsoever
2   contrary to the position that Mr. Phillips engaged the
3   emergency brake inside of that car at the time that
4   the car stopped?
5      A    No.
6      Q    Do you have any -- just from your own
7   perspective -- any opinion about how the transmission
8   was placed into park at a time before Mr. Abdulahad
9   exited the vehicle?
10      A    No.  Because when they -- I just saw them
11   tussling -- I saw -- I could -- I was keyed in on the
12   tag of the car.  That's it.  I was just looking at the
13   tag of the car.  I was trying to get the tag of the
14   car out.  Tried to put it out over the radio.  I
15   really couldn't see much.  And then I saw the car
16   stop.  I thought it was going turn out, but it went
17   straight.  And it started going straight, then it
18   stopped.  I didn't -- I didn't know what happened.
19   And why it stopped.  I didn't know anything.
20      Q    Okay.  My question at this point is
21   something different from what you actually saw.  My
22   question at this point is:  What opinion do you have
23   about what caused the vehicle to stop?  Who did what
24   to bring it to a stop?  What's your opinion?
25      A    I think that my opinion -- I'm thinking

**74**

1    Abdulahad probably pulled the emergency brake up to

2    try to stop the car while the guy was driving.  I mean

3    that's my only opinion.  Yeah.

4         Q    Prior to the car stopping, you didn't hear

5    any gears engaged such as one would hear say when, you

6    know, in a manual transmission you're trying to go

7    from one gear to another without fully engaging the

8    clutch.  You didn't hear any such sound, did you?

9         A    No.  I had tunnel vision on the tag.

10        Q    I'm asking what you heard right now.  I'm

11   not asking what you saw.  Do you understand that?

12        A    I understand.

13        Q    All right.  And you did not hear, did you --

14        A    No.

15        Q    -- any grinding of gears before the car

16   stopped?

17        A    No.

18        Q    So howsoever it ended up in park, it ended

19   up in park without any forcing of the lever while the

20   car was still moving; correct?

21        A    I didn't hear anything.  I couldn't tell you

22   that, sir.

23        Q    But you do understand, do you not, that if

24   you try to put a car in park while it is still moving

25   the gears will cause a sound; you understand that, do

75

1  you not?

2     A     I understand that.  And I understand that --

3  do you understand if you see tunnel vision sometimes

4  you can't hear.  You just see.

5     Q     I don't know what you saw or didn't see,

6  sir, and I'm not asking you for an explanation of

7  tunnel vision.  You've used that phrase a lot now.

8     A     Right.

9     Q     I understand that you've used it a lot.

10    A     Right.

11    Q     And your testimony then still remains you

12  heard no gear sound whatsoever before Mr. Abdulahad

13  got out of the vehicle after he had shot Mr. Phillips;

14  that's your testimony, isn't it?

15    A     Yes.

16    Q     The car in which Phillips and Mr. Abdulahad

17  were riding came to a complete stop before

18  Mr. Abdulahad got out; correct?

19    A     Yes.

20    Q     Describe the tussling that you saw inside

21  the vehicle as it was driving away from you.

22    A     As it was driving away, all I saw was he

23  grabbed -- when I passed him off to Abdulahad, they --

24  they tussled a little bit and then he got loose from

25  Abdulahad and jumped in the car.  He went in behind

**76**

1    him.  And I thought Abdulahad was going to come out of

2    the car.  But the next thing, you know, I just see the

3    car pulling off and he was in it.  I thought he was

4    going to get out.  And they just pulled off.

5          Q    Mr -- excuse me, please go ahead.

6          A    Excuse me?

7          Q    I didn't mean to interrupt you, sir.  Please

8    continue with your answer.

9          A    Yes.  That's the only tussle that I saw,

10   like when he grabbed him.  He looked like he was

11   trying to get loose from Abdulahad.  Then he did get

12   loose and then he jumped into the car.  And Abdulahad

13   went into the car to try, I guess, to try to grab him

14   again.  You know, I thought Abdulahad was just going

15   to back out and the car was just going to speed off.

16   But he stayed in the car and the car pulled off with

17   him -- with him in it.  I didn't see anything else

18   after that.

19         Q    What tussling did you see going on in the

20   interior of the car after Abdulahad had -- let me

21   rephrase the question.

22              There came a point in time as the car

23   left the parking slot that it was in that

24   Mr. Abdulahad was inside of the car; right?

25         A    (Nods head.)

1     Q    Okay.  And what you could see is the car

2   moved away from your location.  What physical activity

3   did you see Mr. Abdulahad engaged in?

4     A    I really couldn't see.  I couldn't see.  It

5   just looked like he was on his knees.

6     Q    On his knees in the interior of the car;

7   correct?

8     A    Correct, yes.

9     Q    No part of Mr. Abdulahad's feet were on the

10   ground as the vehicle was leaving your presence;

11   correct?

12     A    Correct.

13     Q    His body was entirely inside of the car as

14   he was leaving your presence; correct?

15     A    Yes.

16     Q    He was not being dragged along on the

17   ground, was he?

18     A    No, I didn't see that.  No.

19     Q    And in fact, the car door -- the passenger

20   side door in to -- through which Mr. Abdulahad had

21   gained access to the car, that door was fully closed

22   as the car drove away from you; correct?

23     A    Yes.

24     Q    You have been informed of the fact, have you

25   not, that the gun found on the floor of the Malibu did

**78**

1    not contain any DNA from Mr. Phillips?  You have been

2    informed of that, have you not?

3        A    No.

4        Q    Have you received any information whatsoever

5    about the results of the testing done on that gun?

6        A    No.

7        Q    Other than that it was -- that you saw it on

8    the floor of the Malibu.  You were unaware of any

9    connection whatsoever between that gun and

10   Mr. Phillips; correct?

11       A    Correct.

12       Q    The City of Atlanta has certain standard

13   operating procedures with respect to investigations

14   into officer misconduct; correct?

15       A    Yes.

16       Q    And would you agree, would you not, that

17   among those standard operating procedures there is one

18   by which you are prohibited from contacting a

19   complaining witness or a witness concerning

20   allegations of police misconduct?

21       A    Yes.

22       Q    You're also aware, are you not, that where

23   there is an officer involved shooting, including a

24   shooting that results in injury or death, the

25   witnesses to that incident are both to stay around and

1   are to be told not to discuss the incident with one

2   another?

3        A    Correct.

4        Q    And you were told, were you not, on that one

5   and same night as when Mr. Phillips was shot, that you

6   were not to discuss the shooting with any other

7   witnesses?

8        A    Correct.

9        Q    And you knew that you were not to contact

10  other witnesses; correct?

11       A    Yes.

12       Q    Do you remember your interview with Atlanta

13  Police Department Investigator Half about the Phillips

14  shooting, you were asked if you had spoken with anyone

15  about the incident other than the GBI; do you recall

16  that?

17       A    I don't remember, but maybe.

18       Q    Do you recall that you responded to Half's

19  question by saying no?

20       A    No.

21       Q    Do you recall that?

22       A    No.

23       Q    Do you agree or disagree with the fact that

24  Mr. Abdulahad had called you a total of six times on

25  the day after the shooting using his cellphone and

1  sent you a total of nine text messages between

2  January 27th and January 28th of 2017?

3       A    He may have, but, you know -- you know, he

4  may have.  I am not aware.  But, you know, we talk all

5  the time.  We're friends.  We share the same religion,

6  you know.  You know, we're friends.

7       Q    Is it fair to say that you do not deny that

8  recounting of the number of times of phone contact and

9  text context is correct; you're not denying that?

10      A    Yes, I'm not denying it.

11      Q    Can you tell us, please, what you talked

12  about when Abdulahad called you the day after shooting

13  Mr. Phillips?

14      A    No, I don't remember.

15      Q    Did you talk at all about what happened?

16      A    No.

17      Q    Or why?

18      A    Because we didn't -- not only did they tell

19  us not even to talk about it.  It just wasn't a --

20  it's just not a conversation that we wanted to talk

21  about.  You know, it was just an uncomfortable --

22  uncomfortable situation.

23      Q    But you also knew you were not to have

24  contact with witnesses involving the allegation, but

25  you were having that very contact with Mr. Abdulahad,

81

1    were you not?

2         A    Yes.  We were still working together.

3         Q    And you understood, did you not, in the wake

4    of the shooting, that the SOP and the City of Atlanta

5    Police Department called for you not to have contact

6    with witnesses to the shooting which included

7    Mr. Abdulahad?  You understood that?

8         A    Yes.  Yes.

9         Q    And you decided that you were simply not

10   going to follow that SOP?

11        A    We were still working together.  We were

12   still partners at that time.  We were still in the

13   same unit.  They didn't move me until months after.

14        Q    The answer to my question then, you decided

15   you were going to continue to have contact with him;

16   correct?

17        A    Yes.

18        Q    In the days between the shooting and

19   February the 13th of 2017, when you were

20   interviewed, there came a time when you had a call of

21   over 30 minutes with Mr. Abdulahad.  Do you recall

22   that?

23        A    No.

24        Q    Do you deny it?

25        A    No.

82

1      Q    Do you agree or disagree that in the time

2   from the date of the shooting until the date of your

3   interviews with the GBI and OPS that you and

4   Mr. Abdulahad engaged in 14 telephone calls totaling

5   over an hour and engaged in 28 text messages until

6   February 13th, 2017.  Do you agree or disagree with

7   that?

8      A    I agree.

9      Q    Did you keep all those text messages?

10      A    I don't have my phone.  I can't recall.  I

11   don't know.  They took my phone.

12      Q    Did you delete any of those text messages --

13      A    No.

14      Q    -- at any time?

15      A    No.

16      Q    So is it your testimony that if an analysis

17   was done of your text messages resident on that phone

18   after the seizure of your phone in September of 2017,

19   that all the text messages that we see on your phone

20   records are going to be there on that phone or on the

21   evaluation done on that phone?

22      A    Absolutely.

23      Q    Do you agree or disagree that during your

24   interview with Investigator Half of OPS that you were

25   instructed not to communicate with other witnesses?

1      A    Yes.

2      Q    And that was on February the 13th, 2017?

3      A    Yes.

4      Q    And after that time you continued to have

5  communication both by telephone and by text with

6  Mr. Abdulahad; correct?

7      A    Yes.

8      Q    What gave you the authority to disobey

9  Mr. Half's instruction to you?

10     A    Because we were still working together.

11     Q    Your testimony is that as of

12  February 13th, 2017, that you were still partners

13  with Mr. Abdulahad; is that your testimony?

14     A    Yes.  I think we were still partners at the

15  time.  I can't recall, but we were -- we were still

16  working together.

17     Q    Okay.  And let's see.  You were told by

18  Investigator Half that except as authorized or

19  required, employees could not interfere or contact the

20  persons involved in an internal investigation.  You

21  understand that you were told that?

22     A    Yes.

23     Q    And you understood that as of at least of

24  February the 13th, 2017, that there was an internal

25  investigation that was being conducted by the City of

84

1    Atlanta Police Department into the Phillips shooting?

2         A    Yes.

3         Q    And you made the decision to go ahead with

4    further communications with Mr. Abdulahad?

5         A    Yes.

6         Q    As did he obviously?

7         A    Yes.

8         Q    Do you have any reason to deny the fact that

9    between the date of your interviews:  February 13th,

10   2017 and September 7th of 2017, that there were a

11   total of 55 calls and 108 text messages between

12   yourself and Mr. Abdulahad?

13        A    No, I'm not aware.

14        Q    But you had the communication.  Are you

15   denying that's the number?

16        A    No, I'm not denying that.  I just don't know

17   the number.

18        Q    You are aware, are you not, that after the

19   shooting of Mr. Phillips that the Atlanta Police

20   Department issued a statement to the effect that

21   Mr. Abdulahad fired his weapon killing Mr. Phillips

22   while Mr. Abdulahad was halfway in the vehicle?  You

23   understand that, do you not?

24        A    Yes, I understand.

25        Q    But that is not what you saw happen, is it?

1      A    I didn't see him fire his weapon.  I saw him

2  inside the vehicle.  That's what I saw.

3      Q    You saw it and he was fully inside the

4  vehicle before the vehicle stopped; correct?

5      A    Correct.

6      Q    And at the time that you saw him fully

7  inside the vehicle, Mr. Phillips was not yet shot, was

8  he?

9      A    Correct.

10      Q    So he was shot after Mr. Abdulahad was fully

11  inside the vehicle; correct?

12      A    Yes.

13      Q    So when you heard the announcement from the

14  City of Atlanta Police Department to the effect that

15  Mr. Abdulahad had fired his weapon and killed

16  Mr. Phillips while Mr. Abdulahad was still halfway in

17  the vehicle, you understood that that was not a

18  correct description of what had happened?

19      A    Correct.

20      Q    What step, if any, did you take to alert any

21  officer either in your chain of command or involved in

22  the internal affairs investigation or the GBI, that

23  that claim that had been put out by the APS was

24  incorrect?

25      A    I actually -- I never saw it in writing.  I

1    mean it was just hearsay.  I don't know, it was in the

2    open investigation.  I was told not to talk about it.

3         Q    All right.  I don't care whether -- I don't

4    care how you heard about it, sir, you knew that was

5    what was being put out into the press about what

6    happened and you knew it wasn't true.  My question is:

7    What step did you take, if any, to alert investigating

8    officers -- who you knew you could talk to because

9    they were investigating it -- what steps did you take

10   to alert them to the fact that was not accurate?  Any?

11        A    None.

12        Q    After the interview that you had or as part

13   of the interview that you had with the GBI

14   investigator about the shooting, you prepared a sketch

15   for him, did you not?

16        A    I don't remember -- I don't recall.

17        Q    That's fine.

18             MR. SPEARS:  Jeff, if you could, please,

19        pull up the proposed exhibits for this witness's

20        deposition and go to that which starts with --

21        let me see if I can find it.  Actually, this is

22        Exhibit 10, the awareness statement and sketch.

23        If you could please pull that up.

24        Q    (By Mr. Spears) Let me the record reflect we

25   are now looking at Plaintiff's Exhibit 10 to this

1  deposition, which is a 2-page document.  You would

2  have seen the first of those two pages, sir?

3      A    Yes.

4      Q    All right.  And do you see it's entitled

5  Atlanta Police Department Awareness Statement,

6  Truthfulness that business up there at the top?

7      A    Yes.

8      Q    And you recognize your signature there below

9  the typewritten words below, El Malik Robeson-El?

10      A    Yes.

11      Q    And just so we are clear about this.  This

12  is the form that you signed off on on the day of your

13  interview with Investigator Half with the City of

14  Atlanta Office Professional Standards; correct?

15      A    Yes.

16      Q    And the second page, could we take a look at

17  that?

18           All right.  And do you see what's in

19  front of us now that's in the lower left-hand corner

20  that's entitled Exhibit A?

21      A    Okay.

22      Q    Do you recognize that as a copy of the

23  sketch that you drew for Investigator Half?

24      A    Yes.  I mean -- yes.

25      Q    Okay.  And it shows, let's see, it shows, as

1    I recall the -- you see the initials B and there's an

2    initial A?

3         A    Uh-huh.

4         Q    All right.  And the lower of the two

5    locations marked with B that in your interview with

6    Half, that is more or less is what you used to

7    characterize where you were when the vehicle pulled

8    away; correct?

9         A    Yes.

10        Q    And the second B, further up on the page,

11   you wrote that there to indicate about where you were

12   when the car stopped; correct?

13        A    Yes.

14        Q    All right.  And the A that stands for where

15   the car stopped; correct?

16        A    Yes.

17        Q    Abdulahad got out of the passenger side,

18   didn't he?

19        A    Yes.

20        Q    And were you able to even see the driver

21   side of the car from where you stood at this second

22   position B in the middle of the page?

23        A    Not -- not really.

24        Q    All right.  When you went up closer to -- I

25   take it you went up closer to the car at some point;

1  correct?

2      A    Yes.

3      Q    And you did that after you had contact with

4  Abdulahad?

5      A    Yes.

6      Q    All right.  And did you circle the car?  Did

7  you walk all the way around it?

8      A    No.

9      Q    So you only saw it from the -- you only

10  observed the car from the passenger side?

11      A    Yes.

12      Q    Does -- in terms of what you observed that

13  night after the shooting, you made no observation of

14  how the front driver side door had been opened, did

15  you?

16      A    No.

17      Q    And sitting here today you cannot deny, can

18  you, that the driver side door, the forward driver

19  side door of that car had been opened at a time before

20  Mr. Abdulahad got out of the car?  You cannot deny

21  that, can you?

22      A    I had no knowledge of it.

23      Q    But you don't deny it, do you?

24      A    Correct.

25      Q    Earlier you told me that you have no

90

1    recollection of hearing the discharge of the weapon

2    that killed Mr. Phillips.  How can you explain the

3    fact that a witness further away from the car than

4    you, who was in the parking lot, clearly heard the

5    shot?

6             MS. MILLER:  Objection, but you can answer.

7        Q    Explain that for us, please.

8        A    I didn't hear anything.  I was -- I was

9    looking at the tag and I was trying to communicate

10   over the radio to put the information out over the

11   radio.

12       Q    As the car was moving away from you, you are

13   aware of fact, are you not, that there is no record of

14   radio communication between you and anyone at dispatch

15   as the car was driving away?  You are aware of that

16   fact, are you not?

17       A    Yes I -- yes, I believe so.

18       Q    All right.  So you were not in communication

19   with anyone with dispatch as the car drove away from

20   you, were you?

21       A    The station had changed during the tussle.

22   I had the radio in my hands squeezing it trying to

23   communicate over the radio.  But I didn't know they

24   didn't -- that I wasn't on the correct channel until

25   everything had stopped.

1      Q     How does one change the channel on that
2    radio?
3      A     Because it's a lot of different buttons on
4    the radio.
5      Q     I'm asking you how it's done.  I understand
6    there's buttons on it, sir.  How is it changed?
7      A     I changed --
8      Q     By -- you changed the channel?
9      A     You can change the channel by the knobs on
10   the top or some buttons on the front -- on the front
11   screen of the radio.
12     Q     Okay.  All right.  And -- and the only
13   person who had physical possession of that radio
14   between the time that you pulled into the parking slot
15   in which your red car placed itself and the time that
16   Mr. Phillips was shot, the only person who had
17   possession of that radio was you; correct?
18     A     Yes.  Yes.
19     Q     The only person who could have changed the
20   channel in that period of time was you; correct?
21     A     False.
22     Q     Who put their hand in your pocket?  Are you
23   telling me that Mr. Phillips put his hand in your
24   pocket while you were standing there?
25     A     I said that I took the radio out to put out

1    on the radio because I asked Abdulahad to hold him.

2    And this is the reason that I asked him to hold him so

3    I can put out on the radio.  But when I go to attempt

4    to key up he tried to come through me.  That's when

5    the kid tried to come through me.  He tried -- that's

6    when -- that's when the pushing came.  So I pushed --

7    I held him back with one hand and said, Abdulahad,

8    grab him so I can put out on the radio.  And, you

9    know, everything took place after that.

10        Q    And Mr. Phillips never had the radio in his

11   hand, did he?

12        A    He never had the radio in his hand.  I had

13   it in my hand.

14        Q    You were the only person who had possession

15   of that radio?

16        A    Yes.

17        Q    Right.  The only person -- so the only

18   person whose movements could have changed the station,

19   the communication channel was you; correct?

20        A    Listen, false.  I just told you.  He must

21   have changed when he pushed -- when he was doing an

22   altercation between him and I, he must have pushed the

23   radio because I had my radio in one hand and I had him

24   with the other hand.

25        Q    Okay.  And how does that mean that pushing

93

1    your body means that his hand moved the channel on

2    your radio?

3                MS. MILLER:  Objection, but you can answer.

4         Q    Physically how does that happen?

5         A    He could have pushed one of the buttons on

6    the front of the screen.

7         Q    You didn't see that happen, did you?

8         A    No, I didn't.

9         Q    And you didn't feel that happen, did you?

10        A    Wasn't aware of it.

11        Q    How much noise does it make when you change

12   the channel on your radio?

13        A    You really can't -- you really can't hear

14   it.  It's a small -- a small tone.  A really light

15   tone.  You really can't hear it.

16        Q    So when you changed the channel --

17        A    Depending on the volume.

18        Q    When you change the channel on your radio it

19   doesn't make much noise; correct?

20        A    No.  It depends on the volume.

21        Q    Right.  So the changing of the channel on

22   your radio would not have interfered with you hearing

23   the gunshot, would it?

24        A    No.

25        Q    On the day of January the 26th, 2017, where

**94**

1   did you start your shift?

2       A    At headquarters.

3       Q    And were you with Mr. Abdulahad when you

4   started your shift?

5       A    Yes.

6       Q    Describe for me, please, what your

7   activities were during that day prior -- excuse me,

8   prior to contact with Mr. Phillips?

9       A    We punched into work and we had -- we all --

10  we had cases that we had to investigate -- finish

11  investigating.  We got warrants for -- we got warrants

12  for our case.  And then we was just trying to get the

13  warrants closed out by the end of the day.  So we

14  was -- we was really trying to rush so we could get

15  off work on time.  And, you know, we -- that was

16  pretty much it as far as I can remember.

17      Q    What, on that date, would have been the

18  closeout time for your shift?

19      A    Yeah.  We got off at 12:00 o'clock.

20      Q    Twelve midnight?

21      A    Yes.

22      Q    Were you on 12-hour shifts?

23      A    No.  We worked -- it was 4:00 to 12:00.  We

24  were on evening watch.

25      Q    Did you make any physical arrests that day?

95

1          A     No.

2          Q     I think you told us earlier that there were

3     a couple of warrants that you had prepared.  What do

4     you remember -- do you remember what the subject of

5     those warrants happen to be; that is, to say what the

6     offense was for which you were seeking a warrant?

7          A     No, I don't remember the subject.  But it

8     was for aggravated assault.  For aggravated assault.

9          Q     Was it one incident of aggravated assault or

10    more than one?

11         A     I can't recall.  I don't know.

12         Q     Excuse me.

13         A     I don't know.  I don't know whether it

14    was -- I had a case and he had one as well.  I'm not

15    sure.  I think it was his case because we was joint --

16    I was a coinvestigator on -- we were coinvestigators

17    on each case -- on each other's cases.

18         Q     All right.  And when you took the step to

19    prepare an affidavit for a warrant, what log or record

20    did you maintain that reflected that you had prepared

21    an affidavit in a given case?

22         A     Case notes.  We have case notes that's put

23    into ICCS.  And we also maintain a case file.

24         Q     Is there a -- or at that time was there a

25    way in which you separately kept track of how many

96

1    warrants you were applying for in any given day?

2        A    No.  Our supervisors -- I think our

3    supervisors kept a tally of that.

4        Q    Did you have to have a supervisor

5    authorization for securing a warrant before you sought

6    it?

7        A    No.

8        Q    What was the basis of information for your

9    supervisor being able to prepare and maintain a tally

10   of your warrant applications?

11       A    We would give him a copy of our search

12   warrants -- I'm sorry.  Give him a copy of our arrest

13   warrants.

14       Q    And was that copy one that would be provided

15   to them before or after it was executed?

16       A    Before.

17       Q    And would it be provided to them before or

18   after it was signed on off by the magistrate?

19       A    After.

20       Q    You used the phrase that the warrant, I

21   believe you said, that the warrant would be put into

22   ICCS, is that what you said?

23       A    No.  I said we will put our -- put

24   information into ICCS into our case notes.  Get all

25   the information that we place.

1    Q    But, can you tell us, please, what the ICCS

2   stands for?

3    A    No.  I don't know what it stands for.

4    Q    What function does it serve?  Is it some

5   sort of database of information about your cases?

6    A    Yes.  It's report.  It was a report writing

7   system that was used -- we don't use it anymore.  But

8   at that time we use it to, you know, conduct reports

9   and maintain our case files and how we generate our

10  cases.  And how -- a system is set up to basically

11  maintain all our reports and case files.

12   Q    In February of 2017, did you prepare daily

13  activity reports?

14   A    No.

15   Q    Are you familiar with daily activity reports

16  prepared by field officers?

17   A    Yes.

18   Q    Okay.  What reporting process did you use to

19  summarize your daily activities, if it was not a daily

20  activity report?

21   A    Well, as officers they used, you know, the

22  daily activity when they're putting out on calls.  But

23  as a investigator, we place our notes inside a case

24  management and our case management is set up through

25  ICCS.  So all the work we did that day we would

98

1  document it.  We would document it and save it, and

2  our supervisors would review it.

3      Q    And in terms of your performance, your

4  supervisors being able to assess your performance,

5  what was your understanding of the base of information

6  that they used in order to generate those performance

7  evaluations?

8      A    Our case clearances, they would look at, you

9  know -- would look at our case clearance and overall

10  performance such as attendance and, I guess, how well

11  we work with others.  And, you know, tardiness.

12  Things like that.

13      Q    Did they also look at the number of warrants

14  that were generated by virtue of your activity?

15      A    Yes.  That's what I say, case clearances.

16      Q    Oh, okay.  So a case clearance refers to, I

17  guess, your stage of that case being concluded;

18  correct?

19      A    Yes, just exhausting all our leads.

20      Q    Okay.  And you would also receive -- your

21  evaluation would also have a relationship to the

22  number of arrests that were made by you?

23      A    We don't make arrests.  We just do an

24  investigation.  So it was mainly, like I said,

25  basically they would give us an evaluation due to like

**99**

1    us exhausting all of our leads because sometimes may

2    not -- your investigation may not lead up to an

3    arrest, because you don't have enough evidence or, you

4    know, but you exhausted all your leads.  And however,

5    you know, and if you're doing what you're supposed to

6    do, you'll have -- you're organizing your case

7    management you would be able to -- you would be able

8    to, you know, do what you're supposed to do.  So I

9    guess that's how you evaluate us on performance.

10        Q    The warrants that you sought, were those

11   primarily warrants alleging felony criminal acts?

12        A    Yes.

13        Q    The same for misdemeanor?

14        A    No.  We only handle aggravated assaults with

15   shootings.

16        Q    Okay.  All right.  Let's see.  On going back

17   to the night of the shooting, while Officer Abdulahad

18   was -- I think you said you saw him -- it appeared to

19   be he was on his knees inside the interior of the

20   vehicle as the vehicle left your presence?

21        A    Yes.

22        Q    Okay.  And as the vehicle left your presence

23   and before the car stopped, did you see Abdulahad pull

24   his gun out of the holster?

25        A    No.

1      Q    Did you see what Phillips was doing other

2  than operating the car right before he was shot?

3      A    No.

4      Q    Did you see Mr. Abdulahad pointing the gun

5  at Mr. Phillips' head before the gun was fired?

6      A    No.

7      Q    Did you see how far Abdulahad's gun was from

8  Phillips before it was fired?

9      A    No.

10      Q    You didn't see Abdulahad holding onto to

11  anything in the interior of the car before he fired

12  his gun, did you?

13      A    No.

14      Q    Did you ever hear Abdulahad tell Phillips to

15  stop the car?

16      A    No.

17      Q    Did Abdulahad ever tell Phillips not to get

18  out of the car?

19      A    No.

20      Q    Did Abdulahad ever tell you that he saw a

21  gun before he shot Phillips?

22      A    No.

23      Q    He never told you that Phillips had reached

24  for a gun before he shot him, did he?

25      A    No.

1      Q    What is your understanding of why

2   Mr. Abdulahad did not get out of the car before he

3   shot Mr. Phillips?

4           MS. MILLER:  Objection, but you can answer.

5      A    I don't know.

6      Q    What is your opinion about why he didn't get

7   out of the car?

8           MS. MILLER:  Objection, but you can answer

9        if you know.

10          MR. SPEARS:  Please don't say if you know.

11       It coaches the witness to not answer the

12       question.  I ask that you not use that phrase.

13       If you have an objection, just say objection.

14       Don't tell him:  If you know.  I know from

15       experience that's a signal not to answer.

16          MS. MILLER:  I'm not saying knowing or

17       coaching anything.  I'm just making my objection.

18          MR. SPEARS:  Just make the objection and

19       don't say:  If you know.

20          MS. MILLER:  Investigator Robeson, you can

21       answer.

22      A    I don't know.

23      Q    Not asking what you know now, sir.  I'm

24   asking for your opinion.  What is your opinion as to

25   why Mr. Abdulahad did not simply get out of the

1   vehicle before he shot and killed Mr. Phillips?

2          MS. MILLER:  Same objection, but you can

3      answer.

4      A    My opinion he probably -- because he

5   committed himself already inside.

6      Q    And by he, you're referring to

7   Mr. Abdulahad, he committed himself already?

8      A    Yes.  He committed himself already.  And so,

9   I guess, he just went on with it.  That's my opinion.

10     Q    Given what you've told us as to what you did

11  not see in the car immediately before the shooting,

12  would you agree with me that you do not have an

13  opinion one way or another whether Abdulahad was

14  justified in shooting Phillips?

15     A    I agree.

16     Q    The state [sic] of Atlanta has certain

17  standard operating procedures with respect to the use

18  of deadly force; correct?

19     A    Yes.

20     Q    Certain parameters in terms of when it's

21  justified and not justified, that sort of thing;

22  correct?

23     A    Yes.

24     Q    There's also training that you receive on an

25  annual basis with respect to firearm proficiency;

1    correct?

2         A    Yes.

3         Q    In order to maintain your arrest authority

4    and the authority to carry a firearm with you while

5    you're on duty, you have to maintain that certain

6    proficiency on an annual basis; correct?

7         A    Yes.

8         Q    With respect to the City of Atlanta's

9    standard operating procedure on the use of deadly

10   force, you understand, do you not that the

11   department's policy provides that officers are not to

12   fire at moving vehicles?

13        A    Yes.

14        Q    And that's a standard operating procedure

15   that was in place both before and after Mr. Phillips'

16   death?

17        A    Yes.

18        Q    And would it be fair to say that you never

19   received any training on a safe way to shoot someone

20   while they're driving a car while you're in it?

21        A    A safe way to drive a car while you're in

22   it.  No.  We haven't received any training on that,

23   no.

24        Q    And you're not aware of any such training

25   that would counsel officers on a safe manner to shoot

1    the driver of a car while the officer is in that very

2    car?

3         A    No.

4         Q    You would agree with me, would you not, that

5    it is a very, very risky step to take to shoot the

6    driver of a car while you're still in it?

7         A    Yes.

8         Q    On the night of the shooting, I believe you

9    told us that you carried a .9 millimeter Glock issued

10   by the department; correct?

11        A    Yes.

12        Q    Do you recall the brand of shells?

13        A    No.  You mean the bullet?  No.  No.

14        Q    Okay.  And on that night, Mr. Abdulahad also

15   had a .9 millimeter Glock issued to him; correct?

16        A    Yes.

17        Q    As far as you know the same brand of shells?

18        A    Yes.

19        Q    And you were aware of the fact, were you

20   not, that Mr. Abdulahad had additional weapons on his

21   person or with him that night while you were on duty?

22        A    No.

23        Q    Have you ever fired your .9 millimeter Glock

24   in the nighttime?

25        A    In the nighttime?

1    Q    That's my question.

2    A    No.

3    Q    Did you ever know Mr. Abdulahad had to use

4 low flash gunpowder?

5    A    No.

6    Q    Did you ever know him to use flash

7 suppressant gunpowder?

8    A    No.

9    Q    Did you ever know him to have a flash hider

10 attachment to his weapon?

11    A    No.

12    Q    Do you know what a muzzle flash is, do you

13 not?

14    A    Like A silencer?  Like a silencer?

15    Q    No.  A muzzle flash.

16    A    No, I don't know what that is.

17    Q    Well, you are aware, are you not, there's a

18 flash caused by the explosion of gunpowder as the

19 bullet is being projected out the barrel of a gun?

20    A    Okay.

21    Q    You're aware of that?

22    A    Yes.

23    Q    Right.  Gunpowder comes out the barrel of

24 the gun along with the bullet; right?

25    A    Yes.

1      Q     And the gunpowder explodes in order to force
2   the bullet out of the barrel?
3      A     Yes.
4      Q     And that flash is visible, is it not?
5      A     Yes.  No, it's not visible.
6      Q     It's not visible?
7      A     No.  I never saw it.
8      Q     Never ever?
9      A     Never.
10     Q     The muzzle flash happens whether the gun is
11  fired in the day or night; correct?
12     A     Yes.
13     Q     And are you aware of the fact that the
14  muzzle flash from Abdulahad's firing of his weapon
15  happened after the car stopped?
16     A     I'm not aware.  No, I wasn't aware.
17     Q     You saw the flash of the firing of the
18  weapon, didn't you?
19     A     No.
20     Q     Given that Mr. Phillips was shot by
21  Abdulahad's weapon, we know obviously that Abdulahad
22  had pulled his weapon from the holster; right?
23     A     Say it again.  Repeat what you said.
24     Q     Given that Mr. Phillips was killed by
25  Mr. Abdulahad, we know that Abdulahad pulled -- at

1  some point in time pulled his weapon from his holster

2  before he --

3      A    Yes.

4      Q    Okay.  Did you see when Abdulahad piled the

5  weapon from his holster before he entered the vehicle?

6      A    No, I didn't.

7      Q    At what point did you see Mr. Abdulahad pull

8  the weapon from the holster on his right side?

9      A    I never saw him pull the weapon.

10      Q    When you saw him on his knees, referring to

11  Mr. Abdulahad in the passenger side of the car, did

12  you see what was in his hands referring to

13  Mr. Abdulahad?

14      A    No.

15      Q    So fair to say then that you don't know one

16  way or another whether Mr. Abdulahad had that gun

17  pointed to Mr. Phillips' head the entire time that

18  they were driving together?

19      A    That's correct.

20      Q    You wouldn't know.

21      A    I don't know one way or another.

22      Q    And do you know one way or another in order

23  to bring the car to a stop, Mr. Phillips had agreed to

24  stop and was starting to get out of the car?  You

25  don't know one way or another whether or not that's

1  true?

2       A    Correct.

3       Q    At the time of Mr. Phillips' death, can you

4  recall any signage in the parking lot of the police

5  Annex that declared that it was illegal to park in

6  that lot?

7       A    No.

8       Q    At the time that this shooting occurred, was

9  it lawful or unlawful to sit in a parked car in that

10  parking lot in the public area?

11       A    It was lawful.

12       Q    So sitting in a parked car was activity that

13  by itself was not suspicious; agreed?

14       A    I agree.

15       Q    And there was no prohibition, was there, to

16  a person who was seated in a car parked in that

17  parking lot to smoke?

18       A    No.

19       Q    So we know that smoking in a parked car in

20  that parking lot was not itself unlawful behavior;

21  correct?

22       A    Correct.

23       Q    And hence was not by itself suspicious

24  behavior; correct?

25       A    Correct.

1      Q    A person seated in the parking -- excuse me,

2  in the passenger seat of a lawfully parked car in the

3  parking lot of that Annex by itself is not criminal,

4  is it?

5      A    No.

6      Q    And those facts do not themselves reflect

7  that such a person seated in that car smoking was

8  about to commit a crime; correct?

9      A    I didn't hear the last part.  You faded out

10  a little bit.

11      Q    All right.  Sorry, if my voice went low.  A

12  person seated in the passenger seat of a lawfully

13  parked car in that parking lot smoking, they by virtue

14  of that activity alone are not themselves engaging in

15  any criminal behavior, are they?

16      A    No.

17      Q    In entering that parking lot on that night,

18  it was Mr. Abdulahad who was driving; correct?

19      A    Yes.

20      Q    And he backed the car in which the two of

21  you were riding in a parking spot close to the vehicle

22  we now know that Mr. Phillips was riding; correct?

23      A    Yes.

24      Q    And before you got out of the car -- before

25  you got out of the car -- and by the way you were in

1    front passenger side of the car?

2         A    Yes.

3         Q    You were further -- because it backed in to

4    the spot?

5         A    Yes.

6         Q    Okay.  So the person closest to Mr. Phillips

7    at the time that the car was pulled into that parking

8    spot was Mr. Abdulahad; correct?

9         A    Yes.

10        Q    All right.  Before you got out of the car,

11   you did not know what, if anything, Mr. Phillips was

12   smoking, did you?

13        A    No.  I was just told by Abdulahad, he

14   said -- he said he's sitting right beside us smoking

15   marijuana.  Smoking weed.

16        Q    Your window was up at the time; correct?

17        A    No.  It was up.  It was kind of cold

18   outside.

19        Q    Right.  The windows to your vehicle in which

20   you and Mr. Abdulahad were riding, the windows were

21   up; correct?

22        A    Yes.

23        Q    And the windows to the vehicle in which

24   Mr. Phillips was situated were up, were they not, when

25   you got out of the car?

                                                                111

1        A    Yes.

2        Q    Okay.  But you didn't smell anything when

3   Mr. Abdulahad said that, did you?

4        A    No.

5        Q    But when you looked over you didn't see

6   anybody smoking anything, did you?

7        A    No.

8        Q    Did you ask Mr. Abdulahad, say I just looked

9   over there and I saw this guy, but I didn't see

10  anybody smoking anything.  Did you say that to him?

11       A    No.

12       Q    Because as you walked towards the car you

13  didn't see anybody smoking anything, did you?

14       A    No.

15       Q    All right.  So the activity that

16  Mr. Abdulahad claimed to have seen isn't what you saw;

17  correct?

18       A    Right.

19       Q    And in fact your observations contradicted

20  his claim to you, didn't it?

21       A    No.  It just -- I just -- I wasn't paying

22  attention to it.  I didn't even see the guy.  I wasn't

23  paying attention.  He may have saw it and I didn't.

24  But I didn't see it.

25       Q    You didn't see it.  And as you walked toward

1    the car, you didn't see anybody smoking anything, did

2    you?

3         A    Correct.

4         Q    And that observation on your part was

5    inconsistent to what Mr. Abdulahad had told you,

6    wasn't it?

7              MS. MILLER:  Objection, but you can answer.

8         Q    It was inconsistent was it not, sir?

9         A    At that time yes.

10        Q    Okay.  So at the time you approached the

11   window, behind which Mr. Phillips was situated, all

12   you saw was a man sitting in a seat, that's all you

13   knew about him; right?

14        A    Yes.

15        Q    You didn't know how Mr. Phillips had gotten

16   there?

17        A    No.

18        Q    You didn't know whether or not he had driven

19   the car?

20        A    No.  He was on the passenger side.

21        Q    Okay.  And you didn't know whether he had

22   been smoking anything.

23        A    Not until he rolled the window down.

24        Q    Well, when he rolled the window down you

25   didn't see him smoking anything then, did you?

1       A    No.  No.

2       Q    Before you got out of the car, that is to

3  say the car in which you were riding Mr. Abdulahad,

4  you told Mr. Abdulahad, did you not, tell this guy to

5  get out of here with this?  He needs to get out of

6  here.

7       A    Yes.

8       Q    You told Mr. Abdulahad that, didn't you?

9       A    Yes.

10      Q    You wanted Mr. Phillips to leave, didn't

11 you?

12      A    I mean, yes, if he was doing anything

13 illegal.  If he was smoking, I just didn't feel that

14 that was necessary to, you know -- I just wanted him

15 to be aware of what he was doing.  You know, to keep

16 him out of trouble.

17      Q    Right.  You told your partner that you

18 wanted the guy to leave; right?

19      A    Right.

20      Q    Because that's indeed what you wanted to

21 happen; correct?

22      A    Yes.

23      Q    And when you talked to Phillips among other

24 things he told you, did he not, that -- I mean you

25 could see him sitting there in the passenger side of

1    the car; right?

2         A    Yes.

3         Q    And you didn't think he was the one who had

4    driven the car there?

5         A    Right.

6         Q    And indeed the engine was still running;

7    right?

8         A    Yes.

9         Q    And so you -- you saw by virtue of the

10   information that you had available to you that he was

11   waiting for somebody that was inside?

12        A    Yes.

13        Q    And that's what he told you?

14        A    Yes.

15        Q    And there was nothing unlawful about him

16   waiting for somebody who was inside if Mr. Phillips

17   was not smoking weed, was it?

18        A    I didn't see him smoking weed.

19        Q    Right.  Right.  So there was nothing

20   unlawful about him sitting in that car waiting for

21   friends who were inside if he wasn't smoking weed?

22        A    Right.

23        Q    So why at that point did you tell Phillips

24   he had to leave?

25        A    My partner said that he was smoking and I

1   wasn't telling him to leave.  I was saying if you're

2   doing anything illegal, maybe you shouldn't be doing

3   that around this police station.  You should go

4   somewhere else and do that.  Why would you do it on

5   the police station -- in front of a police station.

6   That's what I was telling him.  I tried to.

7        Q    Right.  You were giving him that information

8   and Phillips was telling you that he wasn't smoking

9   weed right then; didn't he?

10       A    Right.

11       Q    Right.  So you hadn't seen him smoked and he

12  was saying:  I wasn't smoking.  So from your vantage

13  point he could stay under those circumstances,

14  couldn't he?

15       A    Correct.

16       Q    You told Phillips, nonetheless, that he

17  needed to leave, didn't you?

18       A    No.  I told him -- no.  I said if you are

19  going to be smoking, you need to leave.  He said -- he

20  said that I'm not smoking.  I think he said he had a

21  Black Mamba or something like that -- something like

22  that along those lines.  He said he did it prior,

23  because I smelled it.  Oh, we did that prior.  Yeah.

24       Q    Correct.  And you didn't have any

25  information to the contrary that even if he had

1    smoked, it was something he had done before he had

2    gotten into the parking lot?  You didn't have any

3    information to the contrary, did you?

4         A    Right.

5         Q    Okay.  So if he's there and it's lawful for

6    him to be waiting for his friends and he's not engaged

7    in smoking marijuana in your presence, then at that

8    point in time when you're beside the window there's

9    not activity that you saw him engaged in that was

10   criminal activity; correct?

11        A    Correct.

12        Q    Okay.  So when you exited the car in which

13   you and Abdulahad had arrived, what were you planning

14   to do?

15        A    My plan was just to tell him to leave.  I

16   wasn't trying to make an arrest.  I was trying to go

17   home on time.  I was telling him, like, you know,

18   trying to keep him out of trouble.  Those are my

19   plans.  Just trying to keep the guy out of -- you

20   know, I'm just trying to keep him out of trouble.

21        Q    But when you got out of the car according

22   to -- I believe according to what you told us before,

23   you told Abdulahad that Phillips had to leave; right?

24        A    Right.

25        Q    And you told him that after you had walked

1    over towards -- you told that to Abdulahad after you

2    had walked over towards Phillips; correct?

3         A    No.  Abdulahad said that the kid he was --

4    he said this guy is sitting right next to us smoking

5    marijuana.  I said for real.  I said, man, tell him to

6    leave.  Right?  Then I got out and then I just said --

7    I went over to go talk to him.  You know, just go talk

8    to him, you know.  I just went over there to go talk

9    to him and let him -- you know, try to keep him out of

10   the trouble.  Those were my intentions.

11        Q    All right.  So going over to talk him, that

12   was your idea, not Abdulahad's; correct?

13        A    Right.

14        Q    In fact, initially when the two of you got

15   out of the car, you and Mr. Abdulahad, Mr. Abdulahad

16   was walking into the Annex.  He wasn't walking towards

17   the car, was he?

18        A    I don't -- I don't think so.  I don't think

19   so.  I think -- you know, I think that he was getting

20   his stuff together to get out of the car and I just

21   got out.  And I don't know what Abdulahad was doing at

22   that time.  I really don't.

23        Q    Okay.  Well, you got out of the car and you

24   walked -- you walked directly over to the car in which

25   Phillips was seated?

1       A       Right.

2       Q       And Abdulahad, if he started to go directly

3   into the Annex, you don't know one way or another

4   whether that was his original direction?

5       A       No.

6       Q       Okay.

7       A       Because he was behind me.

8       Q       Well, he was behind you once you got

9   alongside the car; right?

10      A       Right.  Right.

11      Q       And he was as close to the entrance to the

12  Annex as you were; right?

13      A       Yes.

14      Q       My understanding that as far as any physical

15  activity in which Mr. Phillips was engaged before you

16  got to the window, you didn't see what he was doing at

17  all?

18      A       No.

19      Q       Other than just being there, that's all he

20  was doing?

21      A       Yes.  The car was running and he was just

22  sitting there.

23      Q       And as he was sitting there, indeed he was

24  slouched against the passenger door adjacent to the

25  passenger seat in which he was riding, wasn't he?

1        A      Yes.

2        Q      That was the physical position that he had

3   as you walked up to the window?

4        A      Yes.

5        Q      And when you walked up to the window that's

6   when you got his attention; correct?

7        A      Yes.  I don't know if he had Abdulahad's

8   attention first.  I don't know if he got his attention

9   first that he knew that we were cops or whatever, I

10  don't know.  Because at that point I wasn't paying

11  attention or he told me afterwards.  He may have saw

12  us before we saw him -- before I saw him.  He may have

13  seen Abdulahad first.

14       Q      What did Abdulahad tell you afterwards?

15       A      He just told me the guy was smoking --

16  smoking marijuana in the car.

17       Q      No.  Afterwards.

18       A      What do you mean afterwards?

19       Q      You just used the word afterwards referring

20  to Abdulahad, he said he just told me afterwards and

21  then you went on to some other thought.

22       A      No, what I was saying.  The passenger -- I

23  mean, I'm sorry.  The kid -- I forget the kid's name.

24  He may have saw Abdulahad first and then he told me,

25  you know, because he saw him first.  I didn't see

1   anything.  I forgot what I was doing.  I wasn't even

2   paying attention.  But we was just backing in, and he

3   said, yeah -- I don't know if they locked eyes or

4   what.  How -- how he came in contact with them, but he

5   was on his side.  But after he told me that I got out

6   of the door.  I said tell the kid -- just tell the kid

7   to leave, you know.  When I went to get out, I was

8   going to tell him to get out of here with that, so.

9       Q    All right.  That's the reason why he walked

10  over to the window?

11      A    Right.  Right.

12      Q    Okay.  And as you approached the window,

13  Phillips he was slouched down against the passenger

14  door of the car; correct?

15      A    Yes.

16      Q    And you couldn't see anything that he was

17  doing?

18      A    No.

19      Q    Okay.  In the period between you arriving at

20  the side of the car and until Phillips got out of the

21  car, I think you told us already that Phillips was not

22  smoking; correct?

23      A    Right.

24      Q    You told him to roll down the window and he

25  did; correct?

1      A     Yes.

2      Q     And when he rolled down the window, did you

3  see in any of his physical -- referring to Phillips --

4  any of his physical activity required to activate the

5  window?

6      A     No.

7      Q     Well, you assumed he used his hand to

8  activate the window; right?

9      A     Yes, he did.  He rolled it down and -- yeah.

10 Yeah, I mean.

11     Q     He rolled it down.  But you didn't see his

12 hand as he rolled the window down, did you?

13     A     I mean, yeah, I saw his hands because I was

14 looking in the car like -- I was looking in trying to

15 see his hands.

16     Q     And when you saw -- and because you were

17 looking in the car to see his hands, you saw his hands

18 as he rolled the window down?

19     A     Yes.

20     Q     And when he rolled it down, that's when he

21 denied that he was smoking in the parking lot;

22 correct?

23     A     Yes.

24     Q     And -- let's see.  In the time -- between

25 the time that the window got rolled down by Phillips

1    and the time that you learned that Phillips had been

2    shot, you didn't see Phillips ever throw anything to

3    the ground, did you?

4        A    No.

5        Q    And you didn't see anything in his hands in

6    that span of time, did you?

7        A    No.

8        Q    You didn't see him place -- he, Phillips,

9    place anything into the interior of the car with his

10   hands, did you?

11       A    He was fidgeting when I approached him.  He

12   looked like he was putting something on the side.  He

13   took his hands from off the window and started placing

14   his hands on the side as if -- that's the reason I

15   asked him to step out because I couldn't see his hands

16   anymore.  He started like, you know, reaching further

17   down -- he lift up and starting lifting further down.

18       Q    All right.  You said his windows were on

19   window; right?

20       A    Right.

21       Q    And his hands were on the window at a time

22   when the window had already been rolled down; right?

23       A    Yes.  Yes.

24       Q    And in order to comply with your request

25   that he get out of the car, he had to move his hands

1    into the side of the passenger side door to open the

2    door; didn't he?

3         A    That was before.  That was before.  I didn't

4    ask him to step out of the vehicle until he started

5    fidgeting.  Until he started fidgeting.  He kept

6    fidgeting.  And I was like I told you I don't care

7    about the weed.  Why are you moving around so much?

8    Then I asked him to step out.  And then he moved his

9    hands to open the door.

10        Q    Okay.  And when you saw his hands there

11   wasn't anything in them?

12        A    Right.

13        Q    So the information that you have as to the

14   time that he opens the door --

15        A    Right.

16        Q    -- the information that you actually have is

17   that he has not had anything in his hands?  That's the

18   information you had?

19        A    Correct.

20        Q    Correct, okay.  So at the time he opened the

21   door and gets out you had no information other than

22   that he had nothing in his hands, did you?

23        A    Correct.

24        Q    At the time that he had -- after the time

25   that he rolled down the window and then opened the

1    door.  As of that point in time, he had not seen him

2    smoking anything let alone marijuana, had you?

3         A    Correct.

4         Q    He had denied that he had been smoking

5    marijuana in the parking lot; correct?

6         A    Yes.

7         Q    You didn't see anything in his hands;

8    correct?  Correct?

9         A    Correct.

10        Q    And you knew that he was waiting on friends

11   and you knew that was lawful?

12        A    Right.

13        Q    All right.  So as of the time that he has

14   been standing alongside of the car in which he had

15   been riding, you didn't have any information to the

16   effect that right then at that point in time that he

17   was engaged in criminal behavior, did you?

18        A    Correct.

19        Q    What reason then was there to arrest him at

20   that point in time?

21        A    He wasn't arrested.  I did not arrest him.

22   I just -- I had him step out for my safety.  I smelled

23   marijuana.  So I had him to step out and I wanted to

24   pull out on the radio because it lead to me talking to

25   him to me asking him more questions.  When I started

1    to asking more questions why are you moving around.

2    So I wanted to pull out on the radio.  That was not,

3    you know -- that was the reason.

4         Q    Of course, you had him step -- I'm sorry

5    sir.  Go ahead.

6         A    Because I was having an interaction with

7    him.  Right?  And his fidgeting became alarming to me

8    as though -- like he had something to hide.  And I

9    told him I didn't care about the marijuana, but he

10   was -- he was just started moving and his manner -- a

11   lot of times when people are moving like that they're

12   trying to hide something.

13        Q    I'm asking about Mr. Phillips, sir.  I'm not

14   asking about somebody else.

15        A    Right.  Okay.

16        Q    From your observation, the physical activity

17   that you saw, your words are that he was fidgeting

18   while he was in the car?

19        A    Correct.

20        Q    Okay.  And you have told us that you made

21   the decision that for the purpose of officer safety

22   you would have him get out of the car; correct?

23        A    Correct.

24        Q    He complied with that request; correct?

25        A    Yes.

1    Q    And once he complied with your request and
2  was standing alongside of the car that enhanced
3  officer safety as you had wished, didn't it?
4    A    Yes.
5    Q    You didn't see anything on the floor of that
6  car on the passenger side when he got out, did you?
7    A    No.  I didn't get that close.
8    Q    Well, you were within inches of the man,
9  weren't you?
10   A    Right.  I backed up.  I just backed up away
11 from him --
12   Q    Okay.
13   A    -- and kept him at arm's length so I can --
14 just so I can, you know, just -- so.
15   Q    Your at arm's length away from him?
16   A    Right.
17   Q    No more than three feet?
18   A    Right.
19   Q    You're close enough that you can see his
20 entire body; correct?
21   A    Correct.
22   Q    And thus successful in your effort to
23 enhance officer safety by asking him to get out of the
24 car.  He complied.  And hence, your safety was
25 enhanced by him standing out of the car; correct?

1      A     Right.  Correct.

2      Q     Than when he was seated in the car; correct?

3      A     Correct.

4      Q     Okay.  You used the phrase pull out, I

5  think.

6      A     Yes.

7      Q     You were going to pull him out.  Describe

8  for us, please, what you mean by that phrase.

9      A     Pulling out just informing the dispatcher of

10  my location and, you know, what we have going on.

11  Just giving her our location, because she never knew

12  we were there.

13      Q     Okay.  All right.  And I think we've gone

14  over the fact that you never reached anybody with

15  dispatch.  You never told them you were pulling out.

16      A     Correct.

17      Q     Pulling out is a phrase that refers to --

18  you were engaged in something at the time, that's kind

19  of what it means; right?

20      A     Yes.

21      Q     Okay.  You were engaged in some official

22  duty.  You weren't at the same time, though, calling

23  dispatch to get information about Phillips; correct?

24      A     No.

25      Q     Because at that time you didn't know his

128

1    name.

2         A    Right.  I was going to tell them -- tell

3    radio -- tell them, you know, give them a way of my

4    location and, you know, that we encountered, you know,

5    a black male of given description.

6         Q    Okay.

7         A    Right.

8         Q    All right.  You never -- there wasn't a

9    point in time that evening before he was shot that you

10   asked Phillips' name or asked for his driver's license

11   or ID, you didn't ask any of that from him; right?

12        A    No.

13        Q    I wanted to ask you this about the smoking

14   business.  How do you explain the fact that there was

15   no roach found in the car that would have corresponded

16   with anybody smoking in the car when you pulled up?

17        A    I never searched the car.

18        Q    I didn't ask you to search it.  How do you

19   explain the fact that no roach or burnt material was

20   found in the interior of the car after Phillips was

21   killed?

22        A    I can't explain it.

23        Q    Do you have any facts on which to dispute

24   that no burnt marijuana was found inside of that car

25   after Phillips was killed?  You don't have anybody to

1   speak to that, do you?

2        A    No.

3        Q    And no explanation for it, do you?

4        A    No.

5        Q    Once you were alongside the car with the

6   window rolled down, did you ever ask Phillips to show

7   you the marijuana?

8        A    No.  He said that he wasn't smoking.  He

9   said he smoked yesterday.  Before.

10       Q    All right.  So you didn't -- and you never

11  saw what, if anything, he ever had in his hands before

12  he got out of the car?

13       A    Correct.

14       Q    And you told him to get out of here,

15  something to that effect, once he got out of the car;

16  correct?

17       A    No.  I told him this while he was sitting in

18  the car.

19       Q    Okay.  All right.  And obviously he disputed

20  that he had to leave?

21       A    No.  No.  He didn't.

22       Q    He didn't say I've got friends inside, all

23  I'm doing is waiting?

24       A    Right.  Yeah, he said that.  Yeah, he said

25  something that.  I think he said something like I'm

1    waiting on my cousin or something, you know, they went

2    inside.

3         Q    Okay.  And you had no information to the

4    contrary; that is, to say as far as what you knew he

5    was saying was true?

6         A    Correct.  I believed him.

7         Q    Other than what you've told me so far, can

8    you describe any other actual physical movement on the

9    part of Mr. Phillips' hands that he took while he was

10   inside the car and before he got out in response to

11   your telling him to get out of the car?  Can you think

12   of anything else that you haven't told us about his

13   hands?

14        A    No.

15        Q    And once he was standing alongside of the

16   car, can you think of anything else that he did with

17   his hands before he got back into the car that you

18   haven't already told us?

19        A    No.

20        Q    You never directed Phillips to put his hands

21   on the dash of the car while he was still inside of

22   it, did you?

23        A    No.

24        Q    And you never ordered him to put his hands

25   on the windowsill while he was still inside the car,

1  did you?

2       A    No.

3       Q    If you were worried about what he was doing

4  with his hands while he was still inside the car, an

5  option that you had would have been to direct that he

6  put his hands either on the dash of the car or on the

7  windowsill; correct?

8       A    Yes.

9       Q    Before ordering Phillips out of the car,

10 there were no words that he said to you or to

11 Mr. Abdulahad that you would interpret it to be a

12 threat, were there?

13      A    No.

14      Q    And in fact in the entire period of time in

15 which you saw or heard Mr. Phillips on that night, he

16 never said any word that in your hearing it you took

17 as a threat?

18      A    No.

19      Q    In the period of time in which Mr. Phillips

20 is situated inside of the car and before he was

21 standing alongside of it, there never came a time, did

22 there, in which Mr. Phillips used his body in such a

23 way to direct a motion towards you that you considered

24 to be threatening; correct?

25      A    Yes.  He came up -- he came to me once I

1    started to grab the radio.  When I went to pull out

2    the radio that's when he came at me and grabbed me.

3         Q    Please understand, sir.  I understand that

4    you have information that you want to give us about

5    that stage.  Okay?

6         A    Right.

7         Q    Right now I'm segregating that period of

8    time between the time you come up to -- walk up to the

9    window and Mr. Phillips is in the car, and the point

10   in time in which he is now just standing outside.

11   Okay?

12        A    Yes, sir.

13        Q    I want to hear what you can tell us after

14   that point.  But in that period of time he's in the

15   car, the window comes down.  You tell him to get out,

16   and then he's standing up.  In that period of time,

17   there's no physical movement that he took with his

18   hands that you viewed as using his hands to engage in

19   a physical threat towards you; correct?

20        A    None.

21        Q    Okay.  So now he's standing alongside the

22   car.  Okay.  We're at that point in time.  And you

23   told us that in addition -- can you think of anything

24   else that you told him while the two of you were

25   standing close to one another once he stood up that

1  you haven't already told us?

2       A    No.

3       Q    Okay.  That being the case then, you never

4  told Phillips that he could not leave, did you?

5       A    No.

6       Q    Not having told him that he could not leave,

7  as far as what you had communicated to him, he was

8  still free to go; wasn't he?

9       A    Yes.

10      Q    But when he started to move in your

11 direction that you're standing alongside him and he's

12 standing as well, that's the point in which you told

13 Abdulahad to grab him?

14      A    Yes.

15      Q    And when you told Abdulahad to grab

16 Mr. Phillips, it's because you had decided that you

17 were going to keep Phillips present there with you;

18 correct?

19      A    After he -- yes.  After he pushed me, you

20 know.

21      Q    With what part of his body -- referring to

22 Phillips -- did he in your words push you?

23      A    With his hands.

24      Q    With both hands or one hand?

25      A    Both hands.

1     Q     And on what part of your body did
2   Mr. Phillips' two hands touch?

3     A     My chest.

4     Q     All right.  And when he touched your two
5   hands [sic], you are within arm's reach of one another
6   clearly; correct?

7     A     Yeah.

8     Q     And Mr. Abdulahad is not between the two of
9   you, is it?

10     A     No.

11     Q     Mr. Abdulahad is where at the point in time
12   that you say Mr. Phillips had placed his two hands on
13   your chest?

14     A     He was standing beside me, like --

15     Q     All right.  On which side?

16     A     On my right side.

17     Q     All right.  And when the two hands of
18   Mr. Phillips were placed onto your chest, what
19   physical action did Mr. Phillips take next?

20     A     He attempted to go back inside the car.

21     Q     All right.  So in placing his hands --
22   taking what you just described to us then, I'm correct
23   in understanding then that Mr. Phillips put his two
24   hands on your chest did not move you from where you
25   were; correct?

1      A    Yes.

2      Q    You stood your ground; correct?

3      A    Yes.

4      Q    He didn't push you out of the way, did he?

5      A    No.

6      Q    And he didn't touch Mr. Abdulahad, did he?

7      A    No.

8      Q    All right.  So going back into the car on

9 Mr. Phillips' part, you didn't know what he was going

10 to do next, did you?

11     A    No.

12     Q    And because you didn't know what he was

13 going to do next, for all you knew he was going to

14 stay there just like you wanted; correct?

15     A    No.  I thought, you know -- I mean, repeat

16 the question.

17     Q    You just told us, sir, that you did not know

18 what he was going to do next when he went into the

19 interior of the car after he had placed his two hands

20 on your chest.  That's what you just told us; am I

21 right?

22     A    Right.

23     Q    Thus, you did not know what his next step

24 was going to be, did you?

25     A    Correct.  I did not know.

1     Q    And you did not have any facts known to you

2    at that time on which to conclude that he was going to

3    do anything other than sit in that seat, did you?

4     A    No.  He jumped in the driver's side.  I knew

5    he was going to pull off.

6     Q    I understand he ended up in the driver side.

7    We all know that; right?

8     A    Right.

9     Q    I'm asking you from what you understood at

10    the time when he first went into the car.  Not where

11    he ended up.

12     A    I don't know.

13     Q    But when he first went into the car, you

14    didn't know anything about what he was going to do

15    next; did you?

16     A    Correct.

17     Q    Because when he went first into the car he

18    went into the passenger side of the car; right?

19     A    Correct.

20     Q    He didn't stay, hey, I'm going to drive

21    away, did he?

22     A    No.

23     Q    He didn't say I'm going to leave my friends

24    who are still inside; did he?

25     A    No.

1      Q    All he did was he reentered the car out of
2    which you told him to leave; correct?
3      A    Yes.
4      Q    And when he initially entered the car, he
5    went into the passenger side; correct?
6      A    Yes.
7      Q    And when he went into the passenger side,
8    you didn't know whether he wanted to drive away or
9    stay; did you?
10     A    No.
11     Q    You couldn't tell from his initial reactions
12   were, could you?
13     A    Correct.
14     Q    But you had told Abdulahad to hold onto him;
15   right?
16     A    Yeah.
17     Q    And because you had told Abdulahad to hold
18   onto him Abdulahad did; right?
19     A    Yes.
20     Q    And as he held onto him -- as Abdulahad held
21   onto Mr. Phillips, that's when Mr. Phillips started
22   moving over towards the driver side; correct?
23     A    Yes.
24     Q    Because Abdulahad went in after him; right?
25     A    Yes.

1     Q    Okay.  So once he moved over into the driver

2  side -- well, as you saw him and you certainly were

3  watching at that point -- as you saw him move -- him

4  Phillips -- from the passenger side where he had

5  started out and into the driver side, you were able to

6  observe his actions; correct?

7     A    Yes.

8     Q    Okay.  In moving over he had to cross

9  over -- he Phillips -- had to cross over the console

10  of the car; correct?

11     A    Yes.

12     Q    He was able to do that quickly; correct?

13     A    Yes.

14     Q    When he climbed over the brake lever was not

15  pulled up, was it?

16     A    I didn't see it.

17     Q    Right.  It was in the down position, wasn't

18  it?

19     A    I didn't see it.

20          MS. MILLER:  Objection.

21     Q    You didn't see it.  Let me ask it this way,

22  sir.  You didn't see the brake -- the emergency brake

23  lever veer pulled up, did you?

24     A    I wasn't paying attention.

25     Q    I'm just asking what you saw or didn't see.

1  You didn't see it, did you?

2       A    I didn't see it.

3       Q    Okay.  Now, when Mr. Abdulahad went in after

4  Mr. Phillips he was still -- he, Abdulahad, was still

5  holding onto Mr. Phillips' body -- some part of his

6  body; correct.

7       A    I couldn't see.  Once Abdulahad went into

8  the car fully I couldn't see.  The door closed.  He

9  pulled the door for a minute and the door was starting

10 to close.

11      Q    Well, the door closed pretty much right away

12 once he got into the car; right?

13      A    No.  It didn't close right away.  It closed

14 as he's pulling off.

15      Q    Okay.  And you told us earlier that

16 Mr. Abdulahad was positioned as he -- once he got into

17 the car he was on his knees, his knee having contact

18 with the passenger side seat; correct?

19      A    Yes.

20      Q    So he was in a position, as you saw it,

21 relatively speaking, where he was higher in the

22 interior of the car than Mr. Phillips?

23      A    I could just see his knees.  And I could

24 just see his lower -- from like the waist down, you

25 know, him on his knees.  After that part I couldn't

1  see it because it was a blind side for me.

2      Q    By blind side, you were blocked from seeing

3  Mr. Phillips?

4      A    Yes.

5      Q    Because Mr. Abdulahad's body had kind of

6  taken up the interior space in terms of your ability

7  to see Mr. Phillips; is that correct?

8      A    Yes.

9      Q    Okay.  So you didn't see -- I take it you

10 didn't see Mr. Phillips actually engage the

11 transmission?

12     A    No.

13     Q    Obviously we know it happened because they

14 pulled away; right?

15     A    Yes.

16     Q    Okay.  And you did not hear, did you, you

17 did not hear Mr. Abdulahad tell Mr. Phillips to stop?

18     A    No.

19     Q    And you did not hear hence Mr. Abdulahad say

20 anything to Mr. Phillips to the effect that I have a

21 gun and I am going to shoot you if you continue

22 driving?  You didn't hear any of that, did you?

23     A    No.

24     Q    What did you say to either Mr. Abdulahad or

25 Mr. Phillips once you realized that Abdulahad had gone

141

1    into the car?

2         A    I didn't say anything.  I froze like.  I

3    just froze for a second because it caught me by

4    surprise.

5         Q    Just going back for a second.  Am I correct

6    in understanding that at least as you sit here today

7    you don't have any recollection of having a flashlight

8    that you used to shine into the interior of the car

9    before Mr. Phillips got out?

10        A    Right.

11        Q    Okay.  Would it be your testimony today that

12   that did not happen or just that you don't recall?

13        A    I just don't remember.

14        Q    And again, kind of summarizing what I

15   believe is the case from your testimony that between

16   the time you walked over to Mr. Phillips' car -- or

17   sometimes I'll call it the Malibu -- between the time

18   that you walked over towards the Malibu and the time

19   that the Malibu stopped after the shooting, you never

20   saw anything on the floor of the car?

21        A    No.

22        Q    And you didn't see anything on the driver's

23   seat either other than obviously Mr. Phillips?

24        A    What?  After the car stopped?

25        Q    I don't mean to confuse you, sir.  I want to

1   be clear on the time.  That isn't what I asked, but I

2   appreciate you asking me to clarify.

3                     Let's do it this way.  In the period of

4   time prior to Mr. Phillips getting out of the car as

5   you're standing there alongside up to that point in

6   time you had not seen anything on the passenger seat

7   itself, did you?

8        A    No.

9        Q    And in that same period of time you had not

10   seen anything on the driver's seat itself, did you?

11        A    No.

12        Q    And once -- let's see, in the period of time

13   between the point where Mr. Phillips is standing

14   alongside the car and the time that he gets into the

15   driver's seat, other than seeing Mr. Abdulahad with

16   his knees on the passenger seat, you didn't see

17   anything else on the passenger seat in that time frame

18   either, did you?

19        A    No.

20        Q    At the point in time that Mr. Phillips

21   pulled away from where you were situated with

22   Mr. Abdulahad in the vehicle, the fact is that you did

23   not have any information on which to conclude that

24   there was a weapon in the Phillips' car other than the

25   weapon that Mr. Abdulahad carried; correct?

143

1      A      Correct.

2                        Sir, I want to inform you I only have

3      like 5 percent left on my phone.  It's plugged up, but

4      my charger -- this phone, it's my work phone, and it

5      don't -- it don't charge well.

6      Q      You're using the phone for this Zoom call?

7      A      Yes.

8      Q      Okay.  Let's go off the record for a moment.

9      Let me understand that, sir, and we'll see what, if

10     anything, we need to do.

11                       (Off the record from 1:41 p.m. to

12                       1:43 p.m.)

13     Q      (By Mr. Spears) While Mr. Phillips stood

14     alongside of the Malibu and before he got back in, you

15     didn't see anything unusual about what he was wearing,

16     did you?

17     A      No.

18     Q      You didn't take note of anything that -- any

19     emblems on his jacket or on his pants?

20     A      No.

21     Q      Okay.  There wasn't anything unusual about

22     anything that he was wearing on his head; correct?

23     A      No.

24     Q      If you noticed that the beltline of his

25     pants were low and below his buttocks?

1       A     No.

2       Q     Did Mr. Phillips say anything to you at the

3   point in time that either of his hands were on your

4   chest?

5       A     No.

6       Q     And in the physical motion of placing his

7   hands on your chest it didn't injure you; right?

8       A     No.

9       Q     It wasn't a blow to your chest; right?  He

10  placed his hands on your chest?

11      A     Yes.

12      Q     And you were not pushed back, you told us

13  that?

14      A     He tried to push me back, but he didn't.

15      Q     I'm not asking right now for what you

16  interpret his actions to have meant.  His physical

17  motions of placing hands on your chest did not push

18  you back; did they?

19      A     No.

20      Q     Okay.  Do you recall that -- excuse me, let

21  me rephrase the question.

22              I know I have asked you a number of

23  questions about what you saw -- what you saw in the

24  interior of the car before Mr. Phillips manipulated

25  the car in such a way that it pulled away.  Do you

1   have any information to the effect that Mr. Abdulahad

2   had any unique or different information about

3   Mr. Phillips and his actions that you have not already

4   described to us as it pertains to that particular

5   point of time?

6        A    No.

7        Q    When he went into the car while he was

8   holding onto Mr. Phillips, as far as you knew he knew

9   the same -- he had the same information as you did

10  about Mr. Phillips?

11       A    Yes.

12       Q    Did you hear anything that Mr. Abdulahad had

13  said to Mr. Phillips while Mr. Abdulahad was in the

14  interior of the car with Mr. Phillips?

15       A    No.

16       Q    Did you hear Phillips say anything at all

17  after he started into the car?

18       A    No.

19       Q    After Mr. Phillips went into the driver

20  seat, am I correct in understanding based on your

21  testimony, that you were not able to see what

22  Phillips' physical motions consisted of?

23       A    Correct.

24       Q    Hence, you never saw him reach for a gun

25  anywhere in that car, did you?

1      A    No.

2      Q    Or anything for that matter.  You didn't see

3  him reach for anything once he went into the car other

4  than getting in the driver seat?

5      A    No.

6      Q    And when Phillips went into the driver side,

7  do you recall the interior dome light came on.

8      A    No.  I don't recall.

9      Q    Between the shooting of Mr. Phillips and

10  your becoming aware that the Atlanta Police Department

11  had put out a news release to the effect that

12  Abdulahad had been kind of half in and half out of the

13  car.  Can you think of anyone who you spoke to about

14  the facts and circumstances as you saw them of this

15  incident other than what you've already told us?

16      A    No.

17      Q    When the car pulled out of the parking spot

18  where it was situated with Mr. Abdulahad and Phillips

19  in it, could you hear the car?

20      A    No.

21      Q    Can you think of any impediment to your

22  capacity to hear that existed on that night?

23      A    No.

24      Q    Do you have any reason to think that you

25  heard the gunshot, but just don't remember?

1      A     No.  I didn't hear it.

2      Q     What is your explanation, if any, for how

3   you did not actually hear the gun go off?

4      A     I didn't hear it.

5            MS. MILLER:  Objection.  Objection.  But you

6        can answer.

7      A     I didn't hear it.

8      Q     I understand that's your testimony.  I'm not

9   trying to say, oh, you didn't say that.  I'm asking

10  whether you have any explanation for how it could be

11  that you didn't hear it?

12     A     No.

13     Q     Can you think of anything that -- any

14  activity that you saw taking place inside of the

15  Malibu as it pulled away from you that you have not

16  already described to us?

17     A     No.

18     Q     Is it the case that as the Malibu was moving

19  away from where you were situated that you continued

20  to watch it?

21     A     Yes.

22     Q     And as you continued to watch it through the

23  rear window of the vehicle, you could see that there

24  was some commotion going on; correct?

25     A     No.  I was keyed in on the tag.

1      Q    I'm sorry.  Please say again.

2      A    No.

3      Q    No, you didn't see anything going on in the

4  interior?

5      A    No.  I couldn't see.

6      Q    Do you have any sense of how quickly the car

7  was moving away from you when it pulled out of the

8  parking slot?

9      A    I couldn't catch up with it while I was

10  running behind it, so it was moving pretty fast.

11      Q    All right.  And because it was moving pretty

12  fast, you do know -- obviously there came a point in

13  time when it stopped.  Right, the car stopped?

14      A    Right.

15      Q    Right.  And in order for the car stopped it

16  had to slowed somewhat before it came to a full stop;

17  correct?

18      A    Yes.

19      Q    All right.  And in coming to a full stop,

20  you didn't hear any screeching sound of tires on the

21  asphalt; did you?

22      A    No.

23      Q    All right.  So from what you could tell, at

24  least from the, you know, senses that you had

25  available to you, the car came to a controlled stop?

1      A     Yes.

2      Q     Did it appear to you then -- did you notice

3  that the car was slowing down before it fully stopped

4  or you just kind of logically understand that's what

5  happened?

6      A     I kind of logically understood that's what

7  happened.

8      Q     Okay.  And do you have a sense of how

9  long -- I mean, I realize it was going kind of fast

10  when it first started off and you started to kind of

11  run after it; right?

12                I'm sorry.  Mr. Robeson left?  Can you

13  hear us, sir?  Mr. Robeson.

14                Ms. Miller, do you have any idea what's

15  going on?

16           MS. MILLER:  I don't.

17           MR. SPEARS:  I'm sorry?  I couldn't hear

18      you.

19           MS. MILLER:  I said I don't, but I can try

20      to give him a call since he's -- the phone --

21           MR. SPEARS:  I mean, it's clear he's still

22      connected, I guess, to the call.  Since we can

23      see a visualization.

24           MR. FOSTER:  I'm quite sure his phone just

25      died.

1          MS. MILLER:  Okay.  I'll give him a call.

2          MR. SPEARS:  All right.

3          MR. FOSTER:  And, Brian, he was trying to

4     explain before this happened, the devices that we

5     have, if he's not using the native charger for it

6     the ones that he's using the power it may not

7     give the capacity to charge while doing video

8     calls or videos generally.  I have a similar

9     device and if I don't use that native charger,

10    and it did not appear from what he showed us,

11    that was a native charger.  It will run until it

12    dies.

13         COURT REPORTER:  Are we still on the record?

14         MR. SPEARS:  We have been.  Now let me

15    suggest we go off the record for now.

16                    (Off the record at 1:55 p.m. to

17                    3:03 p.m.)

18         MR. SPEARS:  Let the record reflect that at

19    some point -- and I forget exactly what time it

20    was maybe.  Let's say around about 10 minutes

21    till 2:00.  The witness, it appears -- the

22    witness's phone ran out of a charge and we lost

23    contact with the witness.  Counsel has attempted

24    to reach him by phone since that time; that is to

25    say, Ms. Miller and City attorneys' office has

151

1          tried to reach him since that time and have not

2          had contact with him.  We're agreeing to resume

3          this witness's deposition tomorrow.  That will be

4          the 17th, March 17th at 1:00 p.m.

5                  In the meantime, if you could, Staci,

6          continue to try to reach him and see if we can

7          resume sometime at 1:00.  Anything else from

8          anybody?

9                  MS. MILLER:  Nothing else from me.

10                 MR. SPEARS:  All right.  Thank you,

11         everyone.  We'll resume tomorrow at 1:00 o'clock

12         and see you then.

13                         (Ended at 3:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

152

1                               DISCLOSURE

2     STATE OF GEORGIA        DEPOSITION OF EL MALIK ROBESON-EL

3     COUNTY OF PAULDING    Date: March 16, 2021

4                   Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:

6
                      I am a Georgia Certified Court Reporter.  I
7     am here as a representative of American Court
      Reporting Company, Inc.

8
                      I am not disqualified for a relationship of
9     interest under provisions of O.C.G.A. 9-11-28(c).

10                    American Court Reporting Company, Inc., was
      contacted by the offices of Brian Spears, Esquire to
11    provide court reporting services for this deposition.

12                    American Court Reporting Company, Inc. will
      not be taking this deposition under any contract that
13    is prohibited by O.C.G.A. 15-14-37(a) and (b).

14                    American Court Reporting Company, Inc., has
      no exclusive contract to provide reporting services
15    with any party to the case, any counsel in the case,
      or any reporter or reporting agency from whom a
16    referral might have been made to cover this
      deposition.

17
                      American Court Reporting Company, Inc., will
18    charge its usual and customary rates to all parties in
      the case, and a financial discount will not be given
19    to any party to this litigation.

20                    This the 16th day of March 2021.

21

22

23

24
                          --------------------------
25                        CATHY M. COX, B-441

153

1                       C E R T I F I C A T E

2       STATE OF GEORGIA)

3       COUNTY OF PAULDING)

4               I hereby certify that the foregoing

5       transcript was taken down, as stated in the caption,

6       and the proceedings were reduced to typewriting under

7       my direction and control.

8               I further certify that the transcript is a

9       true and correct record of the evidence given at the

10      said proceedings.

11              I further certify that I am neither a

12      relative or employee or attorney or counsel to any of

13      the parties, nor financially or otherwise interested

14      in this matter.

15              This the 11th day of April 2021.

16

17

18

19

20      _Cathy M. Cox_

21

22      --------------------------------

23      CATHY M. COX, CCR, RPR

24      Certificate No. B-441

25

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

---

**[**

---

**[sic] (2)**
102:16;134:5

---

**A**

---

**Abdulahad (158)**
15:25;19:12;21:21;22:5,
21;23:23;24:12,15,21;25:2,
5,10,15;26:20;28:8;30:10;
31:4;32:8,17,20;34:10,20;
35:3,13,20;36:9,10,15;
49:23;50:11,15,25;51:6;
52:12,18;53:4,24;54:20,24;
55:9;60:3,19,20;61:4;
64:22;65:5;66:16;67:13,17;
72:17;73:8;74:1;75:12,16,
18,23,25;76:1,11,12,14,20,
24;77:3,20;79:24;80:12,25;
81:7,21;82:4;83:6,13;84:4,
12,21,22;85:10,15,16;
88:17;89:4,20;92:1,7;94:3;
99:17,23;100:4,10,14,17,
20;101:2,25;102:7,13;
104:14,20;105:3;106:21,25,
25;107:4,7,11,13,16;
109:18;110:8,13,20;111:3,
8,16;112:5;113:3,4,8;
116:13,23;117:1,3,15,15,
21;118:2;119:13,14,20,24;
131:11;133:13,15;134:8,11;
135:6;137:14,17,18,20,24;
139:3,4,7,16;140:17,19,24,
25;142:15,22,25;145:1,12,
13;146:12,18

**Abdulahad's (9)**
33:13;64:17;77:9;100:7;
106:14,21;117:12;119:7;
140:5

**ability (1)**
140:6

**able (20)**
6:3,4;9:3,4;16:15;34:11,
13;38:24;42:7;43:4;44:18;
46:1;88:20;96:9;98:4;99:7,
7;138:5,12;145:21

**Absolutely (1)**
82:22

**Academy (1)**
14:4

**acceptable (1)**
41:23

**access (4)**
11:22;28:5,8;77:21

**accident (3)**
7:7,10;60:15

**according (2)**
49:7;71:20;116:21,22

**account (2)**
11:15,16

**accurate (2)**
27:13;86:10

**Act (1)**
5:14

**action (1)**
134:19

**actions (3)**
138:6;144:16;145:3

**activate (2)**
121:4,8

**activities (4)**
18:4;51:22;94:7;97:19

**activity (18)**
20:11,25;45:8;77:2;
97:13,15,20,22;98:14;
108:12;109:14;111:15;
116:9,10;118:15;121:4;
125:16;147:14

**acts (1)**
99:11

**actual (2)**
55:9;130:8

**actually (7)**
37:5;73:21;85:25;86:21;
123:16;140:10;147:3

**added (1)**
9:12

**addition (3)**
23:9;37:18;132:23

**additional (2)**
22:6;104:20

**adjacent (1)**
118:24

**administering (1)**
5:15

**adult (2)**
7:2;8:14

**advance (1)**

**39:3**

**affairs (1)**
85:22

**affidavit (4)**
71:9,17;95:19,21

**afterwards (8)**
30:23;39:15;119:11,14,
17,18,19,20

**again (16)**
13:19;18:13,14,15;20:17;
25:3;32:7;34:10;40:1;
43:17;51:21;69:2;76:14;
106:23;141:14;148:1

**against (4)**
35:25;63:21;118:24;
120:13

**agencies (5)**
14:7,10,14,15;68:18

**agency (3)**
13:15;24:22,23

**Agent (2)**
37:25;43:9

**ages (1)**
9:20

**Aggravated (5)**
15:15;95:8,8,9;99:14

**ago (3)**
11:2,4,16

**agree (17)**
5:11,18,20;41:13;46:13;
47:17,25;78:16;79:23;82:1,
6,8,23;102:12,15;104:4;
108:14

**agreeable (1)**
6:15

**agreed (2)**
107:23;108:13

**agreeing (1)**
151:2

**agreement (3)**
4:15;5:8,17

**ahead (11)**
5:8,9;47:13;48:16;49:4,
10;56:1;67:17;76:5;84:3;
125:5

**air (2)**
13:2,3

**alarming (1)**
125:7

**alert (3)**

**85:20;86;7,10**

**alerted (1)**
28:22

**Alif (4)**
50:17,19,20,24

**allegation (1)**
80:24

**allegations (1)**
78:20

**alleging (1)**
99:11

**allowed (2)**
44:22;66:1

**alone (3)**
4:18;109:14;124:2

**along (4)**
57:25;77:16;105:24;
115:22

**alongside (19)**
30:3,5,9,9;32:10,22;34:9;
35:12;118:9;124:14;126:2;
129:5;130:15;131:21;
132:21;133:11;142:5,14;
143:14

**altercation (1)**
92:22

**Although (1)**
39:23

**Amendment (9)**
57:8;10;59:4,17,20,25;
63:17,20,24

**among (2)**
78:17;113:23

**amount (2)**
6:24;46:7

**analysis (1)**
82:16

**Annex (12)**
19:20;25:16;27:13,17;
28:13;46:21;48:5;108:5;
109:3;117:16;118:3,12

**announcement (1)**
85:13

**annual (2)**
102:25;103:6

**answered (2)**
6:14;60:12

**anticipate (1)**
62:20

**anticipated (1)**

---

American Court Reporting Company, Inc.   (1) [sic] - anticipated

35:25

**anticipating (1)**
47:16

**anymore (2)**
97:7;122:16

**APD (4)**
28:19,20,23;39:20

**appear (2)**
149:2;150:10

**appeared (1)**
99:18

**appears (1)**
150:21

**application (3)**
71:20;72:3,9

**applications (1)**
96:10

**applying (1)**
96:1

**appreciate (2)**
36:23;142:2

**apprehension (1)**
58:5

**approached (3)**
112:10;120:12;122:11

**approximate (1)**
16:15

**approximately (2)**
6:22;15:21

**apps (2)**
54:16,17

**APS (1)**
85:23

**area (1)**
108:10

**arm's (3)**
126:13,15;134:5

**Around (10)**
22:20;50:4;66:18;70:8;
78:25;89:7;115:3;123:7;
125:1;150:20

**arrest (10)**
13:25;17:2,2;18:17;
96:12;99:3;103:3;116:16;
124:19,21

**arrested (2)**
18:7;124:21

**arrests (10)**
16:3,6,12,16,17,23,25;
94:25;98:22,23

**arrival (2)**
25:24;28:22

**arrived (6)**
19:19;26:12;28:25;29:2;
66:15;116:13

**arriving (1)**
120:19

**asphalt (1)**
148:21

**Assault (6)**
15:15;16:9,10;95:8,8,9

**assaults (1)**
99:14

**assert (2)**
59:4;63:23

**asserted (1)**
63:17

**asserting (4)**
57:7,9,18;59:17

**assertion (2)**
57:1;65:15

**assess (1)**
98:4

**assigned (2)**
39:17;53:4

**assignment (1)**
53:16

**assistant (1)**
10:12

**associated (6)**
17:9;27:18;28:14;39:6;
48:14;52:9

**associates (1)**
18:3

**assume (2)**
6:13;70:8

**assumed (2)**
50:21;121:7

**Atlanta (14)**
14:8,15,17;39:11;78:12;
79:12;81:4;84:1,19;85:14;
87:5,14;102:16;146:10

**Atlanta's (1)**
103:8

**attachment (1)**
105:10

**attempt (1)**
92:3

**attempted (2)**
134:20;150:23

**attempts (1)**
37:6

**attendance (1)**
98:10

**attention (14)**
24:9;34:22,22,23,23;
35:4;111:22,23;119:6,8,8,
11;120:2;138:24

**attorney (1)**
41:7

**Attorneys (2)**
67:22;70:11

**attorneys' (1)**
150:25

**audio (14)**
38:8,16;40:2,3,6,8,12,22;
41:4;42:1,12,17,23;48:13

**authority (5)**
13:25;14:12;83:8;103:3,4

**authorization (1)**
96:5

**authorized (1)**
83:18

**available (2)**
114:10;148:25

**aware (23)**
24:15,19;25:6,7;39:10;
57:3;72:21;78:22;80:4;
84:13,18;90:13,15;93:10;
103:24;104:19;105:17,21;
106:13,16,16;113:15;
146:10

**awareness (2)**
86:22;87:5

**away (22)**
45:7;75:21,22;77:2,22;
88:8;90:3,12,15,19;126:10,
15;136:21;137:8;139:11,
13;140:14;142:21;144:25;
147:15,19;148:7

**B**

**back (20)**
29:4;33:19;42:19,21;
43:18;48:1;63:5;65:4;68:6;
76:15;92:7;99:16;130:17;
134:20;135:8;141:5;
143:14;144:12,14,18

**backed (4)**

109:20;110:3;126:10,10

**background (1)**
49:24

**backing (1)**
120:2

**badge (2)**
23:11;53:10

**Baltimore (3)**
14:11,12,12

**barrel (2)**
105:19,23;106:2

**base (1)**
98:5

**based (3)**
59:24;61:23;145:20

**basically (3)**
69:22;97:10;98:25

**basis (6)**
57:1,14;58:4;96:8;
102:25;103:6

**Bates (2)**
39:5,7

**bear (1)**
42:14

**became (3)**
13:12;50:7;125:7

**become (2)**
14:2;50:7

**becoming (2)**
50:2;146:10

**began (2)**
15:13;51:8

**begin (1)**
42:5

**beginning (8)**
39:2;42:6,11;46:11,16;
48:8;51:7,9

**behalf (2)**
57:18;65:24

**behavior (4)**
108:20,24;109:15;124:17

**behind (6)**
35:3;75:25;112:11;118:7,
8;148:10

**belonged (1)**
68:19

**below (3)**
87:8,9;143:25

**beltline (1)**
143:24

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL -  Vol. I
March 16, 2021

**beside (3)**
110:14;116:8;134:14

**better (1)**
42:19

**binding (1)**
5:15

**bit (2)**
75:24;109:10

**Black (2)**
115:21;128:5

**blind (2)**
140:1,2

**blocked (1)**
140:2

**blow (1)**
144:9

**body (13)**
22:19;23:20;32:2,5;
77:13;93:1;126:20;131:22;
133:21;134:1;139:5,6;
140:5

**both (8)**
16:9;19:15;52:20;78:25;
83:5;103:15;133:24,25

**bothers (1)**
55:15

**brake (6)**
72:11;73:3;74:1;138:14,
22,22

**brand (2)**
104:12,17

**break (4)**
62:25;63:2,7,16

**breakfast (1)**
50:25

**Brian (5)**
46:22;48:15;62:24,24;
150:3

**bring (2)**
73:24;107:23

**broaden (1)**
38:8

**brought (1)**
7:3

**build (1)**
33:7

**building (2)**
52:4,6

**bullet (4)**
104:13;105:19,24;106:2

**Bureau (2)**
37:25;43:10

**burnt (2)**
128:19,24

**business (2)**
87:6;128:14

**buttocks (1)**
143:25

**buttons (4)**
91:3,6,10;93:5

## C

**call (8)**
39:17;68:11;81:20;
141:17;143:6;149:20,22;
150:1

**called (13)**
12:2,5;15:23;47:1;68:8,8,
12;69:12,12,14;79:24;
80:12;81:5

**calling (2)**
48:5;127:22

**calls (5)**
15:16;82:4;84:11;97:22;
150:8

**came (16)**
29:13;39:14;68:18;75:17;
76:22;81:20;92:6;120:4;
131:21,25,25;132:2;146:7;
148:12,16,25

**camera (1)**
46:20

**cameras (4)**
24:23;25:1,4,8

**can (76)**
12:24;13:1,21;16:22;
18:12;23:7;25:20;29:22;
31:6,13;38:21,21,23;39:15,
24;40:18;41:13;42:18;
46:13,18;47:11,17,25;48:8;
49:16,20;57:21;59:8;60:24;
61:20;62:6,7,7,17,24;64:3,
14;65:9,12,19;66:20;71:7;
80:11;86:21;89:17,21;90:2,
6;91:9;92:3,8;93:3;94:16;
97:1;101:4,8,20;102:2;
108:3;112:7;126:13,14,19;
130:7,11,16;132:13,23;
146:13,21;147:6,13;149:12,

19,22;151:6

**capacity (3)**
58:17;146:22;150:7

**captures (1)**
44:10

**car (211)**
7:7,10;19:6,7,18,20,21,
24;20:2,5,6,8,10,13,20,21,
24;21:3,5;29:23;30:9,10;
32:8,22;33:20;34:9,10;
35:12,13,20;45:7;46:6;
47:2;56:6,19;60:16;61:5;
65:2,3,6;67:18;68:22;
71:21;72:11,17,19;73:3,4,
12,13,14,15;74:2,4,15,20,
24;75:16,25;76:2,3,12,13,
15,16,16,20,22,24;77:1,6,
13,19,21,22;88:12,15,21,25;
89:6,10,19,20;90:3,12,15,
19;91:15;99:23;100:2,11,
15,18;101:2,7;102:11;
103:20,21;104:1,2,6;
106:15;107:11,23,24;108:9,
12,16,19;109:2,7,13,20,24,
25;110:1,7,10,25;111:12;
112:1,19;113:2,3;114:1,4,
20;116:12,21;117:15,17,20,
23,24;118:9,21;119:16;
120:14,20,21;121:14,17;
122:9,25;124:14;125:18,22;
126:2,6,24,25;127:2;
128:15,16,17,20,24;129:5,
12,15,18;130:10,11,16,17,
21,25;131:4,6,9,20;132:9,
15,22;134:20;135:8,19;
136:10,13,17,18;137:1,4;
138:10;139:8,12,17,22;
141:1,8,16,20,24;142:4,14,
24;144:24,25;145:7,14,17,
25;146:3,13,17,19;148:6,
13,15,25;149:3

**care (5)**
67:5;86:3,4;123:6;125:9

**carried (4)**
23:3,8;104:9;142:25

**carry (4)**
22:5,15;34:5;103:4

**carrying (1)**
51:14

**cars (1)**

44:11

**case (26)**
17:3;23:22;54:25;67:13;
94:12;95:14,15,17,21,22,22,
23;96:24;97:9,11,23,24;
98:8,9,15,16,17;99:6;133:3;
141:15;147:18

**cases (4)**
94:10;95:17;97:5,10

**catch (2)**
25:4;148:9

**caught (1)**
141:3

**cause (1)**
74:25

**caused (5)**
29:17,23;30:1;73:23;
105:18

**cellphone (14)**
10:18,21,24;11:5,7;
67:25;68:5,9,11,16;69:6,9,
17;79:25

**Center (2)**
27:10,15

**certain (6)**
6:2;37:18;78:12;102:16,
20;103:5

**certainly (2)**
47:22;138:2

**certified (2)**
13:25;14:2

**CH07 (1)**
48:6

**chain (6)**
21:7,8,9,14,16;85:21

**chance (1)**
9:12

**change (5)**
11:1;91:1,9;93:11,18

**changed (12)**
11:2;13:3;15:11;21:12;
90:21;91:6,7,8,19;92:18,21;
93:16

**changing (1)**
93:21

**channel (11)**
90:24;91:1,8,9,20;92:19;
93:1,12,16,18,21

**characterize (1)**
88:7

American Court Reporting Company, Inc.

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

**charge (4)**
35:25;143:5;150:7,22
**charger (4)**
143:4;150:5,9,11
**chef (1)**
68:20
**chest (10)**
134:3,13,18,24;135:20;
144:4,7,9,10,17
**child (1)**
8:14
**children (1)**
9:18
**chose (2)**
51:17,20
**circle (1)**
89:6
**circumstance (1)**
8:13
**circumstances (2)**
115:13;146:14
**City (10)**
14:7,15,17;78:12;81:4;
83:25;85:14;87:13;103:8;
150:25
**CIU (7)**
14:20,22,24;16:20;50:24;
52:25;53:2
**Civil (1)**
4:5
**claim (3)**
58:25;85:23;111:20
**claimed (1)**
111:16
**clarify (1)**
142:2
**clear (6)**
8:10;32:13;59:2;87:11;
142:1;149:21
**clearance (2)**
98:9,16
**clearances (2)**
98:8,15
**clearly (3)**
6:4;90:4;134:6
**client (3)**
56:16;57:4,4
**climbed (1)**
138:14
**Clint (1)**

**43:9**
**clip (3)**
23:24,25;24:1
**close (9)**
48:6;49:15;109:21;
118:11;126:7,19;132:25;
139:10,13
**closed (5)**
77:21;94:13;139:8,11,13
**closeout (1)**
94:18
**closer (2)**
88:24,25
**closest (1)**
110:6
**clothes (1)**
21:22
**clutch (1)**
74:8
**coaches (1)**
101:11
**coaching (1)**
101:17
**coinvestigator (1)**
95:16
**coinvestigators (1)**
95:16
**cold (1)**
110:17
**College (1)**
14:12
**coming (3)**
40:3;52:7;148:19
**command (5)**
21:7,8,14,16;85:21
**comment (1)**
59:7
**commit (1)**
109:8
**committed (3)**
102:5,7,8
**commotion (1)**
147:24
**communicate (4)**
54:1;82:25;90:9,23
**communicated (1)**
133:7
**communication (6)**
54:11;83:5;84:14;90:14,
18;92:19

**communications (1)**
84:4
**Company (1)**
11:5
**complaining (1)**
78:19
**complete (1)**
75:17
**complied (3)**
125:24;126:1,24
**comply (1)**
122:24
**computers (1)**
13:4
**concerning (1)**
78:19
**conclude (2)**
136:2;142:23
**concluded (2)**
68:3;98:17
**conclusion (1)**
9:25
**conditions (3)**
7:21,24;8:6
**conduct (1)**
97:8
**conducted (2)**
4:6;83:25
**conducting (2)**
26:4;36:3
**confuse (1)**
141:25
**connected (1)**
149:22
**connection (2)**
58:24;78:9
**considered (1)**
131:23
**consisted (1)**
145:22
**console (1)**
138:9
**contact (22)**
20:23;24:11;29:1;30:24;
31:4;44:3;52:18;53:23;
54:7;79:9;80:8,24,25;81:5,
15;83:19;89:3;94:8;120:4;
139:17;150:23;151:2
**contacted (2)**
24:3,5

**contacting (1)**
78:18
**contacts (1)**
8:21
**contain (1)**
78:1
**contents (1)**
69:5
**context (1)**
80:9
**continue (10)**
16:19;52:20;62:12;64:15;
65:20;66:5;76:8;81:15;
140:21;151:6
**continued (8)**
40:6,12;42:23;54:8,19;
83:4;147:19,22
**contradicted (1)**
111:19
**contrary (6)**
71:25;72:13;73:2;115:25;
116:3;130:4
**controlled (1)**
148:25
**conversation (1)**
80:20
**cooperation (1)**
36:24
**Cops (2)**
12:5;119:9
**copy (11)**
46:19;47:17,25;49:17;
70:13,17;71:17;87:22;
96:11,12,14
**corner (2)**
49:1;87:19
**correction (1)**
13:24
**correctional (1)**
13:14
**correctly (2)**
28:2;37:9
**correspond (1)**
43:8
**corresponded (1)**
128:15
**counsel (9)**
4:15,22;5:3,4,11,19;59:3;
103:25;150:23
**counseling (1)**

59:19

**count (1)**
6:24

**County (2)**
67:22;70:10

**couple (5)**
38:15;45:24;50:1;51:11;
95:3

**course (17)**
4:12,17;6:6,11;7:2;16:2,
5;17:7;30:24;31:4;41:3;
46:5;47:18;61:3;65:22;
66:2;125:4

**COURT (7)**
5:7,11;6:20;13:21;58:16;
59:23;150:13

**cousin (1)**
130:1

**crafts (1)**
13:3

**created (1)**
11:21

**Crime (3)**
27:9,14;109:8

**Crimes (2)**
15:11,14

**Criminal (10)**
14:22,24;27:22;58:5;
62:20;99:11;109:3,15;
116:10;124:17

**cross (2)**
138:8,9

**cross-examination (4)**
4:4;5:24;61:25;62:1

**crying (6)**
31:15,17,17,18;56:3;65:3

**cubicle (2)**
51:25;52:3

**cubicles (1)**
52:2

**current (1)**
5:12

**currently (3)**
8:17;12:11;53:2

**custody (2)**
36:1,2

**cut (1)**
18:9

**CVN73 (1)**
12:23

# D

**DA (1)**
68:19

**daily (5)**
97:12,15,19,19,22

**DA's (1)**
68:12

**dash (2)**
130:21;131:6

**database (1)**
97:5

**date (6)**
4:16;51:9;82:2,2;84:9;
94:17

**dates (1)**
15:21

**day (13)**
7:25;50:25;69:11;79:25;
80:12;87:12;93:25;94:7,13,
25;96:1;97:25;106:11

**days (3)**
69:12,13;81:18

**dead (4)**
19:8;65:1;71:21;72:10

**deadly (2)**
102:18;103:9

**death (4)**
21:20;78:24;103:16;
108:3

**Deaundre (1)**
17:18

**Deaunna (1)**
35:5

**decals (1)**
19:21

**decide (1)**
41:19

**decided (3)**
81:9,14;133:16

**decision (2)**
84:3;125:21

**declared (1)**
108:5

**declares (1)**
72:10

**decline (1)**
58:3

**defendant (2)**
7:5,6

**defendants (1)**
5:19

**delete (1)**
82:12

**demographics (1)**
27:24

**denied (2)**
121:21;124:4

**deny (6)**
80:7;81:24;84:8;89:17,
20,23

**denying (4)**
80:9,10;84:15,16

**department (12)**
13:15;14:18;50:16;52:12;
79:13;81:5;84:1,20;85:14;
87:5;104:10;146:10

**department's (1)**
103:11

**Depending (1)**
93:17

**depends (3)**
47:8;62:4;93:20

**DEPONENT (3)**
4:20;5:1;48:12

**deposition (29)**
4:3,6,8,11,14,16,17;5:15;
6:3,7,17;36:23;37:3,16;
38:7,15;41:22;43:14,19,23;
49:19;54:25;58:13;63:25;
64:10;70:22;86:20;87:1;
151:3

**depositions (1)**
66:2

**describe (8)**
12:24;36:25;49:23;54:24;
75:20;94:6;127:7;130:8

**described (5)**
17:5;66:17;134:22;145:4;
147:16

**description (2)**
85:18;128:5

**designed (1)**
62:1

**desk (1)**
53:9

**desks (1)**
52:1

**details (3)**

**device (1)**
56:5,7,10

**device (1)**
150:9

**devices (1)**
150:4

**died (1)**
149:25

**dies (1)**
150:12

**different (4)**
68:18;73:21;91:3;145:2

**difficult (4)**
7:21,25;8:7;20:3

**direct (2)**
131:5,23

**directed (1)**
130:20

**direction (2)**
118:4;133:11

**directly (2)**
117:24;118:2

**disagree (1)**
79:23;82:1,6,23

**discharge (1)**
90:1

**discovery (1)**
4:4

**discuss (2)**
79:1,6

**discussions (1)**
12:13

**disobey (1)**
83:8

**dispatch (5)**
29:1;90:14,19;127:15,23

**dispatcher (1)**
127:9

**dispute (1)**
128:23

**disputed (1)**
129:19

**distance (1)**
9:5

**District (2)**
67:22;70:10

**Division (1)**
14:22

**divisions (1)**
14:18

**divorce (1)**

10:1
**DNA (1)**
  78:1
**document (4)**
  71:18;87:1;98:1,1
**documentation (1)**
  28:14
**documents (2)**
  27:21,23
**dome (1)**
  146:7
**done (9)**
  15:11;26:18,19;28:2;
  78:5;82:17,21;91:5;116:1
**door (22)**
  30:5;32:10,25;77:19,20,
  21;89:14,18,19;118:24;
  120:6,14;123:1,2,9,14,21;
  124:1;139:8,9,9,11
**dot (1)**
  48:6
**down (22)**
  29:6;34:16;112:23,24;
  120:13,24;121:2,9,11,12,18,
  20,25;122:17,17,22;123:25;
  129:6;132:15;138:17;
  139:24;149:3
**dragged (1)**
  77:16
**drew (1)**
  87:23
**drive (3)**
  103:21;136:20;137:8
**driven (3)**
  29:13;112:18;114:4
**driver (13)**
  88:20;89:14,18,18;104:1,
  6;136:6;137:22;138:1,5;
  145:19;146:4,6
**driver's (5)**
  128:10;136:4;141:22;
  142:10,15
**driving (9)**
  45:7;74:2;75:21,22;
  90:15;103:20;107:18;
  109:18;140:22
**drove (2)**
  77:22;90:19
**drug (2)**
  16:16,16

**drug-related (1)**
  16:6
**drugs (3)**
  16:7,13,17
**due (1)**
  98:25
**duly (1)**
  5:22
**during (15)**
  4:12;6:6;7:2;10:10;17:7,
  15;31:3;41:3;63:7,24;64:9;
  66:1;82:23;90:21;94:7
**duties (2)**
  51:15;53:9
**duty (4)**
  12:25;103:5;104:21;
  127:22

**E**

**ear (1)**
  8:12
**earaches (2)**
  8:6,12
**earlier (4)**
  15:3;89:25;95:2;139:15
**early (1)**
  11:10
**earrings (2)**
  8:8,9
**eat (1)**
  50:25
**effect (11)**
  20:10;50:13;72:5,22;
  84:20;85:14;124:16;
  129:15;140:20;145:1;
  146:11
**effort (1)**
  126:22
**eFile (1)**
  42:3
**either (19)**
  24:10;26:20,24;29:1;
  31:5;35:17;38:3,9,23;
  43:14;44:19;58:24;71:23;
  85:21;131:6;140:24;
  141:23;142:18;144:3
**EL (3)**
  5:21;9:8;87:9
**electronically (2)**

26:19,22
**else (21)**
  4:24,24;30:15;44:2;
  61:12;62:14;64:23;65:5;
  66:16,23;67:1,7;76:17;
  115:4;125:14;130:12,16;
  132:24;142:17;151:7,9
**elsewhere (1)**
  22:19
**emailed (1)**
  37:7
**emblems (1)**
  143:19
**Emergency (4)**
  5:13;73:3;74:1;138:22
**employees (1)**
  83:19
**encounter (1)**
  51:3
**encountered (2)**
  17:20;128:4
**end (9)**
  4:7;39:3;40:13;46:2,12,
  14,17;49:10;94:13
**ended (5)**
  74:18,18;136:6,11;
  151:13
**enforcement (5)**
  7:12,15,18;14:7,14
**engage (2)**
  132:18;140:10
**engaged (13)**
  51:22;72:11;73:2;74:5;
  77:3;82:4,5;116:6,9;
  118:15;124:17;127:18,21
**engaging (2)**
  74:7;109:14
**engine (2)**
  71:22;114:6
**enhance (1)**
  126:23
**enhanced (2)**
  126:2,25
**enough (3)**
  23:16;99:3;126:19
**entered (3)**
  47:12;107:5;137:4
**entering (1)**
  109:17
**entire (4)**

19:9;107:17;126:20;
  131:14
**entirely (1)**
  77:13
**entirety (2)**
  45:2,11
**entitled (4)**
  12:8;57:8;87:4,20
**entitles (1)**
  63:20
**entity (1)**
  27:9
**entrance (1)**
  118:11
**entry (1)**
  39:11
**equipment (2)**
  23:7,8
**equipped (2)**
  21:24;22:11
**estimate (1)**
  16:23
**evaluate (1)**
  99:9
**evaluation (3)**
  82:21;98:21,25
**evaluations (1)**
  98:7
**even (6)**
  18:11;80:19;88:20;
  111:22;115:25;120:1
**evening (8)**
  18:16,24;19:5;23:9,9;
  28:7;94:24;128:9
**events (3)**
  55:9;65:6;66:17
**everybody (1)**
  39:21
**everyone (2)**
  48:8;151:11
**evidence (1)**
  99:3
**exact (1)**
  15:21
**exactly (1)**
  150:19
**examined (1)**
  5:22
**except (1)**
  83:18

**excuse (8)**
70:5;71:10;76:5,6;94:7;
95:12;109:1;144:20

**executed (1)**
96:15

**exhausted (1)**
99:4

**exhausting (2)**
98:19;99:1

**exhibit (12)**
39:18,20;42:3;46:13,15;
47:12;48:5;70:22;71:11;
86:22,25;87:20

**exhibits (4)**
38:14,15,24;86:19

**exist (1)**
37:24

**existed (1)**
146:22

**existence (1)**
25:25

**exited (2)**
73:9;116:12

**expect (1)**
46:25

**expedite (1)**
39:4

**experience (1)**
101:15

**explain (8)**
6:12;68:23;90:2,7;
128:14,19,22;150:4

**explanation (4)**
75:6;129:3;147:2,10

**explodes (1)**
106:1

**explosion (1)**
105:18

**express (1)**
7:25

**ex-spouse's (1)**
10:5

**exterior (1)**
46:20

**eyes (1)**
120:3

---

**F**

---

**Facebook (2)**
11:15,16

**fact (19)**
36:10;60:2;77:19,24;
79:23;84:8;86:10;90:3,13,
16;104:19;106:13;111:19;
117:14;127:14;128:14,19;
131:14;142:22

**facts (6)**
25:14;72:21;109:6;
128:23;136:1;146:14

**faded (1)**
109:9

**Fair (5)**
18:24;54:19;80:7;103:18;
107:15

**False (2)**
91:21;92:20

**familiar (6)**
12:3,6,9;64:1;71:23;
97:15

**family (4)**
24:3,6,10,10

**far (11)**
9:1;18:12;46:6;94:16;
100:7;104:17;118:14;
130:4,7;133:7;145:8

**farsighted (2)**
8:25;9:2

**fast (6)**
40:10;42:14,15;148:10,
12;149:9

**favorable (1)**
66:9

**fear (1)**
62:21

**February (11)**
38:1;40:24;43:10;45:15;
81:19;82:6;83:2,12,24;
84:9;97:12

**Federal (1)**
4:5

**feel (2)**
93:9;113:13

**feet (2)**
77:9;126:17

**felony (2)**
16:10;99:11

**female (1)**
42:19

**few (5)**

**fidgeting (6)**
122:11;123:5,5,6;125:7,
17

**Field (2)**
14:22;97:16

**Fifth (17)**
57:4,6,8,10;58:1,3,7,25;
59:4,17,20,25;60:10;62:19;
63:17,20,24

**file (2)**
48:5;95:23

**files (2)**
97:9,11

**FILIPOVITS (17)**
39:19,25;40:3,7;42:2,10,
13,21,25;48:4,13,20,23;
49:5,12;70:19;71:3

**fill (2)**
27:23,24

**find (2)**
17:11;86:21

**fine (1)**
86:17

**finish (3)**
38:20;47:10;94:10

**fire (2)**
85:1;103:12

**firearm (5)**
21:25;22:16;23:9;102:25;
103:4

**fired (8)**
72:17;84:21;85:15;100:5,
8,11;104:23;106:11

**firing (2)**
106:14,17

**first (31)**
5:22;6:4;9:12;11:17,17,
17,18;12:12;15:13;18:21;
19:19;20:8,9,18;32:1;39:1;
40:15;49:23;50:10;51:3;
63:6;87:2;119:8,9,13,24,25;
136:10,13,17;149:10

**fit (1)**
23:16

**fixing (1)**
13:4

**flash (10)**
105:4,6,9,12,15,18;106:4,
10,14,17

**flashlight (13)**
22:11;33:9,13,14,23,25;
34:4,5,7,12,14,15;141:7

**Fleming (1)**
10:6

**floor (5)**
52:1;77:25;78:8;126:5;
141:20

**folks (1)**
45:24

**follow (2)**
56:23;81:10

**following (1)**
12:2

**follows (2)**
5:23;63:16

**Force (4)**
15:6;102:18;103:10;
106:1

**forcing (1)**
74:19

**forget (2)**
119:23;150:19

**forgive (1)**
47:14

**forgot (3)**
27:6,6;120:1

**form (11)**
4:9;25:22;44:3;62:11;
65:11,14,22,25,25;66:2;
87:12

**formed (1)**
62:9

**forums (1)**
12:14

**forward (4)**
40:10;42:14,15;89:18

**FOSTER (2)**
149:24;150:3

**found (7)**
25:1;71:21;72:10;77:25;
128:15,20,24

**fourth (1)**
71:11

**frame (3)**
19:9;45:8;142:17

**free (2)**
36:6;133:8

**friend (1)**
24:6

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

**friends (12)**
24:11;50:7;54:3,6,20;
80:5,6;114:21;116:6;
124:10;129:22;136:23
**front (9)**
32:24;33:2;87:19;89:14;
91:10,10;93:6;110:1;115:5
**froze (2)**
141:2,3
**full (3)**
9:7;148:16,19
**fully (7)**
74:7;77:21;85:3,6,10;
139:8;149:3
**Fulton (2)**
67:21;70:10
**function (1)**
97:4
**further (6)**
84:4;88:10;90:3;110:3;
122:16,17

## G

**gained (1)**
77:21
**Gangs (1)**
15:9
**gave (4)**
13:18;68:21;69:13;83:8
**GBI (9)**
38:10;42:3;44:19;45:12;
68:18;79:15;82:3;85:22;
86:13
**GCIC (11)**
25:18,20;27:3,5,18;28:4,
9,15,18,18,23
**gear (3)**
72:3;74:7;75:12
**gears (3)**
74:5,15,25
**generally (1)**
150:8
**generate (2)**
97:9;98:6
**generated (1)**
98:14
**George (1)**
12:22
**Georgia (6)**

14:3,13;27:9,14;37:25;
43:10
**gets (2)**
123:21;142:14
**given (11)**
9:11,13;16:19,22;28:20;
95:21;96:1;102:10;106:20,
24;128:5
**giving (2)**
115:7;127:11
**glad (1)**
71:1
**glasses (2)**
8:15;9:4
**Glock (5)**
22:2,3;104:9,15,23
**GMC (1)**
10:15
**goes (2)**
32:17;47:24
**governmental (1)**
32:1
**grab (5)**
76:13;92:8;132:1;133:13,
15
**grabbed (5)**
30:17;65:3;75:23;76:10;
132:2
**graduated (1)**
14:4
**grinding (1)**
74:15
**ground (7)**
33:22;56:13,14;77:10,17;
122:3;135:2
**grounds (1)**
62:11
**guess (8)**
46:10;58:21;76:13;98:10,
17;99:9;102:9;149:22
**Gun (47)**
14:20;15:2,3,6,15,23;
17:5,7,13,13,15;50:8,9;
51:22;52:7,20;53:10,12;
60:4,7,17,17,19,21;61:2,11;
64:19,25;67:14,15;77:25;
78:5,9;99:24;100:4,5,7,12,
21,24;105:19,24;106:10;
107:16;140:21;145:24;
147:3

**gunpowder (5)**
105:4,7,18,23;106:1
**guns (2)**
17:9,11
**gunshot (3)**
29:9;93:23;146:25
**guy (10)**
33:7;64:25;74:2;111:9,
22;113:4,18;116:19;117:4;
119:15

## H

**Half (10)**
41:1,14;79:13;82:24;
83:18;87:13,23;88:6;
146:12,12
**Half's (2)**
79:18;83:9
**halfway (2)**
84:22;85:16
**hand (16)**
35:17;60:5,8,21;91:22,
23;92:7,11,12,13,23,24;
93:1;121:7,12;133:24
**handle (1)**
99:14
**hands (49)**
35:6,9,10,11,14,19;60:25;
90:22;107:12;121:13,15,17,
17;122:5,10,13,14,15,21,25;
123:9,10,17,22;124:7;
129:11;130:9,13,17,20,24;
131:4,6;132:18,18;133:23,
24,25;134:2,5,12,17,21,24;
135:19;144:3,7,10,17
**happen (8)**
46:8;84:25;93:4,7,9;95:5;
113:21;141:12
**happened (21)**
7:17;29:6;34:2;53:16;
54:25;56:4,6;61:12,18,18;
66:23;67:10;73:18;80:15;
85:18;86:6;106:15;140:13;
149:5,7;150:4
**happens (1)**
106:10
**hard (2)**
8:3;55:14
**head (4)**

76:25;100:5;107:17;
143:22
**headquarters (2)**
52:6;94:2
**Health (1)**
5:14
**hear (41)**
6:4;7:22;8:7;29:8;39:22,
23,24;41:15;42:7,18,19;
66:22;67:9;74:4,5,8,13,21;
75:4;90:8;93:13,15;100:14;
109:9;132:13;140:16,17,19,
22;145:12,16;146:19,22;
147:1,3,4,7,11;148:20;
149:13,17
**heard (16)**
17:18;19:6;29:11;38:8;
41:10,15;43:7;57:24;67:6;
74:10;75:12;85:13;86:4;
90:4;131:15;146:25
**hearing (6)**
8:4;48:15;67:1;90:1;
93:22;131:16
**hearsay (7)**
57:5,20;59:8;61:24;62:4,
10;86:1
**held (4)**
36:13;92:7;137:20,20
**hell (2)**
56:4;61:18
**hence (4)**
108:23;126:24;140:19;
145:24
**Hey (2)**
62:24;136:20
**hide (2)**
125:8,12
**hider (1)**
105:9
**higher (1)**
139:21
**himself (3)**
102:5,7,8
**hired (1)**
52:15
**history (2)**
19:1;27:22
**hit (1)**
29:14
**hold (10)**

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

35:21;36:4,9,10,16,17;
92:1,2;137:14,17
**holding (3)**
100:10;139:5;145:8
**holds (2)**
57:15,16
**holster (10)**
22:17,18,22;23:4,4;
99:24;106:22;107:1,5,8
**home (3)**
24:24;25:8;116:17
**Homeland (1)**
24:23
**honest (1)**
34:3
**Hood (1)**
12:5
**hospital (1)**
10:11
**hour (1)**
82:5
**hours (2)**
53:19,20
**house (2)**
54:4,5
**Housing (1)**
14:12
**howsoever (1)**
74:18
**Huh (1)**
22:14
**huh-uh (1)**
21:10
**hundreds (2)**
6:25;16:18
**hurt (2)**
31:9,20

**I**

**ICCS (5)**
95:23;96:22,24;97:1,25
**ID (2)**
23:11;128:11
**idea (2)**
117:12;149:14
**identification (3)**
38:13,19;39:4
**identified (2)**
41:23;70:21

**identify (2)**
43:4;46:1
**illegal (6)**
20:7,25;21:5;108:5;
113:13;115:2
**illumination (3)**
34:12,14,15
**immediately (2)**
53:16;102:11
**impediment (1)**
146:21
**inches (1)**
126:8
**incident (10)**
17:9;44:14;51:10;55:4,5;
78:25;79:1,15;95:9;146:15
**include (2)**
54:12;62:2
**included (2)**
51:23;81:6
**including (2)**
16:6;78:23
**inconsistent (2)**
112:5,8
**incorrect (2)**
72:6;85:24
**indeed (3)**
113:20;114:6;118:23
**indicate (1)**
88:11
**indication (2)**
20:7,22
**infection (1)**
8:12
**inform (1)**
143:2
**Information (35)**
13:4;19:1;27:9,15;28:15;
29:25;55:16;69:9;71:23;
72:4,12;73:1;78:4;90:10;
96:8,24,25;97:5;98:5;
114:10;115:7,25;116:3;
123:13,16,18,21;124:15;
127:23;130:3;132:4;
142:23;145:1,2,9
**informed (2)**
77:24;78:2
**informing (1)**
127:9
**initial (3)**

46:4;88:2;137:11
**initially (2)**
117:14;137:4
**initials (3)**
14:24;27:5;88:1
**injure (1)**
144:7
**injured (2)**
31:1,5
**injuries (1)**
31:8
**injury (4)**
31:22;32:2,4;78:24
**inside (30)**
20:8;56:6;65:6;66:17;
72:17;73:3;75:20;76:24;
77:13;85:2,3,7,11;97:23;
99:19;102:5;114:11,16,21;
128:24;129:22;130:2,10,21,
25;131:4,20;134:20;
136:24;147:14
**Insofar (1)**
29:23
**Instagram (1)**
11:12
**Institution (2)**
13:16,19
**instruct (1)**
56:12
**instructed (1)**
82:25
**instructing (2)**
57:13;59:14
**instruction (3)**
56:21,24;83:9
**intended (1)**
36:10
**intentions (1)**
117:10
**interaction (1)**
125:6
**interfere (2)**
25:5;83:19
**interfered (1)**
93:22
**interior (14)**
76:20;77:6;99:19;100:11;
122:9;128:20;135:19;
139:22;140:6;141:8;
144:24;145:14;146:7;148:4

**internal (3)**
83:20,24;85:22
**interpret (2)**
131:11;144:16
**interrupt (2)**
62:12;65:13,17;66:10;
76:7
**interview (16)**
37:20,24;38:9;39:3;41:3,
14;42:3;43:8;44:18;45:15;
79:12;82:24;86:12,13;
87:13;88:5
**interviewed (2)**
40:25;81:20
**interviews (3)**
38:4;82:3;84:9
**InterviewWMA (1)**
39:21
**into (58)**
19:7,19;20:3;23:16;27:3;
32:8,17,20;34:10;35:13,20;
36:1,2;45:22;48:1;53:11;
56:5;72:23;73:8;76:12,13;
78:14;84:1;86:5;91:14;
94:9;95:23;96:21,24,24;
110:7;116:2;117:16;118:3;
122:9;123:1;130:17;135:8,
18;136:10,13,17,18;137:5,
7;138:1,5;139:7,12,16;
141:1,8;142:14;145:7,17,
19;146:3,6
**investigate (2)**
15:16;94:10
**investigated (1)**
67:21
**Investigating (5)**
14:23;17:6;86:7,9;94:11
**investigation (14)**
17:1,16;26:3;36:3;37:25;
43:10;45:12;68:3;83:20,25;
85:22;86:2;98:24;99:2
**Investigations (2)**
14:25;78:13
**investigative (1)**
51:24
**Investigator (10)**
46:23;57:12;79:13;82:24;
83:18;86:14;87:13,23;
97:23;101:20
**involve (1)**

American Court Reporting Company, Inc.

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

7:14

**involved (4)**
20:11;78:23;83:20;85:21

**involving (1)**
80:24

**issue (2)**
56:14,15

**issued (8)**
23:7;26:10,15;27:2;
67:24;84:20;104:9,15

**J**

**jacket (3)**
23:17,18;143:19

**January (10)**
15:23;17:17;18:16,25;
24:2;25:16;51:5;80:2,2;
93:25

**jeans (1)**
23:17

**Jeff (10)**
38:25;39:18,24;41:25;
46:14;48:3;49:9;70:16,24;
86:18

**job (2)**
11:21;13:3

**joint (1)**
95:15

**judge (1)**
27:21

**judicial (1)**
9:25

**jumped (3)**
75:25;76:12;136:4

**justified (3)**
102:14,21,21

**K**

**keep (8)**
69:11;82:9;113:15;
116:18,19,20;117:9;133:17

**keeping (1)**
69:22

**kept (8)**
51:24;53:5,7,8;95:25;
96:3;123:5;126:13

**key (1)**
92:4

**keyed (2)**
73:11;147:25

**kicked (1)**
30:15

**kid (5)**
92:5;117:3;119:23;120:6,
6

**kid's (1)**
119:23

**killed (9)**
29:8;56:18;66:19;85:15;
90:2;102:1;106:24;128:21,
25

**killing (1)**
84:21

**kind (16)**
8:18,20;25:12;29:5;45:7;
51:23;55:14;110:17;
127:18;140:5;141:14;
146:12;149:4,6,9,10

**king (1)**
9:9

**knee (1)**
139:17

**knees (8)**
77:5,6;99:19;107:10;
139:17,23,25;142:16

**knew (24)**
18:3,6,11;19:5,12;20:18;
50:5,14,14;79:9;80:23;86:4,
6,8;112:13;119:9;124:10,
11;127:11;130:4;135:13;
136:4;145:8,8

**knobs (1)**
91:9

**knowing (2)**
37:1;101:16

**knowledge (7)**
17:23;18:17,20;19:9;
72:20,24;89:22

**known (7)**
8:3;15:5,6,14;27:9;49:24;
136:1

**L**

**last (4)**
44:15;69:8,10;109:9

**later (4)**
53:22;61:16;69:12,15

**law (5)**
7:11,14,18;14:6,14

**lawful (4)**
108:9,11;116:5;124:11

**lawfully (2)**
109:2,12

**lawsuit (2)**
7:3,6

**lawyer (6)**
57:25;58:8,14,15;68:24;
69:1

**lawyers (1)**
58:23

**lead (2)**
99:2;124:24

**leads (3)**
98:19;99:1,4

**learned (1)**
122:1

**least (7)**
41:15,21;44:10;49:18;
83:23;141:6;148:24

**leave (15)**
113:10,18;114:24;115:1,
17,19;116:15,23;117:6;
120:7;129:20;133:4,6;
136:23;137:2

**leaving (2)**
77:10,14

**led (1)**
67:2

**LEE (1)**
62:24

**left (11)**
13:5,8,9,10,12;23:5;
76:23;99:20,22;143:3;
149:12

**left-hand (1)**
87:19

**length (3)**
46:18;126:13,15

**lenses (1)**
8:17

**less (1)**
88:6

**letting (1)**
36:24

**lever (3)**
74:19;138:14,23

**Lexus (1)**

10:13

**license (1)**
128:10

**life (1)**
7:2

**lift (1)**
122:17

**lifting (1)**
122:17

**light (3)**
67:17;93:14;146:7

**limited (1)**
28:5

**line (2)**
63:25;65:14

**lines (1)**
115:22

**link (3)**
37:8,14,19

**LinkedIn (1)**
11:19

**list (1)**
29:4

**listen (3)**
38:3,22;92:20

**listened (1)**
41:19

**listening (3)**
31:14;41:9,10

**litigation (1)**
4:13

**little (4)**
23:25;69:14;75:24;
109:10

**locate (1)**
39:14

**located (1)**
52:3

**location (6)**
27:2;69:9;77:2;127:10,
11;128:4

**locations (1)**
88:5

**locked (1)**
120:3

**log (1)**
95:19

**logically (2)**
149:4,6

**long (10)**

15:8;30:7;40:9;41:10;
42:5;49:24;51:5,9;69:16;
149:9

**longer (6)**
50:16;52:12,14;53:12;
64:7;69:14

**look (12)**
37:20,23;44:13;45:10,18,
20;46:11;70:24;87:16;98:8,
9,13

**looked (8)**
33:9;47:22;65:3;76:10;
77:5;111:5,8;122:12

**looking (13)**
29:17,20,21;35:4,5,5;
70:21;73:12;86:25;90:9;
121:14,14,17

**loose (3)**
75:24;76:11,12

**lost (3)**
68:6,7;150:22

**lot (22)**
19:19;21:12;26:13;28:25;
45:22;52:1;75:7,9;90:4;
91:3;108:4,6,10,17,20;
109:3,13,17;116:2;121:21;
124:5;125:11

**loud (1)**
46:3

**low (3)**
105:4;109:11;143:25

**lower (3)**
87:19;88:4;139:24

**lying (1)**
61:5

## M

**magistrate (3)**
26:16,21;96:18

**main (2)**
52:5,5

**mainly (1)**
98:24

**maintain (7)**
95:20,23;96:9;97:9,11;
103:3,5

**Major (2)**
15:11,14

**making (2)**

35:25;101:17

**male (1)**
128:5

**Malibu (16)**
29:13,17;30:3;32:18,20;
45:22,23;71:22;77:25;78:8;
141:17,18,19;143:14;
147:15,18

**MALIK (4)**
5:21;9:8,9;87:9

**Mamba (1)**
115:21

**man (5)**
61:4;65:12;112:12;117:5;
126:8

**management (3)**
97:24,24;99:7

**manipulated (1)**
144:24

**manner (4)**
4:16;45:6;103:25;125:10

**manual (1)**
74:6

**many (3)**
6:22;16:23;95:25

**March (2)**
14:5;151:4

**marijuana (13)**
16:12;36:14,20;110:15;
116:7;117:5;119:16;124:2,
5,23;125:9;128:24;129:7

**marked (4)**
39:20;42:2;71:9;88:5

**markings (1)**
19:23

**marriage (2)**
10:1,10

**married (4)**
9:14,16,22;10:3

**Maryland (2)**
13:16,17

**material (2)**
51:24;128:19

**matter (2)**
7:8;146:2

**matters (1)**
62:2

**may (15)**
4:12;8:10;9:12;18:20;
34:21;62:10;80:3,4;99:1,2;

111:23;119:11,12,24;150:6

**maybe (3)**
79:17;115:2;150:20

**mean (32)**
13:3;16:17;18:9;28:19;
34:15;38:6;39:10;43:21;
51:16;53:6;55:3,21;58:19;
60:15;67:4;74:2;76:7;86:1;
87:24;92:25;104:13;
113:12,24;119:18,23;
121:10,13;127:8;135:15;
141:25;149:9,21

**means (3)**
9:9;93:1;127:19

**meant (2)**
51:13;144:16

**meantime (1)**
151:5

**media (1)**
11:11

**meet (1)**
43:22

**meeting (1)**
26:20

**member (1)**
24:3

**members (1)**
70:10

**men (1)**
44:12

**messages (8)**
54:12;80:1;82:5,9,12,17,
19;84:11

**messaging (2)**
54:16,17

**met (5)**
43:13;44:2;49:23;50:1,1

**method (1)**
47:18

**Michaels (2)**
41:7;69:1

**middle (1)**
88:22

**midnight (1)**
94:20

**might (2)**
39:10;62:21

**military (1)**
12:16

**MILLER (58)**

5:6,19;13:1;31:6,13;37:7;
39:5,8,13;40:18;43:24;
44:3;46:22;47:5,10;48:11;
49:20;56:8,11,15,22;57:3,
11,16,19;58:16;59:3,7;
60:22,24;61:20,24;62:6,17;
64:6,11,14;65:9,18;66:3,8,
20;90:6;93:3;101:4,8,16,20;
102:2;112:7;138:20;147:5;
149:14,16,19;150:1,25;
151:9

**millimeter (3)**
104:9,15,23

**minute (3)**
42:14;70:17;139:9

**minutes (14)**
31:24;40:9,10;42:4,15,
22;43:1;45:3,3;48:25;49:7,
13;81:21;150:20

**miscellaneous (1)**
16:9

**misconduct (2)**
78:14,20

**misdemeanor (1)**
99:13

**misunderstanding (1)**
33:16

**mobile (1)**
23:19

**mode (1)**
45:8

**moment (4)**
38:13;42:6,15;143:8

**month (1)**
16:22

**months (3)**
51:11;70:2;81:13

**more (15)**
10:3;26:6,7;36:22;40:17,
18;43:2;51:11;67:10;69:18;
88:6;95:10;124:25;125:1;
126:17

**morning (2)**
37:12;43:22

**most (3)**
45:17;59:5,7

**motion (2)**
131:23;144:6

**motions (2)**
144:17;145:22

move (5)
81:13;122:25;133:10;
134:24;138:3
moved (4)
77:2;93:1;123:8;138:1
movement (2)
130:8;132:17
movements (2)
44:11;92:18
moving (14)
74:20,24;90:12;103:12;
123:7;125:1,10,11;137:22;
138:8;147:18;148:7,10,11
much (9)
45:20;64:6;66:10;73:15;
93:11,19;94:16;123:7;
139:11
must (2)
92:20,22
muzzle (4)
105:12,15;106:10,14
myself (2)
8:21;33:14

**N**

name (14)
9:7,9,11,12;10:5;13:18;
28:17,19;48:5;50:17;61:7;
119:23;128:1,10
named (1)
7:6
National (1)
5:12
native (3)
150:5,9,11
Navy (8)
12:19,25;13:6,8,9,10,10,
12
nearsighted (1)
8:24
necessary (1)
113:14
need (4)
58:23;65:25;115:19;
143:10
needed (1)
115:17
needs (1)
113:5

neither (2)
28:7,7
news (3)
44:23;45:1;146:11
next (15)
42:1;47:1;71:4,7,8,8,13;
76:2;117:4;134:19;135:10,
13,18,23;136:15
Nicole (1)
10:6
night (17)
21:6,20;29:6;44:12;
55:18,22;62:15;79:5;89:13;
99:17;104:8,14,21;106:11;
109:17;131:15;146:22
nighttime (2)
104:24,25
nine (1)
80:1
Nods (1)
76:25
noise (2)
93:11,19
None (2)
86:11;132:20
nonetheless (1)
115:16
Nor (4)
18:9,20;20:1;28:8
Norfolk (1)
12:23
note (2)
35:14;143:18
notes (4)
95:22,22;96:24;97:23
notice (5)
4:15;19:21,23;20:1;149:2
noticed (2)
33:6;143:24
number (18)
10:21,24;11:8;16:3,6,16;
29:21,22;39:12,17;64:12;
70:2;80:8;84:15,17;98:13,
22;144:22
numbers (2)
39:5,7
Numerous (1)
6:24
nurse's (1)
10:12

**O**

oath (3)
5:15;6:19;37:2
object (4)
61:23;62:6;66:5,7
objected (3)
57:22;58:8;59:9
objecting (1)
66:10
objection (31)
5:14;13:1;31:6,13;56:8,
11;60:22;61:20;62:11,17;
65:9,12,15,19,22,24;66:1,
20;90:6;93:3;101:4,8,13,19,
17,18;102:2;112:7;138:20;
147:5,5
objections (1)
4:8
observation (10)
19:20;29:25;31:14;71:25;
72:2,5,14;89:13;112:4;
125:16
observations (3)
23:3;71:24;111:19
observe (2)
29:16;138:6
observed (7)
20:8,9,12,22;55:17;89:10,
12
obtained (1)
70:10
obviously (6)
84:6;106:21;129:19;
140:13;141:23;148:12
occasion (4)
17:8;43:22;44:25;45:10
occupation (1)
10:7
occupations (1)
13:11
occurred (8)
7:10,11;21:15;44:15;
51:10;55:9;66:17;108:8
o'clock (2)
94:19;151:11
off (20)
18:10;33:22;75:23;76:3,
4,15,16;87:12;94:15,19;

96:18;122:13;136:5;
139:14;143:8,11;147:3;
149:10;150:15,16
Offender (1)
18:21
offense (1)
95:6
offenses (1)
16:6
offered (2)
45:14;62:5
office (13)
28:13,17,20,23;37:21;
38:17;40:25;51:23;67:22;
68:12;70:11;87:14;150:25
officer (35)
5:15;7:18;13:13,14,24;
15:25;19:11;21:21;22:5,21;
23:22;24:14;25:9;26:20;
28:8;32:8;40:21,25;41:1,
14;42:7;50:14;56:18,20;
57:7;60:2;62:14;78:14,23;
85:21;99:17;104:1;125:21;
126:3,23
officers (9)
21:7,13;29:1;55:8;86:8;
97:16,21;103:11,25
offices (1)
68:19
official (1)
127:21
once (22)
10:3;25:19;27:20;28:25;
53:11;55:8;69:18;72:16;
118:8;126:1;129:5,15;
130:15;131:25;132:25;
138:1;139:7,12,16;140:25;
142:12;146:3
one (48)
7:10;9:11;11:21;12:2,2,5,
8;20:1;22:13;25:6;26:6,6,8;
33:14;34:8;36:22;38:3;
41:18;42:6;50:25;54:8;
57:9;69:15,20;70:19;74:5,
7;78:17;79:1,4;91:1;92:7,
23;93:5;95:9,10,14;96:14;
102:13;107:15,21,22,25;
114:3;118:3;132:25;
133:24;134:5
ones (4)

8:22,22;38:16;150:6

**only (17)**
38:18;44:24;69:11,20;
74:3;76:9;80:18;89:9,9;
91:12,16,19;92:14,17,17;
99:14;143:2

**onto (8)**
100:10;134:18;137:14,
18,20,21;139:5;145:8

**open (8)**
32:10,24;48:6;52:1,1;
86:2;123:1,9

**opened (5)**
30:5;89:14,19;123:20,25

**opens (1)**
123:14

**operating (6)**
78:13,17;100:2;102:17;
103:9,14

**Operations (1)**
14:22

**opinion (11)**
73:7,22,24,25;74:3;101:6,
24,24;102:4,9,13

**opportunity (2)**
37:19;63:8

**OPS (5)**
38:9;39:1;44:19;82:3,24

**option (1)**
131:5

**order (10)**
9:4;25:9;27:13;71:18;
98:6;103:3;106:1;107:22;
122:24;148:15

**ordered (1)**
130:24

**ordering (1)**
131:9

**organizing (1)**
99:6

**oriented (1)**
25:13

**original (2)**
71:18;118:4

**others (3)**
11:13;65:22;98:11

**other's (1)**
95:17

**otherwise (3)**
9:4;47:9;71:24

**out (106)**
13:2;20:13;24:6,11;
27:23,24;30:22;36:4,5;
38:8;39:17;46:3;50:24;
51:8,14;56:3,19;60:16;
72:19;73:14,14,16;75:13,
18;76:1,4,15;85:23;86:5;
88:17;89:20;90:10;91:25,
25;92:3,8;94:13;97:22;
99:24;100:18;101:2,7,25;
105:19,23;106:2;107:24;
109:9,24,25;110:10,25;
113:2,5,5,16;116:18,19,20,
21;117:6,9,15,20,21,23;
120:5,7,8,20;122:15,25;
123:4,8,21;124:22,23,24;
125:2,22;126:6,23,25;
127:4,7,9,15,17;129:12,14,
15;130:10,11;131:9;132:1,
15;135:4;137:1;138:5;
141:9;142:4;146:11,12,17;
148:7;150:22

**outside (4)**
20:5;45:24;110:18;
132:10

**over (35)**
16:2,5;37:20,23;38:17;
45:11;47:19;51:10;54:4,5;
68:21;73:14;81:21;82:5;
90:10,10,23;111:5,9;117:1,
2,7,8,11,24;120:10;127:14;
137:22;138:1,8,9,9,14;
141:16,18

**overall (1)**
98:9

**own (4)**
29:25;63:21;71:24;73:6

**owner (2)**
10:13,15

## P

**pace (1)**
71:1

**packet (1)**
27:25

**page (12)**
39:12;70:24,25;71:4,5,7,
8,11,13;87:16;88:10,22

**pages (2)**

70:25;87:2

**pants (2)**
143:19,25

**parameters (2)**
29:6;102:20

**paren (2)**
48:6,6

**park (9)**
46:6;72:4,8,23;73:8;
74:18,19,24;108:5

**parked (6)**
108:9,12,16,19;109:2,13

**parking (25)**
13:3;19:7,19;26:12;
28:25;45:22;72:11;76:23;
90:4;91:14;108:4,10,17,20;
109:1,3,13,17,21;110:7;
116:2;121:21;124:5;
146:17;148:8

**parks (1)**
45:24

**parole (1)**
18:21

**part (16)**
41:15;45:12;46:2,4;50:8;
59:17;77:9;86:12;109:9;
112:4;130:9;133:21;134:1;
135:9;139:5,25

**participate (1)**
12:11

**participated (2)**
12:1,13

**particular (5)**
17:9;28:17;47:20;52:8;
145:4

**partner (7)**
50:8,23,24;51:1,8;
113:17;114:25

**partnered (3)**
50:5,10;51:6

**partners (5)**
50:2;51:13;81:12;83:12,
14

**party (1)**
7:6

**passed (1)**
75:23

**passenger (26)**
32:10,24,25;77:19;88:17;
89:10;107:11;109:2,12;

110:1;112:20;113:25;
118:24,25;119:22;120:13;
123:1;126:6;136:18;137:5,
7;138:4;139:18;142:6,16,17

**passes (1)**
46:7

**password (1)**
11:23

**past (4)**
8:9;9:22;12:12,12

**Patuxent (2)**
13:16,20

**P-A-T-U-X-E-N-T (1)**
13:23

**pause (1)**
42:25

**pausing (2)**
40:7;42:13

**pavement (1)**
32:21

**paying (10)**
34:21,22,23,23;35:4;
111:21,23;119:10;120:2;
138:24

**payment (1)**
32:10

**people (1)**
125:11

**percent (1)**
143:3

**performance (5)**
98:3,4,6,10;99:9

**performed (1)**
12:19

**period (11)**
11:3;91:20;120:19;
131:14,19;132:7,14,16;
142:3,9,12

**permitted (1)**
4:5

**person (22)**
22:15;24:10;26:19;34:1;
43:15;44:7;57:6;68:15,16;
72:22;91:13,16,19;92:14,
17,18;104:21;108:16;109:1,
7,12;110:6

**personal (4)**
24:21;58:4,17;71:24

**personally (2)**
17:13;72:18

**persons (2)**
66:14;83:20

**perspective (2)**
55:12;73:7

**pertains (1)**
145:4

**Phillips (151)**
17:18,20;19:4,13,18;20:6,
12,19,23;24:3,10,14;29:8,
13;30:4,4,6,13,25;31:5;
32:9,9,21;34:9,11,25;35:21;
36:1,11,13,16;45:23;52:17;
55:17;56:19;60:4,4,19;
62:16;64:18,19;66:19;
67:11,14,18;71:21;72:10,
22;73:2;75:13,16;78:1,10;
79:5,13;80:13;84:1,19,21;
85:7,16;90:2;91:16,23;
92:10;94:8;100:1,8,14,17,
21,23;101:3;102:1,14;
106:20,24;107:23;109:22;
110:6,11,24;112:11,15;
113:10,23;114:16,23;115:8,
16;116:23;117:2,25;
118:15;120:13,20,21;121:3,
25;122:1,2,8;125:13;
127:23;128:20,25;129:6;
130:20;131:9,15,19,22;
132:9;133:4,16,17,22;
134:12,18,19,23;137:21,21;
138:4,9;139:4,22;140:3,7,
10,17,20,25;141:9,23;
142:4,13,20;143:13;144:2,
24;145:3,8,10,13,14,16,19;
146:6,9,18

**Phillips' (15)**
21:20;35:14;46:5;100:5;
103:15;107:17;108:3;
128:10;130:9;134:2;135:9;
139:5;141:16;142:24;
145:22

**phone (25)**
54:4,8;68:22;69:22,24,
25;70:2,5,6;80:8;82:10,11,
17,18,19,20,21;143:3,4,4,6;
149:20,24;150:22,24

**phrase (6)**
75:7;96:20;101:12;127:4,
8,17

**physical (18)**

7:21;24:17;44:11;77:2;
91:13;94:25;118:14;119:2;
121:3,4;125:16;130:8;
132:17,19;134:19;144:6,16;
145:22

**physically (4)**
16:25;31:1,7;93:4

**picked (1)**
33:22

**piled (1)**
107:4

**place (16)**
6:23;25:18,20,21;27:2,14,
21;28:2;51:23;92:9;96:25;
97:23;103:15;122:8,9;
147:14

**P-L-A-C-E (1)**
25:21

**placed (7)**
24:23;73:8;91:15;134:12,
18;135:19;144:10

**placement (1)**
25:8

**placing (6)**
27:12,18;122:13;134:21;
144:6,17

**plains (1)**
21:21

**Plaintiff (1)**
5:18

**Plaintiff's (2)**
70:22;86:25

**plan (2)**
63:23;116:15

**planning (1)**
116:13

**plans (1)**
116:19

**platforms (1)**
11:11

**play (2)**
38:20;39:1

**played (4)**
40:2,6,12;43:2

**playing (6)**
39:19;42:5,12,17,23;48:4

**plead (6)**
57:4,6;58:1,2;60:10;
62:19

**pleading (1)**

58:7

**please (35)**
4:23;5:16;6:9,23;9:7,20;
10:7;11:10,25;12:18,21;
13:19,21;18:14;41:21;42:1;
46:14;57:24;65:13;66:4,5;
70:17,23;76:5,7;80:11;
86:18,23;90:7;94:6;97:1;
101:10;127:8;132:3;148:1

**plugged (1)**
143:3

**pm (6)**
143:11,12;150:16,17;
151:4,13

**pocket (8)**
23:14,15,17,17,18;24:1;
91:22,24

**point (38)**
6:6;19:6,8;30:4,12;32:13,
16,17;35:24;36:6;61:8;
73:20,22;76:22;88:25;
107:1,7;114:23;115:13;
116:8;119:10;124:1,16,20;
128:9;132:9,14,22;133:12;
134:11;138:3;142:5,13,20;
144:3;145:5;148:12;150:19

**pointed (1)**
107:17

**pointing (1)**
100:4

**pole (1)**
67:17

**Police (17)**
12:2,14;13:13;14:18;
46:21;78:20;79:13;81:5;
84:1,19;85:14;87:5;108:4;
115:3,5,5;146:10

**policy (1)**
103:11

**portion (4)**
4:11;44:10;45:21;47:6

**portions (1)**
47:3

**posed (2)**
59:5,6

**position (5)**
73:2;88:22;119:2;138:17;
139:20

**positioned (7)**
22:18,19,22;23:4,12;

46:20;139:16

**possession (9)**
16:7,13,17;34:1;69:18;
70:6;91:13,17;92:14

**possible (1)**
40:14

**POST (2)**
14:2;28:14

**posted (1)**
12:1

**power (1)**
150:6

**PPI (1)**
48:6

**practiced (2)**
37:8,11

**precautions (2)**
24:16,20

**prepare (5)**
43:14,23;95:19;96:9;
97:12

**prepared (4)**
86:14;95:3,20;97:16

**preparing (1)**
38:7

**prescription (1)**
8:17

**presence (9)**
34:20,20;41:6;66:16;
77:10,14;99:20,22;116:7

**present (2)**
44:2;133:17

**press (1)**
86:5

**pretty (4)**
94:16;139:11;148:10,11

**primarily (1)**
99:11

**primary (1)**
12:25

**prior (11)**
18:25;28:22;43:24;50:2;
55:17;74:4;94:7,8;115:22,
23;142:4

**private (1)**
12:13

**privilege (15)**
56:14,15;57:2,8,10,14,17;
59:17,20,25;63:17,20,24;
65:15,23

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

**probably (6)**
33:13;50:4;53:21;55:12;
74:1;102:4
**probation (1)**
18:21
**Procedure (3)**
4:6;103:9,14
**procedures (3)**
78:13,17;102:17
**proceed (2)**
6:3;64:3
**proceeding (2)**
7:20;9:25
**proceeds (1)**
4:8
**process (3)**
39:4;47:15;97:18
**processes (1)**
28:13
**production (1)**
39:11
**Professional (3)**
37:21;41:1;87:14
**proficiency (2)**
102:25;103:6
**profile (1)**
11:19
**prohibited (1)**
78:18
**prohibition (1)**
108:15
**projected (1)**
105:19
**proposed (2)**
38:14;86:19
**prosecution (2)**
58:5;62:20
**Protect (1)**
12:8
**provide (1)**
25:9
**provided (4)**
43:9;55:16;96:14,17
**provider (2)**
10:18;11:5
**provides (1)**
103:11
**provisionally (2)**
41:22;49:18
**Public (2)**

**pull (17)**
25:16;36:4,5;41:18;
46:15;70:17;86:19,23;
99:23;107:7,9;124:24;
125:2;127:4,7;132:1;136:5
**pulled (22)**
19:6,7;50:25;74:1;76:4,
16;88:7;91:14;106:22,25;
107:1;110:7;128:16;
138:15,23;139:9;140:14;
142:21;144:25;146:17;
147:15;148:7
**pulling (5)**
76:3;127:9,15,17;139:14
**pulls (1)**
45:22
**punched (1)**
94:9
**punches (1)**
30:13
**purpose (3)**
24:7;62:4;125:21
**purposes (8)**
4:3,5;27:12;38:14,18;
41:21;49:18;51:14
**pursuant (6)**
4:7,14;5:13;6:14;26:3;
70:9
**push (5)**
30:21;133:22;135:4;
144:14,17
**pushed (7)**
30:23;92:6,21,22;93:5;
133:19;144:12
**pushing (2)**
92:6,25
**put (25)**
21:2;24:22,23;27:21,25;
72:22;73:14;74:24;85:23;
86:5;90:10;91:22,23,25;
92:3,8;95:22;96:21,23,23;
130:20,24;131:6;134:23;
146:11
**putting (3)**
15:12;97:22;122:12

**Q**

**quick (1)**

5:13;108:10

62:25
**quickly (2)**
138:12;148:6
**quite (2)**
64:13;149:24

**R**

**radio (36)**
23:11,12,13,13,15;36:4,5;
73:14;90:10,11,14,22,23;
91:2,4,11,13,17,25;92:1,3,8,
10,12,15,23,23;93:2,12,18,
22;124:24;125:2;128:3;
132:1,2
**ran (2)**
33:19;150:22
**reach (6)**
134:5;145:24;146:3;
150:24;151:1,6
**reached (3)**
24:11;100:23;127:14
**reaching (3)**
24:6;67:14;122:16
**reactions (1)**
137:11
**read (5)**
9:4;12:1;33:5,17,17
**reading (1)**
9:1
**ready (2)**
37:2;43:18
**real (1)**
117:5
**realize (2)**
46:8;149:9
**realized (1)**
140:25
**really (20)**
35:4;45:20;50:3,6,7;51:3,
9;55:1,4,14;64:24;73:15;
77:4;88:23;93:13,13,14,15;
94:14;117:22
**rear (1)**
147:23
**reason (8)**
36:16;84:8;92:2;120:9;
122:14;124:19;125:3;
146:24
**recall (31)**

17:22;18:12;21:7;22:22;
23:7;26:7,23;27:8;29:22;
34:3,4,6,8;40:24;64:18;
68:13;79:15,18,21;81:21;
82:10;83:15;86:16;88:1;
95:11;104:12;108:4;
141:12;144:20;146:7,8
**receipt (1)**
28:13
**receive (4)**
52:8;63:13;98:20;102:24
**received (4)**
72:13;78:4;103:19,22
**recent (3)**
45:17;59:5,7
**Recess (1)**
63:3
**recognize (5)**
40:21;41:11;71:16;87:8,
22
**recognizes (1)**
38:23
**recollection (5)**
21:13;23:1;47:23;90:1;
141:7
**record (16)**
4:2;5:4,12,17;46:11;63:5;
70:20;86:24;90:13;95:19;
143:8,11;150:13,15,16,18
**recorded (2)**
40:22;41:4
**recording (15)**
38:9;39:1,9;40:8,11;
41:14;42:1,12,13,16,17,24;
43:5,8;47:22
**recordings (2)**
38:16;39:6
**records (1)**
82:20
**recounting (1)**
80:8
**red (2)**
33:20;91:15
**Reduction (1)**
15:6
**reentered (1)**
137:1
**referencing (1)**
32:13
**referred (1)**

29:5

**referring (7)**
35:21;102:6;107:10,12;
119:19;121:3;133:21

**refers (2)**
98:16;127:17

**reflect (6)**
4:2;39:12;70:21;86:24;
109:6;150:18

**reflected (1)**
95:20

**refreshes (1)**
47:23

**regard (1)**
49:25

**related (1)**
25:1

**relation (1)**
59:20

**relationship (1)**
98:21

**relatively (1)**
139:21

**release (1)**
146:11

**religion (1)**
80:5

**remain (2)**
52:18;53:23

**remains (1)**
75:11

**remember (16)**
8:1;21:9;29:20;33:12,12;
34:5;79:12,17;80:14;86:16;
94:16;95:4,4,7;141:13;
146:25

**remote (2)**
4:17,22

**repeat (4)**
6:12;20:14;106:23;
135:15

**rephrase (5)**
30:6;32:12;44:25;76:21;
144:21

**report (4)**
20:10;97:6,6,20

**REPORTER (4)**
5:7,11;13:22;150:13

**reporting (1)**
97:18

**reports (4)**
97:8,11,13,15

**representing (2)**
58:17,23

**request (3)**
122:24;125:24;126:1

**require (1)**
27:23

**required (2)**
83:19;121:4

**reserved (2)**
4:10;65:23

**reset (1)**
36:24

**resident (1)**
82:17

**respect (9)**
24:16,20;58:24;63:25;
72:2;78:13;102:17,25;
103:8

**respond (2)**
57:22;59:9

**responded (5)**
15:15,16;21:14,17;79:18

**responding (1)**
17:6

**response (4)**
58:4;59:4;62:10;130:10

**Responsibility (1)**
37:21

**responsiveness (1)**
4:10

**rest (1)**
14:21

**resulted (2)**
9:25;67:25

**results (3)**
69:5;78:5,24

**resume (3)**
151:2,7,11

**returned (1)**
69:21

**review (2)**
28:1;98:2

**Richardson (2)**
50:17,21

**ride (1)**
51:20

**riding (8)**
45:23;75:17;109:21,22;

110:20;113:3;118:25;
124:15

**right (187)**
4:21;6:1;8:24;11:3;
13:11;15:8,22;17:3;20:15;
21:3,11,22;22:8;23:5,6,19;
25:14;26:2,23;27:1,17;28:4,
10;31:11,11;33:5;34:17,18;
35:16;36:18;37:5;40:20;
41:25;42:2,7,10,25;43:3,20;
44:6,17;45:2,6,14,21;48:23;
49:5,12,22;51:5;55:22;
56:17;57:23;58:22;60:14,
15;61:3,10,19;62:6;63:6,23;
64:5,14;66:6;67:5;70:20;
71:7;72:2;74:10,13;75:8,
10;76:24;86:3;87:4,18;
88:4,14,24;89:6;90:18;
91:12;92:17;93:21;95:18;
99:16;100:2;105:23,24;
106:22;107:8;109:11;
110:10,14,19;111:15,18;
112:13;113:17,18,19;114:1,
5,7,19,19,22;115:7,9,10,11;
116:4,23,24;117:4,6,11,13;
118:1,9,10,10,12;120:9,11,
11,23;121:8;122:18,19,20,
22;123:12,15;124:12,13,16;
125:7,15;126:10,16,18;
127:1,13,19;128:2,7,8,11;
129:10,19,24;132:6,7;
134:4,15,16,17,21;135:8,21,
22;136:7,8,18;137:15,18,
24;138:17;139:11,12,13;
140:14;141:10;144:7,9,15;
148:11,13,14,15,19,23;
149:11;150:2;151:10

**right-handed (1)**
23:1

**risky (1)**
104:5

**roach (2)**
128:15,19

**Robeson (12)**
6:1;43:4;56:24;57:24;
63:7;64:16;66:12;70:23;
71:4;101:20;149:12,13

**ROBESON-EL (9)**
5:21;9:8;39:20;46:23;
57:11,12,20;71:16;87:9

**roll (1)**
120:24

**rolled (12)**
112:23,24;121:2,9,11,12,
18,20,25;122:22;123:25;
129:6

**Rules (2)**
4:5,7

**run (4)**
49:7,14;149:11;150:11

**running (5)**
48:25;71:22;114:6;
118:21;148:10

**rush (1)**
94:14

## S

**safe (3)**
103:19,21,25

**safety (7)**
24:17,21;124:22;125:21;
126:3,23,24

**sake (1)**
46:10

**same (22)**
11:7;40:11;51:14,22;
53:7,7,8;60:9;61:20;62:17;
68:15,16;79:5;80:5;81:13;
99:13;102:2;104:17;
127:22;142:9;145:9,9

**Sandra (2)**
41:7;69:1

**save (1)**
98:1

**saw (64)**
19:8;25:1;35:6,9;44:16,
17,23;45:1;50:3;55:18;
64:19;67:17,20;73:10,11,
15,21;74:11;75:5,20,22;
76:9;78:7;84:25;85:1,2,3,6,
25;89:9;99:18;100:20;
106:7,17;107:9,10;111:9,
16,23;112:12;114:9;116:9;
119:11,12,12,24,25;121:13,
16,17;123:10;125:17;
129:11;131:15;138:2,3,25;
139:20;141:20;144:23,23;
145:24;146:14;147:14

**saying (9)**

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

58:2,3,7;79:19;101:16;
115:1,12;119:22;130:5
**scene (9)**
21:14;33:20;47:1;55:7,
19,19,21;62:15;66:15
**school (1)**
17:24
**screeching (1)**
148:20
**screen (3)**
48:9;91:11;93:6
**scroll (2)**
70:24;71:4
**sealing (1)**
71:18
**search (8)**
67:24;68:22;69:5;71:10;
72:3,9;96:11;128:18
**searched (1)**
128:17
**seat (14)**
109:2,12;112:12;118:25;
136:3;139:18;141:23;
142:6,10,15,16,17;145:20;
146:4
**seated (8)**
19:18;20:6;108:16;109:1,
7,12;117:25;127:2
**second (7)**
33:16;70:19;87:16;88:10,
21;141:3,5
**seconds (12)**
40:8,9,10;42:5,16,22;
43:1;49:1,4,7,14,15
**Section (3)**
5:13;15:8,10
**sections (1)**
14:18
**securing (1)**
96:5
**security (5)**
24:15,19,23;25:2,9
**seeing (4)**
29:20;54:8;140:2;142:15
**seeking (1)**
95:6
**segregating (1)**
132:7
**seize (1)**
17:8

**seized (3)**
17:13,15;68:16
**seizure (3)**
67:25;71:10;82:18
**sense (6)**
20:17,18;46:17;47:23;
148:6;149:8
**senses (1)**
148:24
**sent (3)**
38:17;52:22;80:1
**separated (5)**
52:1,22;55:7;66:21;67:4
**separately (1)**
95:25
**September (3)**
70:6;82:18;84:10
**sequence (1)**
47:20
**series (1)**
25:14
**Serve (2)**
12:8;97:4
**served (2)**
12:16;70:13
**Service (4)**
5:14;10:18;11:20;17:7
**set (2)**
97:10,24
**several (1)**
31:24
**share (1)**
80:5
**shared (1)**
51:14
**shells (2)**
104:12,17
**shift (4)**
72:3;94:1,4,18
**shifts (2)**
53:15;94:22
**shine (1)**
141:8
**shoot (4)**
103:19,25;104:5;140:21
**shooting (40)**
19:16;21:6,15;25:10;
31:25;33:19;34:1;52:17;
53:17,24;54:9;55:7,10,17,
22;60:16;66:15;67:2;70:1;

78:23,24;79:6,14,25;80:12;
81:4,6,18;82:2;84:1,19;
86:14;89:13;99:17;102:11,
14;104:8;108:8;141:19;
146:9
**shootings (5)**
15:16,17;17:6,6;99:15
**short (2)**
47:2;53:18
**shortly (1)**
61:17
**shot (31)**
19:4;24:14;30:18,20,20;
56:18;60:3;61:4,10;62:15;
64:17,19;65:1;66:18;67:10;
71:21;72:10;75:13;79:5;
85:7,10;90:5;91:16;100:2,
21,24;101:3;102:1;106:20;
122:2;128:9
**show (4)**
45:3;46:25;47:5;129:6
**showed (2)**
32:1;150:10
**shows (5)**
45:7;46:5,5;87:25,25
**side (8)**
23:5,5,6;32:24,25;35:6;
77:20;88:17,21;89:10,14,
18,19;107:8,11;110:1;
112:20;113:25;120:5,20;
122:12,14;123:1,1;126:6;
134:15,16;136:4,6,18;
137:5,7,22;138:2,4,5;
139:18;140:1,2;146:6
**signage (1)**
108:4
**signal (1)**
101:15
**signature (1)**
87:8
**signed (4)**
25:19;27:20;87:12;96:18
**signing (2)**
26:16,18
**silencer (2)**
105:14,14
**similar (1)**
150:8
**simple (1)**
38:19

**simply (2)**
81:9;101:25
**sit (3)**
108:9;136:3;141:6
**sitting (10)**
89:17;108:12;110:14;
112:12;113:25;114:20;
117:4;118:22,23;129:17
**situated (6)**
110:24;112:11;131:20;
142:21;146:18;147:19
**situation (1)**
80:22
**six (1)**
79:24
**sketch (3)**
86:14,22;87:23
**skip (1)**
48:15
**slot (3)**
76:23;91:14;148:8
**slouched (2)**
118:24;120:13
**slowed (1)**
148:16
**slowing (1)**
149:3
**small (5)**
23:16;33:7,7;93:14,14
**smell (1)**
111:2
**smelled (4)**
36:14,20;115:23;124:22
**smoke (1)**
108:17
**smoked (3)**
115:11;116:1;129:9
**smoking (33)**
33:3;108:19;109:7,13;
110:12,14,15;111:6,10,13;
112:1,22,25;113:13;114:17,
18,21,25;115:8,12,19,20;
116:7;117:4;119:15,16;
120:22;121:21;124:2,4;
128:13,16;129:8
**Snapchat (2)**
54:14,15
**social (1)**
11:11
**somebody (3)**

114:11,16;125:14

**someone (5)**
24:5;50:4,14;63:20;
103:19

**sometime (1)**
151:7

**sometimes (6)**
17:11;51:16;54:4;75:3;
99:1;141:17

**somewhat (1)**
148:16

**somewhere (1)**
115:4

**Sonoma (1)**
10:15

**SOP (2)**
81:4,10

**sorry (13)**
13:9,18;15:17;18:9,14;
61:24;96:12;109:11;
119:23;125:4;148:1;
149:12,17

**sort (4)**
33:17;44:1;97:5;102:21

**sought (3)**
69:8;96:5;99:10

**sound (4)**
74:8,25;75:12;148:20

**source (2)**
72:5,13

**space (1)**
140:6

**span (1)**
122:6

**speak (2)**
63:8;129:1

**speaking (4)**
45:6;51:1;64:8;139:21

**SPEARS (71)**
4:2,21;5:2,7,9,18,25;39:7,
9,16,23;40:5,14,20,21;
41:25;42:18;43:3;46:1,25;
47:8,14;48:10,17,22;49:3,9,
16,21,22;56:13,17,23;57:7,
12,17,19,23;59:2,10;61:23;
62:9,14;63:1,5,6;64:5,6,8,
12,16;65:11,18,21;66:3,6,9,
12;70:16,20;86:18,24;
101:10,18;143:13;149:17,
21;150:2,14,18;151:10

**special (4)**
24:15,19;37:25;43:9

**speed (1)**
76:15

**spell (1)**
13:21

**spelling (3)**
13:23;21:18;25:22

**spoke (6)**
43:24;50:6;51:2;67:3;
68:13;146:13

**spoken (3)**
10:8;55:8;79:14

**spot (5)**
19:7;109:21;110:4,8;
146:17

**spraying (1)**
34:16

**Sprint (2)**
10:19;11:5

**squeezing (1)**
90:22

**Staci (9)**
37:7;38:14;40:15;43:24;
46:4;47:14;49:17;58:16;
151:5

**stage (2)**
98:17;132:5

**stand (3)**
27:5;65:4;70:19

**standard (5)**
78:12,17;102:17;103:9,
14

**Standards (2)**
41:1;87:14

**standing (22)**
30:5;32:9,21;33:2;34:9;
35:12,17;91:24;124:14;
126:2,25;130:15;131:21;
132:10,16,21,25;133:11,12;
134:14;142:5,13

**stands (3)**
88:14;97:2,3

**start (8)**
5:2,5;6:1;38:20;39:18;
46:15;48:3;94:1

**started (19)**
11:18;13:2;15:12;73:17;
94:4;118:2;122:13,16;
123:4,5;124:25;125:10;

132:1;133:10;137:21;
138:5;145:17;149:10,10

**starting (10)**
42:6,10;48:7,23;49:5;
51:8;64:21;107:24;122:17;
139:9

**starts (1)**
86:20

**state (8)**
5:4,8,16;9:7;13:16;14:3,
13;102:16

**statement (5)**
5:10;59:23;84:20;86:22;
87:5

**statements (1)**
64:17

**States (1)**
12:19

**station (5)**
90:21;92:18;115:3,5,5

**stationed (2)**
12:21,22

**status (1)**
18:20

**stay (5)**
78:25;115:13;135:14;
136:20;137:9

**stayed (1)**
76:16

**step (11)**
85:20;86:7;95:18;104:5;
122:15;123:4,8;124:22,23;
125:4;135:23

**steps (7)**
25:7,9;36:25;37:2,4,5;
86:9

**still (28)**
10:24;11:5,7;58:12;
71:22;74:20,24;75:11;81:2,
11,12,12;83:10,12,14,15;
85:16;104:6;114:6;130:21,
25;131:4;133:8;136:24;
139:4,4;149:21;150:13

**stipulate (4)**
38:21;40:16;46:18;49:17

**stolen (2)**
17:12,14

**stood (4)**
88:21;132:25;135:2;
143:13

**stop (17)**
29:14,18,23,23;30:1;
73:16,23,24;74:2;75:17;
100:15;107:23,24;140:17;
148:16,19,25

**stopped (18)**
56:2,3;73:4,18,19;74:16;
85:4;88:12,15;90:25;99:23;
106:15;141:19,24;148:13,
13,15;149:3

**stopping (1)**
74:4

**straight (2)**
73:17,17

**strange (1)**
19:23

**stuff (1)**
117:20

**subject (5)**
27:23,24;34:24;95:4,7

**successful (1)**
126:22

**successfully (2)**
6:3;9:5

**suggest (1)**
150:15

**suggested (1)**
20:24

**summarize (1)**
97:19

**summarizing (1)**
141:14

**superior (1)**
55:8

**supervisor (2)**
96:4,9

**supervisors (4)**
96:2,3;98:2,4

**supporting (1)**
71:17

**suppose (1)**
38:19

**supposed (2)**
99:5,8

**suppressant (1)**
105:7

**sure (12)**
5:9;22:10;27:6;28:1;
31:7;32:13;33:11;37:14;
39:21;47:15;95:15;149:24

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

**surprise (1)**
141:4
**suspicious (3)**
21:3;108:13,23
**swear (1)**
4:23
**sworn (3)**
5:1,22;6:19
**system (8)**
25:20;27:3,19;28:3,4,4;
97:7,10

## T

**tag (11)**
29:19,20,21,21,21;73:12,
13,13;74:9;90:9;147:25
**talk (14)**
39:15;55:1,2,4;80:4,15,
19,20;86:2,8;117:7,7,8,11
**talked (5)**
54:3;55:19;67:5;80:11;
113:23
**talking (5)**
32:16;48:20;55:15;66:23;
124:24
**tally (2)**
96:3,9
**tardiness (1)**
98:11
**Task (1)**
15:6
**tasks (1)**
52:9
**technologist (1)**
13:4
**telephone (3)**
63:8;82:4;83:5
**telephonically (3)**
43:14;44:7,8
**telling (9)**
69:18,21,21;91:23;115:1,
6,8;116:17;130:11
**term (1)**
25:21
**terms (6)**
33:17;71:20;89:12;98:3;
102:20;140:6
**testified (2)**
5:23;60:18

**testify (3)**
6:19;58:3,12
**testifying (1)**
37:1
**testimony (16)**
29:7;34:18;55:6;58:16,
25;67:9,11;75:11,14;82:16;
83:11,13;141:11,15;145:21;
147:8
**testing (1)**
78:5
**tethered (1)**
23:20
**texts (1)**
63:13
**theirs (1)**
24:6
**thereabouts (1)**
53:19
**thereof (1)**
4:12
**thinking (2)**
46:3;73:25
**third (1)**
71:10
**Thomas (1)**
43:9
**though (3)**
30:8;125:8;127:22
**thought (6)**
73:16;76:1,3,14;119:21;
135:15
**thousand (1)**
14:4
**threat (3)**
131:12,17;132:19
**threaten (1)**
25:5
**threatening (1)**
131:24
**three (1)**
126:17
**throughout (1)**
11:3
**throw (2)**
30:13;122:2
**thus (2)**
126:22;135:23
**till (1)**
150:21

**times (6)**
6:22,24;50:1;79:24;80:8;
125:11
**timestamp (5)**
48:21,24;49:1,6,13
**time-wise (1)**
30:9
**timing (1)**
29:24
**tinted (1)**
20:2
**tires (1)**
148:20
**today (6)**
7:20;54:22;58:16;89:17;
141:6,11
**together (12)**
15:13;27:22;50:22,22;
51:17,20;81:2,11;83:10,16;
107:18;117:20
**told (77)**
19:12;25:6;30:21;32:4;
35:21;36:9,15,17;60:3,5,14,
14,20;64:18;65:3;67:13,16,
18;68:9,20,23;69:4;79:1,4;
83:17,21;86:2;89:25;92:20;
95:2;100:23;102:10;104:9;
110:13;112:5;113:4,8,17,
24;114:13;115:16,18;
116:22,23,25;117:1;119:11,
15,20,24;120:5,21,24;
123:6;125:9,20;127:15;
129:14,17;130:7,12,18;
132:23,24;133:1,4,6,12,15;
135:17,20;137:2,14,17;
139:15;144:12;146:15
**tomorrow (2)**
151:3,11
**tone (2)**
93:14,15
**took (16)**
31:25;36:25;37:2;45:17;
53:9;68:17;69:10,10;82:11;
91:25;92:9;95:18;122:13;
130:9;131:16;132:17
**top (3)**
49:1;87:6;91:10
**total (4)**
70:25;79:24;80:1;84:11
**totaling (1)**

82:4
**touch (4)**
25:12;33:15;134:2;135:6
**touched (2)**
72:18;134:4
**toward (1)**
111:25
**towards (8)**
111:12;117:1,2,16;
131:23;132:19;137:22;
141:18
**town (1)**
52:4
**track (1)**
95:25
**traffic (1)**
13:2
**training (5)**
52:8;102:24;103:19,22,
24
**transcript (3)**
37:20,23,24
**transfer (1)**
53:15
**transmission (4)**
72:23;73:7;74:6;140:11
**transpired (1)**
65:6
**traveling (1)**
67:18
**Tried (7)**
73:14;92:4,5,5;115:6;
144:14;151:1
**trouble (4)**
113:16;116:18,20;117:10
**truck (1)**
10:16
**true (3)**
86:6;108:1;130:5
**Truthfulness (1)**
87:6
**try (10)**
39:25;55:1;68:8;74:2,24;
76:13,13;117:9;149:19;
151:6
**trying (22)**
20:17;25:4;36:5,23;37:6;
41:18;73:13;74:6;76:11;
90:9,22;94:12,14;116:16,
16,18,19,20;121:14;125:12;

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

147:9;150:3

**tunnel (4)**
29:19;74:9;75:3,7
**turn (2)**
68:21;73:16
**turned (1)**
45:11
**tussle (2)**
76:9;90:21
**tussled (1)**
75:24
**tussling (3)**
73:11;75:20;76:19
**Twelve (1)**
94:20
**Two (26)**
14:4;17:15;26:2;29:1;
38:16;44:12;51:1,1;52:8,
11;55:6;69:12,12,13;87:2;
88:4;109:20;117:14;
132:24;134:2,4,8,12,17,23;
135:19
**typewritten (1)**
87:9

**U**

**unaware (1)**
78:8
**uncomfortable (2)**
80:21,22
**under (4)**
5:12;6:19;37:2;115:13
**understandably (1)**
43:25
**understood (9)**
6:8,13;41:4;81:3,7;83:23;
85:17;136:9;149:6
**unfold (1)**
47:19
**unique (1)**
145:2
**Unit (29)**
14:20,23,25;15:3,3,9,11,
13,14,15,23;17:2,5,7,14;
50:2,8,9,24;51:7,8,22;52:7,
21;53:7,8,8,12;81:13
**United (1)**
12:19
**University (2)**

14:11,11
**unlawful (5)**
20:11;108:9,20;114:15,
20
**unless (1)**
65:23
**unusual (2)**
143:15,21
**up (48)**
32:1;33:22;34:16;37:10;
42:19;46:15;50:5,25;54:22;
65:2;67:2;70:17;74:1,18,
19;86:19,23;87:6;88:10,24,
25;92:4;97:10,24;99:2;
110:16,17,21,24;119:3,5;
122:17;126:10,10;128:16;
131:25;132:8,8,16,25;
136:6,11;138:15,23;140:6;
142:5;143:3;148:9
**use (14)**
4:12;9:1,3;11:18;34:5;
97:7,8,18;101:12;102:17;
103:9;105:3,6;150:9
**used (18)**
11:11,20;20:25;25:21;
46:13;63:21;75:7,9;88:6;
96:20;97:7,21;98:6;119:19;
121:7;127:4;131:22;141:8
**using (6)**
33:9;79:25;132:18;143:6;
150:5,6
**USS (1)**
12:22

**V**

**vacation (1)**
37:5
**vantage (1)**
115:12
**veer (1)**
138:23
**vehicle (32)**
7:15;22:13;29:17;32:1;
51:14;56:2,3;66:18;73:9,
23;75:13,21;77:10;84:22;
85:2,4,4,7,11,17;88:7;
99:20,20,22;102:1;107:5;
109:21;110:19,23;123:4;
142:22;147:23

**vehicles (1)**
103:12
**video (31)**
44:9,10,13;45:1,2,7,11,
18,21;46:2,4,10,15,19,19,
24;47:6,12,17;48:1,6,7,14,
24,25;49:6,8,10,14,17;
150:7
**videoconference (1)**
5:16
**videos (1)**
150:8
**view (1)**
44:18,22
**viewed (2)**
44:9;132:18
**Virginia (1)**
12:23
**virtue (6)**
26:15;36:1;62:21;98:14;
109:13;114:9
**vis-à-vis (1)**
18:21
**visible (3)**
106:4,5,6
**vision (3)**
29:19;74:9;75:3,7
**visualization (1)**
149:23
**voice (5)**
40:2;41:11;42:20;43:5;
109:11
**volume (2)**
93:17,20

**W**

**waist (6)**
22:19,20,23,24;23:5;
139:24
**waiting (7)**
114:11,16,20;116:6;
124:10;129:23;130:1
**wake (2)**
25:10;81:3
**walk (2)**
89:7;132:8
**walked (12)**
65:2;111:12,25;116:25;
117:2,24,24;119:3,5;120:9;

141:16,18
**walking (2)**
117:16,16
**wall (1)**
46:20
**warrant (30)**
17:1;25:16,18,19,25;26:6,
9,16,18,24;27:1,3,12,14,18,
20;67:24;68:22;70:9,14,18;
71:17;72:3,9;95:6,19;96:5,
10,20,21
**warrants (13)**
18:17;28:14;94:11,11,13;
95:3,5;96:1,12,13;98:13;
99:10,11
**Washington (1)**
12:22
**watch (4)**
47:11;94:24;147:20,22
**watching (2)**
46:9;138:3
**way (28)**
8:11;12:12;20:1;21:2;
28:23;31:20;34:8;38:23;
47:20;57:9;60:10;89:7;
95:25;102:13;103:19,21;
107:16,21,22,25;109:25;
118:3;128:3;131:23;135:4;
138:21;142:3;144:25
**weapon (16)**
72:17;84:21;85:1,15;
90:1;105:10;106:14,18,21,
22;107:1,5,8,9;142:24,25
**weapons (2)**
22:6;104:20
**wear (2)**
8:20,22
**wearing (2)**
143:15,22
**websites (1)**
11:24
**weed (6)**
110:15;114:17,18,21;
115:9;123:7
**week (1)**
69:15
**weeks (2)**
53:21,21
**weren't (2)**
126:9;127:22

DEAUNNA PHILLIPS, etc.
YASIN ABDULAHAD

EL MALIK ROBESON-EL - Vol. I
March 16, 2021

**what's (6)**
24:25;44:1;53:3;73:24;
87:18;149:14

**whatsoever (7)**
19:2;20:22;72:21;73:1;
75:12;78:4,9

**whereabouts (1)**
68:9

**whole (2)**
41:16;46:9

**whose (1)**
92:18

**wife (1)**
54:5

**window (26)**
110:16;112:11,23,24;
116:8;118:16;119:3,5;
120:10,12,24;121:2,5,8,12,
18,25;122:13,19,21,22;
123:25;129:6;132:9,15;
147:23

**windows (5)**
20:2;110:19,20,23;
122:18

**windowsill (2)**
130:25;131:7

**wished (1)**
126:3

**wishes (1)**
5:4

**within (7)**
14:17;16:22;17:7;28:19;
53:19;126:8;134:5

**without (2)**
74:7,19

**witness (25)**
4:18,23;5:16;37:1;38:22;
40:16;41:23;42:18;47:18;
56:17;57:15,16,18;58:18;
59:3,11;62:13;64:9;65:24;
78:19,19;90:3;101:11;
150:21,23

**witnesses (7)**
62:3;78:25;79:7,10;
80:24;81:6;82:25

**witness's (4)**
39:2;86:19;150:22;151:3

**wonder (2)**
38:12;49:16

**word (2)**

119:19;131:16

**words (8)**
33:7;58:5;60:21;63:21;
87:9;125:17;131:10;133:22

**work (11)**
12:14;16:19;50:9;51:17;
52:7,20;94:9,15;97:25;
98:11;143:4

**worked (11)**
14:6,14,19,20;37:14,19;
50:4,21,22;52:12;94:23

**working (13)**
10:11;13:5;14:21;21:21;
37:9;50:23;52:14;53:2,12;
81:2,11;83:10,16

**worn (1)**
8:15

**worried (1)**
131:3

**writing (2)**
85:25;97:6

**wrote (1)**
88:11

**Y**

**year (6)**
11:2,4;14:21;15:19,20,21

**years (1)**
11:16

**yesterday (1)**
129:9

**Z**

**zone (12)**
21:17,18,18,19,19;50:4,
22,23,23;52:23,24;53:12

**Z-O-N-E (1)**
21:18

**Zoom (2)**
43:15;143:6

**0**

**0 (1)**
49:4

**1**

**1 (7)**
21:19;42:14;48:5,6;50:4,
23;70:25

**1:00 (3)**
151:4,7,11

**1:41 (1)**
143:11

**1:43 (1)**
143:12

**1:55 (1)**
150:16

**10 (4)**
71:13;86:22,25;150:20

**108 (1)**
84:11

**10-minute (1)**
63:1

**11 (2)**
70:22;71:13

**11:31 (2)**
63:2,3

**11:42 (1)**
63:3

**12 (1)**
71:13

**12:00 (2)**
94:19,23

**12-hour (1)**
94:22

**13 (1)**
71:13

**13th (9)**
40:24;43:10;45:15;81:19;
82:6;83:2,12,24;84:9

**14 (4)**
40:7;49:6;71:14;82:4

**15 (3)**
40:9;45:3;71:14

**16 (1)**
71:14

**17 (2)**
40:10;71:14

**170213_0284FP3 (1)**
42:4

**17th (2)**
151:4,4

**18 (1)**
71:14

**19 (2)**
9:21;71:14

**193600 (1)**
48:19

**193606 (1)**
49:2

**1948 (1)**
49:4

**194806 (1)**
49:6

**195748 (1)**
49:13

**1996 (1)**
10:15

**1997 (1)**
12:20

**2**

**2 (3)**
39:20;48:25;49:15

**2:00 (1)**
150:21

**20 (2)**
45:3;71:14

**2000 (1)**
12:20

**2008 (1)**
14:5

**2013 (1)**
10:13

**2017 (32)**
9:16;10:13,18;11:4,10;
15:23;17:3,17;18:16,25;
24:2;25:16;38:1;40:24;
43:11;44:15;45:15,19;51:5;
67:21;70:7;80:2;81:19;
82:6,18;83:2,12,24;84:10,
10;93:25;97:12

**21 (4)**
9:21;42:21;43:1;71:14

**22 (2)**
42:15;71:14

**23 (3)**
42:4;49:13;71:14

**24 (3)**
53:19,20;71:14

**24-minute (1)**
48:7

**25 (1)**
71:14

**26 (4)**

9:21;17:17;18:16;71:14

**26th (3)**
  18:25;25:16;93:25
**27 (3)**
  42:16;71:1,15
**27th (1)**
  80:2
**28 (2)**
  42:5;82:5
**28th (1)**
  80:2
**2-page (1)**
  87:1

---
### 3

**3:03 (1)**
  150:17
**3:05 (1)**
  151:13
**30 (1)**
  81:21
**319 (1)**
  5:13
**35 (1)**
  40:10
**3600 (1)**
  48:18
**39 (1)**
  42:22

---
### 4

**4 (1)**
  50:24
**4:00 (1)**
  94:23
**404-621-1531 (1)**
  10:22
**45 (1)**
  49:13

---
### 5

**5 (7)**
  9:21;48:25;49:7;52:23,
  24;53:12;143:3
**55 (2)**
  43:1;84:11

---
### 6

**6 (1)**
  71:13

---
### 7

**7 (2)**
  9:21;71:13
**7th (1)**
  84:10

---
### 8

**8 (2)**
  40:8;71:13

---
### 9

**9 (5)**
  42:3;71:13;104:9,15,23